IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY McKINNEY, as Administrator for the
Estate of R.E., Deceased,

       Plaintiff,

vs.

FRANKLIN COUNTY, ILLINOIS, *et al*.,

       Defendants.

Case No: 15-CV-01044

**PLAINTIFF'S RESPONSE TO DEFENDANTS FRANKLIN COUNTY,
ILLINOIS' AND RANDALL CROCKER'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Mary McKinney, as Administrator for the Estate of R. E., Deceased, by and through her attorneys, Groves Powers, LLC, and for her Response to Defendants Franklin County, Illinois' and Randall Crocker's Motion for Summary Judgment, states as follows:

**Plaintiff's Statement of Material Facts**

1.  Franklin County, Illinois financed and constructed the Franklin County Juvenile Detention Center ("FCJDC") to meet the needs of Franklin County, as well as other counties in Southern, Illinois, for providing safe, secure, and modern facilities for holding and detaining juveniles. Deposition of Randal Crocker on April 23, 2018, Ex. 12 at 23:22-24:5. The FCJDC was established by Franklin County. Ex. 12 at 109:6-24; FCJDC Policy and Procedure Manual, Ex. 1 at 005331.

2.  The decision to build the FCJDC was solely Franklin County's, and it was approved by Franklin County voters in a 1998 referendum. Deposition of Randal Crocker on July 2, 2018, Ex. 13 at 221:1-10. The approved referendum gave Franklin County the power to levy and collect a

1

tax to pay for the cost of establishing and maintaining the FCJDC. Circuit Court Order Certifying 1998 FCJDC Referendum, Ex. 20.

3. Franklin County also considered "generated revenue" and "avoided costs" that the County would realize if it built the FCJDC, and it determined the total amount would be $142,500 per year. Ex. 13 at 231:1-232-21; Franklin County Board Minutes, Ex. 18 at FC000485.

4. The revenue the FCJDC generates for Franklin County comes from other counties that pay Franklin County to house their juveniles. Ex. 12 at 25:20-26:14; Franklin County FCJDC Budgets 2003-2014, Ex. 24A-L. On average, Franklin County receives $692,380[1] per year from other counties who pay Franklin County to house their juveniles. Ex. 24A-L. These payments become part of a fund which Franklin County controls through its budget. Ex. 12 at 28:16-29:4. As for costs avoided, Franklin County no longer has to pay other counties to house Franklin County juveniles since they are now placed in the FCJDC. Ex. 13 at 232:22-233:8.

5. Franklin County financed the construction of the FCJDC by taking out a three million dollar loan, which the County is still paying off. Ex. 13 at 231:24-232:7; Ex. 18 at pp. 78, 484, 501. Construction was also financed by grants in the amounts of $1,533,710 and $250,000 that Franklin County applied for and received. Ex. 13 at 312:16-21; Ex. 18 at pp. 501, 534.

6. Franklin County owns the FCJDC. Ex. 13 at 312:13-15. Franklin County holds the FCJDC out to the public as a "Franklin County Government Facility." Ex. 12 at 23:11-24:2; FCJDC Website.

**Defendant Franklin County's Final Policymaking Authority on Housing Conditions**

7. On September 23, 2014, R.E. was assigned to A pod, which has eight cells, only two of

---

[1] This number represents the average amount Franklin County received per year from other counties for housing their juveniles from Fiscal Year 2003-2004 to Fiscal Year 2014-2015.

which are equipped with a sink-toilet combination with a handrail. Dr. Tyler Kress Affidavit, Ex. 26 at ¶¶ 6 and 8. Although R.E. was not physically handicapped, he was placed in one of these cells – Cell A2. Lindsay Hayes Deposition, Ex. 17 at 108:4-12. The handrail in A2 posed an obvious risk of harm given its potential for use in a suicide attempt. *Id*. and Ex. 26 at ¶ 11. Another detainee had previously used the handrail in cell A-2 in attempt to hang herself using a sheet. Ex. 17 at 197:15-21.

8.  Cell A-2 is less than 7 feet wide and about 12'8" inches long. Ex. 26 at ¶ 7. There is a solid steel cell door. Ex. 15 at 64:22-65:2. The door has a rectangular window which is about 3-1/2 inches wide and a little less than 2 feet long; the bottom of the glass window is approximately 4' 5" inches off the ground. Ex. 26 at ¶¶ 8-9.

9.  Franklin County was solely responsible for the construction of the FCJDC. Doc. 146-1 at p. 2 ¶ 1. Franklin County hired an architect for the construction of the FCJDC. Ex. 18 at 422.

10. During the construction of the FCJDC, Franklin County maintained communication with the architect. Ex. 18 at pp. 399-400. Meetings were held and the architect provided the board with a status update via letter. *Id*.

11. Franklin County had a disagreement with the architect and was aware that several items at the FCJDC "were not in compliance." *Id*. at 352.

12. Franklin County had the responsibility to "[p]rovide the necessary equipment for the safe, secure, and efficient operation of the Center." Doc. 146-1 at p. 2 ¶ 2. "The final decision on the use of County funds to purchase the requested equipment rests with the County." *Id*.

13. The Probation and Probation Officers Act similarly provides that counties have the duty to furnish suitable rooms and accommodations, equipment and supplies for detention staff. 730 ILCS 110/13.

14. Franklin County was responsible for purchasing equipment for the FCJDC. Ex. 15 at 26:17-27:6. Franklin County was also responsible for equipping FCJDC cells with sink/toilet combinations. Ex. 12 at 76:24-77:5.

15. As of March 9, 2017, the sink toilet combinations with the non-suicide resistant handrails were still in Pod A-2, the pod in which R.E. was housed. Ex. 26 at ¶ 8.

### Defendant Franklin County's Operation of the FCJDC

16. In 2006, the co-management agreement between Franklin County and the Chief Judge of the Second Judicial Circuit was memorialized in writing and entitled "Memorandum of Understanding Between the Chief Judge of the Second Judicial Circuit and the Franklin County Board and Other Franklin County Agencies" (the "Memorandum"). Doc. 146-1. The Franklin County Board approved the Memorandum on May 26, 2006. Ex. 12 at 33:23- 35:10; Board Minutes at p. 3-4. The Memorandum was executed by the Franklin County Board Chairman, the State's attorney, and the office of the Chief Judge of the Second Judicial Circuit. Ex. 12 at 40:2-17; Doc. 146-1, p. 7, and it was still in effect in 2014. Ex. 12 at 40:19-41:15.

17. The Memorandum sets forth the responsibilities of Franklin County and the Second Judicial Circuit with respect to the ownership, maintenance and operation of the FCJDC.  Ex. 12 at 41:21-42:7. Pursuant to the agreement, Franklin County's duties include: sole responsibility for the finances of the FCJDC; provision of necessary equipment for the safe, secure and effective operation of the FCJDC; and establishing an annual budget for the operation of the FCJDC after conferring with the Chief Judge. Doc. 146-1, Memo, p. 2 ¶¶ 1-3. Franklin County has the final say in determining the annual budget. *Id*. at p. 2 ¶ 3.

18. Together with the Chief Judge of the Second Judicial Circuit, Franklin County shares policymaking authority with respect to the FCJDC because the Second Judicial Circuit must "[d]evelop written policies and procedures supportive of meeting the goals and objectives

established by the Franklin County Board and the Chief of the Circuit." Doc. 146-1, p. 5 ¶ 15.

19. Pursuant to the Memorandum, the Second Judicial Circuit and Franklin County agreed "(1) [t]o meet on a regular basis to discuss operational needs, performance and finances; (2) [t]o keep each other informed of any circumstances that might or could effect (sic) the legitimate operation of the Detention Center;" and "(3) [t]o encourage open communication between the parties in order to assure that the Juvenile Detention Center is operated in a professional, efficient and economical fashion." *Id*. at p. 6 ¶¶ 1-3.

