IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY McKINNEY, as Administrator for the
Estate of R.E., Deceased,

     Plaintiff,

vs.

     Case No: 15-CV-01044

FRANKLIN COUNTY, ILLINOIS, *et al.*,

     Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS ABELL, FREEMAN,
SANDERS, BECHELLI, LYNCH, MENDOZA, STEWART,
<u>THOMAS AND UPCHURCH'S MOTION FOR SUMMARY JUDGMENT</u>**

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

<u>**R.E.'s Documented Mental Health History**</u>

1.  In March 2011, eight-year-old R.E. was referred to counseling through the Southeastern Illinois Counseling Center, Screening, Assessment, Support Services ("SASS") after telling a school counselor that he had thoughts of not being in the world. Richland County Probation File, Ex. 46 at pp. 006792, 006808, 0006824. At the SASS intake interview, R.E. stated that he had a history of depression and ADHD. *Id.* at p. 006825. His DSM symptoms included: death of mother by suicide in November 2009, inattention, feelings of sadness, reported anger toward self over decline in school, and "made vague suicide attempts at school." *Id.* at p. 006792. A Biopsychosocial Assessment was conducted and R.E. was diagnosed as having Depressive Disorder and ADHD by history. *Id.* at p. 006796. R.E. underwent counseling with SASS. *Id.* at p. 006818. His discharge diagnosis was "Depressive Disorder; ADHD by history." *Id.* at p. 006819.

2.  On August 1, 2012, then ten-year-old R.E. was first admitted to the FCJDC for a nine-day detention. FCJDC Assessment and Intake File, Ex. 21 at p. 006947.

3.   On December 8, 2012, R.E's dad told R.E.'s probation officer, Linda Brown that R.E. was having behavioral problems and R.E. and his dad were speaking about those problems in relation to his mom's death. Linda Brown Deposition, Ex. 48 at 38:8-39:1.

4.   On April 23, 2013, R.E.'s school called the CARES hotline and reported that R.E. had threatened to kill himself. Ex. 46 at p. 006823; Ex. 49 at 00059. R.E.'s probation officer Brown's case notes from April 23, 2013 reflect that R.E. is threatening to kill himself to the kids at school. Brown Notes, Ex. 49 at p. 00059. Brown advised the school to call the CARES –SASS hotline and not to wait if minor is threatening suicide due to the history of his mother killing herself. *Id.*

5.   Brown testified that she is an employee of the Second Judicial Circuit and that her case notes are entered into a database and are available to employees of the Second Judicial Circuit. Ex. 48 at 23:22-25:17. Brown does not know whether her notes were available to the superintendents or the director of court services at the FCJDC. *Id*. at 25:18-21.

6.   On April 24, 2013, R.E. was again referred to SASS for counseling, where he reported having suicidal thoughts. His School reported he had been having trouble with the law since his mom killed herself a few years ago. A Biopsycholosocial Assessment diagnosed R.E. with Depressive Disorder, for which he received three months of counseling regarding his mother's suicide and during which he expressed suicidal thoughts. Ex. 46 at 6823-6850.

7.   On March 28, 2014, R.E. was admitted to the FCJDC to undergo psychiatric, psychological and substance abuse evaluations. Ex. 50 at p. 006916; Ex. 48 at 63:4-11. FCJDC Assistant Superintendent Defendant Sanders was the one who was coordinating and arranging for the evaluations to be done at the FCJDC. Diane Sanders Deposition, Ex. 42 at 70:1-5.

8.   On April 8, 2014, while in the custody of the FCJDC, R.E. underwent a Psychological Evaluation. Psychologist Jeremy Jewell's report, which is in FCJDC records, reflects suicide risk

2

factors, recommendation for psychiatric evaluation, grief counseling and therapy. pp. 6857-6865; Ex. 42 at pp. 61-63; Ex. 46.

9.  On May 20, 2014, R.E. was admitted to the FCJDC in order to undergo a psychiatric Evaluation by Dr. Splat. 5.20.14 Assessment Intake Sheet, Ex. 54 at p. 6906. Defendant Upchurch was the Shift Supervisor who performed the intake. *Id*. at p. 6906.

10.  Dr. Spalt's report reflects a history of suicide risk, a possible diagnosis of depression and a recommendation for follow-up. Ex. 46 at p. 6866-6869.

### FCJDC's Intake Policies and Procedures

11. FCJDC's written policies, implemented in 2004, specifically acknowledge that "every juvenile is viewed as posing some risk of suicide." Ex. 1 at 5531.

12. Admission policies state that when a referral to detain a juvenile is received, "the gathering information begins at the earliest point in the process (during the call to the Center from law enforcement and other jurisdictions).  Ex. 1 at 5536.

13. Phone calls concerning the possible intake of a juvenile must be handled by a detention shift supervisor. Ex. 11 at 71:17-72:5. The supervisor is to determine through the detention screening process if the juvenile is appropriate for detention at the facility. Ex. 1 at 5499-5502; Ex. 11 at 73:7:12. Staff taking the telephone referral is required to inquire as to any known or suspected attempts or plans by the juvenile to plan or realize self-harm. Ex. 1 at p. 5536.

14. Written policy requires that admitting detention staff must notify the parent, legal guardian during the admission process, or as soon as possible, and shall obtain information including mental/emotional health information. Ex. 1 at pp. 5527-5528.Written policies require that the detention center staff will retrieve prior juvenile files from the intake area if the youth had previous admissions. Ex. 1 at p. 5525.

15. FCJDC admissions policies require that all information, including suicide attempts, allergies, medical problems, etc. be documented and that the admission supervisor check case notes for any pertinent information on the juvenile. Ex. 1 at 5522.

16. Written Admission Policies require that a youth is to be "classified" as to his/her level of suicide risk, as either Low Risk, Medium Risk, or High Risk and that the classification be documented. Ex. 1 at 5531. Defendant Sanders admitted that the policy is in place for the purpose of protecting a child who is being admitted. Ex. 42 at 77:20-78:15.

17. Juveniles who are classified as medium or high-risk are not to be isolated and are to be included in all activities with other juveniles during the waking hours of the day, with heightened staff awareness of these juveniles' interaction, moods and general state. Ex. 1 at 5532.

18. FCJDC policy requires that youth who have been diagnosed with depression, who are sad at intake, or who is currently taking psychotropic medications be referred for an evaluation by a mental health professional. September 17, 2014 Assessment and Intake File, Ex. 21 at p. 6976.

**R.E.'s September 17, 2014 Admission**

19.  In the early morning hours of September 17, 2014, Decedent was referred to the FCJDC by Richland County Probation and Parole for admission, after having spent the night in a convenience store restroom and being arrested for burglary for taking a pack of cigarettes when he left the store. Ex. 48 at 76:19-77:8; Doc. 146-34.

20.  Probation Officer Brown received a telephone call regarding Riley's arrest at 2:14 a.m. Ex. 48 at 76:19-23. Brown called the FCJDC to request that R.E. be admitted. Ex. 48 at 78:2-6. Brown testified that she does not remember if FCJDC staff asked about whether R.E. had any mental health problems. Ex. 48 at 78:15-24. Shift Supervisor Cockran took the call but did not document whether R.E. had mental health issues. Transport Form, Ex 21. at p. 6981.

21. It is FCJDC's responsibility to gather information, including whether the youth has mental health issues. Ex. 48 at 50:11-50:21; Ex. 42 at 54:10-22. Probation Officer Brown testified that it is the responsibility of the FCJDC staff, and not that of the probation officer, to screen the youth for the risk of self-harm upon admission. Ex. 48 at 50:22-51:10.

22. Defendant Upchurch was the Shift Supervisor responsible for R.E.'s September 17, 2014 admission. Ex. 21 at 00696; Ex. 52 at 56:22-57:1.

23. Brown testified that at the time of this admission, R.E. was having a lot of problems and needed continued counseling. Ex. 48 at.98:18-23.