20. As such, Franklin County maintained the right to "confer with the Chief Judge and/or the Director of Court in the event of any dissatisfaction the county may have with the manner in which the Juvenile Center is being operated." *Id*. at p. 3 ¶ 9. The Second Judicial Circuit also agreed to "meet and confer with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Juvenile Detention Center in a safe, secure, economic and efficient manner." *Id*. p. 4 ¶ 3.

21. As Director of Court Services for the FCJDC, Defendant Abell's duties and obligations included: the general supervision of the FCJDC and its Superintendent; meeting and conferring with appropriate representatives of the County Board about the number and classification of staff necessary to operate the FCJDC in a safe, secure, economic and efficient manner; evaluating the performance of the Superintendent, and in doing so, conferring with Defendant Franklin County; and developing written policies and procedures to support the goals and objectives established by Franklin County and the Chief Judge of the Circuit. Doc. 146-1, p. 4-5.

22. Franklin County is responsible participating in the selection of superintendent for the facility; and placing on the County's roles, the individuals selected by the Director of Court Services and the Superintendent as persons hired to perform the necessary services and duties in

the Juvenile Detention Center. Doc. 146-1, p. 4-5.

23. Franklin County provided a representative, Defendant Crocker, to participate in the selection of Defendant Freeman as the Superintendent for the FCJDC. Doc. 139, Request for Admissions, p. 8. When Freeman was hired as Superintendent of the FCJDC, he accepted employment with Franklin County. Ex. 12 at 93:14-20; Ex. 41. In his position as Superintendent, Freeman represented the Second Judicial Circuit **and** Franklin County in matters related to the FCJDC. Ex. 12 at Crocker 93:21-94:4, Ex. 41. Freeman's job duties included coordinating facility functions with the Second Judicial Circuit and Franklin County. Ex. 41.

24. Franklin County also provided a representative to participate in the hiring of Defendant Sanders. Ex. 12 at 88:8-89:13. When hired as Assistant Superintendent of the FCJDC, Sanders accepted employment with Franklin County. Ex. 42 at 39:15-19; Ex.12 at 95:10:15; Ex. 43. Sanders' job duties included serving as assistant to the Superintendent and acting as Superintendent in the extended absence of Freeman. Ex. 43.

25. In their respective FCJDC positions, Defendants Abell, Freeman and Sanders possessed policymaking authority on the issues of training, supervising and disciplining FCJDC employees, creating and enforcing policies and procedures to provide for the safety of detained minors, and overseeing the provision of healthcare to detained minors. Doc. 169, Answer to Second Am. Compl., ¶¶ 20, 32-33, 138.

26. Given Franklin County's financial responsibility to the FCJDC, after it opened in 2006 Franklin County applied for and received an additional grant in the amount of 1.5 million dollars to fund the operation of the FCJDC. Ex. 13 at 260:14-261:7; Ex. 18 at p. 302. Grants awarded to Franklin County for the operation of the FCJDC are not placed in a specific FCJDC fund, but rather a County fund that Franklin County controls and administers. Ex. 15 at 41:5-25.

27. Franklin County is to "hire individuals and or contract independently for necessary support services staff for the efficient operation of the Center." Doc. 146-1, p. 3 ¶ 6. Consistent with this obligation, in December 2008, Defendant Crocker and Defendant Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the FCJDC. Ex. 13 at 294:20-295:19; Ex. 27, Healthcare Agreement. Amendments to the healthcare agreement were signed by Defendant Freeman on behalf of Franklin County. Ex. 13 at 295:23-298:12. The agreement was in effect in September 2014. Ex. 13 at 296:1-3.

28. Franklin County maintains a liability insurance policy which covers its employees and agents. Ex. 13 at 240:19-241:18. Although Franklin County's corporate representative, Defendant Crocker, denied it applied to FCJDC staff, *Id.* at 241:19-22, 258:9-259:19, the Memorandum explicitly requires Franklin County alone to "[a]rrange for liability insurance on the facility and on persons employed to provide juvenile detention services." Doc. 146-1, p. 3 ¶ 7. On the contrary, Defendant Abell testified the liability policy applies to the FCJDC and "persons employed to provide juvenile detention services." Ex. 15 at 34:4-13. The Second Judicial Circuit has no role in arranging any liability insurance for persons employed to provide juvenile detention services. *Id.* at 14-16.

29. The FCJDC Policy Manual dictates that "all policies and procedures shall, when appropriate, be compatible with the policies of the Second Judicial Circuit and the Franklin County Board." Ex. 1 at 005344-5345.

30. The FCJDC Policy Manual requires the development of a "personnel manual" to cover administrative and personnel matters, "in addition to" the Policy and Procedure Manual. Ex. 1 at 005377.

31. No FCJDC-specific personnel manual has been produced in this litigation. Ex. 13 at 305:20-306:7. Instead, Franklin County produced a Franklin County Personnel Manual that "shall concern the supervisors/department heads appointed by the County Board and the employees under their jurisdiction." Franklin County Personnel Manual, Ex. 35 at p.1. The Franklin County Personnel Manual is an Ordinance passed by the Franklin County Board, and the County Board reserves the right to change the Personnel Manual at any time without notice to employees affected by it. *Id.* at p.1.

32. In his deposition, Defendant Crocker initially attempted to argue that Franklin County's Personnel Policies do not apply to FCJDC staff. Ex. 13 at 304:3-310:17. He stated that the FCJDC "have their own." *Id.* at 305:16-19. When Plaintiff's Counsel stated that no FCJDC personnel manual was ever produced to her and asked Defendant Crocker why he thought one existed, he responded, "I just do. I just think there is one. I don't have it." *Id.* at 305:20-306:7. Ultimately, however, Defendant Crocker admitted that Franklin County's Personnel Policies apply to FCJDC staff. Ex. 13 at 310:18-314:11.

33. Consistent with Franklin County's Personnel Policies, which states that "[a]ll employees are entitled to Workers' Compensation benefits," Ex. 35 at p. 27, Franklin County obtained insurance to provide workers' compensation benefits for FCJDC employees. Ex. 13 at 100:4-8, 308:7-9.

34. Selection of FCJDC employees shall be based on: "merit, applicable state statute, AOIC and IDOC standards, personnel policies, and requirements established by the County of Franklin and the Second Judicial Circuit of Illinois." Ex. 1 at 005405-5406. Selection, retention and promotion of FCJDC staff "shall be based on merit, applicable state statute, AOIC & IDOC standards, personnel policies, and meet the requirements established by the County of Franklin

and the Second Judicial Circuit of Illinois." Ex. 1 at 005373-5375.

35. It is also Franklin County's responsibility to "[p]rovide appropriate salaries and fringe benefits to Detention Center staff." Doc. 146-1, p. 3 ¶ 8. Consistent with the Memorandum, Franklin County pays the salaries of the juvenile detention officers and superintendent, Ex. 12 at 81:18-21, as well as the fringe benefits. Ex. 12 at 95:22-96:2. The fringe benefits provided to FCJDC staff must be limited so as "not to exceed those provided to **other** Franklin County employees." Doc. 146-1, Memo, p. 3 ¶ 8; Ex. 12 at 96:8-11 (emphasis added). Salaries and wages paid to FCJDC staff "must be based upon the County's ability to pay, as well as the need to attract and retain qualified staff." Doc. 146-1, Memo, p. 3 ¶ 8.