24. Upchurch had previously admitted R.E. in May, 2014 to the FCJDC to see the doctor for a psychiatric evaluation. Ex. 54; Ex. 52 at 53:3-6. In May, 2014, she knew R.E. was being admitted for a court-ordered psych evaluation. Ex. 52:12-22.

25. Defendant Upchurch had worked at FCJDC since it opened. Ex. 52 at 8:14:-24:. She is familiar with the policies and procedures regarding admission of juveniles. Ex. 52 at 11:12-17. She helped put the policy and procedure manual together; the administrators wrote the policy manual, but there was a lot of input from the supervisors too.  Ex. 52 at 11:18-12:77.

26. At the time she made the referral, Brown was aware of R.E's mental health problems; that his problems were thought to be associate with his mother's death by suicide; and that R.E. had been struggling recently.  Ex. 48 at 79:1-15. Brown testified if the person who was doing the intake screening at detention center would have asked her any questions about R.E's mental health status, she would have told them everything she knew. Ex. 48 at 79:16-23. If she had been asked anything about prior suicidal ideation she would have told the FCJDC the information she had about R.E. making prior threats. Ex. 48 at 80:4-11. No admission record reflects Upchurch contacted Brown to question her about R.E.'s mental health. Ex 21 at 6964-6981.

5

27. Based on her experience in the criminal justice system and in working in detention facilities and with probation and parole, Upchurch has been aware for a long time that suicide attempts and suicides do happen in both adult and juvenile facilities.  Ex. 52 at 47:2-8. Upchurch knows that that is the reason for policies and procedures that require screening for suicidal ideation. Ex. 52 at 49:14-17.

28. Upchurch does not follow the policy as far as classifying youth as to whether they are high, medium or low risk for suicide. Ex. 52 at 48:21-550:6. She testified that "We just look and visually… and just decide again what would best benefit that person and deal with it that way." Ex. 52 at 50:8-8-15.

29. Both Defendant Sanders and Defendant Upchurch testified that the intake officer would have had access to records from a juvenile's previous admission records in paper form. Ex. 52 30:11-19; Ex. 42 62:20-22. Thomas testified that the supervisor doing intake would have access to assessment side records on the computer. Ex. 39 at 121:13-19.

30. R.E. tested positive for Marijuana/THC during the admission screening. Ex 21, 006972.

31. Upchurch completed a MAYSI screening instrument for R.E.  She recorded that R.E. answered "no" to all questions on the form with the exception of one question. Ex.21 at 006969. The MAYSI screening document reflects that R.E. had never gotten in trouble when he had been high or had been drinking; had never used alcohol or drugs to help him feel better; had never in his whole life had something very bad or terrifying happen to him. Ex. 21 at 006969-70. Upchurch then recorded R.E's MAYSI-2 scores as Zero for alcohol/drug use; angry/irritable; depressed-anxious; suicide ideation; thought disturbance; and traumatic experiences. Ex. 21 at 00697.

32. Upchurch testified that if a child were to give an answer to a screening question that she

knew was incorrect, she "might look at him, like, you know, come one." She testified that the child would "normally go back and change their answer." Ex. 52 at 53:3-19.

33. In completing a screening for drug treatment, Upchurch did not indicate whether R.E. had used alcohol or drug in the past two years. Ex. 21 at 006975. Upchurch did not complete the screening instrument requiring that a youth who is currently on any psychotropic medications or who had a prior diagnosis of depression be referred to a mental health professional, but instead left the form blank and signed it. Ex. 21 at p.000696.

34. Upchurch completed a medical screening form and noted that R.E. was currently on Adderall; that he had not used alcohol or drugs recently; that he had never thought about hurting or killing himself. Ex 21 at 00678-6980. Upchurch noted that R.E. was currently taking Adderall and had received "some type of court ordered" mental health treatment. Ex 21 at 00678-80.

35. Upchurch testified that R.E. was a little upset during his admission because he though he was going to be that he was going to be at the Detention Center for a while.  Ex. 21; Ex. 52 at 63:10-21.  However, on the Medical Screening report, she recorded that R.E. was calm; and did not appear sad. Ex. 21 at 006979.

36. Upchurch did not attempt to contact R.E.'s parent to obtain information concerning his mental health. Ex. 23 at 5994.

**September 18 – 22, 2014**

37. The September 17, 2014 Shift Change Report reflects that R.E. was upset at the end of 1st Shift; that Upchurch "was too busy to get phone call." Ex 23 at p. 005994.

38. The September 17, 2014 Shift Change Report from First Shift to Second Shift reflects that Upchurch "didn't get parent notification completed." Ex 23 at p. 005994.

39. R.E. made two intercom calls requesting to speak to Upchurch.  Intercom Call, Ex. 58

(will be filed under seal).  R.E. was told that Ms. Upchurch was busy. Ex. 58.

40. There is no record reflecting that Upchurch or any other FCJDC talked to R.E. about why he was upset or responded to his request to speak to Ms. Upchurch.

41. On the morning of September 18, 2014, R.E. was transported back to Olney, Illinois for a court appearance. Ex 23 at 005996. The September 18, 2014 Shift Change Report for First Shift to Second Shift contains a note about R.E.'s medications. Ex 3, 005997.  The Shift Change reports for September 19, 2014 through September 23, 2014 do not contain any notation reflecting that any Shift Supervisor check on R.E.'s status. Ex. 3 at 0005995-006015.

42. Det. Minton testified that juvenile S.B., who was housed in the same cell with R.E., reported that R.E. was crying and upset on two different occasions. Once when he was first detained and then after he had gone to court and had not been released. Ex. 51 at 160:19-24. Minton testified that S.B.  told him Riley had an altercation with another youth named J.D. when he first admitted and again after he went to court and was not released. Ex. 51 at 161:8-10.

43. Minton testified that he talked to J.D. who minimized the altercation between them but admitted that he said something to the effect that RE was a "little man or little boy." Ex. 51 at 161:5-162:12. Minton recalled that R.E. was very little. Ex. 51 at 162:13-15.

44. Minton testified that Z.P., the kid who was housed in A1, told him that R.E. had talked to him about being afraid that he might be sent to the Department of Corrections and that R.E. was also concerned about his behavioral level. Ex. 51 at 163:1-19.

45. Behavioral Sheet for September 17 through September 19 reflects that R.E. lost paints for "positive Peer Interaction; "Followed Teacher Instruction;" "Appropriate Free Time/Movies; Appropriate Recreation/Sportsmanship. Ex. 22 at 00019. There is nothing in the comment section of the sheet to explain why R.E. lost points. *Id*.

46. Behavior Sheets for September 20 through September 22 reflect that R.E. lost points for "Positive Staff Interaction"; "Lying & Manipulating"; "Disruptive" and "Instigating Problems'; and "Appropriate Recreation/Sportsmanship. Ex. 22 at 00018. The only comments on the behavior sheet describing R.E.'s behavior are "Asking serval different staff about his free time when already told once" and "loud in pod; warned." *Id.*

**September 23, 2014**

47. Behavior Sheets for the morning of September 23, 2014, reflect that R.E. lost points for "Positive Peer Interaction"; "Inappropriate Discussions' "Refusal to Follow Staff Orders; "Excessive Talking." Ex. 22 at 00002.

48. Second shift begins at 3:00 p.m., which on a school day would be right after the kids come back in from class. Ex. 39 at 147:4-7.

49. On September 23, 2014, defendant Thomas was acting as Shift Supervisor for the 3:00 p.m. to 11:00 p.m. shift. Ex. 39 at 141:7-142:3. It was her job to see that everybody was following the rules necessary to keep the kids safe. *Id.* at 18:9-13.

50. FCJDC's policies require that youth who are not on a "Crisis/Suicide" status but are in their rooms will be checked at intervals not exceeding 15 minutes and documented through the "Watch Tour" program. Ex. 4 at pp. 005680-81. Detention officers are directed by the policy that in conducting these checks, they "must be positive that they see a living, breathing human body before verifying the juvenile's presence." *Id.* They are warned to make sure a youth is not doing anything in preparation to harm himself, such as sharpening a tooth brush.