36. It is solely the responsibility of Franklin County to pay for training of detention staff at the FCJDC. Ex. 13 at 180:25-181:3. The money used to fund training comes from the income Franklin County receives from other counties who pay Franklin County to house their juveniles. Ex. 13 at 181:11-182:12. Nobody reimburses Franklin County for training costs. Ex. 13 at 180:22-24.

37. In addition to training, the money Franklin County receives from other counties is used to pay for all other FCJDC expenses, such as training, medical, office equipment, uniforms, fringe benefits, operating supplies for detention staff and salaries. Ex. 13 at 183:25-184:23; Ex. 24A-L. The only expense reimbursed by the State is for salaries. Ex. 13 at 183:21-24, 185:8-10, 186:2-5.

38. Franklin County is also responsible for "participat[ing] in the selection of superintendent for the facility." Doc. 146-1, p. 3 ¶ 9. The "committee (appointed by the Chief Judge) for the purpose of selecting a Superintendent…**must** include…a representative of the Franklin County Board." Doc. 146-1, Memo, p. 4 ¶ 5 (emphasis added). Franklin County's responsibilities further include "[p]lac[ing] on the County's roles, the individuals selected by the Director of Court

Services and the Superintendent as persons hired to perform the necessary services and duties in the Juvenile Detention Center." Doc. 146-1, Memo, p. 4 ¶ 15.

39. In their respective FCJDC positions, Defendants Abell, Freeman and Sanders possessed policymaking authority on the issues of training, supervising and disciplining FCJDC employees, creating and enforcing policies and procedures to provide for the safety of detained minors, and overseeing the provision of healthcare to detained minors. Doc. 169, Answer to Second Am. Compl., ¶¶ 20, 32-33, 138.

40. The FCJDC Defendants and Franklin County effectively admit there was a longstanding and persistent epidemic of suicide attempts at Franklin County's detention center. Doc. 146 at ¶ 54.

41. The Supervisors at the FCJDC condoned and facilitated continued violations of policy, creating a culture where detention officers felt free to violate policies with impunity. Affidavit of Dr. Tyler Kress, Ex. 26 at ¶¶ 24-27.

**Defendant Franklin County's Final Policymaking Authority on Training at the FCJDC**

42. Franklin County, Illinois operates through the Franklin County Board ("the Board"), which serves as the legislative and executive branch of the government for Franklin County. Ex. 12 at 7:24-8:11. The Board enacts ordinances for Franklin County, Ex. 12 at 8:12-17, and adopts an annual budget for Franklin County each year. Ex. 12 at 9:6-10. The annual budget is an "Ordinance" enacted by the Board in which it makes "appropriations for all corporate purposes for the County of Franklin, Illinois," including "the amounts…as may be necessary…for the corporate purposes of the County of Franklin, Illinois to defray all necessary expenses and liability of the said County of Franklin, Illinois." Ex. 24A-L.

43. As part of the budget process, Franklin County determines revenue and expense

appropriations for the FCJDC for the upcoming year. Ex. 13 at 177:4-19. The expenses reflect money that the FCJDC requires to meet its obligations. Ex. 12 at 55:10-25. The Board makes the final decision on the funding provided for the operation of the FCJDC. Ex. 12 at 50:20-51:3. When other counties issue payments for the housing of their juveniles, the money is placed into Franklin County's account designated for the operation of the FCJDC and administered by the Board for the operation of the FCJDC. Ex. 12 at 26:3-14 and 28:12-29:4. The income is then appropriated toward items that Franklin County "had to pay for the detention center," including training of the FCJDC staff. Ex. 13 at 181:15-182:12.

44. The expenses that are not reimbursed are paid out of the income that Franklin County receives from payments by other counties. Ex. 13 at 183:15-184:23. The money that Franklin County appropriates and spends on training for the staff at the FCJDC is not reimbursed by any entity, including the Second Judicial Circuit or the State of Illinois. Ex. 13 at 180:22-181:3. The FCJDC has to request funding for training at the annual budget meeting, where the Board has the right to ask what the money will be used for. Ex. 12 at 59:13-17 and 60:14-16.

45. Franklin County provided $5,000.00 for the training of staff at the FCJDC, or 0.0034% of its appropriated revenue for the FCJDC, in the fiscal year 2003-2004.[2] Ex. 24-A. This was the same amount provided for office equipment at the FCJDC that year. *Id.*

46. In 2004-05, it provided $5,000.00 for training, which was 0.0027% of its appropriated revenue for the FCJDC, and $1,000.00 less than provided for office equipment. Ex. 24-B. Similarly, in 2005-06, Franklin County provided $5,000.00 for training, which was 0.0028% of its appropriated revenue for the FCJDC, and $1,000.00 less than provided for office equipment. Ex. 24-C.

---

[2] The Franklin County fiscal year runs from December 1 through November 30.

47. In 2006-07, it provided $2,500.00 for the training of the staff at the FCJDC, which was 0.00091% of its appropriated revenue, and the same amount allocated for postage. Ex. 24-D. This was $4,000.00 less than provided for office supplies and $3,500.00 less than for uniforms. *Id*. In January 2007, the Illinois Department of Juvenile Justice ("IDJJ") inspected the FCJDC and issued a Report finding the FCJDC non-compliant with Illinois County Juvenile Detention Standards ("Juvenile Detention Standards") requiring minimum training of staff who have direct contact with detainees, as well as three other Juvenile Detention Standards. Franklin County Board Minutes, Vol. II., Ex. 18-B at 82-84. The then-Chairman of the Board, Harry Stewart, was copied on the Report. *Id*. At the March 20, 2007 County Board meeting, Defendant Crocker reviewed the January 2007 Report and indicated he was "proud of the overall performance." Ex. 18-B at 77. The Board moved to accept the Report as presented, which the entire Board affirmed. *Id*.

48. In 2007-08, the Board provided $5,000.00 for the training, which was 0.0017% of its appropriated revenue for the FCJDC; this was less than allocated for office supplies. Ex. 24-E. In January 2008, the IDJJ issued an Inspection Report finding the FCJDC was non-compliant with Juvenile Detention Standards requiring minimum training requirement of staff who have direct contact with detainees. Ex. 18-B at 72-73. The January 2008 Report was read at the March 18, 2008 Board meeting; the Board moved to accept the Inspection Report, which the entire Board affirmed. Ex. 18-B at 66-70. At some point, Crocker discussed the FCJDC training non-compliance with Abell; Crocker characterized the conversation as: "…I want to make it clear, you know. We provided the funding for that to happen…" Ex. 12 at 136:10-137:10, 138:3-7.

49. In 2008-09, the Board provided $5,000.00 for training, which was 0.0018% of its appropriated revenue for the FCJDC, and $1,000.00 less than allocated for uniforms. Ex. 24-F. In

January 2009, the IDJJ issued an Inspection Report finding the FCJDC non-compliant with Juvenile Detention Standards requiring minimum training requirement of staff who have direct contact with detainees. Ex. 25. Crocker was copied on transmission of the Report. *Id*. In its 2009 Inspection Report, the IDJJ recommended that Franklin County "consider hiring a full time Training Coordinator to ensure that all staff receive at least 40 hours of training annually. Ex. 25, p. 1. The January 2009 Report was presented at the March 17, 2009 Board Meeting. Ex. 18-B at p. 58-61. It had also been discussed at the Committee Meeting. *Id*. The Board accepted the Report. *Id*. The only thing the Board did after the third straight year of non-compliance was to provide funding for training, and Crocker had a conversation with Abell. Ex. 12 at 141:1-16.