51. Detention staff, including Defendants Thomas, Lynch, Mendoza, and Bechelli were instructed on the importance of the watch tour checks. Ex. 8; Ex. 9. On August 29, 2014, Mendoza attended a staff meeting where staff were direct to "Make sure when you are doing

watch tours that you actually look in the windows. Kids have been hanging form vent in the past …. Do not just breeze by the door or talk to youth on the other side of the hallway." Ex. 8; Ex. 38 at 26:14-28:4. Mendoza understood that the purpose of the watch tour was to determine if the kids were safe. Ex. 38 28:6-29:1. Lynch received the same instructions at a meeting on February 15, 2014. Ex. 9. Bechelli received those same instructions on February 15, 2014. Ex. 9.

52. Thomas knew that suicide is something that can happen in juvenile detention centers. Ex. 39 at 19:11-15. Before R.E.'s death, Thomas new how vitally important it was for the staff to take their jobs seriously with respect monitoring kids for their safety. *Id*. at 59:19-60:4. Thomas understood that it was her responsibility to see that counts were being done correctly. *Id*. at 68:21-24. It was Thomas' responsibility to see watch tours were called at least every 15 minutes. *Id*. 70:20-71:7. The 15 minutes is the mandatory limit for calling watch tours. *Id*. at 71:25-72:4.

53. When the Second shift began, Bechelli was assigned to the control room. *Id*. at 143:21-25. He was responsible for calling watch tours. Ex. 14 at 116-17. Carter, Lynch and Mendoza were responsible for doing the watch tours and counts. Ex. 39 at 144:11-14. There were 6 kids in the A Pod at 3:00 p.m. Video of A-Pod, Ex. 59 (will be filed under seal).

54. Video surveillance of the A-Pod shows that, according to the video clock (which is 19 minutes and 22 seconds behind), Mendoza enter A Pod and reaches the first cell at approximately 14:41:18 and finishes her count/watch tour at approximately 14:41:38. Ex. 59.

55. At approximately 3:11 p.m., Defendant Lynch entered the A Pod and allowed three other detainees to leave their cells to go to outdoor recreation. Ex. 59. R.E. remained in room confinement due to his behavioral scores.

56. Mendoza and Carter took kids outside for outdoor recreation, leaving only Bechelli and Lynch to perform watch tours. Ex. 38 at p. 66, 71.

57. Thomas testified that she was at her desk on her computer "most likely checking my emails as that was [her] first day back after being off for two days." Ex. 39 at p. 159:7-10.

58. The watch tour logs reflect that 31 minutes passed between time R.E. was observed on watch tour. Ex. 31 at pp. 5900, 5991-5993. This was in violation of policy. Ex. 11 208:6:14.

59. At 3:31 p.m. Lynch entered the A-Pod; pushed the button outside R.E.'s room, walked down to the end of the A Pod and, when walking back toward R.E.'s room, looked in the window. Ex. 59.

<u>**Sheriff's Office Investigation**</u>

60. Minton obtained R.E.'s records from the Detention Center. When asked whether it was true that "based on his investigation none of these state defendants …. knew that R.E.'s mother had committed suicide, he testified that he could not say who but "someone knew because apparently the records came– from the detention center saying that." Ex. 51 at 203:20-204:14.

61. Detective Minton testified that he learned during his investigation that information Defendant Lynch gave him about what he did when he went into pod was not true. *Id*. at 207:15-23. Minton testified the records including the control room long and watch tour electronic log reflect that the information Bechelli gave in his interview about calling a watch tour 15 minutes after the last count was not true. *Id*. 207:24-208:4.

62. Upchurch told Minton that she did not have contact with R.E. on September 23, 2014. Doc. 146-43 at p. 20. At deposition, she testified that she does not recall having contact with R.E. during the rest of his time at the Center. Ex. 52 at 69:9-20. The Medication Administration sheet reflects that Upchurch gave R.E. his medication on September 19, 20 and 23, the morning of his death. MAR, Ex. 47; Ex. 53 at 129:22-130:17.

63. In answers to interrogatories, Freeman stated that "No officer failed to comply with or

violated any detention center policies, procedures, guideline or directives with respect to care, supervision, or monitoring of R.E. on September 23, 2014." Ex. 57 at p. 7. Freeman admitted at deposition that if R.E. was not observed on watch tour for a period of 31 minutes, it was a violation of policy. Ex. 11 at 208:6-14. Freeman refused to directly answer the question as to whether his answer to Interrogatory was false , but testified that things had changed "based on the process [deposition] today." Ex. 11 at 215:14-224-19.

64. No employee, servant or agent with the FCJDC was discipline, reprimanded, terminated or required to undergo training or retraining as a result of the September 23, 20014 incident. Ex. 84 at p. 8; Ex. 11 at 216:22-2:19-4.

### The FCJDC Defendants Were Agents, Servants and/or Employees of Defendant Franklin County, Illinois

65. Franklin County holds the FCJDC out to the public as a "Franklin County Government Facility." Ex. 12 at 23:11-24:2; Ex. 55, FCJDC Website.

66. On May 26, 2006, the Franklin County Board approved the Memorandum of Understanding. Ex. 12 at 33:23- 35:11; Ex. 18B at p. 3-4. The Board minutes reflect that a Board member questioned whether the Board was "going to monitor the Juvenile Detention Center;" that "discussion followed" and that "All agreed everyone involved should be (sic) participate in the monitoring; and that "How this is accomplished is to be determined." Ex. 18B at p. 3-4.

67. Plaintiff's Statement of Material Facts from Plaintiff's Response to Defendants Franklin County, Illinois' and Randall Crocker's Motion for Summary Judgment is hereby incorporated.

### ARGUMENT

I.      **Plaintiff's Official Capacity Claims are not Barred by the Eleventh Amendment.**

Defendants contend that the official capacity claims against Abell, Freeman and Sanders

are barred by the Eleventh Amendment because all FCJDC Defendants are state employees.[1] However, Plaintiff sued Abell, Freeman and Sanders in their official (and individual) capacities as "agent[s], servant[s] and/or employee[s] of Defendant Franklin County," Doc. 157 ¶¶ 8-10, and county officials undisputedly are not entitled to Eleventh Amendment immunity. Therefore, Defendants have failed to meet their burden on summary judgment because they failed to establish a lack of genuine issue of material fact regarding whether Abell, Freeman and Sanders acted as agents of Franklin County on the issues of training, supervising and disciplining FCJDC employees, creating and enforcing policies and procedures to provide for the safety of detained minors, and overseeing the provision of healthcare at the FCJDC.

### A. Defendants Abell, Freeman and Sanders were Agents of Franklin County with Respect to the Pertinent Issues in the Case at Bar.

The fact that detention staff are labeled as judicial employees under the Probation and Probation Officers Act ("Probation Act") is not determinative for purposes of the Eleventh Amendment. 730 ILCS 110/9b(3). As the Supreme Court explained in *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997), the question cannot be answered by state law "simply labeling as a state official an official who clearly makes county policy." The question is not whether the official acts for the state or local government "in some categorical, 'all or nothing' manner," because an official can be the policymaker for the state for one type of act and the policymaker for the local government for another type of act. *Id*. Instead, the question is whether the official, under state law, is a final policymaker "for the local government in a particular area, or on a particular issue." *Id*. at 785-86.

The *McMillian* Court explained that to hold a local government liable for an official's

---

[1] The FCJDC Defendants incorrectly assert that they are all being sued in their official capacities. To the contrary, the only FCJDC Defendants sued in their official capacities are Abell, Freeman, Sanders and Thomas. Plaintiff moves to drop the official capacity claim against Thomas, but still maintains the individual capacity claim against her.

conduct, a plaintiff must establish that the official (1) had final policymaking authority "concerning the action alleged to have caused the particular constitutional or statutory violation at issue" and (2) was the policymaker for the local governing body for the purposes of the particular act. *Id*. at 785. Here, Abell, Freeman and Sanders undisputely had final policymaking authority on the issues of training, supervising and disciplining FCJDC employees, creating and enforcing policies and procedures to provide for the safety of detained minors, and overseeing the provision of healthcare at the FCJDC. Doc. 169 ¶¶ 20, 32-33, 138. Consequently, all that is left to decide is whether they represented the State or Franklin County on these issues. *McMillian*, 520 U.S. at 785-86. Because it was the latter, summary judgment should be denied.