50. In 2009-10, the Board provided $5,000.00 for training, which was 0.0018% of its appropriated revenue for the FCJDC, and less than appropriated for office supplies. Ex. 24-G. In January 2010, the IDJJ found the FCJDC non-compliant with Juvenile Detention Standards requiring minimum training of staff who have direct contact with detainees. Ex. 18-B at 55-56. Defendant Crocker was copied on transmission of the Report. *Id*. In the 2010 Inspection Report, the IDJJ inspector recommended that Franklin County "[c]ontinue to utilize the recently appointed Coordinator to ensure that all staff with direct care responsibilities acquire at least 40 hours of training annually." Although it appears that someone told the Inspector that a Training Coordinator had been hired, Defendant Abell testified that no one had been hired and that he believed the Coordinator was Freeman. Ex. 15 at 101:1-24. The January 2010 Report was read at the February 16, 2010 Board meeting; the Board moved to accept the Inspection Report as presented, which the Board affirmed. *Id*. at 49-53. Crocker testified that the Board was still proud of the way the FCJDC was operating, following its fourth straight year of non-compliance regarding minimum standards of training of officers who have direct contact with juvenile

detainees. Ex. 12 at 144:23-145:11.

51. In 2010-11, the Board provided $3,500.00 for training, which was 0.0013% of its appropriated revenue for the FCJDC, and less than the amount appropriated for uniforms. Ex. 24-H. In January 2011, the IDJJ found the FCJDC non-compliant with Juvenile Detention Standards requiring minimum training of staff who have direct contact with detainees. Ex. 18-B at 45-46. Defendant Crocker was copied on transmission of the Report. *Id*. The January 2011 Report was read at the April 19, 2011 Board meeting; the Board moved to accept the Inspection Report as presented, which the Board affirmed. *Id*. at 36-40.

52. In 2011-12, the Board provided $1,700.00 for training, which was 0.00067% of its appropriated revenue for the FCJDC, and only $200 more than appropriated for pest control; this was over $2,000.00 less than appropriated for office supplies or uniforms. Ex. 24-I. In January 2012, the IDJJ found the FCJDC non-compliant with Juvenile Detention Standards requiring minimum training of staff who have direct contact with detainees. Ex. 18-B at 32-33. Defendant Crocker was copied on transmission of the Report. *Id*. The January 2012 Report was read at the February 21, 2012 Board meeting; the Board moved to accept the Inspection Report as presented, which the Board affirmed. *Id*. at 26-30.

In 2012-13, the Board provided **$1,000.00** for training, which was 0.00043% of its appropriated revenue for the FCJDC, and was the same amount budgeted for pest control. Ex. 24-J. This was less than the amount budgeted for garbage pick-up, office supplies, or uniforms. *Id*. In January 2013, for the seventh year in a row, the IDJJ found FCJDC non-compliant with Juvenile Detention Standards requiring minimum training of staff who have direct contact with detainees. Ex. 18-B at 24-25. After the FCJDC was non-compliant with minimum training standards for a seventh year in a row in 2013, the IDJJC Inspection Report "recommend[ed] that

the Franklin County Board provide the necessary funds to the Franklin County Juvenile Detention Center. Ex 76. Defendant Crocker was copied on transmission of the Report. *Id*. The IDJJ recommended the FCJDC get more funding from the Board for training. Ex. 36 and Ex. 15 at 107:3-15. Abell recalls the recommendation made in 2013. Ex. 15 at 107:3-15. Abell claims they never received the additional funding. Ex. 15 at 107:3-109:1.

53. At a March 2013 Board meeting, Board member Jim McPhail requested Defendant Freeman make a presentation to the Board regarding the continued non-compliance with Juvenile Detention Standards regarding training. Benton News Article, Ex. 16. Freeman stated the FCJDC had been in non-compliance with training standards all but one year of its existence. *Id*. Freeman also stated it would be extremely difficult to bring the FCJDC into compliance because of current budget and staffing. *Id*. Freeman stated it would cost $3,324.00 to conduct the necessary training and that the FCJDC was only currently receiving $1,000.00. *Id*. Freeman's presentation to the Board regarding this issue was published in a local newspaper. *Id*. and Ex. 13 at 206:12-14. The Board reviewed the report at the March 19, 2013 Board meeting and moved to accept the Inspection Report as presented, which the Board affirmed. Ex. 18-B at 15-22.

54. When asked what action the Board took following these repeated reports of non-compliance, Crocker testified they would receive reports from Defendant Abell. Ex. 12 at 148:25-149:9. Crocker stated he mainly would have been the one to discuss the issue with Abell. *Id*. at 149:6-9. When pressed on whether the Board did anything else, Crocker stated they provided the funding for the training to be accomplished. *Id*. at 149:25-150:6. When confronted with his earlier statement that "funding was not the problem," Crocker stated: "We didn't take the funding away, though, that would not allow them to do it." *Id*. at 150:7-10.

55. Crocker also testified that, in 2013, the Board "stressed the issue with being

noncompliant and <u>asked that they correct that</u>." *Id*. at 154. He stated that "[m]aybe we got a little more forcible about it" and "maybe we stressed the issue more strongly [that] particular year." Ex. 12 at 154:22-155:12 (emphasis added).

56. The following year the FCJDC was compliant with Juvenile Detention Standards regarding training for the first time in eight years. Ex. 18-B at 14. Franklin County provided $4,000.00 for the training of the staff at the FCJDC (an increase of 300% after the publication of the article), which was still only 0.0025% of its appropriated revenue for the FCJDC for the 2013-2014 fiscal year. Ex. 24-K. When the FCJDC requested an increase to $4,000.00 from the prior year's funding for training, Crocker is sure the Board had questions about the increase in funding. Ex. 13 at 204:22-205:6.

57. Franklin County and FCJDC's contract with Defendant CHC required CHC to provide ongoing health and mental health education and training for the County staff "in accordance with the needs mutually established" by the County and CHC (then "HPL"). Franklin County Healthcare Agreement, Ex. 27 at p. 6. Defendant CHC's records reflect that it provided the FCJDC with mental health training materials on DVD so that FCJDC could do the staff training "without having someone else on-site to do it." Deposition of Andrew Walter, Ex. 37 at p. 123. According to CHC, the program was prepared by a mental health professional and covers "identifying suicidal risk, what to look for, those types of things." Ex. 37 at p. 126-27.

58. CHC records reflect that a site visit was made at FCJDC on February 10, 2014 and that notes from that inspection state "they currently have suicide DVD." *Id*. Additionally, another note from February 21, 2014 reflects that the FCJDC had the "suicide DVD." *Id*.

59. The FCJDC was free to provide training to the staff to meet the 40 hour minimum requirement and it could have been any type of training according to what Abell and the

16

Superintendent thought the staff needed. Ex. 15 at 101:11-19. Mendoza underwent training as a newly hired detention officer in July 2014 and the only suicide prevention she recalls receiving was "PowerPoints." Ex. 38 at 19:17-23. Despite working at the FCJDC for two years prior to R.E.'s death, Defendant Lynch had not even received basic training as of the date of R.E.'s death. Ex. 44 at 55:10-56:24. Defendant Bechelli could not recall exact training in suicide prevention, but stated "it could have been mixed in with other trainings that I have received." Ex. 14 at 74:3-8. Defendant Thomas could not recall if she received suicide prevention training at the FCJDC. Ex. 39 at 14-20. All Thomas could recall was that she knew "there was a section on suicide" at her basic training. Ex. 39 at 18:21-19:1.

60. In January 2015, the Department of Juvenile Justice did its annual inspection of the FCJDC, and the Inspection Report, under "Inspector Comments," states: The facility has not modified any of the ADA Complaint rooms since the unfortunate suicide that occurred in September. According to Director Abel, he has been advised against any modification to cells by his legal team. Department of Juvenile Justice Report 2015, Ex. 40 at p. 16.