The establishment and maintenance of a detention center in the State of Illinois is governed by the County Shelter Care and Detention Home Act ("County Detention Home Act"). 55 ILCS 75/1, *et seq*. The County Detention Home Act allows counties to "establish, support and maintain a detention home for the care and custody of delinquent minors." 55 ILCS 75/1. Similarly, Franklin County established the FCJDC to provide "safe, secure, and modern facilities for holding and detaining juveniles," Ex. 12 at 23:22-24:5, and it did so pursuant to the statutorily required procedure set out in. 55 ILCS 75/6. After first acquiring court certification of the proposition to build the FCJDC, Franklin County voters approved the proposition, which word-for-word mirrored the statute, in a 1998 referendum. Ex. 13 at 221:1-10; Ex. 20 Court Certification of FCJDC Referendum.

The County Detention Home Act mandates that counties must <u>regulate</u> detention centers in a manner consistent with the Act. 55 ILCS 75/9.2. The term "regulate" means "to control (an activity or process) especially through the implementation of rules." REGULATE, Black's Law Dictionary (10th ed. 2014). The County Detention Home Act also requires that detention centers

14

established under the Act must comply with minimum standards established by the IDJJ. 55 ILCS 75/2. These minimum standards include Section 702.20 (b)(3)(A), which requires detention center staff who have direct contact with detainees to receive a minimum of forty scheduled hours of training each year. As such, Illinois law makes abundantly clear that, because Franklin County established the FCJDC pursuant to the County Detention Home Act, it has a duty to regulate the FCJDC in a manner that complies with IDJJ minimum standards. Thus, when Abell, Freeman, and Sanders trained, supervised and disciplined FCJDC staff, they did so on behalf of Franklin County, who has the express obligation to "regulate" the detention home in a manner consistent with the County Detention Home Act and IDJJ minimum standards.

Defendants' reliance on *Villalobos v. Kinn*, 2001 WL 980552 (N.D. Ill. Aug. 21, 2001) is misplaced. In that case, the "particular issue" at hand was the probation officer's hiring abilities. *Id*. at *3. The court determined that, under the Probation Act, which probation officers represent the State, not the county, when exercising hiring policymaker authority. *Id*. at *4. Unlike *Villalobos*, however, the "particular issues" that apply here do not concern hiring, but rather training, supervising, disciplining, creating and enforcing policy and overseeing the provision of healthcare. These issues, under Illinois law and the Memorandum, which is consistent with Illinois law, are ultimately county responsibilities. As such, Abell, Freeman and Sanders represented Franklin County, not the State, with respect to the managerial and operational issues of training, supervising, disciplining, creating and enforcing policy and overseeing the provision of healthcare.

The Memorandum, which is based on and consistent with Illinois law, demonstrates that Abell, Freeman and Sanders acted on behalf of Franklin County with respect to the particular issues at hand. As for creating policy, it is shared between Franklin County and the Second

Judicial Circuit because Franklin County has the power to set FCJDC goals and objectives that must be developed into written policies and procedures. Doc. 146-1 p. 5 ¶ 15. As for training, Franklin County has the final say in deciding the extent to which FCJDC staff are trained. This follows from the fact that Franklin County has the sole discretion in determining how much appropriate for training. Ex. 13 at 194:4-195:8, 197:6-200:4, 201:19-203:19, 290:10-24. The money Franklin County uses to fund training comes from the income Franklin County receives from other counties who pay Franklin County to house their juveniles. Ex. 13 at 181:11-182:12. Nobody reimburses Franklin County for training costs. *Id*. at 180:22-24.

Additionally, overseeing the provision of healthcare is a responsibility exercised solely on behalf of Franklin County because it is Franklin County's obligation to "hire individuals and or contract independently for necessary support services staff for the efficient operation of the Center." Doc. 146-1 p. 3 ¶ 6. Consistent with this obligation, Crocker and Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the FCJDC, Ex. 13 at 294:20-295:19; Ex. 27 at Healthcare Agreement, and Freeman signed amendments to the agreement on behalf of Franklin County. Ex. 13 at 295:23-298:12. Also, as with training, income Franklin County receives from other counties is used to pay for medical expenses. *Id*. at 183:25-184:23. It is thus clear that Abell, Freeman and Sanders represented Franklin County, not the State, with respect to issues of training, supervising, disciplining, creating and enforcing policy and overseeing the provision of healthcare.

**II.** **Defendants Mendoza, Lynch, Bechelli, Thomas and Upchurch Are Not Entitled to Summary Judgment Because a Reasonable Jury Could Find R.E. Was Housed in Conditions That Posed a Substantial Risk of Serious Harm and Defendants Were Deliberately Indifferent to R.E.'s Risk of Self-Harm and Suicide.**

At the outset, Defendants' Motion for Summary Judgment must be denied because they

have failed to meet their burden as movant, which requires that they establish the "non-existence of any genuine issue of material fact entitling them to summary judgment." Fed.R.Civ.P. 56(c). Viewed in the light most favorable to the non-movant, the motion must be denied. [2]

A.       **R.E. Had a Right to Be Protected Against Substantial Risk of Serious Harm.**

In its prohibition against "cruel and unusual punishments," the Eighth Amendment imposes a duty on prison officials to ensure inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Sanville v McCaughtry,* 266 F.3d 724, 733 (7th Cir. 2001). The protections granted to pre-trial detainees under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to prisoners." *Washington v. LaPort County Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002); *Hall v. Ryan*, 957 F.2d 402 (7th Cir. 1992). To date, the Seventh Circuit has generally found the Eighth and Fourteenth Amended analysis to be identical in cases involving in-custody suicide. *Estate of Miller, ex rel Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012).

Defendants devote much effort arguing that the Supreme Court's decision in *Kinglsey v. Hendrickson*, 135 S.Ct. 2466, 2473-76 (2015) "does not alter that summary judgment is warranted." The Seventh Circuit's opinion in *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017), however, strongly suggests otherwise. In *Mulvania*, the court, recognizing the distinction between the Eighth and Fourteenth Amendments – that is that a pre-trial detainee cannot be punished at all – applied *Kingsley* in a conditions of confinement case**.**

In this case, a twelve-year old juvenile and pretrial detainee, was on "room confinement"

---

[2] Defendant attempts to present the record in the light most favorable to them. such as where Defendants conspicuously omit Det. Minton's testimony that his post-interview investigation revealed that Defendants Lynch and Bechelli provided untrue information in their interviews. Ex. 51 at 207-08.

when he used a sheet and non-suicide resident handrail to hang himself. Ex. 17 at 105:16-18. Room confinement has been used in juvenile detention facilities as a behavioral sanction. *Id*. at 105:12-15. It is common knowledge in the juvenile justice community, and well detailed in various suicide prevention training curricula and national juvenile detention standards, that room confinement is closely associated with a greatly increased risk of suicide. Doc. 146-22, p. 26. In an article cited by Mr. Hayes' report, a mental health clinician put it this way: "When placed in a cold and empty room by themselves suicidal youth have little to focus on – except all of their reasons for being depressed and the various ways they can attempt to kill themselves." *Id*. at p. 27. Under the facts of this case, the greatly increased risk of suicide must have been obvious to the Defendants, when they inflicted punishment by placing him on room confinement.  Plaintiff believes that the Fourteenth Amendment objective standard should be applied in determining whether Defendants were deliberately indifferent to R.E.'s substantial risk of harm. As, the Seventh Circuit has not resolved the issue, Plaintiff's argument will follow the analysis currently used by the Seventh Circuit in cases of deliberate indifference to a risk of self-harm and suicide.