<u>Argument</u>

## I.    Summary Judgment Standard

"Because summary judgment is such an extreme remedy, it should not be granted unless the non-moving party cannot prevail under any discernable circumstances." *Bonds v. Coca-Cola Co.*, 806 F.2d 1324, 1331 (7th Cir. 1986). It must not be granted unless there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "On summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inference to draw from the facts; these jobs are for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Moreover, the facts must be construed in the

light most favorable to the non-moving party. *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**II.     Franklin County is Liable Pursuant to 42 U.S.C. § 1983.**

Franklin County, in a joint effort with the FCJDC Defendants, seeks to convince this Court that no one can be held accountable for violating R.E.'s Constitutional right to be free from the risk of self-harm and suicide. The FCJDC Defendants are sued as agents, servants and employees of Franklin County and the facts in the record clearly establish that agency relationship.  Even if that were not so, however, Franklin County cannot escape liability under § 1983 because, under *Monell*, it can still be held directly liable for its own policies and customs and practices if a jury finds that its policies and practices caused Constitutional injury to R.E.

**A.     Franklin County is Directly Liable for Its Own Wrongdoing Pursuant to 42 U.S.C. § 1983.**

"A municipality or other local government may be liable under § 1983 if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to  be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. New York City Dept. of Social Servs*, 436 U.S. 658, 692 (1978)). Because there is no vicariously liability under § 1983, plaintiffs who seeks to impose liability on local governments under this section must prove that action pursuant to official municipal policy caused their injury. *Id.* Official municipal policy includes: (1) decisions of a government's lawmakers; (2) the acts of its policymaking officials; and (3) practices so persistent and widespread as to practically have the force of law. *Id.* at 60-61 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480-481 (1986); *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167-168 (1970)).

Liability under *Monell* arises when there exists a "custom or usage" "that has the force of law, even though it has not received formal approval through the body's official decision-making

channels." *Monell,* 436 U.S. at 691. This liability may be based upon "a series of decisions by a subordinate official [which] manifested a 'custom or usage' of which the supervisor must have been aware." *St. Louis v. Praprotnik,* 485 U.S. 112, 130 (1988). A municipality's policies or customs and usages need not be unconstitutional, as liability arises when a constitutional custom or usage is applied in an unconstitutional manner. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

A municipality can be liable for its own failure to act in the face of "actual or constructive notice" that such failure is likely to result in Constitutional deprivations. *See Ross v. Town of Austin, Ind*. 343 F.3d 915, 918 (7th Cir. 2003) (citing *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)). This is why *Monell* does not require that a jury find an individual liable before it can find a local government body liable. *See Thomas v. Cook Cty. Sheriff's Dept*., 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict."). *See also Glisson v. Indiana Dept. of Corrections*, 849 F.3d 372, 378 (7th Cir. 2017) (finding that under *Monell, "*if institutional polices are themselves deliberately indifferent…institutional liability is possible").

### 1.     Franklin County Is a Final Policymaker for the FCJDC.

Franklin County is liable under § 1983 because it was a final policymaker in three areas of FCJDC business that caused Plaintiff's Constitutional injuries: (1) the training of FCJDC staff; (2) the provision of healthcare at the FCJDC; and (3) the conditions in which juveniles were housed. To determine whether or not Franklin County is a final policymaker for the purpose of municipal liability, this Court's inquiry is guided by two principles. First, this Court must determine "those officials who have the power to make official policy *on a particular*

19

*issue.*" *McMillian*, 520 U.S. at 785 (citation omitted) (emphasis in original). The law does not expect nor require a Court to decide whether Franklin County or the State controlled the FCJDC "in some categorical, 'all or nothing' manner,'" *McMillian*, 520 U.S. at 785, and the U.S. Supreme Court recognized that more than one official or body may share final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("We are also aware that there will be cases in which policymaking responsibility is shared among more than one official or body"). Furthermore, the inquiry requires a district court to determine whether a government entity "possessed" final policymaking authority in the relevant area of its business, *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 738 (1989), which is distinct from whether that entity exercised its authority. A government entity may be held liable under § 1983 if it has final policymaking authority but fails to act. *See, e.g.*, *City of Canton*, 489 U.S. at 387 (municipality liable for failure to train).

One indicator that Franklin County is a final policymaker for the FCJDC is that the FCJDC represents a form of intergovernmental cooperation sanctioned by the Illinois Constitution. Ill. Const. Art. 7, § 10(a). Pursuant to Article 7, Section 10 of the Constitution, units of local government "may contract or otherwise associate among themselves" with, *inter alia*, the State. *Id*. Such was the case with the FCJDC, since Franklin County built and established the FCJDC to meet its needs, as well as the needs of other counties in Southern, Illinois, for providing "safe, secure, and modern facilities for holding and detaining juveniles." Ex. 12 at 23:22-24:5.

### a. Franklin County Had Final Policymaking Authority over FCJDC Staff Training.

Franklin County, under the County Shelter Care and Detention Home Act ("County Detention Home Act"), had final policymaking authority over FCJDC staff training. The County

Detention Home Act allows counties to "establish, support and maintain a detention home for the care and custody of delinquent minors." 55 ILCS 75/1. *See T.S. v. Twentieth Century Fox Television*, 2017 WL 1425596, at *7 (N.D. Ill. Apr. 20, 2017) (explaining that the Detention Home Act allows counties to operate juvenile detention centers). Franklin County established the FCJDC pursuant to the statutorily required procedure set out in the County Detention Home Act. 55 ILCS 75/6. After first acquiring court certification of the proposition to build the FCJDC, Franklin County voters approved the proposition, which word-for-word mirrored the statute, in a 1998 referendum. Ex. 13 at 221:1-10; Ex. 20.

The County Detention Home Act mandates that counties must <u>regulate</u> detention centers in a manner consistent with the Act. 55 ILCS 75/9.2. The term "regulate" means "to control (an activity or process) especially through the implementation of rules." REGULATE, Black's Law Dictionary (10th ed. 2014). As such, Illinois law makes abundantly clear that, because Franklin County established the FCJDC pursuant to the County Detention Home Act, it has a duty to regulate the FCJDC in a manner consistent with the Act.

The County Detention Home Act also requires that detention centers established under the Act must comply with minimum standards established by the IDJJ. 55 ILCS 75/2. These minimum standards include Section 702.20 (b)(3)(A), which requires detention center staff who have direct contact with detainees to receive a minimum of forty scheduled hours of training each year. Ex. 18-B at 72-73. The IDJJ inspects the FCJDC each year pursuant to Illinois statute, and prior to 2013, it found that the FCJDC failed to meet the forty-hour requirement every year but one. *Id*. at 82-84, 72-73, 63-64, 55-56, 45-46, 32-33, 24-25. Tellingly, a copy of the annual IDJJ inspection report was always sent directly to the Franklin County Board Chairman. *Id*. A Franklin County Board meeting would be held each year for the purpose of reviewing the report

21

and accepting it through formal vote. *Id*. at 77, 66-70, 58-61, 49-53, 36-40, 26-30, 15-22. Illinois law and the evidence in this case thus make clear that Franklin County is the final training policymaker because it had the statutory requirement to make sure the FCJDC complied with IDJJ minimum training standards.

Further evidence that Franklin County had final training policymaking authority is evidenced by its exercise of 55 ILCS 75/4. At 55 ILCS 75/4, the Detention Home Act provides counties with the right to demand such information as the County may require concerning the conduct, maintenance or residents of the home. Franklin County exercised this right at a March 2013 Board meeting, where Board member Jim McPhail had Defendant Freeman make a presentation to the Board regarding the FCJDC's continued non-compliance with training standards. Benton Evening News Article, Ex. 16. The Board also had Defendant Abell come to meetings and explain the training issues. Ex. 12 at 148:25-149:9.