**B.      R.E. Was Housed in Conditions That Posed a Substantial Risk of Serious Harm.**

Detained juveniles have a higher concentration of mental illness, behavioral disorders, impulsivity and ADHD than the general juvenile population; for this reason, they are at a higher risk of suicide. Ex. 17 at 184:5-185:1. FCJDC policy recognizes the risk posed to the juvenile detainees housed in its facility, and has a written policy mandating that all juveniles are to be seen as posing some risk of suicide. Ex. 1 at 005531. The same policy requires that juveniles be classified upon intake as "low, medium or high risk" and that their suicide risk level be documented in the detention files. *Id*. The stated purpose of the written policy is to determine the most suitable housing and level of supervision for a particular detainee. *Id*.

In practice, however, FCJDC officers, with Defendant Freeman's knowledge and approval, flagrantly ignored this classification policy. Ex. 11 at 111:2-114:24. FCJDC written policy required that juveniles classified as medium or high-risk, were not to be isolated during waking hours; they are specifically to be included in all activities, including recreation time, with the staff to pay heightened awareness to the at-risk juvenile's interactions, mood and general state. Manual at 15.15. Defendant Freeman claims FCJDC officers followed this policy. Ex. 11 at 120:15-121:1. Freeman testified that the risk classification policy yields to the behavioral policy that allows only certain juveniles to attend recreation time. Ex. 11 at 123:8-124:20. Essentially, it was the practice of the FCJDC staff to isolate juveniles whose behavior did not meet the requirements for recreation as a form of punishment.

In an apparent attempt to cure the obvious risks inherent in leaving a child isolated and unobserved in a concrete room, FCJDC had a policy that watch tours be conducted at intervals of no more than 15 minutes. Ex. 4 at 005628; Ex. 15 at 63:4-64:10. In order to properly complete a watch tour, the FCJDC officer must look through the window in the cell door, observe the youth, ensure that they are presently safe and not doing anything that could lead to their harm. Abell 67:2-10. The officer must not rush the watch tour; if the juvenile has their head covered, the officer must make them uncover it, to ensure they are safe. Ex. 15 at 67:16-21. After observing a youth safely meets these requirements, the FCJDC officer presses a button located outside the cell "testifying" the juvenile is safe. Ex. 15 at 67:11-15.

Defendants admit there were an alarming number of suicide attempts at the FCJDC, including 21 attempts in the eight months before R.E.'s death. Doc. 146 at ¶ 54. Although staff were warned that "we have found kids hanging," and that watch tours were the "Number 1 priority," many, if not most, of the detention officers persistently violated this policy, despite the

19

fact that they knew they could be viewed on video surveillance and that their performance was being recorded. Ex. 11 at 159:26-23; Ex. 15 at 77:19-78:4; Ex. 5, 7, 8, 9 ,10, 48; Ex. 39 at 76:18-77:9, 95:7-96:23 and 98:9-15.

R.E. had a documented history of mental illness and past history of suicidal ideation. Ex. 46. Proper classification under the written policy would have classified him to be, at least, medium risk. Ex. 1 at 005530. He was taking psychotropic medications for ADHD and was upset during intake and had policy been followed, he would have been referred to a mental health professional for further evaluation. Ex. 21 at 006969-006971. Instead, R.E. was put in "general population."

On September 23, 2014, R.E. was assigned to A pod, which has eight cells, two of which are equipped with a sink-toilet combination with a handrail. Ex. 26 ¶¶ 6 and 8. Although R.E. was not physically handicapped, he was placed in one of these cells – Cell A2. Ex. 17 at 108:4-12.The handrail in A2 posed an obvious risk of harm given its potential for use in a suicide attempt. *Id*. and Ex. 26 ¶ 11. Another detainee had previously used the handrail in cell A-2 in an attempt to hang herself using a sheet. Doc. 169 at ¶ 71; Ex. 17 at 197:15-21. The FCJDC has a capacity for 32 juveniles. Ex. 39 at 49:4-6. Throughout R.E.'s detention, the FCJDC was never at full capacity. Ex. 23. R.E. was also provided with a bedsheet. From the date of his admission until the day of his death, R.E. was on room confinement due to behavioral demerits he received pursuant to FCJDC policy. Ex. 17 at 137:5-138:19; Ex. 22; Ex. 39 at 124:14-132:25.

    **C.**    **Defendants Mendoza, Lynch, Bechelli, and Thomas Recklessly Disregarded, with "Something Approaching Total Unconcern," What They Knew Was a Substantial Risk that R.E. Might Harm Himself or Commit Suicide.**

The deliberate indifference standard reflects "a mental state somewhere between the culpability poles of negligence and purpose and is thus properly equated with reckless disregard"

and requires a showing of "more than mere or gross negligence, but less than purposeful or knowing infliction of harm" and "something approaching a total unconcern for [the detainee's] welfare in the face of serious risk"). *Farmer*, 511 U.S. at 835.

As the Seventh Circuit has aptly stated "a simple statement of this principle" does not automatically resolve every fact-bound situation and each case must be decided on its own facts. *Pittman ex rel. Hamilton v. County of Madison, Ill*., 746 F.3d 766, 777 (7th Cir. 2014). Thus, the Supreme Court and the Seventh Circuit have recognized that "[w]hether a prison official had the requisite knowledge of a substantial risk **is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence**." *Farmer,* 511 U.S. at 842 (emphasis added); *Sanville*, 266 F.3d at 737 (quoting *Farmer*). One way a fact-finder may conclude that a prison official knew of a substantial risk "is from the very fact that the risk was obvious."[3] *Farmer*, 511 U.S. at 842. As the Supreme Court explained:

> For example, where a plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-document, or expressly noted by prison officials in the past, and the **circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known" about it, then such evidence would be sufficient to permit the trier of fact to find that the defendant official had actual knowledge of the risk**."

*Id*. at 843. (emphasis added).

Consistent with this scheme, a "prison official cannot escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to" be the specific person to suffer the constitutional violation. *Id*. Again, the Supreme Court clarifies:

> The question under the Eighth Amendment is whether prison officials, acting with

---

[3] *Farmer* in no way requires that a risk be "obvious" in order to find that a defendant was deliberately indifferent. The obviousness of the risk is one way of establishing subjective knowledge when a defendant denies that he or she was cognizant of the risk.

deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and *it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.*

…

*Id.* (internal citations omitted) (emphasis added).

The Seventh Circuit has consistently followed *Farmer's* mandate that a defendant "cannot escape liability under the Eighth Amendment if the evidence showed "that he merely refused to verify underlying facts that he strongly suspects to be true, or declined to confirm inferences of risk he strongly suspected to exists." *Farmer,* 511 U.S. at FN 8; *Tobiasz*, 680 F.3d at 984; *Hill v. Richards*, 525 F.Supp. 2d 1076 ("although ignorance is an absolute defense, plaintiff has the opportunity to prove that defendant's ignorance is feigned, as in any other case in which a defendant's mental state is at issue"); *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) (*reversed on other grounds*) ("going out of your way to avoid acquiring unwelcomed knowledge is a species of intent.*"); and *Mombourquette v. Amundson*, 469 F.Supp. 2d 624, 645 (W.D. Wis. 2007) ("The Constitution does not reward those who play ostrich.")).

On September 23, 2014, R.E. was on room confinement and left alone and unsupervised in cell A2 while other children were taken to outdoor recreation. Ex. 59. Defendants Mendoza, Lynch, Bechelli, were the detention officers charged with responsibility of conducting watch tours in order to protect R.E. and other detainees who were confined in their cells from self-harm. Ex. 39 at 141:7-17. Defendant Thomas was the shift supervisor. *Id*. The shift started at 3:00 p.m. *Id*. at 145:19-24, 147:4-7. Thirty-one minutes later, R.E. was discovered hanging in his cell. *Id*. at 155:19-25.