Finally, Franklin County undoubtedly had final policymaking authority on the issue of training because it is solely the responsibility of Franklin County to pay for training of detention staff at the FCJDC. Ex. 13 at 180:25-181:3. The FCJDC has to request funding for training at the annual budget meeting, where the Board has the right to ask what the money will be used for. Ex. 12 at 59:13-17 and 60:14-16. The money Franklin County appropriates and spends on training comes from the income it receives from other counties who pay Franklin County to house their juveniles, Ex. 13 at 181:11-182:12. Franklin County is not reimbursed for training costs by any entity, including the Second Judicial Circuit or the State of Illinois. *Id*. at 180:22-181:3. Consequently, it is clear that Franklin County was a final policymaker on the issue of training.

       **b.**      **Franklin County Had Final Policymaking Authority over the Provision of Healthcare at the FCJDC.**

Consistent with its duties to operate, support, maintain, and regulate the FCJDC pursuant to the County Detention Home Act, Franklin County had the responsibility to "hire individuals and or contract independently for necessary support services staff for the efficient operation of the Center." Doc. 146-1, p. 3 ¶ 6. In fulfillment of this obligation, in December 2008, Defendant Crocker and Defendant Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the FCJDC. Ex. 13 at 294:20-295:19; Ex. 27. Amendments to the healthcare agreement were signed by Defendant Freeman **on behalf of Franklin County**. Ex. 13 at 295:23-298:12; Ex. 27. The agreement was in effect in September 2014. Ex. 13 at 296:1-3. Also, as with training, Franklin County used the income it receives from other counties to pay for medical expenses. Ex. 13 at 183:25-184:23. Thus, Franklin County undoubtedly had final healthcare policymaking authority since providing healthcare was a responsibility exercised solely by and on behalf of Franklin County.

### c.   Franklin County Had Final Policymaking Authority over the Conditions in Which Juveniles Were Housed.

Illinois law and the evidence in this case show that Franklin County was a final policymaker with respect to housing conditions at the FCJDC. Franklin County was solely responsible for the construction of the FCJDC. Doc. 146-1, p. 2 ¶ 1. During the construction process, Franklin County maintained communication with the architect it hired via meetings and letters in which the architect provided status updates. Ex. 18 at 399-400. Also during construction, Franklin County became aware that several items at the FCJDC "were not in compliance." *Id*. at 352.

As stated, the County Detention Home Act charged Franklin County with the duty to operate, support, maintain, and regulate the FCJDC. 55 ILCS 75/1; 55 ILCS 75/9.2. An

additional duty is provided in the Probation Act, wherein the Illinois legislature endowed counties with the duty and authority to provide juvenile detention centers with "suitable rooms and accommodations, equipment and supplies for detention staff." 730 ILCS 110/13. Accordingly, Franklin County was responsible for purchasing all equipment for the FCJDC. Ex. 15 at 26:17-27:6. It was also responsible for equipping FCJDC cells with sink/toilet combinations, Ex. 12 at 76:24-77:5, such as the one R.E. used in committing suicide. It is clear that, under Illinois law and the evidence in this case, Franklin County was the final policymaker regarding the housing conditions at the FCJDC.

### 2.   Defendant Franklin County Is Liable for Its Failure to Provide Suicide Prevention Training to Franklin County Juvenile Detention Officers.

Franklin County is liable for the violations of R.E.'s Constitutional rights because its persistent and widespread customs and practices of failing to train its staff in suicide prevention caused R.E.'s death. Municipal liability arises when the failure to train amounts to deliberate indifference to the rights of persons with whom officials come into contact. *See City of Canton*, 489 U.S. at 388. Deliberate indifference is demonstrated when a municipality fails to act in the face of "actual or constructive notice" that such failure is likely to result in Constitutional deprivations. *Ross*, 343 F.3d at 918 (7th Cir. 2003) (citing *Robles*, 113 F.3d at 735 (7th Cir. 1997)). Thus, a municipality can be held liable when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and the failure to train results in a constitutional violation. *See Board of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409 (1997) (citing *City of Canton*, 489 U.S. at 390).

In *City of Canton*, the Supreme Court, noting that it might seem contrary to common sense to assert that a municipality would actually have a policy of not taking reasonable steps to train its employees, explained:

> **But, it may happen that in light of the duties assigned to specific officers or employees that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of a city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible and for which the city may be held liable if it actually causes the injury**.

489 U.S. at 390.

The *City of Canton* Court gave the following example of circumstances where a municipality may be held liable for deliberate indifference to an obvious risk, which demonstrates why the record in this case precludes summary judgment:

> For example, city policymakers know **to a moral certainty** that their officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations of the use of deadly force…can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n. 10.

The case at bar fits exactly into the circumstances under which a county can be liable for a failure to train. The FCJDC Defendants and Franklin County effectively admit there was a longstanding and persistent epidemic of suicide attempts at Franklin County's detention center. Doc. 146 at ¶ 54. They do not and cannot deny that they knew "to a moral certainty" that its staff would be unleashed to protect the health and safety of children under the care of Franklin County. The need to provide suicide prevention training to the detention officers was so obvious that the failure to do so can be characterized as nothing less than deliberate indifference.

The Seventh Circuit, like the Supreme Court, has also made clear that municipal liability can arise from a failure to take action, i.e., a "policy of inaction" in the face of clear risks of harm. *Glisson*, 849 F.3d at 380-82. In *Glisson*, the court noted that it was not breaking new ground in finding that an entity can be liable for inaction, in the face of obvious risks. *Id.* at 381.

25

(citations omitted). As the *Glisson* court put it, while the Constitution does not require an entity to adopt certain directives, "the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance." *Id.*

Here, Defendants take pains to point out that "[s]ince the Center opened in 2004, R.E. is the only detainee to have taken his own life." In *Woodward v. Correctional Health Care Services*, 368 F.3d 917, 929 (7th Cir. 2004), the Seventh Circuit responded to this same type of plea by holding that an entity:

> does not get "one free suicide' pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *See Bd. Of Cty. Comm'rs of Bryan Cty*, 520 U.S. at 409. Here, there was a direct link between CMS's policies and [Decedent's] suicide. That no one in the past committed suicide simply shows that CMS was fortunate, not that it wasn't deliberately indifferent.

In this case, Franklin County's liability is based on repeated failures to provide for the training of the FCJDC detention staff to ensure the safety of detainees in a culture that permitted and condoned violations of policies that were designed to protect juveniles housed in its detention center. Beginning in 2007, and for seven years in a row, the Franklin County Board received notice from the IDJJ that its Detention Center was non-compliant with Illinois County Juvenile Detention Standards minimum requirements for training of staff who have direct contact with detainees. Ex. 18-B at 82-84, 72-73, 63-64, 55-56, 45-46, 32-33, 24-25.

In its 2009 Inspection Report, the IDJJ recommended that Franklin County "consider hiring a full time Training Coordinator to ensure that all staff receive at least 40 hours of training annually. Ex. 25, p. 1. In the 2010 Inspection Report, the IDJJ inspector recommended that Franklin County "[c]ontinue to utilize the recently appointed Coordinator to ensure that all staff with direct care responsibilities acquire at least 40 hours of training annually." Although it

appears that someone told the Inspector that a Training Coordinator had been hired, Defendant Abell testified that no one had been hired and that he believed the Coordinator was Freeman. Ex. 15 at 101:1-24. After the FCJDC was non-compliant with minimum training standards for a seventh year in a row in 2013, the IDJJC Inspection Report "recommend[ed] that the Franklin County Board provide the necessary funds to the Franklin County Juvenile Detention Center. Ex 36.