Here, a reasonable jury could find that each Defendant[4] acted with deliberate indifference

---

[4] Plaintiff acknowledges that there is insufficient evidence in the record from which a jury could find that Defendant Stewart was deliberately indifferent to R.E.'s rights and moves to dismiss

to R.E.'s health and safety and, specifically to his risk of suicide in that Defendants were exposed to and knew of a "longstanding, pervasive," substantial risk of self-harm and suicide to detainees of the FCJDC who, like R.E., are left alone and unsupervised in their cells. Doc. 146 at ¶ 54; Doc. 169 at ¶¶29-30; Ex. 1 at 005530-34, Ex. 14 at 73:1-16; Ex. 11 at 159:26-23; Ex. 15 at 77:19-78:4; Ex. 5, 7, 8, 9 ,10, 48; Ex. 39 at 76:18-77:9, 95:7-96:23 and 98:9-15.

Less than one month before R.E.'s death, Defendant Mendoza (who had also recently undergone the new employee training), attended a staff meeting where FCJDC officers were directly warned of the particular risk of detainee self-harm and the attendant importance of properly conducting watch tours. Ex. 8 and 9, Ex. 38 at 26:14-27:2. This is incontrovertible evidence of Defendant Mendoza's awareness of the substantial risk of self-ham. Yet, despite this knowledge, Mendoza completed the eight-cell watch tour – observing R.E. and the other juveniles and testifying that each of them was safe – in approximately twenty seconds. Ex. 59. Mendoza claims she observed that R.E. was not in distress, yet 31 minutes later R.E. was dead from suicide. Ex. 39 at 155:19-25. A jury could reasonably disbelieve Mendoza.

Defendants Lynch and Bechelli were more experienced officers and had more personal experience encountering juveniles who had attempted suicide. Ex. 29, Ex. 14 at 134:9-11, Ex. 44 at 56:16-21. However, despite being two years into his job at the FCJDC, Lynch still had not received the basic orientation training. Ex. 44 at 55:10-57:2. Their tenure at the FCJDC led them to be acutely aware of the suicide risk posed by juveniles isolated in detention. Ex. 1 at 005530-34 and Doc. 169 at ¶¶29-30. As an example, Defendant Bechelli admitted the obvious:

> Q. Do you recall that the Franklin County Juvenile Detention Center policies set forth specifically that all youth are considered to be at some risk for suicide?
> **A. Yes.**
> Q. Okay. And you understand from working in the detention environment that youth who are put in rooms by themselves, who are away from home, who have problems going on

him.

obviously with the court system or they wouldn't be there, can be at risk for suicide because of all these factors that are stressing the child out essentially; right?

**A. Yes.**

Q. All right. You knew that back in 2014 when you were employed as an officer; correct?

**A. Yes.**

Ex. 14 at 73:1-16.

Both officers attended staff meetings seven months prior to R.E.'s death where the importance of watch tours was stressed. Ex. 7. Bechelli had previously been warned that his prior safety violations were placing juveniles at risk for harm. Ex. 34; Ex. 14 at 57-59; Ex. 11 at 177-78.

On September 24, 2014, at 3:00 pm, Mendoza conducted her "watch tour," meaning the next tour was required no later than 3:15 pm. Policy required the control room officer, Bechelli, to call the timely watch tour every fifteen minutes. Ex. 39 at 70:9-19. He cannot recall why he did not timely call the watch tour, but he believed that being on the phone was an appropriate excuse to call a late watch tour. Ex. 14 at 38:3-39:22, and 123:1-6. Around 3:14 pm, Lynch entered A pod to remove the other juveniles for rec time. Ex. 44 at 103:9-11. R.E. was left isolated in his cell at the time. Ex. 44 at 117:3-4.  The watch tour that was due to be completed no later than 3:15 p.m. did not happen because Bechelli failed to call it and Lynch was "doing laundry" at the time, to his memory. Ex. 44 at 100:12-18. Both Lynch and Bechelli knew R.E. was isolated in his cell while the other juveniles enjoyed rec time yet did not conduct the next watch tour until 3:31 pm. Ex. 14 at 114:11-115:17. It was at some point during this 31-minute interval that R.E. removed his bed sheet, fastened it into a noose, looped it through the handrail in his cell, tied it around his neck and hung himself.  Ex. 26 at ¶¶ 22-23.

Defendant Thomas "checking emails" at the time her subordinates were violating the watch tour policy, despite her knowledge that staff available to conduct a watch tour was limited due to two officers being outside for rec time. Ex. 39 at 159:5-10. Much like Defendants Abell

and Freeman, Thomas testified the "watch tour" Mendoza conducted prior to R.E.'s death was proper. Ex. 39 at 154:16-20. Incredibly, Thomas disclaimed awareness of the widespread pattern of juvenile attempted suicide at the FCJDC, though she admitted to finding a juvenile trying to hang themselves in the shower in the A pod. Ex. 39 at 52:25-55:9. A reasonable jury has more than sufficient evidence to find Thomas "must have known" of the "longstanding, pervasive" pattern of FCJDC juveniles attempting suicide at least every two weeks in the years preceding R.E.'s death. Doc. 146 at ¶ 54.

The jury could infer that Defendants Mendoza, Lynch and Thomas, like Bechelli, were subjectively aware of the substantial risk of harm to detainees who were confined in their room, as R.E. was, because that risk was obvious. After all, the written policy said as much and was confirmed by the shocking and consistent pattern of juveniles attempting suicide. The jury could also find these Defendants knew policy required that R.E., like all detainees, was to be treated as having some risk of suicide, that twelve-year-old R.E was at a substantially greater risk due to the fact that he was alone and isolated in a cell and prohibited from engaging in outdoor recreation with the other kids; that they knew if left unobserved there was a substantial *risk that he may* harm himself, and that performing careful and timely watch tours was critical in preventing R.E. from suffering from self-harm and suicide.

All of the Defendants admit to being specifically warned of the risk detainees hanging themselves in their cells. The total disregard of such a serious risk of harm is shocking. However, as Dr. Kress has opined, it was a part of the "culture of the FCJDC." The fac that Defendants did not intend harm is irrelevant to the analysis. *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

**D.      Defendant Upchurch Was Deliberately Indifferent to R.E.'s Serious Medical Need and Substantial Risk of Self-Harm.**

As the Shift Supervisor who had a duty to approve Richland County's request that R.E. be re-admitted to the FCJDC on September 17, 2014, Defendant Upchurch was in a different position than the other Defendants. Ex. 21. *See Sanville*, 266 F.3d at 734 (risk of suicide can be framed in particularized fashion for different defendants and the need for mental health treatment may be characterized as a "serious medical need."). Upchurch had admitted R.E. four months prior to undergo a Court-ordered psychiatric exam. Ex. 20, Ex. 52 at 53:3-6. She knew and understood the policies and their purposes and violated nearly every one of them. Ex. 21; Ex. 52 at 8:14-24 and 11:18-12:7.

Upchurch was not only "exposed to information" about R.E.'s suicide risk, but undeniably *knew* he was taking psychotropic medications and had "some sort of court ordered [mental health] treatment." Despite that knowledge, she did not obtain information regarding R.E.'s mental health history from the probation officer,[5] R.E.'s parents or from records readily available to her. Despite her knowledge that she was required to refer R.E. to a mental health professional, she did not even bother to complete the part of the health screening form designed to document the need for a detainee to be referred to a mental health professional. Egregiously, although staff reported that R.E., a twelve-year-old child, was upset after he was moved to a cell, Upchurch did not respond to R.E.'s request to speak with her of see that anyone else do so.

[5] In their brief, Defendants state that Probation Officer "Brown testified that she did not consider R.E. to be at risk for suicide when he was sent to the Center on September 17, 2014, and had she been asked whether R.E. was a suicide risk at that time, she would have said he was not a suicide risk." Doc. 146 at ¶ 7.  Brown, took a phone call regarding R.E.'s arrest at 2:00 am on the date of R.E.'s arrest and there no evidence that she even saw R.E. that morning. There is no evidence that she has qualifications to offer an opinion as to whether a child is suicidal. Further, Brown testified that it was FCJDC shift supervisor's job, not hers to screen R.E. for suicide; that she knew R.E. had been struggling recently; knew he had a history of mental illness, and that if she had been asked, she would have told FCJDC staff everything she knew.