Defendant Abell testified that the FCJDC was free to provide training to the staff to meet the 40 hour minimum requirement and that it could be any type of training that he and the Superintendent chose according to what the staff needed. Ex 15 at 101:11-19. Based on the testimony of the detention center officers, no suicide prevention training was provided. Defendant Mendoza underwent training as a newly hired detention officer in July 2014; the only suicide prevention she recalls receiving was "PowerPoints." Ex. 38 at 19:17-23. Defendant Lynch, who had been working as a FCJDC officer for two years prior to R.E.'s death, had not even received basic training as of the date of R.E.'s death. Ex. 44 at 55:10-56:24. Defendant Bechelli testified that he could not recall exact training in suicide prevention, but "it could have been mixed in with other trainings that I have received." Ex. 14 at 74:3-8. Defendant Thomas, a FCJDC Shift Supervisor, could not recall if she received suicide prevention training at the FCJDC. Ex. 39 at 14-20. All Thomas could recall was that she knew "there was a section on suicide" at her basic training. Ex. 39 at 18:21-19:1.

Meanwhile, the Board began appropriating less and less money for training, and instead spent more money on other things such as uniforms and office supplies. Ex. 13 at 194:4-195:8, 197:6-200:4, 201:19-203:19, 290:10-24. It was not until after the local paper published an article about the failed inspections in March of 2013 that the Board began making some attempt to cure

the training deficiencies by appropriating some, but not much, additional funding and, as Defendant Crocker put it, "maybe [getting] a little more forcible about it" and "stressing the issue more strongly" with Defendant Abell. Ex. 12 at 154:22-155:12.

The problem with respect to suicide prevention training could have been easily cured. Franklin County and FCJDC had a contract with Defendant CHC, effective December 1, 2008, that required CHC to provide ongoing health and mental health education and training for the County staff "in accordance with the needs mutually established" by the County and CHC (then "HPL"). Ex. 27 at p. 6 of 19. Defendant CHC's records reflect that it provided the FCJDC with mental health training materials on DVD so that FCJDC could do the staff training "without having someone else on-site to do it." Ex. 37 at p. 126-27. According to CHC, the program was prepared by a mental health professional and covers "identifying suicidal risk, what to look for, those types of things." Ex. 37 at p. 126-27.

CHC records reflect that a site visit was made at FCJDC on February 10, 2014 and that notes from that inspection state "they currently have suicide DVD." *Id.* Additionally, another note from February 21, 2014 reflects that the FCJDC had the "suicide DVD." *Id.* There is no evidence that Franklin County or Defendants Abell and Freeman ever took any steps to even bother requiring the staff to watch the suicide prevention training program that was available to them on site.

Defendant Franklin County, through its Board Chairman, has disavowed any knowledge of or responsibility for the attempted suicides at the FCJDC, despite the fact that the Board's office is 3 blocks away from the Detention Center. Ex. 13 at 277:15-18. He made various claims of his ignorance of the happenings in Franklin County, such as his claim that he does not read the newspaper. Ex. 13 at 206:8-18. The County's feigned ignorance of the obvious risks posed to the

health and safety of juveniles housed in its detention center, however, will not shield it from liability, as the Seventh Circuit has held that a government entity "cannot take refuge in Farmer's subjective test by deliberately ignoring obvious risks." *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997). *See Delgado v. Stegall*, 376 F.3d 668, 672 (7th Cir. 2004) ("Deliberate indifference means shutting one's eyes to a risk.")

### 3.   Franklin County Is Liable Because It Had a Custom and Practice of Housing Juvenile Detainees under Conditions That It Knew or Should Have Known Posed a Substantial Risk of Harm.

On September 24, 2014, R.E. was housed in A Pod, Cell A-2. The A Pod has a total of eight cells, two of which are equipped with a sink-toilet combination with a handrail. Ex. 26 at ¶ 8. Although R.E. was not physically handicapped, he was placed in one of these cells – Cell A2. The handrail in A2 was not an ADA compliant, suicide resistant handrail. Lindsay Hayes Deposition, Ex. 17 at 107:24-108:12. It has a space between the sink and handrail bar that can obviously be used to tie a sheet around it in a suicide attempt. Photograph of Handrail, Ex. 45. It posed an obvious danger. Another juvenile who had been housed in Cell A2 used this handrail and a sheet in attempted suicide. Ex. 17 at 108:4-10.

Cell A-2 is less than 7 feet wide and about 12'8" inches long. Kress ¶ 7. There is a solid steel cell door. Ex. 15 64:22-65:2. The door has a rectangular window which is about 3-1/2 inches wide and a little less than 2 feet long; the bottom of the glass window is approximately 4' 5" inches off the ground. Ex. 26 at ¶¶ 8-9. Although there is video surveillance of the common area in A-Pod, there is no surveillance of the interior of the cells. Ex. 11 at 54:8-20; Ex. 15, 65:5-18. When the door is closed and locked, the detainee remains isolated and unsupervised unless someone personally checks on him.

On September 24, 2014, while alone and isolated in his room, not under video

surveillance, and not being checked by detention staff, R.E. used a sheet and the handrail to hang

himself. He was taken to the hospital, but pronounced dead that afternoon.

In January 2015, the Department of Juvenile Justice did its annual inspection of the

FCJDC. The Inspection Report, under "Inspector Comments," states:

> **The facility has not modified any of the ADA Complaint rooms since the unfortunate suicide that occurred in September. According to Director Abel, he has been advised against any modification to cells by his legal team.**

Ex. 40. As of March 9, 2017, the sink toilet combinations with the non-suicide resistant handrails

were still in Pod A-2. Ex. 26 at ¶ 8.

The cell and handrail posed an obvious risk of harm to detainees, especially under the

circumstances here. There were multiple suicide attempts by hanging at the FCJDC, a facility in

which there was an established custom and practice of detention officers violating procedures

that required observation of children via watch tours every 15 minutes.

> **4.  Defendants Abell, Freeman, Sanders, Mendoza, Lynch, Bechelli, Thomas and Upchurch violated R.E.'s Constitutional right to be free of deliberate indifference to his serious medical needs and risk of self-harm and suicide.**

Plaintiff incorporates herein Plaintiff's Response to the FCJDC Defendants' Motion for

Summary Judgment.

> **5.  Defendant Franklin County violated R.E.'s Constitutional rights and caused his death.**

In *Woodward*, the Court noted that the defendant's (a prison healthcare provider) liability

was "based on much more than a single instance of flawed conduct" and that "[i]t [was] based on

repeated failures to ensure the inmates' safety, as well as a culture that permitted and condoned

violations of policies that were designed to protect inmates" like the suicide victim in that case.

368 F.3d at 929. In the case at bar, the same is true. R.E.'s death was proximately caused by

repeated failures to ensure the safety of him and other juvenile detainees housed at the FCJDC,

demonstrating a profound disregard for the juveniles in the face of known and obvious dangers of detainee self-harm and suicide.

Franklin County allowed R.E. to be housed under obviously dangerous conditions, failed to train its detention officers in suicide prevention, and unleashed them, unsupervised, to provide for the safety of the children in its custody and care. The Supervisors at the FCJDC condoned and facilitated continued violations of policy, creating a culture where detention officers felt free to violate policies with impunity. Ex. 26 at ¶¶ 24-27. Because there is a direct link between Franklin County's customs, practices and usages and R.E.'s suicide, Franklin County is liable for his death.