On the day after R.E.'s death, Upchurch was interviewed by the detective who was conducting a criminal investigation. Doc. 146-43. She told Det. Minton that she had worked the 7:00 am to 3:00 p.m. shift on the date R.E. died, but that she had no contact with R.E. that day. Ex. 52 at 69:9-20. However, the evidence in this case reflects that Defendant Upchurch initialed a Medication Administration Sheet to confirm that she gave R.E.'s his medication on September 19, 22, and September 23, the date of his death. MAR, Ex. 47. It is for the jury to consider whether the evidence establishes that Upchurch did see R.E. on the date of his death; whether they believe R.E. was in distress that morning; whether Upchurch knew that there was a substantial risk that R.E. might take his own life that day; or whether she turned a blind eye to the risk to that risk. *See Adickes*, 398 U.S. at 176.

### E.    The Defendants are not entitled to Qualified Immunity.

Qualified immunity turns on the "objective legal reasonableness" of the actions taken by the defendants. *Hall v. Ryan*, 957 F.2d at 404.   A the summary judgment stage, a defendant cannot prevail if a plaintiff can present a version of the facts that is supported by the evidence and under which a defendant would not be entitled to qualified immunity. *Id.* (citing *Findlay v. Lendermon,* 722 F.3d 895, 899 (7th Cir. 2015)).  Qualified immunity is meant to protect public servants from liability for **reasonable mistakes** made while performing their public duties; the immunity does not extend to the plainly incompetent or those who knowingly violate the law. *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018).  Instead, it attaches when an official's conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Id*. In *Hall v. Ryan* the court explained:

> Applying the willful neglect standard[6] to case involving prisoners in need of psychological care was deemed clearly established, not simply because of a right

---

[6] The Court in *Hall* recognized: although the *Joseph* court applied a 'willful neglect' standard, the law current law requires that a defendant be "deliberately indifferent" to a risk of harm.

to medical care but also because of the principle that: ***prison officials are not entitled to an objective good faith defense * * * if they are aware of a risk of injury to an inmate and nevertheless fail to take appropriate steps to protect the inmate from that known danger.***

*Hall* at 405 (quoting *Joseph v. Brierton*, 739F.2d 1244, 1250 (7th Cir. 1984)).

Here, in a carefully worded one sentence argument, Defendants' contend that the Constitutional right in question in this case was not clearly established in 2014. According to Defendants, in *Miller v. Harbough*, the Seventh Circuit held that "no clear law exited in 2014 to impose upon them a duty to protect R.E. from suicide in the absence of evidence that they *knew his suicide was imminent*." As discussed above, Defendants misstate the holding in *Miller*. If Defendants contend, as they appear to do, that they are entitled to qualified immunity unless Plaintiff can prove that they actually predicted R.E.'s suicide, they are laboring under a profound misunderstanding of the law.

The law does not require that a defendant hold a crystal ball and predict suicide, but does require that defendants act reasonably to prevent self-harm and suicide when they are cognizant of a substantial ***risk*** of serious harm. In *Collins v. Seeman*, a case relied on by Defendants to support their motion, the Court interpreted the subjective knowledge requirement as requiring that a defendant be "cognizant of the significant likelihood that an inmate ***may*** imminently seek to take his own life," not that they knew an inmate ***would*** take his own life. Collins, 462 F.3d at 761. The right Plaintiff asserts on behalf of R.E. is the right to be free for deliberate indifference to suicide. There is simply no doubt that this right was clearly established well before 2014. *See Cavalari*, 321 F.3d at 623 (citing Hall v. Ryan, 957 F.2d 402, 406 (7th Cir. 1992)).

The burden on summary judgment is not, as Defendants appear to think, to recite their repeated denials of the subjective risk of harm. *See Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014) (holding that the court cannot resolve disputed issues of fact when it addresses the

question of whether a defendant violated a protected right at the summary judgment stage because the ordinary rules governing summary judgment apply in that situation.); *Hall*, 957 F.2d at 406  (affirming denial of summary judgment on qualified immunity grounds and holding that the allegations of the plaintiff's amended complaint, the deposition  and pre-existing law, considered together, nullified he defense of qualified immunity.)

> **F.     Defendants Misconstrue and Misapply Supreme Court and Seventh Circuit Law.**

Defendants close their section on deliberate indifference by claiming "Alleged negligence – even gross negligence *or recklessness* – is not sufficient to establish deliberate indifference" and quote *Estelle v. Gamble* at pp. 105-06. Doc. 146 at p. 27 (emphasis added). There are two serious mistakes with this claim, which permeate Defendants' analysis of the cases on which they rely. First, nowhere in *Estelle* does the Supreme Court state, or even suggest, that recklessness is not sufficient to establish deliberate indifference. Second, even if some analysis could plausibly read *Estelle* for that proposition, that proposition is resoundingly rejected by the Supreme Court fifteen years later in *Farmer*, where the Supreme Court repeatedly emphasizes "deliberate indifference … is the equivalent of recklessly disregarding that risk," *Farmer* at 836, "to act recklessly … a person must "consciously disregar[d] a substantial risk of serious harm," *Farmer* at 839, "**subjective recklessness** as used in the criminal law … is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and **we adopt it as the test for "deliberate indifference" under the Eighth Amendment**," *Farmer* at 839-40 (emphasis added). Defendants' misrepresentation on the fundamental test of deliberate indifference – a misrepresentation that is plainly and resoundingly repudiated in the seminal Supreme Court case on the subject – is troubling, to say the least.

Defendants' reliance on four Seventh Circuit cases suffers from the same flawed

characterization of the deliberate indifference standard. Defendants rely primarily on *Miller v. Harbough*, 698 F.3d 956 (7th Cir. 2012), out of which Defendants attempt to tease the principle that it is <u>only</u> actual knowledge that a detainee was "on the verge of" (i.e. would) commit suicide that may give rise to § 1983 liability. [7] Defendants' interpretation has been expressly rejected by the Seventh Circuit Committee on Pattern Jury Instructions. Seventh Circuit Pattern Jury Instruction Committee Comment D specifically rejects the interpretation the *Miller* found an "imminent risk of suicide" requirement and declined to incorporate such a temporal standard into the pattern jury instruction for failure to protect from self-harm under the Eighth and Fourteenth Amendments.

Regardless of whether Plaintiff here must show that Defendants subjectively knew that R.E. "*might* imminently" take his own life, Defendants contention that  the standard is "on the verge of suicide," a term which Defendants do not define, is flatly wrong. Furthermore, Defendants do not explain how or why R.E. was, not "on the verge of suicide" 31 minutes before he was found hanging his cell, or offer any argument as to why a child who hangs himself on the sixth day of detention forfeits his constitutional right to be protected from a risk of harm.

Defendants next rely on *Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010) for the proposition that a defendant is not required to "probe[] more deeply." First, Defendant Upchurch did not have to "probe" to obtain additional information – she needed only to pick up the telephone or pull FCJDC's file containing information about his additional risk. The jury's ability to infer from the ample evidence of this substantial risk displaces Defendants' misplaced

---

[7] The *Harbough* court used the term "on the verge of suicide" in discussing the Court's holding in *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003). In *Cavalieri*, the District Court held that an issue of fact existed as to whether an officer was aware that a detainee was "on the verge of trying to commit suicide." This was apparently the reason that the Seventh Circuit, in affirming denial of qualified immunity, framed the question as "[w]hether Shepard was aware that [the detainee] was on the verge of committing suicide. *Id.* at 620.

reliance on *Minix*. For the same reasons, Defendants' citation to *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003) is inapposite. For the additional reason that, as Defendants admit, the *undisputed facts* in *Matos* established a lack of evidence from which a jury could infer the defendants were aware of substantial risk of serious harm.

Lastly, Defendants cite *Collins v. Seeman*, 462 F.3d 757, 759 (7th Cr. 2006), and argue that the Seventh Circuit affirmed that a guard could rely on the prisoner's self-assessment and did not disregard a risk of suicide. The *Collins* court did not make such a broad pronouncement as the defendants claim. In *Collins*, the only thing initially suggesting that an inmate at risk was a statement from the inmate that he was "feeling suicidal." The guard took action immediately, and called for a crisis counsel. When the inmate told the guard that "he was all right and could wait until counselor arrive," the court held that liability not be imposed simply because the officer left the inmate alone for 15 minutes after that.