## III.     Defendant Franklin County is Liable Under the Wrongful Death Act.

Franklin County argues it is entitled to summary judgment on Plaintiff's wrongful death claim for two reasons. Both are contrary to established law and Franklin County's Motion for Summary Judgment should be denied.

First, Franklin County argues it cannot be held liable because it is not involved in the operation of the FCJDC. The evidence in this case, as well as Illinois law, says otherwise. Franklin County pays for the entire operation of the FCJDC, Ex. 13 at 183:25-184:23; Ex. 24A-L, and maintains the right to control the FCJDC as it has the power to set FCJDC goals and objectives that must be developed into written policies and procedures. Doc. 146-1, p. 5 ¶ 15. *See also* 55 ILCS 75/1(a) (counties support and maintain detention centers); 55 ILCS 75/9.2 (counties must regulate detention centers in a manner consistent with the County Detention Home Act); 730 ILCS 110/13 (counties have the duty to furnish suitable rooms and accommodations, equipment and supplies for detention staff). Accordingly, Franklin County plays a major role in the operation of the FCJDC and is liable, under the Wrongful Death Act, for

its willful and wanton actions and inactions that caused R.E.'s death. *See* 745 ILCS 10/1-210 (conduct is "willful and wanton" if it shows a "conscious disregard for the safety of others").

Franklin County is not only liable for its own willful and wanton actions, but also for those of its agents under the doctrine of *respondeat superior*. *See Woods v. Cole*, 693 N.E.2d 333, 336 (Ill. 1998) ("Under the doctrine of *respondeat superior,* a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff."); *White v. Watson*, 2018 WL 2047934, at *15 (S.D. Ill. May 2, 2018) ("Claims seeking to hold a principal liable under the Wrongful Death Act for its agent's acts under a *respondeat superior* theory are permitted and are, in fact, common.").

The existence of an agency relationship turns on whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal. *Valenti v. Qualex, Inc.*, 970 F.2d 363, 368 (7th Cir. 1992). The **right** to control is "the predominant factor" of the inquiry, "regardless of whether or not the principal exercises that right to control." *Id.* at 367-68. (citations omitted). Apart from when the facts are undisputed, the existence of an agency relationship is a question of fact that is to be decided by the trier of fact. *Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989).

Here, all FCJDC Defendants acted as agents of Franklin County. First, Franklin County has the **right** to control FCJDC staff because it has the power to set FCJDC goals and objectives that must be developed into written policies and procedures. Doc. 146-1, Memo, p. 5 ¶ 15. Second, Franklin County's right to control is evidenced by the fact that Franklin County's Personnel Policies apply to FCJDC staff. Ex. 13 at 310:18-314:11. *See Hawkins v. St. Clair*

*County*, 2009 WL 839192, at *2 (S.D. Ill. Jan. 31, 2009) (right to control evidenced by the fact that St. Clair County's personnel policies applied to the St. Clair County juvenile detention officers). Third, Franklin County is responsible for providing FCJDC staff with necessary equipment for the operation of the FCJDC, Doc. 146-1, p. 2 ¶¶ 1-3, and it determines, and is legally responsible under 730 ILCS 110/14 for determining, the amount of compensation for FCJDC employees. Doc. 146-1, p. 3 ¶ 8. *See Amigo's Inn, Inc. v. License Appeal Comm'n of City of Chicago*, 822 N.E.2d 107, 113 (Ill. App. Ct. 2004) (method of payment and furnishing necessary equipment are factors in determining agency relationship). Fourth, Franklin County's agency relationship with respect to Abell and Freeman is clear because they had the ability to affect the legal relationships of Franklin County. Both of them, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the FCJDC. Ex. 13 at 294:20-295:19 and Ex. 27, and amendments to the agreement were signed by Freeman on behalf of Franklin County. Ex. 13 at 295:23-298:12 and Ex. 27. Also, Freeman accepted employment with Franklin County when he was hired as the FCJDC Superintendent. Ex. 12 at 93:14-20; FCJDC Superintendent Job Description, Ex. 41. The same is true for Sanders when she was hired as Assistant Superintendent. Deposition of Diane Sanders, Ex. 42 at 39:15-19; Ex. 12 at 95:10:15; FCJDC Assistant Superintendent Job Description, Ex. 43. Accordingly, Franklin County is liable for the willful and wanton actions and inactions of the FCJDC Defendants under the doctrine of *respondeat superior*.

Franklin County's second argument against liability asserts "the act of suicide is an independent intervening act which breaks the chain of causation and shields the alleged tortfeasor from liability." Doc. 151, p. 21. This is not true, however, when "the defendant had a duty to the decedent to prevent the suicide." *White*, 2018 WL 2047934, at *14. Such was the case

here. "Under Illinois law, jailers have a general duty of care to their prisoners, including a duty to exercise ordinary and reasonable care under the circumstances of the particular case against the possibility of suicide." *Id.* (citing *Dezort v. Village of Hinsdale*, 342 N.E.2d 468, 472-73 (Ill. App. Ct. 1976)) (stating risk that a prisoner may commit suicide in jail is generally foreseeable).

Without question, R.E.'s suicide was foreseeable. In the eight months leading up to R.E.'s suicide, 21 other juveniles at the FCJDC attempted suicide, or approximately one every twelve days. Doc. 146 ¶ 54. The record clearly evidences that all Defendants were exposed to and knew of a longstanding, pervasive, substantial risk of self-harm and suicide to FCJDC detainees who, like R.E., are left alone and unsupervised in their cells. Doc. 146 ¶ 54, Shawn Freeman Deposition, Ex. 11 at 159:26-23; Ex. 15 at 77:19-78:4; FCJDC Training Meeting Material, Exs. 5, 7, 8, 9 ,10, 48; Ex. 39 at 76:18-77:9, 95:7-96:23 and 98:9-15. As such, Franklin County owed a duty to prevent R.E.'s suicide. Its willful and wanton actions and inactions constituted a breach of this duty, and it is thus liable under the Wrongful Death Act.

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant Franklin County, Illinois and Randall Crocker's Motion for Summary Judgment.

Groves | Powers, LLC

  */s/ Linda C. Powers*
Linda C. Powers, #6271689
Steven L. Groves, #6211737
Emery A. Reusch, #6313809
One U.S. Bank Plaza
505 North 7th Street, Suite 2010
St. Louis, Missouri 63101
t: 314.696.2300 | f: 314.696.2304
lpowers@grovespowers.com
sgroves@grovespowers.com
ereusch@grovespowers.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served upon the following parties by operation of the Court's CM/ECF filing system on this 17th day of July, 2018:

Office of the Attorney General, State of Illinois

R. Douglas Rees
100 West Randolph Street, 12th Floor
Chicago, IL 60601
rrees@atg.state.il.us

*Attorneys for Defendants Michael Abell,*
*Shawn Freeman, Diane Sanders, Samantha Thomas,*
*Daniel Lynch, Alicia Mendoza and Anthony Bechelli*

Heyl, Royster, Voelker & Allen

Douglas R. Heise
Mark Twain Plaza III, Suite 100
105 E. Vandalia Street
Edwardsville, IL 62025
dheise@heylroyster.com

*Attorneys for Defendants CHC Companies, Inc., Correct Care*
*Solutions, LLC, Lori Little, and Vipin Shah, M.D.*

Bleyer and Bleyer

Joseph A. Bleyer
601 West Jackson Street
Marion, IL 629590487
jableyer@bleyerlaw.com

*Attorneys for Defendants Franklin County, Illinois*
*and Randall Crocker*

                                            */s/ Linda C. Powers*
                                            Linda C. Powers