There are multiple distinctions from the case at bar. First, R.E. had a documented history of mental illness and suicidal ideation, and other risk factors including his mother's death by suicide, which Defendants either actually knew about or turned a blind-eye to. In cases where an inmate has already demonstrate a tendency to harm himself, courts, including the Seventh Circuit have held that a genuine dispute remains whether the defendants were aware of a risk of serious harm, even when the inmate denies feeling of suicide." See *Cavalieri*, 321 F.3d at 619-20 (inmates's statement that he was "doing fine" not dispositive when inmate had made earlier statement that the was going to kill himself); *Wever v. Lincoln Cnt'y, Neb*., 388 F.3d 601 (8th Cir. 2004) (jury question on deliberate indifference despite inmates promise not to commit suicide when had recently threatened suicide); *Robey v. Chester Cnt'y,* 947 F.Supp. 333, 337-38 (E.D. Pa. 1996) (denial of suicidal intentions not dispositive when inmate had diagnoses of

depression and past history of suicide attempt).  Other pertinent distinguishing facts in this case:
(1) unlike the guard in *Collins*, Upchurch had a duty to screen R.E. for suicide risk and classify
his risk level; (2) FCJDC staff did not refer R.E. to a mental health professional as required by
their own policies; and (3) ***R.E. was not just left alone for 15 minutes; he was left alone and
unsupervised under conditions that obviously posed a substantial risk of self-harm and suicide
for 31 minutes – more than twice the amount of time that he should have been observed
according to policy.***

**III.     Defendants Abell, Freeman and Sanders Are Not Entitled to Summary Judgment
          Because the Claims Against Them Are Not Based on a Theory of *Respondeat
          Superior*, but Instead Based on Their Liability as Supervisors under 42 U.S.C. §
          1983.**

In its argument in favor of summary judgment with regard to Plaintiff's claims against
Defendants Abell, Freeman and Sanders, Defendants mistakenly argue that Plaintiff's § 1983
claims are based on a *respondeat superior* theory.  Plaintiff is instead bringing her claims based
on supervisory liability for condoning and facilitating the conduct of their subordinates. It is
well-settled that a defendant in a supervisory role can be liable for constitutional violations under
42 U.S.C. § 1983 in the absence of personal interaction with the victim. *Sanville v. McCaughtry*,
266 F.3d 724, 740 (7th Cir. 2001). A supervisory defendant may be held liable for violation of
constitutional rights if their personal involvement is such that they are aware of "unconstitutional
conduct and facilitate it, approve it, condone it or turn a blind eye for fear of what they might
see." *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010).

Defendants state no facts and make no argument as to their entitlement to summary
judgment and have clearly failed to meet their burden as movant. However, Plaintiff incorporates
the allegations in her Second Amended Complaint and Statement of Material facts in response to
any implied argument that Defendants' contend to make.

**IV.     Neither State Sovereign Immunity nor Tort Immunity Bar Plaintiff's Wrongful Death Claim.**

Defendants argue that Plaintiff's wrongful death claim is barred by the State Lawsuit Immunity Act, 745 ILCS 5/1, and the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"). 745 ILCS 10/2-202, 10/2-204, and 10/4-103. Not so. With respect to state-law sovereign immunity, it is first important to note that it is distinct from Eleventh Amendment immunity and requires a different analysis. *Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016). There is only one main difference that matters here, however, and it is that "[i]f the plaintiff alleges that state officials or employees violated statutory or constitutional law, sovereign immunity affords no protection." *Murphy*, 844 F.3d at 658-59. Such was the case in *Murphy*, where the plaintiff brought an aggravated battery claim under Illinois law and a 42 U.S.C. § 1983 claim alleging a violation of the Eighth Amendment. *Id.* at 655 ("The Illinois doctrine of sovereign immunity does not apply to state-law claims against a state official or employee who has violated statutory or constitutional law."). As the Illinois Supreme Court has explained, the "exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Leetaru v. Bd. of Trs. of Univ. of Ill.*, 32 N.E.3d 583, 596 (Ill. 2015). Accordingly, Plaintiff's Wrongful Death Act claim is not barred by state-law sovereign immunity because she has also alleged that each Defendant violated the Eighth and Fourteenth Amendments to the U.S. Constitution.

Defendants are also wrong to assert that tort immunity bars Plaintiff's claim. Defendant's argument that 745 ILCS 10/2-202 and 10/2-204 bar Plaintiff's claim can be disposed of quite easily. 745 ILCS 10/2-202 provides that a public employee is not liable for his "act or omission" unless it constitutes "willful and wanton conduct." 745 ILCS 10/2-204 provides that a public

33

employee "is not liable for an injury caused by the act or omission of another person." Here, however, as Plaintiff demonstrated in the preceding sections, each and every FCJDC Defendant acted and failed to act in a manner amounting to deliberate indifference. As such, they cannot claim tort immunity because each of their actions and inactions that caused R.E.'s injuries constituted willful and wanton conduct. *See* 745 ILCS 10/1-210 (conduct is "willful and wanton" if it shows a "conscious disregard for the safety of others"). 745 ILCS 10/2-202 and 10/2-204 therefore do not bar Plaintiff's wrongful death claim.

Additionally, Defendants are not entitled to immunity under 745 ILCS 10/4-103, which provides that "[n]either a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein." Plaintiff seeks redress, however, not for a "failure to provide sufficient equipment, personnel, supervision or facilities," but for R.E.'s death, which was caused by such failures. "Section 4–103 provides immunity for claims about substandard correctional facilities per se, **not** claims for **injuries** those substandard conditions may cause." *Awalt v. Marketti*, 74 F.Supp.3d 909, 942 (N.D. Ill. 2014) (emphasis added). This fact is evidenced by other provisions in the Tort Immunity Act, which tellingly and explicitly specify that the immunity provided therein is for **injuries** caused by the action or inaction. *See, e.g.,* 745 ILCS 10/6-105 (immunity provided for injuries caused by failure to make a physical or mental examination); 745 ILCS 10/4-105 (immunity provided for injuries caused by failure to provide medical care, unless the conduct was willful and wanton). Thus, 745 ILCS 10/4-103 does not serve to provide immunity to the FCJDC Defendants, let alone any of the Defendants in this case.

The Court should deny Defendants' Motion for Summary Judgment.

Groves | Powers, LLC


　　/s/ Linda C. Powers　　
Linda C. Powers, #6271689
Steven L. Groves, #6211737
Emery A. Reusch, #6313809
One U.S. Bank Plaza
505 North 7th Street, Suite 2010
St. Louis, Missouri 63101
t: 314.696.2300 | f: 314.696.2304
lpowers@grovespowers.com
sgroves@grovespowers.com
ereusch@grovespowers.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served upon the following parties by operation of the Court's CM/ECF filing system on this 17th day of July, 2018:

Office of the Attorney General, State of Illinois

R. Douglas Rees
100 West Randolph Street, 12th Floor
Chicago, IL 60601
<u>rrees@atg.state.il.us</u>

*Attorneys for Defendants Michael Abell,*
*Shawn Freeman, Diane Sanders, Samantha Thomas,*
*Daniel Lynch, Alicia Mendoza and Anthony Bechelli*

Heyl, Royster, Voelker & Allen

Douglas R. Heise
Mark Twain Plaza III, Suite 100
105 E. Vandalia Street
Edwardsville, IL 62025
<u>dheise@heylroyster.com</u>

*Attorneys for Defendants CHC Companies, Inc., Correct Care*
*Solutions, LLC, Lori Little, and Vipin Shah, M.D.*

Bleyer and Bleyer

Joseph A. Bleyer
601 West Jackson Street
Marion, IL 629590487
<u>jableyer@bleyerlaw.com</u>

*Attorneys for Defendants Franklin County, Illinois*
*and Randall Crocker*

                                                    */s/ Linda C. Powers*
                                          Linda C. Powers