**EXHIBIT 9**

**In The Matter Of:**

*Mary McKinney v.*
*Franklin County, Illinois, et al.*

---

*Lindsay M. Hayes*
*August 4, 2017*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*

O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS

Original File Lindsay Hayes 8-4-17.txt
Min-U-Script® with Word Index

VOLUME: I
PAGES: 1-209
EXHIBITS: 1-7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
LAW NO.: 3:15-cv-01044-SMY-PMF

MARY MCKINNEY, as Administrator for the Estate of R.E., Deceased,

Plaintiff,

vs.

FRANKLIN COUNTY, ILLINOIS; RANDALL CROCKER; MICHAEL ABELL; SHAWN FREEMAN; DIANE SANDERS; SAMANTHA THOMAS; DANIEL LYNCH; ALICIA MENDOZA; ANTHONY BECHELL; CHC COMPANIES, INC., a/k/a CORRECTIONAL HEALTHCARE COMPANIES, INC.; CORRECT CARE SOLUTIONS, LLC; LORI LITTLE; and VIPIN SHAH, M.D.,

Defendants.



DEPOSITION OF LINDSAY M. HAYES, a witness called on behalf of the Plaintiff in the above-entitled cause, taken before Dawn Mack-Boaden, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, pursuant to the Federal Rules of Civil Procedure, at the Offices of O'Brien & Levine Court Reporting, 195 State Street, 5th Floor, Boston, Massachusetts, on Friday, August 4, 2017, commencing at 9:00 a.m.



APPEARANCES

Douglas R. Heise, Esquire
HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Mark Twain Plaza III
105 West Vandalia Street, Suite 100
Edwardsville, Illinois 62025
(618) 656-4646
Counsel on behalf of Defendants Lori Little; Vipin Shah, M.D.; Correctional Healthcare Companies, Inc., and Correct Care Solutions, LLC

Steven L. Groves, Esquire
GROVES POWERS, LLC
One U.S. Bank Plaza
505 North 7th Street
Suite 2010
St. Louis, Missouri 63101
(314) 696-2300
Counsel on behalf of the Plaintiff



APPEARANCES: (Continued)

Terrance J. Corrigan, Esquire
ASSISTANT ATTORNEY GENERAL
500 South Second Street
Springfield, Illinois 62706
(217) 782-5891
Counsel on behalf of Defendants Abell, Freeman, Lynch, Mendoza, Sanders, Thomas, and Bechelli

Joseph A. Bleyer, Esquire (via speakerphone)
BLEYER LAW
601 West Jackson Street
Marion, Illinois 62959
(618) 997-1331
Counsel on behalf of Defendants Franklin County and Randall Crocker

INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS |
|---|---|---|---|---|
| LINDSAY MICHAEL HAYES | | | | |
| By Mr. Heise | 6 | | | |
| By Mr. Corrigan | | 162 | | |
| By Mr. Bleyer | | 194 | | |
| By Mr. Corrigan | | | | 205 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Report Dated May 17, 2017 | 22 |
| 2 | Reference Material | 23 |
| 3 | Invoice Dated March 9, 2017 | 23 |
| 4 | Handwritten Notes, 14 pages | 24 |
| 5 | Two Flash Drives (retained by Mr. Groves) | 24 |
| 6 | Brandy Shirley's March 31, 2014 Report | 40 |
| 7 | Juvenile Suicide in Confinement: A National Survey | 92 |


** Original exhibits (with the exception of Exhibit 5) retained by court reporter and delivered with the transcript.



P-R-O-C-E-E-D-I-N-G-S

LINDSAY M. HAYES, a witness first having been satisfactorily identified by the production of his Massachusetts driver's license, was sworn and testified as follows:

**DIRECT EXAMINATION**

**BY MR. HEISE:**

Q. Please state your name, sir.
**A. Lindsay Michael Hayes.**
Q. Mr. Hayes, my name is Doug Heise. I represent the medical defendants in this litigation. I'm going to ask you some questions regarding the work that you have done in this case.
You have been -- you've done this rodeo before, I assume?
**A. Yes.**
Q. So, of course, the basics. When you give an answer: Yes, no, whatever you're going to say, etc. etc.
If it's unclear, please let me know. I'm a dumb lawyer; I ask stupid questions. I'm the first one to admit it.



What is your occupation, sir?
**A. I'm a consultant expert in the area of suicide prevention in correctional facilities.**
Q. Do you work with a business entity?
**A. Yes.**
Q. And what is that business entity?
**A. It's the National Center on Institutions and Alternatives.**
Q. What is the National Center on Institutions and Alternatives?
**A. It's a private nonprofit organization that was started in the end of 1977, beginning of 1978, originally headquartered in Washington, D.C. It's now up in Baltimore, Maryland. It currently works in a variety of areas within the human service criminal justice area. I can go into whatever type of detail that you want.**
**My role is very specific to, as I said, suicide prevention consultation in the area of correctional facilities.**
Q. Okay. Were you the founder of that organization?
**A. No.**
Q. Who was the founder?



**A. There were two founders. Herbert Hoelter and Jerome Miller.**
Q. Are those gentlemen still with the center or with the --
**A. Dr. Miller died about two years ago. Herbert Hoelter is still the CEO and founder, yes.**
Q. Do you have an ownership interest in this center?
**A. No.**
Q. Are you an employee of the center?
**A. Yes.**
Q. When it comes to the fees that you receive for the work in this case and similar cases, do those fees go to the center or they go to you?
**A. It depends. In this case, they're -- they're my fees. So I do private consulting in addition to my -- my full-time salary at the NCIA.**
Q. So in regards to your work in this case, you are not sitting here as a representative of the NCIA; rather, you are here as a private consultant working on your own?
**A. Correct.**
Q. As a private consultant, do you have a business entity that you work under?

A. Not officially, no.
Q. Lindsay Hayes, Inc.?
A. That's right.
Q. When did you become involved in the study of suicide and suicide prevention in corrections?
A. Back when our organization was first starting out in the late 1970s, after a series of inquiries, I found that there had never been any national studies of inmate suicide performed.
Our organization was just starting out and we were looking for projects to get funding for, and so after some preliminary research, determined that because there hadn't been any studies done on inmate suicides, that I would develop a proposal to the U.S. Justice Department. They had a small entity -- still do -- called the National Institute of Corrections which funded small research projects.
And so that was in 1979 that I proposed that, and our agency received funding for the first national study on inmate suicide. That was in adult jails, county jails, city jails, police department lockups. That was done in -- we started in '79. We completed our report in 1981. So that was my first entree into the area of suicide prevention in



correctional facilities.
Q. And since the -- since that particular initiation into corrections -- suicide in corrections, has that pretty much been your life's work since that time?
A. Yes.
Q. We'll talk about this later, but there's a National Survey: Juvenile Suicide in Confinement. That is one of your studies, is it not?
A. Correct.
Q. And that was done in 2009 -- or it was published in 2009?
A. That is correct.
Q. Okay. Has it been updated?
A. No.
Q. Would you agree that data on juvenile suicide in detention is very limited?
A. Yes.
Q. The study, Juvenile Suicide in Confinement, a National Survey, is that the only national survey that you are aware of?
A. Yes.
Q. Would it be correct today that there is no data source currently available to adequately



document the extent and nature of juvenile suicide in confinement?
A. Actually, the U.S. Justice Department's Bureau of Justice Statistics -- they're called BJS -- have -- they're required by law -- it's the death -- Death and Custody Act of 2000, I believe. They're required by law to collect data from local jurisdictions around the country on all deaths in custody. That includes juvenile facilities.
So they collect the data on adult and juvenile facilities. They've published data on adult facilities. I'm not sure if they're publishing data on juvenile suicides.
Q. And I would assume if there's somebody who's sitting at this table who would know if that data has been published on juvenile suicide, you're the guy.
A. Well, I haven't seen it. So I don't want to -- because it's not my data, I don't want to speak for another agency. There might be another data source that I'm not aware of that -- in which it is available.
So I'm only saying I know that they're required by law to collect it. Whether or not it's



been published, I have not seen it, certainly.
Q. Sir, regards to your education, you have a bachelor of arts in sociology; is that correct?
A. Yes.
Q. What is sociology?
A. That's the study of everything social. It's been so long. I got that in '77, I believe.
So it's -- when I started out, it was the study of social beings; inner cities, rural areas, rather apolitical. So you're not really looking at the politics of a region of the country or a metropolitan area. You're looking about -- you're looking in to other things about socioeconomics, culture, civil rights, criminal justice. That's really when I started out in that area.
And I don't think it's probably a very popular area anymore, but at the time, it was -- it was a study of a lot of different things. And I got my interest in the criminal justice/juvenile justice system by getting my -- my bachelor's degree and then went on to my graduate work in criminal justice.
Q. I once saw an expert who had a degree in sociology, and he wrote a paper -- a rather

Page 13

extensive paper -- on beer drinking in bars. I was really jealous. I thought, man, I missed it. I missed it. I'm a dumb political scientist.

You have a master's in administration of justice; is that correct?

A. **Correct.**

Q. And what was the study of administration of justice?

A. **It was broken up into, I think, four areas: Police, courts, corrections -- I forgot the fourth area. My -- my concentration was in corrections.**

**So it was -- it was -- it was -- it was a pretty well respected program at American University and had those four concentrations.**

Q. Understanding that your concentration was in corrections, was there a subspecialty in juvenile justice, by chance?

A. **No. I -- I spent a lot of time in undergraduate work looking at juvenile facilities. In fact, I did an internship in a juvenile facility for a semester. But my graduate work did not have a concentration in juvenile justice, no.**

Q. And what kind of work did you -- in your internship at the juvenile facility, what kind of

Page 14

work did you do?

A. **I was a juvenile counselor during -- during -- I think it was about a six-month period.**

Q. Okay.

A. **Four to six months.**

Q. And as a counselor, what were your obligation -- your duties and obligations?

A. **Well, because I was a student, it was a student internship. I didn't have any legal or custodial responsibilities.**

**But I -- I did a lot of chaperoning on trips for youth, both inside and outside the facility. Recreation; you know, tours of housing units, making sure kids were safe. Those kinds of things.**

Q. Okay.

A. **And I was always shadowing the full-time staff.**

Q. Would it be correct to say that you've never provided mental health care for inmates or youth in either jail, a lockup, or a prison?

A. **Yes.**

Q. Would it be correct to say that you've never provided medical care to prisoners or youth in

Page 15

a jail, a lockup, or a prison?

A. **Yes.**

Q. You have never been a corrections officer in a juvenile facility or a regular prison, jail, or lockup?

A. **Correct.**

Q. And would it be correct to say that the only work that you ever did in a jail, lockup, or prison was when you were a chaperone?

**MR. GROVES:** Objection to the form. He said he was an intern, not a chaperone.

**THE WITNESS:** Yeah.

**BY MR. HEISE:**

Q. I'm sorry. You're right. I was pointing to the wrong thing. When you were an intern.

A. **Yes. I also worked briefly one summer at a -- at my local county jail briefly.**

Q. How much time there?

A. **It was a summer. Probably two, three months.**

Q. And, obviously, you were not a guest at that time?

A. **I was not a guest.**

Q. What kind of work did you do at the jail?

Page 16

A. **I was assigned to the jail psychologist at the time and just assisted him in his day-to-day responsibilities.**

Q. Do you believe that work qualifies you to give opinions regarding psychological opinions in -- regarding suicides in jail, lockups, or prison?

A. **Not any clinical opinions, no.**

Q. I've touched on this, but you've never been to medical school; correct, sir?

A. **Correct.**

Q. You've never been to nursing school?

A. **Correct.**

Q. In this case, do you have any intention to provide any types of opinions regarding Dr. Shah, the physician that served the Franklin County Juvenile Detention Facility?

A. **Not at this time. I don't think I've reviewed any documentation; or if he was deposed, I haven't read his deposition. So I don't have any opinions at this point, no.**

Q. You've never been given anything in regards to Dr. Shah; is that correct?

A. **I know his name came up in relationship to Nurse Little, but I don't -- I only have a vague**

Page 17

**recollection of his name appearing in any of the medical records.**
Q. You've never practiced in nursing. Is that a correct statement?
**A. Yes.**
Q. You've never been licensed to practice nursing in any state. Is that a correct statement?
**A. Correct; yes.**
Q. Have you ever instructed or provided instruction at any type of nursing school?
**A. No. I've -- I've taught nurses in suicide prevention, as well as other medical and mental health professionals; but not at a nursing school, no.**
Q. How many hours do you think you've taught nurses in suicide prevention?
**A. Oh, that would be impossible. Nurses and other medical and mental health professionals are often in my training seminars, both when I teach at the National Commission on Correctional Healthcare, when I go on site to a particular facility to train at state training academies.**
**So it would be impossible for me to estimate how many hours of training I've provided to**

Page 18

**nurses.**
Q. Simply because you don't know who might be in your audience?
**A. That's correct.**
Q. Okay. You've never supervised nurses in a hospital setting, have you?
**A. No.**
Q. Have you ever supervised nurses in a correctional setting?
**A. No.**
Q. You've never provided nursing care in a correctional facility?
**A. No.**
Q. Would you agree with me that you are not qualified to provide standard of care opinions regarding nursing care in this case?
**A. I believe that I'm qualified to provide an opinion on nursing care as it relates to suicide prevention.**
**I'm not -- I don't believe I'm qualified to give a clinical opinion on what Nurse Little did or did not do. But I think I'm qualified to give an opinion on her aptitude in the area of suicide prevention.**

Page 19

Q. Mr. Hayes, have you ever been allowed to give standard of care opinions of any sort in any Illinois courts?
**A. I'd have to look at my -- my case records to see if any of those were in -- I've given my deposition before in Illinois. Whether or not it's been in court, live at trial, I would have to go back. I don't believe there are any in there for the last four years. Historically, I would have to go back and look.**
Q. Your deposition testimony has two Illinois cases: Hall versus Village of Oak Forest, and Demouchette D-E-M-O-U-C-H-E-T-T-E versus Cook County. Hall was in the Cook County State courts. Demouchette was in the Northern District.
Do you recall giving standard of care opinions in those depositions?
**A. I'm sure I did because they -- it's a common topic that I'm asked about. So those are both cases that were in deposition only, I recall. I don't believe I testified -- I don't believe those cases went to trial.**
**But I am sure -- I'm pretty confident that most of those cases on that list, as well as in most**

Page 20

**cases, I -- I'm asked about the standard of care for suicide prevention.**
Q. Have you ever reviewed the Illinois Pattern Jury Instructions instruction on standard of care?
**A. I -- that is not something that I recognize, no.**
Q. Are you aware that the term standard of care is a legal term of art when it comes to professional malpractice?
**MR. GROVES:** Object to the form as being an improper statement of the law. Also asking for a legal conclusion. You can answer.
**THE WITNESS:** I only use it in terms of correctional practice, not legal practice. So -- so I don't know the legal definition of standard of care in Illinois or -- or in any other state.
**BY MR. HEISE:**
Q. Have you ever been barred from giving a standard of care opinion in any court?
**A. Not that I'm aware of, no.**
Q. Have you ever heard of the School of Medicine Doctrine in Illinois?

A. **Excuse me. Could you repeat that? I didn't hear you.**
Q. Sure. I'm sorry.
Are you aware of the School of Medicine Doctrine in Illinois?
A. **No.**
Q. Sir, in regards to the information that you have been provided in this case, have you brought that with you today?
A. **All the documentation that I reviewed, yes.**
Q. Okay. Is that in your file in front of you?
A. **These -- what's in my file in front of me are references in my report, citations. Everything else -- my documents are on a flash drive.**
Q. Okay.
A. **Or flash drives. There's two flash drives.**
Q. Can you provide that flash drive to counsel so that he can provide that to us?
A. **Sure. I'll do that now before I forget.**
Q. And, for the record, you have provided counsel two flash drives that have a tab McKinney, and they're -- are those -- there's something under



it and I can't --
A. **Juvenile.**
Q. Juvenile. Okay.
**MR. GROVES:** I will -- for the record, I will take these and we will --
**MR. HEISE:** Guard them judiciously?
**MR. GROVES:** I will guard them judiciously. And then when I return to my abode, I will make copies of them and we'll mail them to everyone, or the next deposition we get together, we'll give them to you guys, if that's okay.
**MR. HEISE:** It will get worked out.
**BY MR. HEISE:**
Q. Sir, in regards to the documents in front of you, I see you have your report; is that correct?
A. **Yes.**
Q. I'm going to mark as -- or, if you will, if you'd mark your report as Hayes Number 1.
************************************
(Exhibit Number 1 was marked for identification.)
************************************
**MR. HEISE:**



Q. What else is in your file, sir?
A. **Deposition notice, billing, and a photocopy of my notes.**
Q. Okay.
A. **As well as, as I said, the references in my report to documents.**
Q. Okay. If we could, we'll mark the references in your report as Exhibit Number 2.
************************************
(Exhibit Number 2 was marked for identification.)
************************************
**BY MR. HEISE:**
Q. Let me take a look at that real quick, if you don't mind.
Next is your invoice?
A. **Right.**
**MR. HEISE:** We'll mark that as Exhibit 3.
************************************
(Exhibit Number 3 was marked for identification.)
************************************
**BY MR. HEISE:**



Q. And next are your notes. We'll mark that as 4.
************************************
(Exhibit Number 4 was marked for identification.)
************************************
**MR. HEISE:** And that completes your file, except that we'll mark as five the tab that you have on your two flash drives.
************************************
(Exhibit Number 5 was marked for identification.)
************************************
**MR. GROVES:** Now I'm getting nervous.
**MR. HEISE:** Exhibit Number 5 is now being entrusted to you, sir.
**BY MR. HEISE:**
Q. Mr. Hayes, are the documents that are on the flash drive on Exhibit Number 5, do they correspond with the documents reviewed that is found on page 3 and 4 of your report?
A. **Yes.**
Q. The notes that you have and that were marked as Exhibit Number 4, are those notes from the

various depositions that you reviewed and other documents that you reviewed?
**A. Yes.**
Q. Okay. And the purpose of making those notes were to refresh your recollection as you were going through and making your report, Exhibit Number 1. Would that be an accurate statement?
**A. Yes.**
Q. Give me a second. I'm going to take a real quick look at Exhibit Number 2. Thank you.
Mr. Hayes, at page 2 of your report, you indicate that you were appointed as a federal court monitor of suicide prevention practices in several adult facilities; is that correct, sir?
**A. Yes.**
Q. How was it you became appointed as the federal court monitor?
**A. It varies. Usually I am selected by agreement with the parties, having no prior knowledge of the case and/or involvement.**
**There are also times in which I would have some involvement with the jurisdiction. I was a consultant or part of an investigation, for example, from the Justice Department, and as a result of that**



**connection or familiarity with the case would be appointed as the -- as the monitor after the investigation was completed and the investigation turned into a settlement agreement.**
Q. Okay. And when you talk about the familiarity of the case, what are you referring to? There's obviously some type of litigation that's going on?
**A. Yes. For example, in several of the Justice Department -- the U.S. Justice Department has a division called the Civil Rights Division.**
**Within the Civil Rights Division, there's a special litigation section that does, initially, investigations of conditions of confinement throughout the country in jails or in prison facilities, including juvenile facilities.**
**Following the investigation, if the investigation determines that there were violations of conditions of confinement and the need for remedial action, they'll approach the defendants to remedy it, and normally that results in either a settlement agreement or a consent judgment.**
**Sometimes it's -- the court has hands-on relationship, and there are other times in which the**



**court kind of sits back and approves various legal documents, such as a settlement agreement, approves the appointment of monitors, but takes kind of a hands-off approach.**
**So my involvement in those kinds of cases would have started as -- initially as a consultant to the Justice Department and was part of the investigation team that went in to look at the jurisdiction and then report our findings to the Justice Department, who would then approach the defendant and say, There has been some findings that we need to remedy and correct; the best way to do that is through a settlement agreement, and we want it monitored by a monitoring team -- made up of myself or -- and there are times in which there are larger issues that involve areas which I don't have expertise. So other monitors will be part of the team.**
Q. How many adult facilities have you been assigned to as a monitor?
**A. I would say -- well, I think it's probably in my CV. I would say there's about four to six of them total.**
Q. Same question --



**A. Probably.**
Q. I'm sorry.
**A. Probably more than that. But it's on my CV.**
Q. How many juvenile facilities?
**A. I believe there's just two of those. Two -- well, jurisdictions. There's -- in the State of Arizona, I was a monitor for three juvenile facilities. The entire state was under a settlement agreement with the Justice Department.**
**And then the fourth -- the fourth agency was the District of Columbia. I was a monitor. It was called the Jerry M. case. It's still going on, but I'm not involved. It's been going on for, like, 30, 40 years.**
Q. So in juvenile facilities, there's Arizona, and then there is District of Columbia?
**A. Correct.**
Q. Okay. When you discussed -- or when you -- when you were working with the juvenile facilities, were you looking at conditions of confinement?
**A. As they relate -- I mean, my specialty being suicide prevention, I would only be looking at that area. But there are -- the issues are normally**

**more than just suicide prevention. They have to do with medical and mental health issues, use of force, those kinds of things. So it would be -- I would not be alone in the monitoring or the investigation.**
Q. Okay. While you were a monitor in any of the adult facilities, did any of those facilities have a suicide during the time of your monitoring?
**A. Had a suicide. Yes.**
Q. How many; do you know?
**A. No.**
Q. Same question regarding the juvenile facilities.
**A. I -- I have to add one too. The State of Hawaii; I was a monitor for both the adult and the juvenile system.**
**I can't recall a juvenile suicide in any of those jurisdictions, but I'm not 100 percent confident. There might have been one, but I don't -- I don't recall one off the top of my head.**
Q. In regards to the times that there were adult suicides during the course of your monitoring, did you initiate an investigation?
**A. I wouldn't necessarily call it an investigation. I -- part of the monitoring was to**



**ensure that the jurisdiction was -- every monitoring agreement has a component to it regarding the ability to self-monitor and to do mortality-morbidity reviews, to do continuous quality improvement.**
**So that would be a provision, a requirement in the settlement agreement that the jurisdiction would have to, following an incident, investigate, review, and take corrective action when necessary. So I would be monitoring that.**
**So to answer your question, if a suicide occurred, I wouldn't necessarily -- I mean, yes, I would review the case. I would review the medical chart, the investigative chart; but I'm more interested in how the jurisdiction is doing that process because the end goal is for the settlement agreement to successfully conclude when the jurisdiction has demonstrated compliance -- substantial compliance and that they can monitor themselves.**
**And so that usually is the last thing to come into compliance with is the ability to monitor yourself.**
**So it would be important as a monitor to --**



**to determine how well the jurisdiction investigates, reviews, and develops corrective actions to any incidents such as a suicide or a serious suicide attempt.**
Q. Would it be correct to state that you were not actively participating in the investigation; rather, you were doing what I'll call a postmortem of the investigation?
**A. At that point. I mean, certainly I am an investigator in other types of work I do as a consultant, or to the Justice Department, to the Department of Homeland Security.**
**But I took your question to be as I'm a federal court monitor.**
Q. Yes.
**A. Yeah. I don't normally -- I don't like to do that while I'm a monitor because I want to see how well the jurisdiction can investigate itself and conduct an investigation. If I'm conducting it for them, then there's not much to be learned.**
**So from the aspect of being a monitor, you know, my monitoring role is pretty focused on determining how well they do their job; and if I'm doing it for them, then that's not very helpful.**



Q. Okay. At page 3 of your report, you indicate that you have reviewed or -- and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities over the past 37 years; correct, sir?
**A. Yes.**
Q. Can you give me a breakdown as to the number of juvenile examinations or reviews that you have done out of that 3,500?
**A. They would be a -- the vast minority of those cases. So it's hard to tell -- give you a specific number.**
**But, for example, the National Study on Juvenile Suicide that we did looked at, I believe it was 100 cases, and I probably, in addition to that -- or separate from that national study, I might have looked at between 50 and 100 suicides, perhaps more, in juvenile facilities.**
Q. Okay. The national survey that you discussed, if I read it correctly, I believe there were 110 cases that were reported; then the survey information was sent out and there was 79 responses. Does that sound familiar to you?
**A. Yes, it does.**

Q. Okay. So when it comes to the investigation, would that be limited to the 79 cases since that's where you got information back?
**A. Yes. Unless we were able to get data without self-reporting. There were -- there were -- both of my adult -- adult jail suicide studies and my juvenile studies, there were times in which the -- because it was a voluntary process, jurisdictions were not required to respond. They were strongly encouraged by the Justice Department but not required. There might have been times in which some of my data was through other sources -- other external sources.**
**For example, the jurisdiction might not have been cooperative but the state regulatory agency was and they were able to send me their investigation report -- investigative report.**
**So I'm -- I -- having not done that study for several years, I'm not sure if that 79 included all of the cases or those 79 were the ones that were self-reported by the jurisdictions. But there probably were only a handful of cases that we gathered that -- in which the jurisdictions were not cooperative.**



Q. And in the other 50 or so cases -- and I'm rounding, and I understand that -- that you discussed, would those have been litigation cases or would they have also been additional work doing surveys and looking at the survey responses?
**A. No, it wouldn't be survey work. It would be consulting work for the jurisdictions. Very few of them would be -- for example, in this case, the McKinney case, there would only be a few of those, probably, that I've done. The vast majority of the others would be investigating cases for -- on behalf of a juvenile justice system.**
**I've consulted in about -- because this question was just asked of me last week, so I know the number -- about 16 state juvenile departments of correction in the past 30 years or so, and the reason for that consultation was because they had one or more suicides that they were very concerned about and so I would go on site and conduct an investigation of those -- of those incidents.**
Q. Would you then make recommendations to that particular facility as to how to improve their suicide prevention?
**A. Yes.**



Q. How many cases have you been retained to render opinions for regarding a juvenile suicide in detention?
**A. That's also a hard -- I mean, I could go through that list for the past four years to see if any of them are juvenile cases. I don't keep a separate record of that; so, you know, I don't know if -- if -- I think I put in here that I worked on about 400 cases of both adult and juvenile throughout my career. And it would be a guess as to how many of those 400 were juvenile cases, but I would --**
Q. I would ask not for a guess, but your best estimate.
**A. Yeah; I would say maybe 20 or 30.**
Q. Whenever you've been asked to review a juvenile case, can you give an estimate as to the number of plaintiffs versus defendants?
**A. I think it would be similar to my overall consulting and -- which is about -- I think about 55/60 percent plaintiff consultations. And I don't think that there would be any difference between whether it was an adult or a juvenile case.**
Q. Have you ever testified on behalf of a



defendant in any court case?
**A. Yes.**
Q. Okay.
**A. Court case meaning trial?**
Q. Yes, sir.
**A. Yes.**
Q. In what cases?
**A. I'd have -- again, I'd have to go through the list there.**
Q. Well, do you have a copy for yourself?
**A. No, I don't.**
Q. Okay.
**A. The second one here, Hamelin versus Smith, is -- I don't know -- did you ask this question in relationship to juveniles or just adults or just --**
Q. Well, I'll tell you what --
**A. -- testifying for the defendant?**
Q. Tell you what. We'll go defendant, and as you go through the list, if you can tell me if it was adult or juvenile.
**A. Okay. So the second case, Hamelin versus Smith, was a trial testimony in December 2016. That was testimony for the defendant.**
**You only want trial testimony; is that**

Page 37

**correct?**
Q. Yes. Right now.
**A. Okay.**
Q. And was that an adult or a juvenile?
**A. That was -- that was an adult.**
Q. Do you know what the result of the case was?
**A. No.**
Q. Okay.
**A. The other -- the only other trial was called Stacy versus Fergus County. That was in Montana in October of 2012. That was for the plaintiff, and that was an adult case as well.**
**I can look through here quickly. I don't think any of these cases involve juveniles.**
Q. Okay.
**A. That are on this list.**
Q. How did the Stacy case turn out; do you remember?
**A. I believe it was a verdict for the plaintiff.**
**MR. HEISE:** I'll tell you what, Joe, I'm getting ready to move on to more of the guts of the documents reviewed and things like

Page 38

that. If you've got any background or CV questions, why don't you jump in.
**MR. BLEYER:** No. Go ahead. Terry's not there yet, is he?
**MR. HEISE:** He is not. So that's why I was wondering if you want to jump in with some CV stuff.
**MR. BLEYER:** No. Go ahead, I said. I'm sorry.
**MR. HEISE:** All right.
**BY MR. HEISE:**
Q. Sir, in regards to the documents reviewed on page 3, you indicate that you reviewed the substance abuse evaluation by Brandy Shirley; correct, sir?
**A. Yes.**
Q. Is Brandy Shirley a qualified mental health professional, in your opinion?
**MR. GROVES:** Objection to form.
**THE WITNESS:** You know, I don't know that off the top of my head. I only reviewed the report. I haven't reviewed anything else about her.
I notice on -- she's an LPC, which my

Page 39

understanding of an LPC is a licensed professional counselor.
So if that is what that acronym stands for for her, then I would say, yes, she would be a qualified mental health professional.
**BY MR. HEISE:**
Q. What information did the Shirley report provide you to aid in any of your opinions?
**A. I would have to, quite frankly, go -- go and review what I said about that report in my report. I believe it just provided, along with the other reports, background information regarding R[redacted]'s mental illness. And I'm not sure off the top of my head whether or not she verified any of his fleeting suicidal thoughts or whether that came from the school records.**
Q. Would Ms. Shirley's report be on the flash drive?
**A. Yes.**
Q. Okay. In your notes, by chance, do you have any summary of Ms. Shirley's report?
**A. Yes; I believe I do.**
**I don't see any reference in my notes to**

Page 40

**her report, but I believe I reference it in my report.**
Q. You don't see any reference to them in your?
**A. In my note.**
Q. Okay.
**A. But I do recall referencing it in the narrative in my report.**
Q. Okay.
**MR. HEISE:** I'll tell you what, we'll mark this as Exhibit Number 6.
************************************
(Exhibit Number 6 was marked for identification.)
************************************
**BY MR. HEISE:**
Q. I apologize. I've got some highlights on it. I don't think I wrote on it, though.
**MR. BLEYER:** What is six, Doug?
**MR. HEISE:** Six is going to be the March 31st, '14 report from Brandy Shirley.
**MR. BLEYER:** Thank you.
**BY MR. HEISE:**
Q. And I'll hand you Number 6, sir.

**A. Okay. And, I'm sorry, was there a question?**
Q. Well, the question is is that the document that you recall reviewing?
**A. Yes.**
Q. Ms. Shirley goes through medical, psychological, and psychiatric, and she includes -- and I'll hand this back to you -- he denies suicidal/homicidal ideations, as well as previous attempts. He further denies self-mutilation and the need to see a counselor for support at time of consultation. He denies medical problems.
Do you recall reviewing that?
**A. Yes.**
Q. Okay. Did you take that into consideration in your opinions?
**A. Yes. I think I quoted her report.**
Q. Okay.
**A. To -- to that effect, yes.**
Q. Do you know, sir, did Nurse Little -- or what I'll call, generally, the medical staff at the detention facility -- did they have Exhibit Number 6 available to them?
**A. My understanding was that they had -- that**



**this was one of the reports that was in the assessment file and that it was -- or in the -- yeah, the assessment file; and that they -- it was available to them.**
**It was not accessed by Ms. Little, she said. She also said that she -- it was unimportant to look at anything other than any self-report by the youth himself. So even if it was in front of her, she wouldn't review it.**
**MR. HEISE:** I move to strike that as not being responsive to the question.
**BY MR. HEISE:**
Q. My question was, sir, was availability. And you indicated that you believe it was available.
What is your basis for saying that the document was available?
**A. My basis is the deposition testimony of various people, including the assistant superintendent, Diane Sanders, who said that although the assessment file was not accessed by staff, that it was available to staff.**
Q. Did you read the deposition of Shawn Freeman?
**A. Yes.**



Q. Who is Mr. Freeman?
**A. He's the superintendent.**
Q. Would he have -- would the word of Mr. Freeman be superior to that of the assistant superintendent?
**MR. GROVES:** Object to the form as to what superior means. But you can answer.
**THE WITNESS:** Yeah; I'm not sure -- I don't understand what you mean by superior.
He is a superior employee by title, but that does not mean that he would have information -- more accurate information, per se.
**BY MR. HEISE:**
Q. Do you recall Mr. Freeman saying that medical did not have access to assessment files?
**A. I don't know if he was specific to medical versus his staff. He -- he testified that -- I thought he only testified about his own staff and that they did not have access to it.**
Q. Do you have any notes from Mr. Freeman?
**A. Yes.**
Q. Did you make any notes as to any page where Mr. Freeman discussed the availability of



assessments?
**A. He said he -- well, here are my notes regarding the assessment file. He said, Reviewed R[redacted]'s detention and assessment center files the next day; next day meaning following the suicide.**
**Claims that the JDOs, which are the juvenile detention officers, didn't have access to assessment reports regarding R[redacted]'s history, only court and PO, which is the probation officer, did.**
Q. And from that, do you -- let's start this way.
The Franklin County Juvenile Detention Facility had what I'll call two sides, the detention side and the assessment side. Does that sound correct to you, sir?
**A. Yes.**
Q. The detention side obviously was for detention purposes, and the assessment side did their work regarding court-ordered assessments; correct?
**A. Yes.**
Q. The only way that the assessment side could assess a juvenile is by order of court; is that your understanding?

A. I -- I don't know what the specific requirements were or the law or regulations in this facility. But I think my experience in other juvenile detention and juvenile commitment facilities is assessments -- well, let's be specific to detention; that I would agree that assessments done -- well, let me back up.

There are -- the term assessment has many meanings. If you're referring specifically to the assessment side of a facility, then I would -- in a juvenile detention facility, then I would agree that that is normally a function that is court ordered.

Q. Okay.

A. Yes.

Q. And the documents that were generated by the assessment side belonged to the court system, did they not?

**MR. GROVES:** Object to the form.

**THE WITNESS:** I don't know who they belonged to.

**BY MR. HEISE:**

Q. You don't recall Mr. Freeman testifying to that?

A. No.



Q. Based --

A. And it -- and I'm sorry to interrupt your train of thought.

In my mind, who -- who had ownership of them was not important. The -- what's important is the availability of the information. Whether it's the documents themselves or the information from those documents were -- should -- were and freely able to be shared amongst staff that needed to know.

Q. Okay. And you noted in your notes that only the court and probation officers were allowed to see the assessment documents; correct?

A. That's according to Mr. Freeman.

Q. According to Mr. Freeman.

A. Those are my notes of what he said. That's not what I believe.

Q. Okay. And your belief is different than Mr. Freeman's based upon the testimony of the assistant superintendent?

A. And also the -- all of the other records in this case. I mean, the -- immediately after -- or almost immediately after R[redacted]'s death, all these records were reviewed, miraculously, by everyone -- well, not everyone. At least Mr. Freeman and



Ms. Sanders. So they were available. They were right there. The issue is were they accessed.

Clearly these were -- these were not confidential records. They were part of the probation officer's file. The probation officer had access to them. That probation officer apparently did not share this information. There's a policy that requires the juvenile detention center staff to have communication with probation and any outside entity during the intake process.

Intake screening is not just the self-reporting of information from the youth. It's a gathering of information from a variety of sources, which would include the probation officer. And I believe someone testified that the policy that spoke to outside entities included the probation officer.

Q. Okay. When it came to probation, do you know if probation had the ability to share confidential psychological information with non-probation individuals?

A. Well, if it's for the welfare of the child -- let me back up.

Any information regarding suicide risk of



an individual, whether adult or juvenile, is not confidential. So, in other words, if there's information in a file that says a child is suicidal or has fleeting thoughts of suicide or is depressed, whatever the case may be, that -- that -- that is potentially an emergent condition; there are no confidentiality prohibitions to sharing such information.

If your question is could a probation officer share a physical copy of a psychological evaluation, there might very well be prohibitions for that. But if there's information in that document that the probation officer is reading and has access to as the probation officer that is -- that relates to an emergent issue such as suicide or the need for a mental health referral or mental health counseling, whatever, they -- they certainly have a duty or responsibility to share that information, just as the juvenile detention staff have a responsibility and -- and is in their own policy to solicit such information with the probation officer.

Q. Do you know if probation officers -- any probation officers shared any of the assessment or

Page 49

assessment side information with corrections or with medical?
**A. There's no information to suggest that that happened, that I've reviewed.**
Q. Is there anything in the assessment records that suggest that R[redacted] was an emergent -- what was your term -- an emergent threat of suicide risk?
**A. Well, those records were several months old. So I wouldn't say that there was information that was of an emergent nature. I -- I meant emergent meaning that there was documentation of a history of -- of suicidal ideation, as well as which is obvious or well known in this case that his mother -- there's documentation or verification that his mother had committed suicide when he was younger. I mean, that's obviously very critical information for the intake and assessment process.**
**Whether it was emergent in the context of that he needed to be placed on suicide precautions because of that, I'm not suggesting that, nor was that in my report.**
Q. Okay. Now, you used one term and then you shifted to something else. You said that if there were documents that show a history of suicidal

Page 50

ideations, and then you start talking about R[redacted]'s mother. Where in the documents from Gateway, Dr. Jewell, or Dr. Spalt does it indicate a history of suicidal ideations?
**A. Well, I'd have to go back and look at those reports, and I might be mixing up some of the psychological reports to some of the school reports and also the other -- I mean, he had a lot of counseling. He was -- he was receiving monthly individual counseling on an outpatient basis. There were school records that the -- that the probation officer had as well.**
**So if you want me to, I can go back and look at Dr. Jewell and also the psychiatrist and see if there was any mention of that.**
Q. Please do.
**A. Okay.**
**MR. HEISE:** And I'll take a quick break while you do that.
****************************************
(OFF RECORD FROM 10:00 TO 10:04 A.M.)
****************************************
**BY MR. HEISE:**
Q. Ready to go?

Page 51

**A. Yes. On both Dr. Jewell's -- in both his evaluation and Dr. Spalt, which is S-P-A-L-T, they both mention that -- I quoted both their reports. Dr. Jewell, for example, quotes R[redacted], who says, quote, "My dad says I haven't been right since my mom died." He does -- "R[redacted] does deny current suicidal ideations or a history of attempts." So there's acknowledgement of his mother's death with Dr. Jewell.**
**And then with Dr. Spalt, he said -- I believe he's quoting -- Dr. Spalt is quoting R[redacted]'s father. He says, "The patient's difficulty with low moods has only been present since his mom's death when the patient was six-years old."**
Q. And, I apologize, maybe my question wasn't clear. I recall from your answer that you indicated there was documentation of a history of suicidal ideations, and I thought that you were referring to R[redacted] had a history of suicidal ideations.
And we're talking within the scope of the --
(SHORT RECESS; ATTORNEY CORRIGAN PRESENT.)
(OFF RECORD FROM 10:05 TO 10:07 A.M.)
****************************************

Page 52

**BY MR. HEISE:**
Q. Okay.
**A. To answer your question about his fleeting thoughts of suicide, those were not from those three reports, but from the school records.**
Q. Okay.
**A. That were available -- that I think were available and were part of the probation file.**
**Dr. Jewell -- there's another notation of Dr. Jewell's reference to his mother's death; that R[redacted] identified the death of his mother as a psychological trauma that he continues to think about frequently.**
Q. I think there's even the addition that it's even more severe around the November-December time frame because she -- that's when she committed suicide; correct?
**A. Correct; yes.**
Q. And what is your understanding as to his mother's suicide as to the cause?
**A. You know, I never really got a thorough understanding of that. So I don't know. I don't know if it came up during Mr. Eads' deposition or not, but -- so I don't know.**

Page 53

Q. Do you recall seeing anything in the records indicating that R[redacted]'s mother had been in a severe automobile accident, and she had back injury; that she had been on pain medications; and that just prior to her suicide, she had been taken off those pain medications and that one explanation of the suicide was that she was in severe pain?
**A. As you're saying that, I do recall that recollection as possible.**
Q. And, in fact, do you recall that being reported -- that information being reported by Mr. Eads?
**A. I don't recall where that came from; but it would seem likely to have come from him.**
Q. Because a parent commits suicide because of severe pain issues, does that make the child more likely to commit suicide?
**A. I don't believe the reason for the suicide is particularly important. I think what's important as a risk factor is simply that there's a family history of suicide.**
**There are a variety of reasons why people commit suicide. So I think the research has indicated that it's more of the fact that there's a**

Page 54

**family history of it and that there's a -- there's a personal knowledge of -- of, particularly in this case, a parent ending their -- seemingly ending their -- their pain in that manner, and there's pretty good research to indicate that there's a strong relationship between family suicide and increasing the risk factor in others within that family. Or it could -- it doesn't have to be a family member; it could be a loved one.**
Q. Because a family member or loved one committed suicide in R[redacted]'s case, does that mean that R[redacted] should have been on a constant suicide watch while at the Franklin Juvenile Detention Facility?
**A. I'm not suggesting that, nor was it in my report.**
Q. Staying with Dr. Jewell's report, would you agree with me that from his report, there's no indication that R[redacted] was a suicidal risk?
**A. Well, a couple of things. One is that, yes, I would agree that the report he did in April did not suggest that he was a current risk of suicide, and the youth did deny it at the time that he was asked it.**

Page 55

**His report, though, was, as we've talked about earlier, was a court-ordered psychological report. It wasn't the -- the impetus for the report was not to assess R[redacted]'s risk of suicide. It was an overall psychological report for the court that gathered information.**
**And it was helpful for me to review because it gathered information regarding his history and his previous diagnosis of ADHD and dealing with his mother's death and those kind of things.**
**But I would agree that there was nothing in the report to suggest that Dr. Jewell was finding that he was at current risk for suicide or was even recommending that he be put on any kind of suicide precautions at the time.**
Q. Would you agree with me that the juvenile court had no indication that R[redacted] was at risk of self-harm?
**A. Yes. My answer would be the same as I just gave.**
Q. Okay. And would it be the same answer that there's no indication that R[redacted] had a need to be monitored for self-harm?
**A. Well, I -- yes, I would agree with that.**

Page 56

**The only reason I'm hesitating with the word "monitoring" is that all youth in a juvenile detention or -- at this point, he was, I think, just in the assessment side of it.**
**But all youth, whether they're on the assessment side or the detention side, should always be monitored -- their behavior should always be monitored. But there was no indication from his report that he had to be monitored any more frequently than any other youth in that facility.**
Q. There was no diagnosis of depression; is that correct?
**A. By Dr. Jewell?**
Q. Yes, sir.
**A. Yes. Correct.**
Q. There was no suggested treatment for depression; is that correct?
**A. Well, actually, no. He says that he -- it's recommended that R[redacted] continue with the recently -- weekly individual therapy, which should be useful increasing his self-monitoring of his ADHD symptoms as well as increasing his ability to cope with frustration while at school.**
**I believe that's taken right from Dr.**

Page 57

**Jewell's report.**
Q. I agree that it is. ADHD is not synonymous with depression, is it?
**A. No.**
Q. And saying that he needs to be -- seek assistance for frustration at school is not a diagnosis or indication that he needs to be treated for depression, is it?
**A. No.**
Q. Now, Dr. Jewell examined [redacted] while [redacted] was in the assessment center. He was in detention, was he not?
**A. Can I just -- oh, I'm sorry. I was reading Dr. Spalt's recommendations. Sorry.**
Q. Okay.
**A. If you could repeat that.**
Q. Sure. Sure. Dr. Jewell saw [redacted] while he was -- and I use the word confined or detained -- at the assessment center; correct?
**A. Yes.**
Q. He was not free to move about in the world on his own, was he?
**A. I believe that's correct.**
Q. And I think Dr. Jewell saw [redacted] in

Page 58

April --
**A. Yes.**
Q. -- of 2014?
**A. April 8th; correct.**
Q. And [redacted] had been in or detained at the assessment center since March 28th. Does that sound accurate?
**A. Yes.**
Q. You also reviewed the report of Dr. Spalt?
**A. Correct.**
Q. And it is your opinion that Dr. Spalt's report was available to medical at the detention center?
**A. Yes. If it was part of the assessment file of the assessment center and available to the probation department, then it should have been available to the medical staff, yes.**
Q. The second or third -- no, excuse me, second, where -- the second point made in Dr. Spalt's report -- and you don't have a copy in front of you. Sorry.
I'll read it to you. Under chief complaint it says, "The patient is evaluated at the request of the court. Both the patient and his father

Page 59

understand that this evaluation is done for the court."
Did I read that correctly under chief complaint?
**A. Yes.**
Q. Dr. Spalt is somebody who you deem a qualified mental health professional; is that correct?
**A. Yes. He's a psychiatrist.**
Q. Would you agree with me that Dr. Spalt did not diagnose depression?
**A. Not at that time. But he had concerns that if his -- I remember reading in his report that he had concerns that if the symptoms -- he said if, at a later date, the patient should develop more classic symptoms of endogenous affect and mood disorder, i.e., the depressive symptom complex, in episodes of significant duration, treatment with appropriate antidepressant medications might be considered at that time.**
Q. And I agree with you. You -- that came right out of his report. And then it continues. Well, strike that.
Was there ever --

Page 60

**MR. GROVES:** I apologize. Could you tell me the date of that report.
**MR. HEISE:** Oh, sure. Sorry.
**THE WITNESS:** May 20th.
**MR. HEISE:** Yes.
**MR. GROVES:** Thank you.
**BY MR. HEISE:**
Q. Doctor Spalt indicates, as you note: "If, at a later date, the patient should develop more classic symptoms..."
At what point in time, in your opinion, did [redacted] later develop more classic symptoms as described by Dr. Spalt?
**A. Can you repeat that question. I'm sorry. I was referring back to Dr. Jewell because I want to amend my answer at the appropriate time.**
**But if you could repeat that question that you just asked.**
Q. Sure. As you note in your report, Dr. Spalt indicated that if, at a later date, the patient should develop more classic symptoms, etc., etc.
In your opinion, at what point in time did [redacted] later develop those more classic symptoms set

Page 61

forth by Dr. Spalt?
**A. Well, I think that his behavior at his subsequent admission to the detention center in September, there were various -- and as I document in my report, that he was -- he was crying. That was observed by several of the staff, as well as other youth.**
**He was upset at various times when he was coming back from -- from court hearings when he was unsure and concerned about where he was going following the detention center. There was an episode of bullying. Those are all symptoms that should have resulted in a mental health referral.**
**And I'm not suggesting that R[redacted] should have gone back to Dr. Spalt. Dr. Spalt was -- was doing a very specific court evaluation to diagnose him. All I'm suggesting is that his subsequent detention in the juvenile detention center in September, I think there's quite a bit of information there to suggest that he was not doing well and needed to be referred to mental health staff for further assessment.**
**Not necessarily Dr. Jewell or Dr. Spalt; they had different responsibilities. They -- they**

Page 62

**were court ordered to give -- not to provide individual counseling. They were there to do evaluations.**
**My understanding is that there was another entity, whose name I'm unclear of from the records, that provided ongoing mental health services at the juvenile detention facility.**
Q. Sir, are you qualified to diagnose an endogenous -- are you qualified to diagnose an endogenous affect/mood disorder, i.e., the depressive symptom complex, in episodes of significant duration?
Are you qualified to make that kind of diagnosis?
**A. No.**
Q. All right. Did you see anything in the records that would suggest to you as a layman that R[redacted] had developed symptoms of endogenous affect/mood disorder, i.e., the depressive symptom complex, in episodes of significant duration?
**A. No. My testimony -- my opinion is specific to risk factors for suicide, and that's what I concentrated on.**
Q. Okay.

Page 63

**A. Not the diagnosis.**
Q. And the reason I'm going through this is because when I asked the question would you agree with me that Dr. Spalt did not diagnose depression, you said correct, and then you referred to this, that paragraph in your -- your report. So that's why I'm going through this.
So you would now agree with me that Dr. Spalt never diagnosed depression; correct?
**A. Yes. I think I stated that.**
Q. And you will not give a qualification that if, at a later date, the patient should develop -- etc., etc. -- because you were not qualified -- or, strike that.
You have no opinions as to whether or not at a later date R[redacted] developed these more classic symptoms that we've discussed; correct, sir?
**MR. GROVES:** Form.
**THE WITNESS:** No. What my testimony was was I was just repeating what was in his report; that he did not -- you asked me whether he diagnosed R[redacted] with a major depressive disorder, and I said no.
**BY MR. HEISE:**

Page 64

Q. I'm sorry to correct you. I said did he ever diagnose depression, not a major depressive disorder.
**A. Right. Correct.**
Q. Okay.
**A. And I said no. But there was some concern in his report for any subsequent behavior based upon his history and what his father had self-reported.**
**I was only repeating what Dr. Spalt had said.**
Q. Okay.
**A. And then you asked me a question about was there any evidence of -- of a concern? And that's when I went into, Well, when he was subsequently detained in the detention center, he was beginning to display concerning behavior. That's all.**
**And before we go on, if you don't mind, I just want to -- Dr. Jewell also said in his recommendations that not only should he get some treatment for his ADHD, but he also said a psychiatric evaluation was also recommended, as well as relaxation skills training, grief counseling to, quote, assist him in coping with the death of his mother, anti-bullying therapy, and refinement of his**

**individual education plan.**
**So I just think, just to make the record clear, that, yes, he was -- he was confirming or continuing the previous diagnosis of ADHD, but he was also concerned enough to have other recommendations for R[redacted] going forward.**
Q. And R[redacted], in fact, got the psychological examination as we were discussing --
**A. Psychiatric evaluation.**
Q. Psychiatric evaluation.
**A. Yes.**
Q. As we were discussing with Dr. Spalt; correct, sir?
**A. Yes.**
Q. Okay.
**A. But he didn't get anything else from the detention center.**
Q. After R[redacted] was released after the assessment -- let's then shift back to Dr. Jewell, since you've told us -- you just told us that Dr. Jewell made some additional recommendations; correct, sir?
**A. Correct.**
Q. Okay. R[redacted] was released from the



assessment center prior to seeing Dr. Spalt; correct?
**A. Correct.**
Q. Okay. Do you know was Dr. Jewell's report shared with R[redacted]'s father?
**A. I don't know.**
Q. Do you know if R[redacted]'s father was ever told of Dr. Jewell's recommendations?
**A. I do not recall that either.**
Q. You know that Dr. Jewell spoke with R[redacted]'s father in the making of this report; correct?
**A. Correct.**
Q. If, in fact, R[redacted]'s father was told of Dr. Jewell's recommendations, did R[redacted]'s father have any obligations to try to meet those recommendations?
**MR. GROVES:** Objection to the form. You can answer.
**THE WITNESS:** I think that if any parent got a -- got a copy of either of those reports and it had recommendations going forward, I think that would be a parental responsibility, yes.
**BY MR. HEISE:**



Q. Going back to Dr. Spalt. I know we've been jumping back and forth. Going back to Dr. Spalt.
Is there anything in Dr. Spalt's report to suggest that R[redacted] was a suicide risk?
**A. I do not believe that he felt that way when he assessed him on May 20th, 2014.**
Q. Okay. Based upon our discussion of your review of Dr. Spalt's report, how would Dr. Spalt's report tell medical or put them on notice that R[redacted] was at increased risk for suicide?
**A. Only in that he was -- the -- I think one of the concerns or, I guess problems, in this case is that there's the assumption, the misperception that suicide risk is only determined by a self-report of that "I'm suicidal" and that everyone -- anything else occurring in that individual, whether it's a 12-year old or a 42-year old, is unimportant or not part of a combination of factors that increase the risk of suicide.**
**So why his -- why his report and why Dr. Jewell's report are important is not to suggest that at the time of their assessments that R[redacted] was suicidal. It is just to acknowledge that he has some pretty horrible baggage in his background: The**



**death of his mother by suicide when he was six and now he's 12; that he's impulsive; he has ADHD; he has a history of being bullied as well as bullying others, which is not uncommon; and that these are all potential risk factors for suicide going forward.**
**So it's not to suggest either Dr. Jewell or Dr. Spalt are putting the county on notice that R[redacted] is suicidal. It's just that these are important documents for medical and mental health professionals going forward to do the best screening and assessment and not to look at just, R[redacted], are you suicidal today when he walks into the facility, but to have more of -- more information to determine whether or not I should make a referral.**
**And that's what -- part of the nurses' responsibility. It's part of the detention staff -- I think her name was Ms. Upchurch who did the intake. You need to gather as much information as is reasonably possible to make -- to make a determination if you need to refer this child to someone else. That's -- that's what screening is.**
**And you don't do that by just asking questions of the youth. That's certainly an**

**important part of it, but there's -- there's more to the process than that.**

**If -- if suicide screening was limited to one question "Are you suicidal?" then there would be no need to ask any other questions. And, yet, when you look at intake screening and mental health assessments and those kinds of things, the health assessment done by the nurse, it's not just one question; it's a series of questions as well as a collection of outside records.**

Q. Okay. Let's stay on the idea of collection of outside records.

Is it your opinion that medical had the ability to go get [redacted]'s school records?

A. **I don't think that would have been reasonable. Those records were available from probation, however.**

**So I don't think, independently, Nurse Little should have called the school -- the local school and said I need [redacted]'s school records. No, I'm not suggesting that. But the probation officer, I believe, had those records.**

Q. So is it your opinion that Nurse Little should have called probation and said please give me



all records you have on [redacted]

A. **I'm not sure if it was reasonable to ask for all records. But if there were records available that were easily accessible, particularly the ones having to do with the assessment side of the house, then I think that, yes, that is reasonable. That is -- those are records that are there.**

Q. Staying with the idea of whether it was reasonable again -- and I'm unclear here.

Do you believe that it was reasonable for Little to call probation and say send over all the records? If I recall, your response was, no, not all records. Would then Little -- would - should she have then tailored through and said, well, what records do you have available, listen to the response, and then say, well, send me this, this, and this?

A. **Well, I think that when -- when you make a document request, every -- it's very common that you -- that a youth and/or a -- or an adult sign a release of information that permits the release of documents. And normally -- in juvenile facilities, you don't really have to do that with a youth**



**because the -- my understanding of the law is that the superintendent or the director of juvenile services, whoever is legal custody -- custodian of that child at the time of detention, has -- has that right to gather that information.**

**So you don't have to go to the parent. You don't have to go to anyone else. You don't have to go to the youth who's 12-years old and ask him for permission to do so.**

**But when you sign a release of information, you normally ask for specific documents or a specific group of documents. So you wouldn't say to the probation officer, I want all of [redacted]'s probation records. Because, to a nurse, there's information on there that's not really relevant to what she has to do.**

**But what she would ask for, I would presume, would be for medical and mental health records that are pertinent to her assessment because she's conducting the health assessment. She has -- she is one of the people responsible to decide whether or not to make a mental health referral or not.**

**This same responsibility extends to the**



**detention center staff when they're conducting the -- their intake screening. It's the same process.**

Q. And it's your opinion that probation had the ability to freely share that information with detention and with medical?

A. **Yes.**

Q. Okay. And --

A. **Absolutely.**

Q. And your basis for that is what?

A. **Is my experience of 37 years being involved in -- in both juvenile detention and juvenile commitment facilities; that this -- this information is readily available and needs to be shared.**

Q. And that information should have been gathered on every youth that was at the detention facility; correct?

A. **For -- what do you mean needs to be shared?**

Q. Well, the medical -- the medical and mental health records that probation had on any youth should have been gathered by medical and shared by probation for all youths at the detention facility.

A. **Well, of course. Why would you just have one -- one policy for one child.**

Q. Okay.

A. If you look at the detention center's policy, it -- it says that. In so many words, it says that.
And -- and Mr. Freeman, the superintendent, said the determination of suicide risk is not just depending upon the self-report of the youth. It is -- and I can go back and look what he specifically said. It's based upon the gathering of information, the gathering of records.
Their own policy says that; that we will solicit information from outside entities to do the assessment process. And they're not talking about the assessment side of the house. They're talking about the detention side of the house.
So, of course, you -- the -- the -- the rules apply -- the policy applies to all youth that come into the facility, not just R[redacted].
Q. Okay. You reviewed the -- and, sir, as you know, if you need to take a break, just say so.
A. It's really the court reporter who needs the breaks.
COURT REPORTER: Thank you.
BY MR. HEISE:
Q. Sir, you indicate that you reviewed the



Agreement for Inmate Health Care Services based on the contract between the Franklin County Juvenile Detention Facility and, at the time, HP?
A. Correct.
Q. Later, correct care -- Correctional Healthcare; correct, sir?
A. Yes.
Q. Okay. What, if anything, did those contracts add to your opinions in this case?
A. Simply that there was a contractual agreement between the county and CHC -- Correctional Healthcare Companies; that there was requirement of -- or there -- I believe there was a requirement for National Commission on Correctional Health Care certification.
There was an agreement or requirement for -- for CHC to provide suicide prevention training. So that -- that I think was the most helpful part of that.
Q. Okay. Let's talk about CHC. Excuse me, NCCHC. A lot of letters there. What is NCCHC?
A. It's the National Commission of Correctional Health Care. It's a private entity based in Chicago that promulgates correctional



health care standards for juvenile facilities, jails, and prisons. And they also have an accreditation component to it.
Q. Okay. And when it comes to the accreditation component, NCC will partner with a particular facility. The facility will seek accreditation, will have to go through NCCHC training, meet their standards, and once they meet their standards, they will be accredited; correct?
A. That's correct.
Q. The standards promulgated by NCCHC are only mandatory to those facilities that seek their accreditation; correct, sir?
A. Correct.
Q. NCCHC promulgates standards, obviously; correct?
A. Yes.
Q. They provide all kinds of information regarding corrections and -- well, regarding corrections and how to properly run a corrections facility?
A. Correctional health care. I wouldn't say corrections in general.
Q. Okay. Correctional health care. And they



also provide guidelines -- guideline information for correctional health care. Would you agree with that, sir?
A. Yes.
Q. Okay. The standards are mandatory, like we said, if you seek accreditation; correct?
A. Right.
Q. The guidelines, are they mandatory on anybody?
A. What -- I'm not sure what you mean by -- you're talking standards and then you're talking guidelines.
Q. Okay. That is correct.
A. And I'm not -- I don't think -- I'm not understanding what you mean by that.
Q. Okay. And maybe there is a term here. Do you believe that NCCHC guidelines are the same as and mean the NCCHC standards?
A. Well, by guidelines, what I'm interpreting by your question is that they -- NCCHC has, in the appendixes to some of their standards as well as on their website, they have position statements, position papers. I believe they also have documents called guidelines, which are supplemental in nature.

Page 77

**They provide, I think, further guidance to -- as a companion to their standards.**
**So that would be the distinction that I would make.**
Q. Okay. Did you happen to bring a copy of the HCC -- excuse me -- the contract between the detention facility and Correctional Healthcare?
**A. No. It's on my -- the flash drive I gave you.**
Q. Okay. To help with your recollection, I'll point you to what is McKinney Bates stamped 5770, 1.11. And I thought -- I think there might be another one, but at least 1.11.
**A. Okay.**
Q. There it talks about the health assessment that is to be given by -- or that is to be taken by the health professional at the facility. The health assessment shall follow current NCCHC guidelines. That's the wording; correct?
**A. Yes, it is.**
Q. Okay. Do you believe that that language means that the health assessment shall follow current NCCHC standards?
**A. Yes.**

Page 78

Q. Okay. So here you're equivocating the word guidelines with standards?
**A. In this paragraph, I am, yes. Because I don't -- I could be wrong, but I don't think there's a -- I don't think there are any guidelines on health assessment from NCCHC. There's a pretty straightforward standard on it.**
**And I think that that just -- that's just the particular -- I'm not going to call it a typo in the agreement, but I think -- I am assuming that the parties were ensuring that the provider, CHC, was simply going to conduct a health assessment that was consistent with the NCCHC standards.**
Q. Okay. But, again, just for us to be clear, that's an assumption on your part that this is some type of typographical error or some type of error in verbiage in the contract regarding the use of the words guidelines versus standards?
**A. In this particular paragraph. Because I -- again, I don't believe there are any -- I don't think there's a difference between NCCHC standards and guidelines regarding health assessment as is referred to in this subparagraph.**
Q. But you don't know if there's even any

Page 79

guidelines when it comes to health assessments promulgated by NCCHC; correct?
**A. Well, no. I'm pretty familiar with the NCCHC guidelines and standards, and I don't remember there being a separate one that would be separate -- that there would be a difference between a standard and a guideline for health assessments.**
**Health assessments is pretty -- pretty clear cut. It is -- the standard provides a listing of those topics that should be addressed and queried into during the assessment, and there's -- I don't -- my -- my best opinion is that I don't believe that there is a difference between a health assessment guideline and standard from NCCHC.**
Q. I believe the only other place that NCCHC is referenced is in 1.4, Dental Oral Screening Only.
**A. To be perfectly honest with you, there's -- this is a -- this is not a -- this is not the best -- the best worded agreement.**
**There's reference to the American Medical Association standards. There are no American Medical Association standards for health care in jails. NCCHC is the -- was promulgated as part of a sub-project of the American Medical Association.**

Page 80

**They were borne -- NCCHC was borne out of the American Medical Association Jail Project.**
**So there's reference to the AMA in here, which clearly is a mistake, and it should be -- and I'm referring to 1.5. That what -- what that should read is that decisions concerning medical care shall be consistent with the applicable NCCHC standards.**
**So that was just poor -- poor editing here, as far as I can see.**
Q. Either that or here -- as you sit here today and for this case, you're rewriting this contract.
**A. No. I'm not rewriting the contract.**
Q. Sure you are. Because you're saying that AMA doesn't apply; that they must have meant NCCHC.
**A. There are no AMA standards for correctional facilities.**
Q. Okay. So be it. That's what the contract says.
**A. Okay.**
Q. But there's also --
**A. No; I'm not here to rewrite it. All I'm saying is that there's another example of how there could be some poor editing in this contract. I**

**don't think it makes a whole lot of difference into the scope of what we're discussing here today.**
**As I said, you asked me for why -- why was this agreement pertinent to my review, and my -- my opinion was that it references the NCCHC standards.**
Q. No, it doesn't, sir. I correct you. It says guidelines.
**MR. GROVES:** Objection to form. You know, this is -- you're now arguing with him.
**THE WITNESS:** Yeah; my opinion is that in the -- in the -- my opinion would be if you're taking this literally as a difference between the standards and the guidelines, then I think you are incorrect and that this, as I -- I have literally read hundreds of agreements between Correctional Healthcare providers and jurisdictions, and there's only one intention in placing NCCHC into an agreement, and that is that they will either abide by the NCCHC standards or they will become accredited and maintain accreditation with the NCCHC standards.
So in this contract, they're not -- I



don't believe there's any language that says they are requiring CHC to become accredited, but they are requiring them to follow NCCHC standards.
You and I can go back and forth about the difference between did they intend it to be a guideline as opposed to a standard. I'm saying the intention was, Hey, folks, you know NCCHC, please follow their standards when you are providing medical services to this facility.
That's my opinion.
**BY MR. HEISE:**
Q. Okay. Does the contract say anything other than following NCCHC guidelines or your opinion of standards other than on intake and dental: 1.11 and 1.4?
**A. Well, I would hope that they're -- to answer your question, this is the only reference to NCCHC that I have that I can find that you pointed out. I'd have to go through this in more detail. I didn't go through this in more detail because I didn't think it was important to do so.**
**I assume if they're employing a nurse and a**



**physician in the -- in the juvenile facility, that both of those employees are following NCCHC standards that are not limited to simply the intake screening or the health assessment and/or not doing anything contrary to those standards.**
Q. Thank you, sir.
**A. There's also a narrative on -- you know, as you go through this, there's -- there's lots of references to NCCHC, and believe it or not, to prove my point --**
Q. Hold on. Give me a reference page.
**A. Page 10 of 19.**
Q. Okay.
**A. 7.3, the very bottom.**
Q. Got you.
**A. It says in accordance with NCCHC standards. It's my opinion that the editing of this report was poor and that the intent was --**
**MR. GROVES:** You said report. You mean contract.
**THE WITNESS:** Or agreement or contract -- that there's no difference in -- in the conception of this agreement to mean NCCHC standards. And simply because the



word guidelines is used periodically does not show a distinction between standards and guidelines.
**BY MR. HEISE:**
Q. Well, let's be clear as to your reference to the standards at 7.3. That is -- that 7.3 references the protection of inmate and detainee health care records being protected in accordance with NCCHC standards; correct, sir?
**A. No. Seven -- no; 7.3 doesn't have to do with records access. It has to do with use of inmate detainees in the provision of health care services; that they should not be used in positions not involving the rendering of health care services.**
Q. And not involving access to detention center population records in accordance with NCCHC standards.
**A. Yeah. I, quite frankly, am having a hard time understanding this subparagraph.**
**My point is that it's just referencing standards, the word standards.**
Q. There it does. I agree with you.
**A. Okay.**
Q. Anywhere else that you find where it

references standards?
**A. Well, I -- there could very well might be. If you want to take a break for me go through this agreement and look for that, we can do that. But I -- in leafing through it, I just noticed it.**
Q. Okay. And the reason I'm being particular about this, sir, is because you have very specific opinions that correct care -- Correctional Healthcare violated NCCHC standards after agreeing to follow them. So that's why I'm being very particular about this.
**A. No. I understand the line of questioning.**
Q. Okay.
**A. I'm only saying that there's no distinction -- in my opinion, there's no distinction between the terms standards and guidelines. And I think that perhaps there's confusion by reading this agreement to suggest that there is a difference, that NCCHC has a set of guidelines which are more applicable in this case; and my opinion would be that's not correct.**
**There -- there is language in this agreement that it appears that the intent is for the provider to follow NCCHC standards, period. Now,**



**they're not providing mental -- it's very clear, too, that they're not providing mental health services. They're only providing medical services. They're only providing two employees, as far as I can tell: A nurse and a physician.**
Q. Okay. Do you wish to go through this contract so that -- to make sure that there's no other reference to NCCHC standards or are you satisfied that we've gone through it all? You're supporting your opinion.
**A. Yes.**
Q. I'm trying to find out how you support your opinion.
**A. No; I'm -- I don't need to go through this more. My testimony would be that there could very well be more references to the word standards; but I don't think we need to waste time doing that.**
Q. Very good. Set that aside and we'll move forward.
At page 5 of your report under Case Analysis, you indicate, "This writer was asked by plaintiff's counsel to examine all pertinent documents available in this case."
Did you rely on plaintiff's counsel to



provide what plaintiff's counsel deemed to be all pertinent documents for your review?
**A. No.**
Q. Okay.
**A. No. I -- probably the use of the word pertinent is not -- is not appropriate. All the documents are -- I normally request all documents that are available in the case.**
Q. Okay. You also talk about the standard of care and standard juvenile detention practices. We've talked about standard of care a bit already.
And what do you mean by standard juvenile detention practices?
**A. Well, sometimes there -- the -- the manner in which the detention center is being managed or the practice is going on differ from what the policy requires or the standard requires. So it's looking at both.**
**You -- one cannot assume that just because there is a policy developed based upon the standard of care, that that policy or standard of care is being consistently implemented in the detention center or is a standard practice in that detention center or other detention centers of -- of similar**



**likeness. Of size, whether it's scope, meaning short term, long term; whether it's male/female; those -- those kinds of things.**
Q. Is there a singular place that you can refer me to where I would be able to find the standard of care that you reference in your report?
**A. No.**
Q. Where would I have to go to find that standard of care?
**A. Standard of care is -- in my opinion, the standard of care is -- is a combination of both documents like the NCCHC standards, the American Correctional Association standards, the -- I also reference The Council on Juvenile Correctional Administrators. They have what are called performance-based standards on juvenile facilities.**
**So it's a combination of those written standards as well as what the field, the juvenile correctional detention field, believes to be the standard of care. Some of it is in -- most of it is in writing in these standards.**
**But that is what the experts, the leadership in the field, believe should -- this should be the standard as we're operating our**

Page 89

juvenile facilities.
Q. Is there an organization -- well, strike that.
You used the term proximate cause in that first paragraph. What do you mean by proximate cause?
**A. Meaning that the -- the actions or inactions of individuals and the -- the promulgation of policies and direction of the officials and supervisors were -- so both -- both individual actions by staff, as well as the policies and procedures of the facility, were they acting jointly or -- or individually to be related to the proximate cause or one of the proximate causes of R[redacted] committing suicide. Were they -- were they related and how were they related?**
Q. What individual actions by Nurse Little do you believe were the proximate cause or were a proximate cause of R[redacted]'s death?
**A. I think her -- I think her complete lack of understanding and complete lack of training in the area of suicide prevention. I think her -- her narrow view that any outside -- anything outside of her interacting with R[redacted] was unimportant to the**

Page 90

**assessment of his potential risk for suicide was one of the proximate causes.**
Q. Anything else?
**A. For Nurse Little?**
Q. Uh-huh.
**A. Not that -- nothing in addition to what -- that I just said or was in my report.**
Q. What about CHC?
**A. There's -- there's really -- other than the fact that there was an agreement -- a signed agreement that CHC was to provide suicide prevention training -- and that, obviously, was not done -- no one who was deposed in this case had any understanding of that, that that was a requirement of the contract, it seems. So it seems -- seemingly it was in the contract, but never -- never invoked because people seem to be surprised by that.**
**So other than the fact that they were contractually required to provide suicide prevention training to not only Nurse Little but to all staff in the detention center and that was not done, then -- their suicide prevention policy was not required in this -- in this facility. So I don't have an opinion about that policy because it was not**

Page 91

**utilized in this facility, apparently.**
Q. Do you know who had the contract for mental health -- to provide mental health care at the facility at the time of R[redacted]'s death?
**A. There was -- as I stated earlier, there was a little bit of inconsistent information about that. I think it -- when I looked at the detention center's policy, it mentioned an entity called, I believe, Franklin/Williamson Health Services, that they provided crisis intervention services to the facility.**
**However, I also -- I think it was Mr. Freeman or someone else mentioned Centerstone or -- no, I'm -- this is in the response. I don't know whose response it was, whether it was the county's or -- or other; but I just have it under the heading of responses that there was a response from one of the defendants that Centerstone provided crisis intervention services.**
**So I'm not sure if Centerstone was a subpart of the county's health department. It was unclear.**
Q. In your report, I believe at page 5, you reference the only national study on juvenile

Page 92

suicide in confinement for the U.S. Justice Department; is that correct, sir? Page 5, second to the last line.
**A. On page 5 of my report?**
Q. Yes, sir. Second to the last line. This writer then bases his professional opinions on his --
**A. Oh, yes. Yes. I'm sorry. I was looking for the title of the study.**
Q. Right.
**A. Sorry.**
**************************************
**(Exhibit Number 7 was marked for identification.)**
**************************************
**BY MR. HEISE:**
Q. I'll show you Exhibit 7, Juvenile Suicide in Confinement. Is that what you're talking about?
**A. Yes.**
Q. Okay. I'd like to go through that a little bit, if we could, please.
**A. Sure.**
Q. At page numbered 3 -- not page 3, but -- yeah, page numbered 3, Self-Injurious Behavior.

Page 93

A. **Yes.**
Q. First sentence, "Little research has been conducted regarding youth suicide in custody."
We've kind of touched on this already. And you agree that is still accurate today, is it not?
A. **Yes.**
Q. The next paragraph begins, "Other studies found that significant percentages of detained youth had histories of suicide attempts."
Correct?
A. **That is where? I'm sorry.**
Q. I'm sorry. The next paragraph under self-injurious behavior.
A. **Yes.**
Q. "Other studies found that significant percentages of detained youth have histories of suicide attempts."
A. **Yes.**
Q. [redacted] did not have a history of suicide attempts; correct?
A. **That's correct.**
Q. And then it goes on to say "and current suicidal behavior."
Did [redacted] ever exhibit suicidal behavior

Page 94

prior to his death while at the detention facility?
A. **It -- well, it depends what you mean by -- I would say that there were -- that he was displaying several suicide risk factors that necessitated a referral to -- to mental health staff.**
**So it depends what you mean by -- by -- if your question is intended to mean did he threaten suicide, did he express suicidal ideations to anyone during his confinement in the juvenile detention center, then my answer would be no.**
**But throughout my whole report, my point is that he was displaying -- he had the history of and was displaying several suicide risk factors that should have necessitated his referral to mental health care.**
Q. Okay. And I'm not trying to be a jerk about this, but this is your report and you used the term "and current suicidal behavior". So I'm just trying to figure out what you mean in this report about current suicidal behavior.
Is that different than risk -- by definition, is that different than risk factors?
A. **Yes.**

Page 95

Q. Okay. Okay. At page 7, the last paragraph, first sentence. It talks about the nature of this particular study.
"There are 83 facilities that had sustained 110 suicides."
Is that correct?
A. **Yes.**
Q. And this was over a how many year period?
A. **I believe it was a five-year period.**
Q. Okay. So in terms of the study, that is basically the major circle, if you will, of suicides over a five-year period in juvenile detention facilities that were found at the time of this study?
A. **Correct. It's not just detention, but commitment facilities and residential treatment programs.**
Q. Yes.
A. **For juvenile offenders, yes.**
Q. Thank you for that. In fact, going to page 9, Findings. Are you there?
A. **Yes.**
Q. To refine that circle a little bit more for this study. "Project staff analyzed data on 79

Page 96

suicides that occurred in public and private juvenile facilities between 1995 and 1999."
Is that correct, sir?
A. **Yes.**
Q. And then going down a little bit, reading the stats, 29 of 79, or 36.7 percent, occurred in detention centers.
Is that correct?
A. **Correct.**
Q. Would the Franklin County Juvenile Detention Center fall within that scope of detention centers as defined in this study?
A. **Yes.**
Q. Okay. So now out of 110, 79 were studied, and out of 79, 29 were found to have been suicides in detentions centers; correct?
A. **Correct.**
Q. Okay. Training schools and secure facilities had the highest level of suicides; is that correct?
A. **Yes.**
Q. Which has the higher population: Training schools, secure facilities, or detention centers?
A. **I don't know the answer to that question.**

Q. Can you give -- based on your experience, give an educated estimate as to which might have a higher population?
**A. No.**
Q. Okay. Going to page 10. "More than 70 percent of victims were between the ages of 15 and 17."
Correct, sir?
**A. Yes.**
Q. The next page, 11, Confinement Status. "Approximately two-thirds, or 67.1 percent, of victims were being held on commitment status at the time of death."
What is meant by commitment status?
**A. That they were not detained; that they were serving a term imposed by the court. It's usually they were committed to a -- normally to a state facility, a state juvenile correction facility.**
Q. What would, then, R[redacted] -- in your opinion, what was R[redacted]'s status? Was he a commitment status or detained?
**A. Detained.**
Q. Okay. Next page, 12, Length of Confinement Before Suicide. Apparently this study differed from



a previous study that you had performed back in 1989 regarding when suicides are committed; correct, sir?
**A. Yes. That prior study was on adult jail suicide.**
Q. Okay. So here's the difference of juveniles versus adults; correct?
**A. Correct.**
Q. Okay. Are there any other significant differences in your opinion between juveniles and adults when it comes to suicide?
**A. Yes.**
Q. Okay. Length of time before suicide would be one of them?
**A. Yes.**
Q. What are some of the other big ones, in your opinion?
**A. Well, obviously, their age.**
Q. Sure.
**A. Youth having higher -- higher rates of impulsivity and related issues of controlling their behaviors.**
**ADHD is obviously found more in -- more in juveniles than in adults, and that is a -- ADHD has been found, not by myself, but by others, to have --**



**to be an increased risk factor for suicide.**
Q. Staying with ADHD, if we could, could you give me a percentage as to how much of a higher risk factor it is --
**A. No.**
Q. -- ADHD versus not ADHD?
**A. No.**
Q. Okay. In regards to general statistics, do -- does the adult incarcerated population have a higher or lower suicide rate than the juvenile incarcerated population?
**A. I can only speak to the adult. I've only conducted national studies on jail suicides that have calculated suicide rates. I did not calculate the suicide rate in this study in the juvenile study because, thankfully, there weren't enough suicides to -- that took place during this time period to calculate the rate.**
**And you asked me a question before about are there more detention centers as opposed to commitment facilities, and I didn't know that. And that's -- you -- obviously, in order to calculate suicide rates, you need to know -- you need to have an accurate determination on the number of**



**individuals detained in detention centers as well as the number of individuals detained in commitment facilities or -- in commitment facilities to calculate suicide rates. One reason why I didn't calculate suicide rate is that that data was not readily available.**
**With that said, there have been other calculations of suicide rates within juvenile facilities that I have not done -- and I'm not sure if I referenced them in my report -- that do suggest that the suicide rate in juvenile facilities is higher than the population outside.**
**It does not equate, as your question does, the difference between suicide rates within juvenile and adult detention facilities. So that -- that -- that is my answer to the question.**
Q. Okay. And a fair one.
Do you know if suicide rates in juvenile detention facilities have increased or decreased since the time of this study?
**A. No, I don't know.**
Q. Okay. At page 14 -- well, hold on a second. I might need to go back a page.
If you'd start at page 13, please. Is

Page 101

substance abuse a indicator of potential suicide risk?
**A. Yes.**
Q. In your opinion, did R[redacted] have a history of substance abuse?
**A. I believe there was reference to him smoking marijuana. I could be incorrect. But I think there's reference to that, yes.**
Q. Correct. And based upon the history that I've read, apparently prior to his incarceration, R[redacted] smoked marijuana one time with a friend.
**A. Okay.**
Q. And he tested positive at the time of his incarceration.
**A. Right.**
Q. Smoking pot one time, does that equal substance abuse?
**A. You know, I'm not an expert in substance abuse. So I'm not going to offer an opinion about that.**
Q. Okay. Medical problems. Other than his ADHD, are you aware of any medical problems that R[redacted] had?
**A. Not that I can recall, no.**

Page 102

Q. And then at page 14, Emotional Abuse. Is that an indicator of a potential suicide risk?
**A. Yes.**
Q. Did you -- are you aware of any emotional abuse that R[redacted] had suffered prior to his incarceration?
**A. I don't believe there's any in the record, no.**
Q. Same questions regarding physical abuse?
**A. I don't believe there's any record to indicate that either.**
Q. Okay. And that, again, would be a potential suicide risk factor to consider -- physical abuse?
**A. Correct.**
Q. Same thing with sexual abuse?
**A. Correct.**
Q. And there's no history of sexual abuse, that you're aware of; is that correct?
**A. That is correct.**
Q. Mental illness, ADHD with R[redacted]. Are you aware of any other mental illness that would have been a risk factor for R[redacted]?
**A. Well, he had been previously diagnosed with**

Page 103

**depression, not most recently as we discussed with Dr. Spalt, but he had previously had -- had such a diagnosis.**
Q. And that was through the SASS counseling?
**A. Correct.**
Q. Okay. Prior suicidal behavior. Had R[redacted] ever exhibited prior suicidal behavior?
**A. I would have to go back and look -- I don't know if it's in here -- about how this was defined, whether it included ideation and physical behavior. I'd have to go back to -- I'm not sure if I have a definition section here or how I defined it. Probably if I had a survey in here. Here we go. Let's see if it's defined in here.**
Q. How about possibly in the -- under prior suicidal behavior, your statistics, I thought you maybe defined it by statistics.
**A. Yes.**
Q. Okay.
**A. I apologize. You're absolutely right.**
Q. Sure.
**A. So I defined it by suicidal attempt, suicidal ideation or threat, suicidal gesture, self-mutilation. Correct.**

Page 104

Q. Okay. Suicide attempts. With R[redacted], you're not aware of any suicide attempts; correct?
**A. Yes.**
Q. Followed by suicidal ideation or threat. Are you aware of any suicidal ideations or threat?
**A. Yes.**
Q. You are aware of that?
**A. Yes. That was in his school records.**
Q. And then suicidal gesture or self-mutilation. Are you aware of R[redacted] ever having suicidal gestures or self-mutilation?
**A. There were -- I will just say that there were some -- there were references to cuts on his arm that weren't really explained. I don't know where that was, whether it was in one of the intake screening forms; but there was no -- no definitive answer whether or not those were scrapes from running through the woods and cutting himself as opposed to -- to self-harm. So I don't know at that point. So the record was unclear about that.**
Q. He had poison ivy when he came in; correct?
**A. I believe there was reference to that, yes.**
Q. Okay. Were you ever allergic to poison ivy?

**A. What's that?**
Q. Are you allergic to poison ivy?
**A. Yes, I am; but I wouldn't refer to that as a cut. I would refer to that as poison ivy.**
Q. Okay. I just remember some of the times that I had it, it was bad.
History of room confinement. Do you see that section, sir?
**A. Yes, I do.**
Q. You define room confinement, do you not?
**A. Yes.**
Q. And room confinement has been used as a behavioral sanction in juvenile detention facilities; is that correct?
**A. Yes.**
Q. Is it your opinion that R[redacted] was on room confinement at the time of his death?
**A. Yes.**
Q. In your opinion, did medical have anything to do with R[redacted]'s room confinement?
**A. No.**
Q. Do you know if medical had any input one way or another as the ability to take a youth off of or in to room confinement?



**A. I can't answer that. There was no policy -- there was no written policy on room confinement. Nurse Little testified she didn't even know what the term meant.**
**So I -- I can't really opine about whether the nurse or CHC had any responsibility for it. There -- there are times in which there are medical reasons for room confinement. If there -- there could be what's termed medical isolation.**
Q. Measles; something like that?
**A. Yeah; if there's contagious or infectious disease, there could be a reason why medical would want to impose room confinement.**
Q. Room confinement is a term of art, at least as you use it in your studies, is it not?
**A. Yes; and it's -- I should state, if it's not clear in my report, that this is not my definition. This is the definition that was carefully crafted by talking to experts in the field, including the Council on Juvenile Correctional Administrators who is an agency made up of all the state juvenile justice directors, and they have standards out there and had previously defined the term room confinement, which is very,**



**very similar to what I used in this study.**
Q. Would you expect a part-time nurse at a juvenile detention facility to have an understanding and be able to define this carefully crafted definition?
**A. I would expect any nurse working in an adult or juvenile facility to know the effects of room confinement or isolation on a 12-year old and how it affects their potential for suicide, and she had zero knowledge of that risk.**
Q. Room confinement does not include the youth being assigned to their room during traditional non-waking hours; correct?
**A. Correct.**
Q. All right. And you understand, of course, that the -- this detention facility had only single bunk rooms for the youth; correct?
**A. I didn't know that for a fact. I did see some videotape of the facility, and I -- I didn't pay attention to see whether or not they were single or double bunk. But if that's what you're -- if that's what you're stating, then I will assume that that's true.**
Q. At page 17, you talk about method



instrument and anchoring devices. Were you aware that R[redacted] was in an ADA-compliant room?
**A. Yes.**
Q. Okay. Are you critical of R[redacted] being housed in an ADA-compliant room?
**A. Not necessarily. I'm -- I'm -- I am -- I would be concerned -- I am concerned by the fact that the hand -- the handrail that was used was not ADA-compliant; that it was dangerous; that it had been used previously in another suicide attempt.**
**So that's where my concern is, and that's what I put in my report.**
Q. Okay. Youth have used doorknobs and hinges as anchoring devices?
**A. Correct.**
Q. Air vents, bed frames, window frames, closet rods, sprinkler heads, toilets, sinks, and television stands; correct?
**A. Yes.**
Q. Going to page 18, if we could. You talk about time span. Your study found that approximately 41 percent of respondents stated that staff found the victim in less than 15 minutes following the last observation of the youth;

Page 109

correct?
A. Yes.
Q. In regards to, specifically, detention centers, approximately one half of the deaths in detention centers were found to be within 15 minutes of the last observation; is that correct, sir?
A. Yes.
Q. Going to page 19, Assessment by Qualified Mental Health Professionals.
Your study found that almost 70 percent of the victims were assessed by a qualified mental health professional prior to their suicide; correct, sir?
A. Yes.
Q. And by that, that is meant at the facility where they were detained at the time of their death; correct?
A. Yes.
Q. Okay. Again, because here with R[redacted], he was assessed some months prior to his death at a different incarceration, this statistic -- this 70 percent -- talks about the incarceration that the victim was assessed during the scope of the incarceration that led to his death?

Page 110

A. Correct.
Q. Okay. You also find that slightly more than half, 51.7 percent, of the detention center victims committed suicide within the first six days of confinement; correct?
A. Yes.
Q. Okay. You also found that almost half --
A. Wait, wait, wait. That's not -- that's in relationship to being assessed by a mental health professional. That's not the overall length of stay prior to suicide.
Q. You're correct. I apologize. And here I'll try to make sure, and correct me if I'm wrong.
"Almost half, 49.1 percent, of the victims receiving a mental health assessment had a contact visit with a qualified mental health professional within six days of their death."
A. Correct.
Q. Okay. Now, that 49.1 percent, would that apply to the total 79 that you were able to study?
A. No. That --
Q. Okay.
A. That 49 percent is of those youth receiving the mental health assessment.

Page 111

Q. That would be --
A. So that would be out of the -- there were 55 out of the 79 youth that received a mental health assessment; 49 percent of that 55 would have had a mental health assessment conducted within six days of their death.
Q. Okay. So basically half of the 70 percent that we were talking about?
A. Yes.
Q. Okay. At page 26, you have a more thorough discussion of room confinement, and in the last full paragraph, first sentence, "Room confinement and isolation can be effective behavioral management tools when appropriately used for short durations that are closely monitored and clearly documented."
Is that correct, sir?
A. Yes.
Q. Okay. The monitoring -- the 15-minute monitoring, would that be adequate monitoring?
A. That would be, I think, a recognized standard of monitoring would be 15-minute checks for youth that are under room confinement.
Q. Okay.
A. I shouldn't -- that would be the maximum

Page 112

amount of observation. There are those that do 5- and 10-minute checks for kids that are put on room confinement status. They -- they generally believe that that status is very similar to suicide precautions.
So because of the increased risk, principally because of the study that I did that associate such a high number of these suicides with a room confinement, as a result of this, many -- many jurisdictions basically changed their room confinement policies to match those that were on suicide watch, if that makes sense.
That -- that whether they were on suicide watch or whether they were on room confinement, they will still be observed at the same level of frequency because of the inherent risk of room confinement to suicides.
Q. Well, statistically you found that it was a 50/50 proposition, was it not?
A. I said --
Q. That of the suicides --
A. Yeah; and that's a very high. Right.
Q. Okay. That it's a 50/50 proposition.
A. Yeah.

Q. Okay.
**A. Well, why that's important is that such a small minority of youth are on that status. So you -- you look at it just as you do in the adult field, you know, 66, 70 percent of the suicides that occur in adult jails occur in isolation. Why is that significant? Because only a small percentage of inmates are held in isolation.**
**So there's a disproportion in numbering rate of suicides in the adult field for inmates that are in a segregation or in isolation. That's why it's -- so that's why it's more telling.**
**It's the same thing with the juvenile field. So few kids are held in room confinement, yet their room confinement is responsible for 50 percent of all the deaths. So there's a disproportion numbering rate of suicides within juvenile facilities. That's why this statistic became important and has resulted in a dramatic reduction in the use of room confinement throughout the country in -- in juvenile facilities.**
**In fact, there's now -- I'm sure you've seen in media, there's -- there's a huge push to end segregation of any form in juvenile facilities**



**around the country.**
Q. Is room confinement, by your -- or, by definition, the same as segregation?
**A. Yes. It's a form of segregation, yes.**
Q. Okay.
**A. And I said that in my report -- in my report on this case as well as in the study, that it takes many forms. It could be a timeout. It could be isolation. It could be segregation. It could be voluntary sometimes. Sometimes a child will ask for a timeout or ask for room confinement.**
Q. Were you aware that [redacted] could see other youth when he was in his cell?
**A. My understanding from looking at the videotape is that there was a window in each cell door so he was allowed to look out. I don't think he could -- he could see on the other side of the corridor; but I don't think he could -- I don't think the youth could see to the left or the right.**
Q. Are you aware that he'd communicate with other youth when he was in his cell?
**A. He was prohibited from doing so.**
Q. But he still had the ability to communicate?



**A. Sure. You know, if he didn't want to get in further trouble, he could do that. I mean, that -- that question you asked is a further perpetuation of the problem of room confinement and suicide. If you're not only confined to your room, but you're not allowed to talk to another human being, that's problematic.**
**MR. HEISE:** I'll tell you what, I'm going to take five real quick and look over some of my notes.
****************************************
(Whereupon, break from 11:32 to 11:40 was taken in the proceedings.)
****************************************
**BY MR. HEISE:**
Q. Sorry to kind of back up a little bit. Are you aware of any NCCHC-certified juvenile facilities?
**A. Specifically? You know, that's not something I pay much attention to. So I can't answer that question.**
Q. Okay.
**A. I know there's probably -- I think the estimate is about five percent of all correctional**



**facilities are accredited by either ACA, American Correctional Association, or National Commission on Correctional Health Care. So I believe the few -- few jurisdictions choose accreditation.**
**I think far -- a far greater number try to abide by their standards, which is not as costly because you don't have to pay for the accreditation process. So you can develop and promulgate -- develop and maintain policies consistent with NCCHC standards without going through the formality of the accreditation process.**
**But specifically juvenile facilities, I can't think of one off the top of my head.**
Q. Okay. Of the adult prisons that are certified, are you aware of a statistic as to the number of suicides they have encountered after certification?
**A. No. I don't know if that's ever been studied.**
Q. You have consulted with juvenile facilities in the past?
**A. Yes.**
Q. Okay. Aside from being a court monitor, you have consulted with them in order to assist in

Page 117

training their staff; correct?
A. **That would be part of the consultation.**
Q. Okay.
A. **It could be. It's not always part of it.**
Q. All right. In regards to the number of facilities where you have provided consultation -- juvenile facilities -- how many do you think you've provided consultation to?
A. **Well, as I said earlier, I provided consultation to I think 16 state departments of juvenile corrections in the country. And out of those, there are multiple facilities within each of those systems.**
Q. I'm trying to hone it down a little bit more specifically. And what I'm trying to get at in the juvenile facilities where you have provided consultation, are you aware of any suicides that have occurred after your consultation?
A. **I guess your question is do I really work magic and prevent all suicides in which I'm consulting with, and I guess I don't know the answer to that question.**
**Unless I heard back from that jurisdiction again saying we went through X number of months or**

Page 118

**years without anything and now, unfortunately, we had another one so we want you to come back, unless I get those kinds of calls, then I don't know whether or not jurisdictions have suicides subsequent to my consultation.**
Q. And you have never sought to perform a study on your own to try to determine the efficacy of your training; correct?
A. **Well, you're asking this as if that's the only thing I do is training. I go on site and I do a very thorough assessment of suicide prevention practices. Sometimes I'm asked to provide training to the staff, but that's not always part of my consultation.**
**And I've written a training curricula on suicide prevention in juvenile facilities that has been disseminated and purchased throughout the country. So if your question is based upon purchasing -- or based upon a jurisdiction having my suicide prevention training curricula, has a study been done on whether it's been beneficial in reducing suicides, no, I have not conducted that study and I don't know of anyone that has.**
Q. Okay. So to kind of expand it, you have

Page 119

your curricula, you have the on-hands work that you have performed for facilities and at facilities, you cannot provide me any type of statistical information as to the efficacy of your work or your training; correct?
And efficacy being a reduction in the number of suicides in those facilities.
A. **That's not something that I have studied.**
Q. And it would be correct to say that those are statistics that you have not sought?
A. **Correct.**
Q. Turning pages is always a good thing.
Okay. Going back to your report at page 6, under [redacted] [redacted] the first paragraph. See where I'm at?
A. **Yes.**
Q. Okay. You indicate -- or you have a discussion of [redacted] being confined at the Franklin County Detention Facility on August 1st of 2012 following his arrest for arson; correct?
A. **Yes.**
Q. Okay. You indicate that MAYSI-2 was not performed; correct?
A. **Correct.**

Page 120

Q. And you indicate that he's not received a health assessment by nursing staff on that -- in that instance; correct?
A. **Yes.**
Q. And he had been confined for nine days; right?
A. **Yes.**
Q. Did the failure to perform a MAYSI or the failure to perform a health assessment on that visit cause or contribute to [redacted]'s death?
A. **No.**
Q. The next paragraph. You talk about [redacted]'s monthly mental health counseling, the SASS program.
[redacted]'s father participated in that program, did he not?
A. **I'd have to go back and look at his father's deposition testimony, but I believe there's some reference to parental counseling as well, yes.**
Q. Okay. Is there any doubt that the findings that those counselors made of [redacted] during those sessions were shared with Mr. Eads?
A. **I don't know the answer to that question --**
Q. Okay.
A. **-- without looking at his deposition**

**testimony.**
Q. Assume that in the deposition he testified that he did, in fact, participate in some of those counseling sessions with R[redacted] and that he was aware of the findings of the counselors -- assume that is true. Okay?
**A. All right.**
Q. Are you aware of Mr. Eads ever contacting the detention facility to discuss with them what he may have known regarding R[redacted]'s behavior at school or the findings that he had been informed of by the SASS personnel?
**A. I don't believe there's any record of him either being contacted by the center or he contacting the center.**
Q. Okay. We know that Mr. Eads became aware of -- became aware that R[redacted] was at the detention facility; correct?
**A. Yes.**
Q. So there was no doubt that he knew where his son was during the course of his detention?
**A. Yes.**
Q. During that time, are you aware of Mr. Eads ever contacting the detention facility for any



reason?
**A. I don't -- I don't believe -- I think I just answered that. I don't believe there was any contact between -- initiated by him to the detention facility.**
Q. Okay. Do you know if Mr. Eads had any contact with R[redacted] during R[redacted]'s assessment detention or his final detention?
**A. I don't recall about the assessment detention, but I -- I do recall him testifying that he did not have contact with R[redacted] during his most recent detention center confinement.**
Q. Can you think of any reason why Mr. Eads would not have contacted the detention facility to advise them of any concerns he may have had regarding R[redacted]'s mental health?
**A. Did you say assumptions?**
Q. Do you have -- what did I say?
**MR. GRAVES:** Can you think of any reasons?
**BY MR. HEISE:**
Q. There we go.
**A. I think one reason is that it's not uncommon for parents or loved ones to assume,**



**wrongly assume, that someone who is in confinement is safe and that they're safer in a detention center than they would be on the street.**
**And R[redacted], of course, was -- I think the day before his detention, he was -- he was sleeping in a store and he was in the woods and in the back of the school, and there could be assumptions -- if you're asking me what would be the reason for a father not -- not being concerned enough to call in to find out how his son is doing, I think -- I find, unfortunately, in many of these cases -- and, of course, I only look at cases involving suicide -- and the question is frequently asked if -- if a loved one, if the father, the daughter, the wife, the husband, had information, why -- why didn't they notify the facility?**
**And many times they do. And in times in which they don't, one of the reasons is that there's the assumption that their loved one is being taken care of. There is the assumption that there is an intake screening being performed that's asking all these questions. The assumption is that the probation officer is somehow in communication with the detention center.**



**So it's all based on assumptions, which is -- which are, you know -- I think if you're a parent, it doesn't -- and don't know anything about the workings of a detention center, it's a poor assumption because as tragically shown in this case, that assumption was incorrect; that Mr. Eads apparently had more information about his son's mental illness and history of suicidal ideation more than any of the staff working in the facility.**
**So I think there are also -- and I don't know this for a fact either. There's that tough love mentality that is -- that works -- not works, but it's out there between a parent and a child; and that could have been one of the reasons.**
**I don't know the reasons. And I don't know if it was explored during his deposition or not. So I can't answer that.**
Q. Were you aware that Mr. Eads had been incarcerated in his past?
**A. I don't remember one way or the other.**
Q. Were you aware that Mr. Eads' sister, the aunt -- R[redacted]'s aunt who they were living with -- was a retired corrections officer?
**A. I don't remember that.**

Page 125

Q. At page 7, first full paragraph, again, you continue talking about the SASS program.
R[redacted] was in two different programs over time, was he not?
**A. Yes, I believe so.**
Q. Did the counselors who saw R[redacted] during those two different periods, did they ever -- did those providers ever suggest that R[redacted] was suicidal?
**A. I don't know other than what I've written in this report.**
Q. Okay. Did they ever suggest that R[redacted] was a danger to himself in any way?
**A. I don't recall.**
Q. Do you recall if they ever indicated that R[redacted] needed some type of special care?
**A. I do not recall.**
Q. Do you recall if they ever suggested that R[redacted] needed some type of monitoring?
**A. I'm not sure what you mean by that.**
Q. Well, monitoring in some way of, you know, additional monitoring by parent, by school staff, by the nurse at the school to make sure that R[redacted] was okay.

Page 126

**A. I don't recall any information regarding that.**
Q. Do you recall those mental health providers saying that R[redacted] did not need a referral to any type of mental health facility?
**A. No, I don't recall that.**
Q. Do you recall them saying that R[redacted] did not need to be institutionalized?
**A. No.**
Q. Going with the next paragraph, this is the time between March 28th and April 15th; correct, sir?
**A. Yes.**
Q. Okay. We have gone through the various reports that were generated from that time period, and I certainly am not going to repeat those.
But here, again, you note that R[redacted] was not given a health assessment. Did that cause or contribute to R[redacted]'s death?
**A. No.**
Q. You point to -- during that time period, you point to two instances where R[redacted] was a little upset and R[redacted] got depressed and began to sob. Do you see those references?

Page 127

**A. Yes.**
Q. Okay. What importance, if at all, do those two notations have to your opinions?
**A. This -- this is simply noting his history while he's in confinement prior to September of 2014.**
Q. Okay.
**A. That's all. I'm not suggesting by this that, 1. He should have been on suicide precautions; or, 2. That they were precipitants to his death.**
**If I felt that way, I would have stated so in my report.**
Q. Okay. They were not noted by the two mental professionals that he saw during the course of his stay; correct?
**A. They were not -- you mean Dr. Jewell and Dr. Spalt?**
Q. Yes.
**A. Correct.**
Q. Okay. You do not note any of the positive notations that were made by staff during that stay; correct?
**A. Such as what?**

Page 128

Q. R[redacted] had a good day. R[redacted] interacted with other youth.
The lack of notation of R[redacted] having an issue on an apparent day would suggest that he was not crying, he was not sobbing, that he was not upset; correct?
**A. Correct.**
Q. But those are not things that you talk about.
You point to those two particular instances where R[redacted] was sad.
**A. Correct.**
Q. The next paragraph, first paragraph on page 8, we have talked about the Brandy Shirley evaluation. I don't think I have any more comments there.
Then we have Dr. Jewell in the next paragraph. Do you feel that Dr. Jewell misdiagnosed -- excuse me. Yeah. Next paragraph. Dr. Jewell. Do you think he misdiagnosed R[redacted] in any way?
**A. I'm not qualified to answer that question.**
Q. Okay. Doctor Jewell had a number of psychological tests given to R[redacted]; correct?

Page 129

A. Yes.
Q. Are you qualified to review those tests and give opinions as to the results?
A. No.
Q. So it would be fair to state you do not question Dr. Jewels assessment or conclusions from those tests; correct?
A. Correct.
Q. The next paragraph, page 9 -- excuse me, first full paragraph. That is your discussion of Dr. Spalt's evaluation; correct, sir?
A. Yes.
Q. I think we've gone through that one too.
Turning pages. Good, good, good.
MR. GROVES: You got to leave yourself time to stop at the airport and eat at the place where I didn't go last night which he suggested, which is Legal Seafood.
(OFF RECORD DISCUSSION.)
BY MR. HEISE:
Q. I think we can skip page 10. That really doesn't talk about medical.
Page 11. Strike that. There is no question.

Page 130

You talk about, the last paragraph, Supervisor Upchurch, and the paragraph then goes on to talk about interviews with Youths S.B. --
MR. BLEYER: What did you say?
MR. HEISE: Youths S.B. and A.W.
BY MR. HEISE:
Q. And you refer to them later on in your report also.
Those interviews were conducted by law enforcement in the investigation of R[redacted]'s death; correct, sir?
A. Yes.
Q. Okay. Is it your opinion that corrections or medical -- and I'll ask it separately if I need to.
Is it your opinion that either corrections or medical has an obligation, in order to protect the youth from suicide under their care, to go out and interview other youths to question them?
For instance, Youth A being questioned, Have you seen anything unusual about Youth B, and then going to Youth B and asking the same question about Youth A.
A. No.

Page 131

Q. Okay. You would agree hindsight is 20/20; correct?
A. Yes.
Q. All right. And here, talking to those youth provided additional information that was not available to medical or corrections at the time?
MR. GROVES: Object to the form as to not available. You can answer.
THE WITNESS: Yeah; I mean, what it -- to me, what it could exemplify is that staff spend very little time interacting with youths and learning more about them.
If there are other youths -- and there's nothing to suggest that these youth were not telling the truth when they were subsequently interviewed by investigators because it turns out that they were talking about behavior that he was -- he meaning R[redacted] -- was displaying, which was consistent with what staff had seen.
But what I'm suggesting is that there was -- there's very little documentation that things were not okay with R[redacted], as documented by staff.

Page 132

Yet, when youth were interviewed after the death, they had a different picture of him that presented additional information that could or could not have been available to staff if they had -- you know, one of the problems with putting a youth in room confinement is that you cut off the ability to communicate with them, and that's -- that's the nature of not only room confinement, it's also -- it's also the nature of detention is that it's not a nurturing environment.
There's not a lot of opportunity for staff to interact with youth, as opposed to what a more therapeutic type of setting would have, like a group home or something like that.
So I just found it interesting that there was -- there was a lot -- there was seemingly a lot of information that was available, and then, tragically, it was after the case that these youth were interviewed.
But I'm not suggesting that, as you said

Page 133

in your question, that in real time before the event, that staff should have been interviewing youth unless they were concerned about him, unless he had been threatening suicide that they heard and then they were trying to verify such an allegation.
But I'm not suggesting that they were to be interviewing youth before an event occurred, no, certainly not.
**BY MR. HEISE:**
Q. Going to page 11, the last paragraph. You talk -- you start a discussion regarding Lori Little. See where I'm at?
**A. Yes.**
Q. Okay. Good. Thanks. You walk through her health assessment where she reported a psychiatric history and noted it to be ADHD; correct, sir?
**A. Yes.**
Q. That R[redacted] complained of poison ivy?
**A. Correct.**
Q. And that R[redacted] did not self-report any other medical or mental health issues, including any suicidal ideations; correct, sir?

Page 134

**A. Correct.**
Q. Okay. And then you indicate, "Despite his diagnosis of ADHD and current prescription for Adderall, R[redacted] was not referred to a mental health clinician for further assessment."
Correct?
**A. Correct.**
Q. Sir, we've got a different document because I'm on page 11 and you're on page 12.
**A. Yeah; you know what, it must be the pagination or the way it was copied. I'm not sure how that happened.**
Q. Okay. I'll take a look at it because we're going to use yours as a copy for the original and also for the exhibit.
**MR. GROVES:** I think it will all be clear.
**MR. HEISE:** Yeah; I'm kind of reading it off.
**BY MR. HEISE:**
Q. Okay. Again, you say, Despite his diagnosis of ADHD, he was not referred to mental health.
Is there a policy or procedure that existed

Page 135

that necessitated Nurse Little to refer R[redacted] to a mental health clinician?
**A. There -- I don't know about the CHC policy. But there's certainly a standard that -- that any time you have a positive finding of mental illness and an active prescription for a psychotropic medication, that's an immediate referral to mental health. It's a pretty basic standard.**
Q. Is there a standard as to what that mental health clinician -- once they get that referral, is there a standard to discuss what that mental health professional is to review with that particular youth?
**A. They should be conducting a mental health assessment to see whether or not there are any other needs to verify the diagnosis, to see -- to look at other records, to see what other services -- mental health services might be applicable/available for this youth during their stay in the detention center.**
Q. And whether or not that referral would have been made, if that would have stopped R[redacted]'s suicide, you cannot say; correct?
**A. No. I'm only saying that all of these were**

Page 136

**proximate causes to him not being -- not being observed and not being monitored and not being assessed by a mental health professional.**
**These are -- all these examples, not only Ms. Little, but also Stephanie Upchurch, you know, she basically did the same thing and had information suggesting the need for referral. She was the one that filled out, completed, or didn't complete completely the mental health -- the MH-JJ Referral Screening.**
**And getting back to your question about, you know, why would I put the youth was crying or acting sad? Well, because that's one of the criteria to get a mental health referral, as per their own policy.**
**So you might think it's not important and you might think I'm taking things out of context, but when there's behavior displayed by youth that fits a criteria for a youth being referred to mental health, that's the reason why you do it.**
**And so there are all sorts of missteps in this case that -- that, you know, did not necessitate, as required, his referral to a mental health professional for further assessment.**

Page 137

Q. Was this failure to refer R[redacted] to a mental health professional a proximate cause of his death?
**A. I think it's one of the proximate causes to his death, yes. Not -- certainly not the only one.**
Q. The failure to refer R[redacted] to a mental health professional when he is found to be sad, sobbing, or saying that he is feeling depressed, was that a proximate cause of R[redacted]'s demise?
**A. I think a proximate cause of his demise was that -- one of the proximate cause -- there are many proximate causes. So I don't want to be tied into one.**
**One of them was that he -- during his six or seven days of confinement here, he was not seen by a mental health professional. And there were all sorts of signs and symptoms that he was displaying that were potential suicide risk factors, as well as other basic germane information about him being on -- there are all sorts of opportunities for him to be referred to mental health, setting aside -- setting aside his risk factors for suicide.**
**Putting those aside for a second, the fact that he was sad and crying, which was a criteria for a referral; the fact that he was on Adderall. He**

Page 138

**was diagnosed with a mental illness; that was also requirement for referral. The fact that he had all this information available in his assessment file, which we've gone through before, and it's a requirement that there be a communication between the detention center staff and the probation officer. And it's -- and it's a combined regulation or combined responsibilities.**
**The probation officer had an obligation to communicate with the detention center. The detention center, as part of their intake screening, had an obligation to communicate with the probation officer.**
**So all of this taken together -- and that's why I spent as much time as I did going through this -- is that there were various missteps throughout the process, and one is not more important than the other. There's a series of missteps that ultimately resulted in his death.**
Q. In terms of -- if I understand correctly, in terms of -- and per your study, 70 percent of the youth that committed suicide in your study had been seen by qualified mental health professionals and that half of them had been seen within six days of

Page 139

their death.
**A. Uh-huh.**
Q. Okay. And those are statistics that still hold true today, to the best of your understanding; correct?
**A. Uh-huh; yes.**
Q. Okay. In the next paragraph on page 12, "During his confinement at the center, R[redacted] was never seen again by any medical staff, nor ever seen to or referred to or seen by a mental health clinician."
And you stress the word never. We've talked about the mental health clinician. What importance, if any, do you give that Nurse Little did not see R[redacted] again?
**A. None, other -- other than what I stated there.**
Q. Just that he wasn't seen?
**A. Correct.**
Q. Okay. Was there -- do you -- are you aware of any complaints that R[redacted] had that he gave to anybody to indicate that he should have gotten a referral from Ms. -- Nurse Little?
**A. No.**

Page 140

Q. Did he put in -- I don't know in prison if they talk about kites or something like that to see the nurse; do you know if R[redacted] did that?
**A. No.**
Q. Do you have an opinion as to whether Nurse Little had some type of obligation to go out and try to find R[redacted] to go see him again for some reason? To have him visit with her again for some reason?
**A. Well, normally the standard is that someone who's on room confinement is seen on a regular basis by health care staff. A regular basis is not defined. In some jurisdictions, it's daily; sometimes it's weekly. Health care staff can be a combination of medical or mental health staff.**
**So I'm -- if -- I didn't -- or I -- the reader shouldn't read too much into what I said in that statement other than the fact that he was never seen again by medical staff and never referred or seen by a mental health clinician.**
**So there's nothing more than that intended by that statement.**
Q. Should Little have known that R[redacted] was on room confinement the day of his death?
**A. I think the health care professional should**

**-- because of the relationship between room confinement and suicide, I think every staff member who's -- including medical -- should know the youth that are on room confinement status, yes.**
Q. And you're aware that Nurse Little was not at the facility because it was not her time -- her hours to be at the facility at the time of [redacted]'s death; do you know that?
**A. Well, I know that she was there part time.**
Q. Right.
**A. I don't know her hours of the week. And I assume she was not there at the time of his suicide because her name doesn't appear in any of the incident reports.**
Q. In regards to the -- you talked about [redacted]'s behavior reports.
Medical has nothing to do with the filling out of the behavior sheets; is that correct?
**A. Those behavior sheets are related to his losing points in his program, and I would agree that unless there was -- I mean, I -- I could conceivably see behavior displayed by youth that's witnessed or --**
Q. For instance --



**A. -- done -- done in a reaction to a medical professional that might result in a behavioral sanction.**
**But I don't think there's anything in the records to suggest that -- that such happened in this case.**
Q. Okay. My page 13, the paragraph that begins, [redacted] apparently had another court hearing.
**A. Correct.**
Q. Okay. I don't have any questions regarding that paragraph. I just want to get us to the same spot.
The next paragraph, "During the early morning of September 23rd, 2014", in regards to that paragraph, based upon your review of the records, was there any unusual behavior that was noted by staff regarding [redacted] during the time period set forth in that paragraph?
**A. Not that I recall. I think if there was, I would have included it within that paragraph.**
Q. Okay. Are you aware of the interactions that [redacted] had with correction staff during that time period?
**A. During the time period on page 13?**



Q. In that paragraph that starts, "During the early morning of September 23rd" and ends in "rooms on Pod A".
**A. I don't recall.**
Q. So you don't recall whether or not he had any positive interactions with staff or any negative interactions with staff. Is that a correct statement?
**A. Yes.**
Q. Okay. And with that understanding, then, you cannot testify as to any actions by [redacted] that would have put staff on notice that [redacted] was a suicide risk; correct?
**A. Correct.**
Q. Do you believe that [redacted] had made a plan by that time?
**A. I have no idea.**
Q. The next paragraph, the one that begins Although facility policy required that all youth, etc. etc.
**A. Correct.**
Q. Did medical have anything to do with the setting of the watch tours or the monitoring of the watch tours?



**A. No.**
Q. We then reach your opinion. Are all your opinions that you plan to render in this case set forth in this report?
**A. Yes.**
**MR. GROVES:** Obviously the opinions that in deposition, if he supplements them; obviously, I'll give those to you as well.
**MR. HEISE:** Sure. You just want to justify your existence.
**MR. GROVES:** I do. And there is discovery ongoing. So if there's additional opinions that he has, we'll supplement with a report.
**MR. CORRIGAN:** If you supplement the opinions, if we have to supplementally depose him, I'll know where to go.
**MR. HEISE:** We might change it.
**MR. GROVES:** Things happen for a reason.
**BY MR. HEISE:**
Q. Okay. Discussing the first of your opinions. "[redacted] had several suicidal risk factors that were either known or available to staff and to medical."

Have we discussed all of those risk factors?
**A. Yes.**
Q. And, summarized, they were his mother committed suicide, he was on Adderall, suffered from ADHD.
**A. He had fleeting thoughts of suicide in his past.**
Q. Okay. Anything else?
**A. He had other -- yes. He was observed as being sad, crying. He had been bullied.**
Q. We -- I think you talk about those later. We'll talk about those later.
We've talked about the failure to refer to a qualified mental health professional.
I think we've talked about standard of care.
Second does not -- the second one does not pertain to medical; correct?
**A. Correct.**
Q. Next you talk about, under third, Suicide protocols or suicide prevention policies.
Is there a particular CHC suicide prevention policy that was not utilized?



**A. No. My understanding was that CHC's suicide prevention policy was not utilized at this detention center.**
Q. Was not utilized at all in this detention center?
**A. The CHC suicide prevention policy was not utilized at this facility. So I have no opinion about it.**
Q. Is that because there was another suicide prevention policy that was created by the facility itself?
**A. Apparently.**
Q. Okay.
**A. I don't know what the reason was.**
Q. Okay. And just to be clear. I believe you note in your document review -- you said you looked at various CHC policies, including L12, Suicide Intervention?
**A. Correct.**
Q. Okay. Do you believe that the CHC policy L12 was violated in regards to R[redacted]'s death?
**A. I didn't -- I had no opinion on it because it wasn't utilized in his case.**
Q. Do you have an opinion as to whether it



should have been utilized in this case?
**A. I would have to look at it again to see if it was any better than the two-page juvenile detention center policy.**
Q. But as you sit here today, you have no such opinion. Fair statement?
**A. Yes.**
Q. Fourth. Fourth does not deal with medical; is that correct?
**A. Well, no. It does in that CHC had a contractual responsibility to provide suicide prevention training, and they did not. So any mention of training and the lack of appreciation for the consequences of room confinement is part of -- is part of the CHC responsibility.**
Q. Okay. So as part of suicide prevention policy, they -- it is your opinion that CHC should have also trained on room confinement?
**A. No. I'm saying that they had a contractual responsibility to provide suicide prevention training. Part of suicide prevention training is to discuss the strong relationship between room confinement and suicide.**
Q. Your fifth opinion: R[redacted] was not referred



to a mental health professional, which we've discussed.
Then you indicate was not observed consistently as required by policy.
Is that in reference to watch tours?
**A. Yes.**
Q. Okay. I just want to make sure there wasn't anything -- is there anything more than the watch tours?
**A. No.**
Q. Okay. Risk factors. We've discussed R[redacted]'s mother's suicide.
I think we've discussed school records.
Next is ADHD. I think we've gone over that.
Next is SAS. I think we've gone over that.
Next we talk about -- you talk about on April 4th, R[redacted] reported being a little upset. On April 10th, he got depressed and began to sob.
And those are the only two notations that you refer to during his April 4 to April 10 stay where he was feeling sad or sobbed; correct, sir?
**A. Yes. Those are from the contact notes from that detention.**

Page 149

Q. Okay.
**A. Correct.**
Q. Some five months before his death?
**A. Correct.**
Q. Okay.
**A. That failed to result in a mental health referral.**
Q. Wait a minute. During that time period, he obtained two mental health referrals. He saw Dr. Jewell and he saw --
**A. Those are court appointed -- those are court-ordered evaluations. They don't deal with the day-to-day activities of mental health conditions within the facility, and -- and the fact that they didn't even -- well, I'd have to say when these were taken.**
**Dr. -- I think Dr. Spalt hadn't seen him yet, and Dr. Jewell --**
Q. Saw him on April 8th, I think.
**A. Yeah; so that would -- he saw them in between. So it could very well be an indication that there was very little, if any, communication between the clinician and the staff.**
**It also could be an indication that**

Page 150

**Dr. Jewell was there specifically not to look at how he's doing in the facility, but how he's doing psychologically as part of the court order for the judge to determine what kind of services that he needs or doesn't need.**
Q. Okay.
**A. Okay. So you -- you mentioned it as -- again, as you did earlier, about these two isolated cases. These are also two examples of how he, per their own policy, should have had a mental health referral.**
Q. Okay. So on April 4th, just to be clear, because it was noted that he got a little upset and started to cry on that date, he should have got a mental health referral.
And then again on April 10th, it was noted he got depressed and began to sob. He should have gotten a mental health referral on that date too?
**A. Correct.**
Q. Okay.
**A. Per -- per their policy.**
Q. Okay. Sir, I'm a dim bulb, and it just brightened a little bit finally.
Next you talk about his September

Page 151

detention. You, again, refer to the interviews with the Youths S.B. and A.W.
**A. And also from the shift log. It's not just the youth themselves, but the shift log said that [redacted] was upset at the end of the first shift.**
Q. Okay. So he should have had a mental health referral after the end of the first shift?
**A. I'm not saying that. I'm not sure what that meant: He was upset. It -- it -- if that's an example of similar conduct that he was sad and depressed and sobbing, then that would make sense. And, yes, then that would have to be, as per policy, result in a mental health referral.**
**It's hard to know exactly what that meant, [redacted] was upset at the end of the first shift, because I don't believe there's any other description on this behavior other than what I quote here.**
Q. Okay. But then it says, "[redacted] was crying when he first arrived at the facility."
That was observed by corrections officer and a youth. He should have gotten a mental health referral because he was crying?
**A. Correct.**

Page 152

Q. Okay.
**A. Per their policy.**
Q. Per their policy.
**A. I just want you -- the record to be clear that I'm not just making this up that these are my personal opinions that he should have done it. I am reflecting my opinion based upon the policy, the requirements.**
**So they have a policy that requires certain types of behavior to be resulting in mental health referrals.**
Q. I hope I'm not giving you the impression I think you're making anything up.
**A. No, I'm not saying making it up. Making up -- what I meant by making up is that these are not my personal standards or my personal guidelines or what I feel that should have been done. These are based upon their -- a reflection of their own policies.**
Q. Okay. The next one, on my page 16 at least, "Each of the evaluations performed on [redacted] when he was confined in the assessment center", I think, basically, we've talked about you believe they should have been available, etc., etc.

And then --
A. **That bullet simply says that they -- each of these evaluations were recommending continuing individual therapy. Yes, they should have been available. But that's something that -- that we've already talked about in other locations in my report.**
**This is just something that is a reflection of consistent recommendations that he should continue to receive these individual therapies.**
Q. Okay. And just very briefly. And those individual therapies were to be helpful and to increase his self-monitoring of his ADHD symptoms; correct?
A. **Yes.**
Q. And to increase his ability to cope with frustration while at school; correct?
A. **Correct.**
Q. Were you aware that R[redacted] was doing pretty good at school during incarceration? Did you ever see any reports on that?
A. **During his schooling in detention, I don't recall that, no.**
Q. Okay. Also to help him with relaxation



skills, training, and grief counseling regarding his mother's death; correct?
A. **Yes.**
Q. Anti-bullying therapy and refinement of his individual education plan; correct?
A. **Correct.**
Q. Okay. Then you talk about R[redacted] returning to court -- or from court.
In your last paragraph, you talk about that -- let me see where I'm at here. A history of mental illness. That history of mental illness was his ADHD; correct?
A. **And depression.**
Q. Okay. And depression from the SAS, but not confirmed or repeated by Dr. Jewell or by Dr. Spalt?
A. **Correct.**
Q. Okay. The depression, again, diagnosed in SAS, but not confirmed by Dr. Jewell or Dr. Spalt; correct?
A. **Correct.**
Q. Sadness and crying, which we've talked about.
A. **Correct.**
Q. Fleeting thoughts of suicide. That was



from him in school; correct?
A. **Correct.**
Q. Substance use. One time that we know about with marijuana?
A. **Correct.**
Q. Anything else under substance use?
A. **I'd have to go back and look.**
Q. Okay. Impulsivity: Is that based upon his ADHD?
A. **I'm not an expert, but I think there were other examples of his impulsive behavior; and they may or may not be related to his ADHD.**
Q. Okay. And then the family history of suicide, which we've discussed?
A. **Correct.**
Q. Are these the reasons why you believe R[redacted] committed suicide?
A. **I believe -- I believe that these are the reasons that put him at increased risk of suicide and that these are the reasons that no one should have been shocked by a youth with his background and symptoms to attempt or commit suicide.**
Q. You indicate R[redacted] was never referred to a qualified mental health professional for further



assessment. I think we've talked about that.
Okay. Number 2. Failure to adequately observe R[redacted].
That all has to do with corrections; correct?
A. **Yes.**
Q. Number 3. Grossly inadequate suicide prevention policies.
We've talked about CHC suicide prevention policy not applying here because Franklin County has their own; correct?
A. **Yes.**
Q. Okay. Do you have an opinion within a reasonable degree of certainty that if R[redacted] would have seen a counselor during the times that you say that the policy dictates he should have, that he would not have committed suicide?
A. **No.**
Q. At what I have as page 20, it begins Nationally recognized correctional standards.
And here you talk about the standards of the NCCHC and the contract. I think we've discussed that in -- at least enough for me. Hopefully enough for you.

A. Yes.
Q. On my page 22, it begins with the paragraph "Although juvenile detention and correctional standards are generally not legally binding and do not set constitutional requirements, U.S. Supreme Court has stated that such standards have the ability to serve as guidelines or benchmarks in assessing 'duty of care' or 'reasonable conduct'."
Not to be picky, but it seems like that sentence really differentiates between standards and guidelines; correct?
**A. Well, are we going back to the contractual agreement?**
Q. I'm talking about your writing, sir. It seems like there is a differentiation regarding standards and guidelines.
**A. Oh, I think that there is.**
Q. Okay.
**A. Certainly. I'm not disputing that there's a difference in terminology between standards and guidelines.**
**I'm just -- we have a difference of opinion as to whether or not the contract or agreement between your client and Franklin County was an**



**editing error or was intentional. I don't believe it was intentional.**
Q. Okay. Do you have a particular Supreme Court case that you like to refer to?
**A. Regarding that sentence?**
Q. Yes, sir.
**A. No. I mean, that's my -- my non-legal opinion about and experience about standards, that they're -- unless a jurisdiction is ordered, as in most of these settlement agreements, there will be a requirement to abide by a standard. You must abide by the ACA standard, you must abide by the NCCHC standard, or, in this case, you know, you must -- you must abide by NCCHC standards as part of your contract or you must become accredited.**
Q. Sure.
**A. Unless that's specified, my experience is that courts have ruled that they're not binding -- they're not legally binding, but they're used as guidelines for the court. Not used for guidelines for the jurisdiction, but the court.**
**The court has no idea how to operator, nor do they micromanage, jails. So they -- they need guidance as to, okay, well, what's applicable? Tell**



**me -- tell me some benchmark that I should be looking at to tell me whether this is a good or bad policy.**
**So that is my experience about how a -- how a court looks at standards.**
Q. And since you referenced U.S. Supreme Court and had -- and quote them in such a way, I was just wondering what case you were referring to.
**A. Well, I think there are several cases that I can remember in the Supreme Court. Bell versus Wolfish is one. And there's several of them that's specific to jail standards.**
Q. Okay. Later on in that paragraph, you say, "Finally, entities such as Franklin County and/or CHC, could avail themselves to national correctional standards in the development of their own policies."
What you mean there is that they could simply use them as reference points and go from there?
**A. Correct.**
Q. Okay.
**A. They don't have to be accredited.**
Q. Understood. Do you have an opinion as to a specific time where R[redacted] should have been placed on



suicide precaution?
**A. No. In many ways, he was -- he was on a level of observation which was consistent to a low level of suicide precaution. He and all the other youth were on 15-minute checks.**
**So in many jurisdictions, that's a -- that's a level of observation for kids that are identified as suicidal.**
Q. But you're not saying that because the detention facility used the 15-minute period, that they were doing it because they felt that their youth needed to be on 15-minute suicide prevention -- a 15-minute suicide prevention program?
**A. What I'm saying is that -- well, I'm saying two things.**
**The first thing I said was that he was on -- he and all the other youth were required to be observed on a level of observation which is commensurate with a low-level suicide watch.**
**The second thing is that jurisdictions don't require 15-minute checks across the board on all youth unless there's a particular acknowledgment that youth in confinement are at higher risk for suicide because it's a very time consuming staff --**

**I forget the term I'm trying to use here -- staff-driven policy. It's far easier to observe children or any human every 60 minutes. That would make everyone's life easier.**

**But the fact that the decision was made to do 15-minute checks on every child to me is an indication that there's an acknowledgment of when you put a kid behind a door, there's an increased risk of suicide. So that was their policy.**

**That was -- that -- I think that even exceeded the state suicide standards. The state only required 30-minute checks. Someone made the decision to do -- have the policy of 15-minute checks. That, to me, is an acknowledgment of the potential for -- the increased potential for suicide for all youth.**

Q. I wasn't trying to be rude. I was just trying to show Steve, Look, I'm down to a blank page now.

**MR. GROVES:** God bless America.

**MR. HEISE:** And all those that live here.

**MR. CORRIGAN:** But I'm not going to be done by 1 o'clock.



**MR. HEISE:** I figured if you don't have to be here when I start, I don't have to be here when you finish.

**MR. CORRIGAN:** That's fine.

**MR. HEISE:** I believe I'm done, sir. I just want to look at my notes for another moment or two.

Mr. Hayes, it's been a most interesting and enlightening discussion. Thank you very much, sir.

**THE WITNESS:** Thank you.

**MR. HEISE:** I apologize, but I have a plane to catch. I don't mean to be rude.

**MR. CORRIGAN:** Do you want to take a break before I start?

**THE WITNESS:** I'm fine. It's really the court reporter.

****************************

**CROSS-EXAMINATION**

**BY MR. CORRIGAN:**

Q. What is -- you said the state standard for checks on youth was 30 minutes?

**A. I believe that's what the regulations were, yes.**



Q. What is the national standard, if there is one, for checks on youth who are not on suicide watch?

**A. I think it's -- I don't think there's a consistent standard. I've seen jurisdictions have 30 minutes, and I've also seen jurisdictions, such as Franklin County, have 15-minute checks.**

**On rare occasions, I've seen checks as high as 60-minute intervals, but I think my experience has been nationally anywhere between 15- and 30-minute checks.**

Q. Now, you said that having 15-minute checks recognizes that there's an increased risk of suicide when children are locked up.

Would that increased risk extend during the nighttime?

**A. I think that the increased risk is 24/7. I think the data, the studies that I've done, and I think the other -- other -- other data out there would suggest that most suicides occur during waking hours. So I think that the risk period is 24 hours and includes the sleeping hours; but I believe that most suicides, when they occur, occur during the waking hour.**



Q. Well, I was -- the reason I was asking this is in your study, you specifically exclude non-waking hours from the term room confinement.

**A. Correct.**

Q. So that -- but are you saying --

**A. Well, I exclude it from the standpoint of if a youth is on room confinement for 24 hours, then obviously that includes sleeping hours.**

Q. Right.

**A. But if -- what I meant by the definition of -- how the definition is interpreted is that if a youth is not being sanctioned and is in the room sleeping, that's not considered room confinement.**

Q. Okay. The reason -- I'm just wondering when you said there's an increased risk, is that -- by room confinement, but it doesn't include the part at night; is that correct?

**A. Well, I think you're asking two different --**

Q. Well, let me clarify my question.

**A. Okay.**

Q. Obviously the vast majority of suicides are going to occur when they're alone?

**A. Correct.**

Page 165

Q. But when you're talking about an increased risk when they're in room confinement, that doesn't include the non-disciplinary time when they just happen to be locked in the room at night.

**A. I think the best way to answer that is to -- is to differentiate between room confinement and a youth being in their room alone. Just because they're in the room alone and -- let me give you an example.**

**A youth that is allowed to go out every day for school, allowed to go out for all activities, go out for food, for meals, go out for appointments to see the nurse or mental health, has free reign of the facility as all other youth do and simply goes to their bed for lights out at ten o'clock is not on room confinement and their time sleeping in the room is not considered room confinement. So that's -- that's what the vast majority of youth go through on a daily basis, that scenario.**

**Youth that are on room confinement are those that are sanctioned because of their behavior, and it can be something as simple as violating the rules or something far more serious as assaulting a staff or assaulting a peer. They are on room**

Page 166

**confinement status throughout the day during non-sleeping hours and are sometimes prohibited from going to school; sometimes their meals are brought to them. When other kids are out in the dayroom or outside in recreation, they are in their rooms.**

**That is the difference between room confinement and a youth being housed alone but just going about their day freely and programming, per se.**

Q. And under that definition, in this case, I think the -- your report reflects that after lunch, all of the children were locked in their rooms until the next activity.

**A. Until next activity, which was school; correct.**

Q. So that -- you wouldn't consider that room confinement?

**A. Well, he wasn't physically under room confinement at the time of that time period; but overall because of his C status --**

Q. I'm not --

**A. -- he was on room confinement.**

Q. Okay. And I'm not talking about R[redacted].

**A. Okay.**

Page 167

Q. I'm talking about the other children locked in their rooms after lunch.

**A. Correct. And I can't talk about whether -- how many of those were on C status and how many --**

Q. Okay.

**A. The easiest way to differentiate between people -- kids on room confinement and kids that are not is what happens when there are no structured programs going on. Are the kids in their rooms or are they out -- out of their rooms?**

**If they're out of their rooms, then there's no room confinement. If these same kids during unstructured programming are confined in their rooms, that's room confinement. So R[redacted] and whoever else was locked up at the time that he was found hanging -- there were other kids that were presumably in that pod on -- on room confinement status because they were not out with the other kids during that -- that rec period.**

Q. And I'm just looking at it because strictly speaking in the study, it excludes being locked in your room during non-waking hours but doesn't exclude the fact that during non-programming time after lunch, everybody was locked in the room.

Page 168

That would fall within strictly the definition of room confinement in the study. And that's all I'm trying to clarify.

**A. Okay. Well, it -- and I think you're just misreading that definition.**

**What is meant by that is that at the time of their death, were they on room confinement. Now, they could be sleeping in their rooms but also under that status.**

**I mean, R[redacted], for example, was on that status 24/7 for that entire period of time. He was on C status. So he's on that status -- that room confinement the entire 24-hour period of time. Even though he was sleeping for eight of those hours, he was still under that status for as long as that sanction lasts.**

**Sometimes you're on that status for a day, a week; sometimes a timeout -- quote, timeout is one hour. It could be excluding time for recreation.**

Q. And when the study says that there's an increased risk if you're on room status, is there any attempt to differentiate the risk based on if you're in timeout for an hour versus locked in your room and not even able to go to class?

Page 169

A. No. It's -- it's -- it's -- there's no difference because it's the sanction itself that is provoking the behavior. So there have been many cases in our study in which there was a voluntary timeout.

Like the kid was upset during class and he said I want to go back to my room or -- or he's -- he wants to call in sick and basically have a lay-in. Well, that's room confinement. He is separating himself from his peers and he's going back. And sometimes you -- you're going back because you want to be isolated in order to have the privacy to commit suicide.

But the length of stay under room confinement is not as important as you'll find in the adult correction field where adult inmates are in segregation for months on end and it deteriorates their mental health because of their lockdown.

Our study found that this -- kids on room confinement status were confined for relatively short -- shorter periods of time. It could have been only an hour or two before they committed suicide and it's -- presumably, experts believe, that it's their immediate reaction to getting that

Page 170

sanction that got them upset enough, and because of their impulsivity, resulted in their suicide.

Q. Now, in the study, you studied 79 suicides out of 110 that occurred during that five-year period?

A. Correct.

Q. How did you pick the 79?

A. We didn't pick them. Those were the -- that was the cooperation -- we got cooperation from jurisdictions to complete our second -- our Phase 2 survey. We had two surveys. One went out to everyone, several thousand juvenile facilities saying did you have a suicide during this five-year period of time.

Once we got that number of 110, then we sent our second survey, which is included in that study in the appendices, five or seven page long, asking very specific questions regarding it.

So out of those 110 suicides, we got cooperation in 79 cases. So we didn't pick certain cases. That is the number of facilities that responded and cooperated with our study.

Q. And did you make any determination as to the statistical significance of your results in

Page 171

terms of the sample size and whether or not it was sufficient to reach any conclusions?

A. Other than the ones we did about the -- the relationship with room confinement. But because our sample size was relatively low because it was the first time that the study had been -- this type of study had ever been conducted, we didn't -- we couldn't calculate suicide rates. So -- it's -- it's more of a survey than a statistical analysis of suicide rates or those other factors such as mental health, substance abuse.

It was a gathering of data on those 79 cases to help practitioners plan accordingly. And what practitioners did with that information is dramatically revise their policies on room confinement.

Q. Now, you indicated that many jurisdictions treat room confinement the same as suicide watch. Can you define the term many? Are we talking about 50 percent, 10 percent --

A. I --

Q. -- 20 percent?

A. No, I can't, other than to say that this is only based upon my working in these jurisdictions.

Page 172

So, as I said earlier, I've been to 16 state departments of juvenile -- juvenile correctional facilities. So that's -- that's quite a few jurisdictions.

And so my -- my knowledge base is that's what it's based on --

Q. And --

A. -- is that many of them, when they -- many of them have gotten rid of room confinement and no longer use it, and they -- they say it's too dangerous.

And, in fact, the Council on Correctional Juvenile -- Council on Juvenile Correctional Administrators, which is referenced in my report -- that is an agency made up of all 50 state juvenile correctional administrators -- they are advocating for the abolishment of room confinement because of that fact. So --

Q. As of when?

A. When my study came out in 2009, 2010, they have been working to reduce and/or abolish the use of room confinement or dramatically reduce the use of room confinement.

Q. Now, you said that you've worked with 16

Page 173

departments of corrections or juvenile justice, or whatever, and many of those have reduced or treated room confinement and suicide precaution as the same. Is --
**A. And I must preface by your combining them, only in the frequency of observation: 15-minute checks.**
Q. How many of those jurisdictions made that change based upon your recommendation?
**A. You know, I can't say. I don't know.**
Q. And the reason I'm asking is if you're looking at the jurisdictions you've worked with, whether it's a trend depends a lot on whether it's people that are working with you and that follows your recommendation versus people that haven't yet had that opportunity.
**A. Right. Right. But even if I hadn't been in -- I mean, there are 16 states I've worked with. There are 34 that I have not. That doesn't mean that that information hasn't gotten out to all of the states --**
Q. No.
**A. -- and it's become a -- you know, as I said, the Council of Correctional Administrators is**

Page 174

**made up of all state administrators, and that's become one of their mantras is to dramatically reduce the use of room confinement throughout their facilities.**
Q. And the real point of my question is is based on the data you have, you're unable to say at this time whether that is standard practice in correctional institutions; is that correct?
**MR. GROVES:** Objection to form as to -- define standard practice.
**THE WITNESS:** Yeah, I guess I'm not clear on your question right now. Is your question that is 15-minute checks for room confinement the standard practice?
**BY MR. CORRIGAN:**
Q. Yes.
**A. Okay. My experience is yes, it is.**
Q. And when you say it's the standard practice --
**A. For room confinement.**
Q. -- how many -- what percentage of facilities follow that practice?
**A. I think the majority -- the majority of facilities that I am familiar with have policies**

Page 175

**that require 15-minute checks of youth that are on room confinement status, if not more frequent.**
**There are those that say 15 minutes is too much time; we want to observe them every ten minutes or every five minutes.**
**Some jurisdictions intentionally make it more onerous of their staff in order to reduce the use of it because lots of staff will want to put a kid in the room and the administrators will say don't do that, it's harmful to them; but if you do, then you got to watch them every five minutes. The staff will say, well, okay, maybe we're not going to put them on room confinement because I don't want to watch this kid every five minutes.**
Q. Have you surveyed -- you talked about the department of corrections on the state levels. Have you surveyed the local detention facilities as to what their practices are?
**A. No. Only those that I've worked in. So I have not surveyed them.**
Q. Okay. And when you said 16 jurisdictions, I thought from your answer you were saying 16 state level jurisdictions.
**A. Correct.**

Page 176

Q. And how many have you worked with that are local facilities?
**A. That's hard to say. I would say dozens throughout my career. Scattered throughout the country.**
Q. Over a 30-year career?
**A. Correct.**
Q. So I assume that some of those early in your career were not having 15-minute checks on people on room status?
**A. You know, it's hard to say. And I don't want to suggest that my study -- my work and my study resulted in a practice of 15-minute checks on room confinement. I'm not -- that's not what I'm suggesting by my testimony.**
**My testimony is that our study was able to find a relationship between suicide and room confinement which has resulted in different practices.**
**I'm not saying that 15-minute checks for room confinement haven't been the standard only since my study. I mean, it could -- it could have easily happened prior to that.**
Q. Again, I'm really just trying to find out

Page 177

when we talked about it being a standard -- and I assume from what you said this isn't the written standard some place, that 15-minute checks for room confinement?

**A. It's not in -- like, for example, I don't think it's in the NCCHC standards only because that's not -- that's more of a correctional requirement as opposed to a health care requirement. I would have to check the ACA standards -- the American Correctional Association standards -- to see if it's a requirement of theirs. It could very well be.**

Q. And assuming it's not a written standard, you're talking about it being a standard based on what lots of people do; right?

**A. Correct.**

Q. But you're unable to quantify how much lots of people is in this case?

**A. Correct; because I haven't surveyed every -- that's not -- that wasn't one of my surveys is to look at how many jurisdictions use room confinement and how frequently they observe youth on room confinement.**

Q. On the second study that you were

Page 178

participating in, the National Study of Jail Suicide: 20 years later.

**A. Yes.**

Q. That looked at 2005, 2006 data?

**A. Correct.**

Q. Was that two years or one year?

**A. Two years.**

Q. Okay. In regard to juvenile suicides, that study reflects that there was -- there were four during that two-year period -- juvenile suicides?

**A. I'd have to look at that. That was in adult jails. Four --**

Q. Oh, four in adult jails?

**A. Yeah, yeah. That's only adult jails.**

Q. Okay.

**A. That's not a juvenile study.**

Q. Okay. And that was my question. I looked at it and it said four at 17 and under. And --

**A. Those were 17-year olds housed in an adult jail.**

Q. Okay. Do you know during the five-year period in which your study took place, how many juveniles nationwide were incarcerated at some point during that five-year period?

Page 179

**A. No. That's why I didn't do -- calculate the suicide rate.**

Q. And when you said that it's higher than on the outside that there was a study that reflects that --

**A. Other studies have suggested and have calculated suicide rates that are higher than the -- yes.**

Q. Do you have a site for that study?

**A. No, I don't. It could possibly be in my -- in the appendices to my -- or the reference section of my report.**

Q. Do you know how much higher the suicide rate is among incarcerated youth versus on the streets?

**A. No.**

Q. We've covered your report quite a bit, but I'm going go back and ask some more questions about it.

**A. Okay.**

Q. Going to page 15 and the risk factors that you found. You indicate that back in 2008, R[redacted] had expressed feelings of both depression and sadness.

Page 180

In the context of this, in what he said, depression was a synonym for sadness, wasn't it?

**A. Depression was what? I'm sorry.**

Q. A synonym of sadness. He wasn't making an assessment of clinical depression; correct?

**A. Well, I -- yeah. And I don't -- I don't believe at 6-years old that he would be able to articulate the word depression. But this is -- these are -- this is from my review of his -- his records at the time.**

Q. And when most people, whether 6-years old or an adult, says I'm depressed about something or other, they're usually using the term in a nonclinical meaning meaning sadness; right?

**A. Yes. It could be a lot more than just simply sadness, but it depends on how it's articulated. But -- but that's not -- that's not a word that I made up or I am suggesting that R[redacted] verbalized.**

**I'm saying that those were in his records after his mother died.**

Q. Now, you said that one of the factors was that he had ADHD. Is that something that -- I think your study says -- said that 46 percent of the

people that were incarcerated suffered from that condition; is that correct?
**A. I don't remember saying that in my study.**
Q. I can't find it offhand. But, in any event, it's fairly prevalent among the population at detention centers, is it not?
**MR. GROVES:** I'm sorry, what's fairly prevalent?
**MR. CORRIGAN:** ADHD.
**THE WITNESS:** Well, it depends how you define prevalent. But I certainly would agree that it's not atypical of a youth that is detained.
**BY MR. CORRIGAN:**
Q. Now, the next factor you list is that he had mental health counseling.
I assume that the risk factor is not the fact that he was counseled, but that he had a condition?
**A. Correct.**
Q. And the condition that he was counseled for was for behavioral disorders?
**A. I think he was counseled for -- for many things. Where -- where are you referring to?**



Q. Well, when you talk --
**A. Because he was --**
Q. -- about counseling --
**A. He was counseled back in 2011, '12, and then in 2013, I believe. If you're referring to -- to the SASS counseling?**
Q. Is -- the counseling was for acting up in school?
**A. Correct.**
Q. And --
**A. Well, I mean, that was part of it, certainly. But it wasn't limited to that because the SASS records also indicated his -- his sadness regarding his mother's death.**
Q. Okay. Well, you indicate at page 7 that he was referred for mental health counseling because of additional behavioral problems, including threats to harm peers.
**A. You know, on page 7 -- where are you referring to? I'm sorry.**
Q. The very top of page 7, the very first line.
**A. So you might have a different page.**
**MR. GROVES:** How does the paragraph



start?
**BY MR. CORRIGAN:**
Q. In addition, subsequent to --
**A. Yes. Behavioral problems, yes, including threat to harm peers. He was, again, referred to SASS program.**
Q. In any event --
**A. Well, wait. I mean, the sentence continues. "R[redacted] continues to express feelings of depression and sadness regarding his mother's death and difficulty at school."**
Q. That was after he was referred for counseling; correct?
**A. Well, after he was referred, but part of the counseling. So he was referred because of behavioral problems. He went to the counseling. And then the counselors were treating him for depression and sadness regarding his mother's death. I mean --**
Q. Well --
**A. So it's either the cart before the horse or the horse before the cart. But it's all in the same context.**
Q. My -- my -- the point of my question was



that he was referred to counseling for behavioral problems which is one -- something that youth are counseled for; correct?
**A. Yes.**
Q. And behavioral problems are, among the juvenile detention population, are common?
**A. Correct.**
Q. To the tune of, I believe your report said, 50 to 90 percent of the population has behavioral disorders?
**A. Again, you're citing statistics that I'm not familiar with, and if they're in my report, I'd like to see them.**
Q. And I'm not talking -- I'm using the word report wrong. I'm talking about studies.
**A. Right. No, no. That's fine. I'm not concerned about the way you term my report.**
**I will agree that there are -- there's a higher concentration of mental illness, behavior disorders, impulsivity, ADHD of youth that are detained. That's why they're at higher risk for suicide. It's kind of a circling around to why do -- why do jurisdictions require all youth to be put on 15-minute checks? It's because they're walking**

Page 185

**into the facility with all these risk factors.**
Q. And, again --
**A. So, I mean, [redacted] is not atypical of that kid. He's already coming in with some of the risk factors that are -- make him at a higher risk for suicide, and he's not alone. There are probably many other kids in that detention center that have similar risk factors.**
**That's why oftentimes jurisdictions make decisions to put all kids on 15-minute checks because of these -- these preexisting risk factors that they come in to the facility with.**
Q. And, really, that was the point of my question.
**A. Okay.**
Q. That if we look at the factors that you listed, including crying and being upset, they were characteristics that he shares with a large number of other youth in the facility or other facilities; is that correct?
**A. That's quite possible.**
Q. And particularly when we look at -- one of the factors that you listed was that he was concerned that his detention time was going to be

Page 186

extended and faced the possibility of being committed to a state facility. By the same token, you would be concerned if somebody was indifferent to that?
**A. Correct; right.**
Q. When you cited to Bell versus Wolfish in regards to standards of care, are we talking about the Bell versus Wolfish that is the case about whether or not strip searches of inmates violate the Fourth Amendment?
**A. I don't -- I don't remember that part of the case. I thought Bell versus Wolfish is a case from the '70s that had to do with conditions of confinement for pretrial adult detainees.**
Q. Okay. And it might be detainees. I don't remember. But I thought it was a Fourth Amendment case.
**A. Okay. That's why I'm not an attorney. I don't have to remember those case citations.**
Q. To your knowledge, has the rate of juvenile suicide remained fairly constant since your survey?
**A. I don't know that because I haven't calculated suicide rate, and I've seen only a handful of prior calculations. So I can't say**

Page 187

**whether it's gone up or down.**
Q. And I think when I was asking you before -- maybe I'm wrong. When I asked you if you had calculated the statistical significance of your findings, did you say only with respect to room confinement?
**A. I found -- my response was -- and maybe I wasn't very articulate. I said that room confinement was one of the more prominent findings that I think was statistically significant because there's a disproportionate number of kids that are on room confinement status.**
**So for 50 percent of them to commit suicide while on room confinement I think is significant.**
Q. And --
**A. Whereas, the other things, as we've been discussing, simply because our finding found that X number -- X percentage of youth had preexisting mental health conditions might not be a valuable predictor of future suicide because many of the children in detention have preexisting mental health conditions.**
Q. Did anyone calculate a margin of error for your conclusion?

Page 188

**A. No.**
Q. And do you understand what I mean by --
**A. Yes.**
Q. Okay. And you would agree that the sample size was fairly small to reach any conclusions?
**A. Yes. Thankfully.**
Q. When you indicated that it was the fact that there was a sanction imposed on the youth by room confinement that was a greater factor than the actual confinement -- am I correct in what you said?
**A. Yes. Most uses of room confinement involve a sanction. There are times in which, as I said, there is a voluntary timeout where a kid just needs some space and wants to get away from staff, wants to get away from peers. So they're not being sanctioned, but they're escorted back to their room.**
Q. And just to be clear, you were saying that the -- you believe that the fact that whether by stigma or whatever -- the fact that sanction was imposed was what you found significant?
**A. No. What I found significant is simply that these youth -- what is significant is that room confinement is not used frequently in correctional -- in juvenile correctional facilities.**

The fact that half of the youth that commit suicide are on that status at the time of their death is significant. So that's it.

And within those deaths, then you look at, okay, how long were they on room confinement? Some of the kids were there for relatively short periods of time: Less than an hour. Some of them are there for longer: A couple of days.

And so the reasons for their suicide will vary. But sometimes when you have a death that occurs an hour after they're put into a sanction like that, you could theorize that, well, they were reacting. They were angry and they were -- they had just gotten into a fight with a peer. They were -- they feel that it was not their fault, yet they -- they and their peer are on room confinement. And so now they're very angry at staff. They're angry at the peer. And sometimes one takes anger out on themselves.

And so sometimes when you have a suicide that takes place in close proximity to when they were placed in room confinement, you can surmise that, well, they're reacting. They're immediately reacting to being sanctioned and their impulsivity



and their lack of coping skills has taken over.

Youth that commit suicide, as well as adults, do it after a period of time -- not the first hour, but after a couple of days, there are probably other precipitants in place. Just the lack of human interaction, the lack of not being able to recreate with their peers, maybe a visit was canceled because they were on this sanction. So they lost privileges. So it gets to them over a period of time as opposed to immediately within the first hour or two.

Q. Have you seen a increased risk of -- an increased risk of suicide when other sanctions are imposed on youth other than room confinement, such as loss of some sort of privilege?

A. That's not something we looked at in our survey. We -- we did ask -- we did ask respondents whether there were any precipitants to the suicide, whether they thought after they reviewed their death whether they had any theories on why it occurred. And I don't remember what all the responses were.

So it's possible that it -- that a suicide could be -- could result as far as a, you know, a program sanction that did not include room



confinement. Certainly.

Q. Do you have any idea of the -- the number or percentage of the suicides that occurred within the first hour or among people that were in room confinement for a short period of time as opposed to those that were in for two days or more?

A. I think it's in our study. I think I break that out, but I'm not sure.

Q. You may be able to find it faster than me.

A. Okay. Here. Let me -- let me look. It's possible that it was not part of that, but let me look.

No. I don't think that we -- we did not break it down further than that.

Q. And, really, where I'm -- what I'm looking at is, once again, when we go to the statistical significance of a conclusion that any period of room confinement increases the risk of suicide, you don't have data that would tell us that answer; is that correct?

A. The only data I have is from that report, which has then been publicized and turned into training curricular, and now staff are trained on being sensitive to that time period.



Q. The time period of being in room confinement?

A. Correct.

Q. Now, one of the things you indicated in regard to the characteristics of room confinement was that, in this case, R[redacted] was prohibited from talking to others while he was in room confinement. And I think you said this --

A. I think -- it wasn't restricted to R[redacted]. I think anyone in their -- confined to their rooms was not allowed to converse with other youth.

Q. But the record indicates that he did talk to others while in room confinement?

A. Yes. He was violating the rules by doing that, yes.

Q. In your study, you made a reference to the number of suicides that occurred in facilities with all seven suicide prevention components. And I'm not going to ask you about the statistics on that.

My question was do you know what percentage of facilities have all seven suicide prevention components?

A. That did not have suicides?

Q. No. Just in general, whether or not they

have suicides.
A. **Yes.**
Q. The seven suicide prevention components, is that something that most facilities have, don't have, or --
A. **That I don't know.**
Q. Okay.
A. **I only surveyed those that had suicides.**
Q. Although it's been a few years ago since the report, your study, do you still agree with the seven suicide prevention components that were reflected in the study?
A. **Yes.**
Q. You indicated that the hardware in the cell was not ADA compliant?
A. **It was not suicide resist -- it was -- ADA-compliant hardware is also -- can also be suicide resistant.**
Q. Okay. I just --
A. **So it's a combination. If I said it wasn't ADA compliant, I'm not an expert in that. I am an expert in suicide resistant ADA-compliant hardware. And it was available -- it's been available for many years; well before 2014.**



**MR. CORRIGAN:** That's all I have.
*********************

**CROSS-EXAMINATION**

**BY MR. BLEYER:**
Q. Mr. Hayes, can you enlighten me more -- and this is going to be quick -- about -- when you talked about ADA-resistant hardware.
A. **Yes.**
Q. I mean suicide-resistant hardware that's also ADA compliant.
A. **Yes. And I'll give you the very simple example of that handrail that I -- that was used in this case.**
**There -- that handrail might have been ADA compliant, but it was not suicide resistant. And they make suicide-resistant ADA-compliant hardware, including that handrail.**
**So what would happen -- it's a simple solution. Instead of there being a hole between the rail and the bracket that's attached to the wall, a stainless steel bracket is attached to the bottom of the handrail so that the individual cannot weave a piece of clothing or other material through it. So it acts as a handrail, but it does not act as a --**



**as an -- an anchoring point for a ligature.**
Q. So, in other words, you put a plate on the bottom of this rail?
A. **Correct.**
Q. So then how did -- is there such a thing as an ADA suicide resistant grab rail?
A. **Yes. That's exactly what that is.**
Q. Well --
A. **Yes. That's exactly what that is.**
Q. Well, grab rail, according to the ADA, you have to be able to get completely around it. Wouldn't a shield on the bottom of it prevent you from grabbing the handrail to use as a --
A. **No. No. Because when you're -- when you're holding a grab -- a handrail or a grab rail, you're not putting your -- the rail is made in such a way that you have -- your hand is sturdy enough to balance and not fall over while at the same time being suicide resistant.**
**It's hard to -- hard to explain, even if you were here live, without having a -- having a exhibit.**
**But there are certainly -- many correctional facilities, both adult and juvenile,**



**have suicide-resistant ADA equipment or hardware, and it's not -- it's not just the grab rail. Everything dealing with ADA compliance.**
Q. -- for design in the construction of a jail?
A. **I'm sorry. I didn't hear the beginning of that question.**
Q. Okay. I'm sorry. And I apologize for the phone.
Have you ever been involved in designing or constructing a juvenile detention facility or any type of detention facility?
A. **I have been -- I have been consultant to architects or jail designers for retrofitting and expansion of jails in juvenile facilities, yes; very, very specific to consulting with the number and the interior of cells utilized to house suicidal youth and/or adult inmates.**
Q. And what training do you have to qualify as an expert in that facility -- in that field?
A. **Just my experience as a consultant for 37 years and knowing -- I've written about it. You can go online. And I coauthored a scientifically peer-reviewed article with an architect on the**

Page 197

**components of a suicide-resistant cell that is out there and utilized.**
Q. Are you going to render opinions in this particular case about the construction of this facility as it relates to suicide prevention?
**A. Not -- I -- my opinions right now are based upon my report, and there's nothing in my report about what we're talking about right now.**
**I'm not -- I have no opinion, other than what I've said, that -- that that was not a suicide-resistant handrail and -- and my opinion, as I stated in my report, is that it was also utilized previously in that same room by another youth and -- and, as such, should not have been there.**
Q. Who was that?
**A. It was another individual. It was another youth several years earlier. I -- I don't have the name of the youth, but there's a document -- there's documentation that there was a suicide attempt using that same handrail X number of years earlier in that same room.**
Q. Are there any studies about suicide in youths about if someone really wants to commit suicide, it's eventually going to happen? I mean,

Page 198

can you absolutely prevent it if someone intends to really want to commit suicide?
**A. I've been doing this for 37 years, and if I thought they weren't preventable, I wouldn't be doing this more than a year.**
**It's my belief, and I think the data suggests, the rate of suicides in jails -- I can't speak for juvenile facilities because we've already talked about the lack of data to calculate suicide rates -- but the suicide rate in jails around the country has dropped dramatically in the past 20, 25 years.**
**That's because of a lot of different things: Better training, better policies, better jail construction, better intake screening, asking better questions, better resources, having mental health staff come into the facility. That's resulted in a dramatic reduction of suicide.**
**So that answers the question: That suicides are preventable. Can you prevent 100 percent of them? No. And I've never suggested that you could. But suicides are preventable. Most people that work in the area of suicide prevention, not only in correctional facilities, but out in the**

Page 199

**community, believe very strongly that suicides can be prevented or else they wouldn't be in that profession.**
Q. When Mr. Heise was there earlier, you talked about the contract with his client, the medical provider, and Franklin County.
Do you -- are you -- have you been asked to give any opinions as to the relationship between the Second Judicial Circuit, the Chief Judges Office in Franklin County in the operation of the facility?
**A. You know, I guess it depends upon the question. I -- I think that regardless of whether employees were employees of the state or whether they were employees of the county or a combination thereof, I think that there's combined responsibilities.**
**My understanding is that Franklin County provided the physical plant, provided the facility. They provided -- they were responsible for the budget. They contracted with CHC. They were -- you know, they, I think, were involved in hiring staff, not exclusively, but were on -- from my recollection of some of the testimony.**
**I understand that some of the -- that the**

Page 200

**oversight was more of a state responsibility; that there was, as you say -- and I don't know what -- what circuit court it was, but that they provided the kind of legal oversight of the facility. But Franklin Counsel obviously was involved in what I just said: The physical plant, the building, the budget, the hiring of the medical contractor.**
**I can presume that they were also responsible for contracting any mental health services that came in the building, not the court-ordered responsibility, but whoever the provider was to come in to provide crisis intervention counseling or services. That -- that was also done by Franklin County.**
**So that's going to be the extent of my opinion in this case regarding Franklin County as opposed to -- to any state -- state agency involvement.**
Q. When you have these opinions about the suicide was preventable and who should have -- are you talking about the correctional officers -- the juvenile correctional officers should have observed his demeanor and things of that nature when you're talking about crying and everything like that and

Page 201

should have then referred him for further health care, or are you talking about someone from Franklin County?
**A. Well, I -- you know, I'm not quite clear who -- my understanding was that there was -- that these employees were paid by the county. Now, that money might have come from the state, which is not uncommon, but I'm -- I am going to allow others to determine whether they were state or county employees.**
**I only have opinions about their conduct, and that's the extent of my opinion.**
Q. Let me clear it up, and I think --
**A. Okay.**
Q. -- and I realize that this is more legal questions as to the lawyers jockeying who's employed by whom.
But is it fair to say you're here to give opinions as to the persons at the facility and what they should or could have done to prevent this and not necessarily who employed that individual?
**A. Well, if the question is specific to the line staff -- the line juvenile detention officers and Ms. Sanders and Mr. Freeman and such, then I**

Page 202

**would agree that it's -- that there might be a difference of opinion about whether they were state or county employees. So my -- my opinion has to do with their conduct and their actions or interactions as opposed to anything else.**
**On the other hand, I do have an opinion that Franklin County is -- should be sharing in the responsibilities for what happened to R[redacted] E[redacted] because they also entered into a contract with the medical provider, and that medical provider was to provide a service. And I've already stated my opinions about that service.**
**It also has to do with the county was providing training or -- now, they might have contracted that responsibility to CHC for training. That did not happen.**
**They're responsible for the budget, and so if there are any kind of excuses or reasons why we couldn't do something because of budgetary concerns, then I think that that's a -- that's an issue for the county.**
Q. And I assume you -- you're not -- strike that.
As far as the construction of the facility,

Page 203

the only thing you were concerned about is this one handrail?
**A. Well, yes. That's the only thing that I could -- that -- I saw a videotape and I think I saw some photographs of the inside of the cell too. And, yes, as far as the physical plant, that -- that seems to be the only issue that I have an opinion on with his case.**
Q. And, I guess, what qualifications do you have to give opinions that Franklin County would be responsible for operation of this facility?
**A. I don't have -- I don't think I have any particular expertise. I only have my experience of dealing -- being hired by jurisdictions such as yourselves and being hired by other jurisdictions having -- that there is an obligation -- a shared responsibility or obligation. It's not any kind of legal opinion that I have.**
**But these decisions are not -- the -- the maintenance of a facility is normally not specific to an individual entity. It's a lot of moving parts, and I think that this -- this case kind of exemplifies. And it's not atypical of other juvenile detention facilities around the country**

Page 204

**where there's a core -- core kind of responsibility or core oversight. There's -- there's a county responsibility because that's where the detention center is physically housed. And there's -- when you contract out for medical services, there's that private contractor entity.**
**So it's a shared responsibility, and that's the extent of my -- my knowledge and expertise.**
Q. And your basis of a shared obligation is based upon what, sir?
**A. My experience.**
Q. Have you ever had another facility like this where a juvenile detention center is actually operated by the chief judges office but owned by the county?
**A. Yes. I think that's fairly common. In my experience, in -- it's very different in adult jails. Most adult jails are run by the county. They report to the county commissioners or the board of supervisors, and mostly the sheriff has the oversight. It's pretty clean. There's not a lot of murkiness to it.**
**But in juvenile -- in juvenile detention facilities, it's -- what I find occurring in**

Page 205

**Franklin County is not unusual at all; that there's, you know, the Franklin -- the juvenile courts are -- are not atypically responsible for oversight of the detention part of it and -- and sharing that with whatever county is physically housing the facility.**
Q. I assume you're not here to give opinions or interpret the contract between the Second Judicial Circuit and the County, are you?
**A. No.**
Q. You're saying the shared obligation is your other experience, but it's not based upon any agreement in this particular case between the County and the Second Judicial Circuit Chief Judges Office; is that correct?
**A. Yes; correct.**
**MR. BLEYER:** I think that's all the questions I have. Thank you.
**MR. CORRIGAN:** I actually have a follow-up question that I forgot to ask.
************************
RE-CROSS EXAMINATION
**BY MR. CORRIGAN:**
Q. When you talked about a prior suicide attempt at the institution, that just reminded me

Page 206

that I forgot to ask you when one talks about suicide attempts, that terminology encompasses behavior that is not determined to actually be an authentic suicide attempt; correct?
**A. It can be -- it can certainly. I mean, there's --**
Q. Let me clarify.
**A. Yeah, please do. Because I'm troubled by the term authentic.**
Q. Okay. Well, there is -- there is a lot of acting-out behavior that juveniles engage in that is not intended by the juvenile to take their own life; correct?
**A. Correct.**
Q. And some of that behavior can be encompassed within the terminology suicide attempt?
**A. Correct.**
Q. And that includes wrapping a sheet around the neck in order to get attention?
**A. Correct.**
Q. And other attention-getting things --
**A. Correct.**
Q. -- whether it be a nonlethal cut of the arm, to getting down on the knees and pretending

Page 207

that they're going to commit suicide.
**A. Is that a question?**
Q. That -- all that falls within the term suicide attempt.
**A. Correct. And regardless of its lethality, it all should be taken seriously.**
Q. That's outside --
**A. Yes.**
Q. My question is it all falls within the definition.
**A. Correct.**
Q. Okay.
**MR. CORRIGAN:** Thank you. That's all I have.
**MR. BLEYER:** I have nothing further.
**MR. GROVES:** Do you want to read or waive?
**THE WITNESS:** I can waive.
**MR. BLEYER:** I just want an e-tran only. I don't need paper. JABLEYER@BLEYERLAW.COM.
**MR. CORRIGAN:** I want whatever's cheapest.
**MR. GROVES:** I'll take an electronic with exhibits.

Page 208

(Whereupon, the deposition was concluded at 1:51 p.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
Norfolk, SS.

I, DAWN MACK-BOADEN, RPR, and a Notary Public duly qualified in and for the Commonwealth of Massachusetts, do hereby certify that:

LINDSAY M. HAYES, the witness whose testimony is hereinbefore set forth, was duly sworn by me, and that such testimony is a true and correct transcription of my original stenographic notes taken in the forgoing matter, to the best of my knowledge, skill and ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial seal this 17th day of August, 2017.

Dawn Mack-Boaden, RPR
Notary Public

My Commission Expires: August 21, 2020

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT

## *

*********************** (1)**
194:2
************************* (1)**
205:20
***************************** (1)**
162:18
************************************* (13)**
22:20,23;23:9,20,23;
24:3,6,10,13;40:12,15;
92:12,15
************************************* (1)**
23:12
*************************************** (5)**
50:20,22;51:24;
115:11,14

## A

**abide (6)**
81:21;116:6;158:11,
11,12,14
**ability (11)**
30:3,22;47:19;56:22;
69:14;72:4;105:23;
114:23;132:7;153:16;
157:7
**able (12)**
33:4,16;46:9;88:5;
107:4;110:20;168:24;
176:16;180:7;190:6;
191:9;195:11
**abode (1)**
22:9
**abolish (1)**
172:21
**abolishment (1)**
172:17
**Absolutely (3)**
72:8;103:20;198:1
**abuse (12)**
38:14;101:1,5,17,19;
102:1,5,9,14,16,18;
171:11
**ACA (3)**
116:1;158:12;177:9
**academies (1)**
17:22
**access (7)**
43:16,20;44:7;47:6;
48:14;84:11,15
**accessed (3)**
42:5,20;47:2
**accessible (1)**
70:4
**accident (1)**
53:3
**accordance (3)**
83:16;84:8,16
**according (3)**
46:13,14;195:10
**accordingly (1)**
171:13
**accreditation (9)**
75:3,5,7,13;76:6;
81:23;116:4,7,11
**accredited (6)**
75:9;81:22;82:2;
116:1;158:15;159:22
**accurate (5)**
25:7;43:12;58:7;
93:5;99:24
**acknowledge (1)**
67:23
**acknowledgement (1)**
51:8
**acknowledgment (3)**
160:22;161:7,14
**acronym (1)**
39:3
**across (1)**
160:21
**Act (2)**
11:6;194:24
**acting (3)**
89:12;136:13;182:7
**acting-out (1)**
206:11
**action (2)**
26:20;30:9
**actions (6)**
31:2;89:7,11,17;
143:11;202:4
**active (1)**
135:6
**actively (1)**
31:6
**activities (2)**
149:13;165:11
**activity (2)**
166:13,14
**acts (1)**
194:24
**actual (1)**
188:10
**Actually (5)**
11:3;56:18;204:13;
205:18;206:3
**ADA (8)**
193:15,21;194:10,
14;195:6,10;196:1,3
**ADA-compliant (6)**
108:2,5,9;193:17,22;
194:16
**ADA-resistant (1)**
194:7
**add (2)**
29:13;74:9
**Adderall (3)**
134:4;137:24;145:5
**addition (5)**
8:17;32:15;52:14;
90:6;183:3
**additional (7)**
34:4;65:21;125:22;
131:5;132:3;144:12;
182:17
**addressed (1)**
79:10
**adequate (1)**
111:19
**adequately (2)**
10:24;156:2
**ADHD (25)**
55:9;56:21;57:2;
64:20;65:4;68:2;98:22,
23;99:2,6,6;101:22;
102:21;133:18;134:3,
22;145:6;148:14;
153:13;154:12;155:9,
12;180:23;181:9;
184:20
**administration (2)**
13:4,7
**Administrators (7)**
88:15;106:21;
172:14,16;173:24;
174:1;175:9
**admission (1)**
61:3
**admit (1)**
6:24
**adult (39)**
9:20;11:10,12;25:14;
27:19;29:6,14,21;33:6,
6;35:9,23;36:20;37:4,
5,13;48:1;70:21;98:3;
99:9,12;100:15;107:7;
113:4,6,10;116:14;
169:16,16;178:12,13,
14,19;180:12;186:14;
195:24;196:18;204:17,
18
**adults (5)**
36:15;98:6,10,23;
190:3
**advise (1)**
122:15
**advocating (1)**
172:16
**affect (1)**
59:16
**affect/mood (2)**
62:10,19
**affects (1)**
107:9
**again (25)**
36:8;70:10;78:14,20;
102:12;109:19;117:24;
125:1;126:17;134:21;
139:9,15;140:7,8,18;
147:2;150:8,16;151:1;
154:17;176:24;183:5;
184:11;185:2;191:16
**age (1)**
98:17
**agency (7)**
9:19;11:20;28:11;
33:16;106:21;172:15;
200:17
**ages (1)**
97:6
**ago (2)**
8:5;193:9
**agree (24)**
10:16;18:14;45:6,11;
54:18,21;55:11,16,24;
57:2;59:10,21;63:3,8;
76:2;84:22;93:5;131:1;
141:20;181:12;184:18;
188:4;193:10;202:1
**agreeing (1)**
85:9
**agreement (26)**
25:19;26:4,22;27:2,
13;28:10;30:2,7,17;
74:1,11,16;78:10;
79:19;81:4,20;83:21,
23;85:4,17,23;90:10,
11;157:13,23;205:12
**agreements (2)**
81:17;158:10
**ahead (2)**
38:3,8
**aid (1)**
39:9
**Air (1)**
108:16
**airport (1)**
129:16
**allegation (1)**
133:7
**allergic (2)**
104:23;105:2
**allow (1)**
201:8
**allowed (7)**
19:1;46:11;114:16;
115:6;165:10,11;
192:11
**almost (4)**
46:22;109:10;110:7,
14
**alone (6)**
29:4;164:23;165:7,8;
166:7;185:6
**along (1)**
39:12
**Alternatives (2)**
7:8,10
**although (4)**
42:20;143:19;157:3;
193:9
**always (6)**
14:17;56:6,7;117:4;
118:13;119:12
**AMA (3)**
80:3,15,16
**amend (1)**
60:16
**Amendment (2)**
186:10,16
**America (1)**
161:20
**American (8)**
13:13;79:20,21,24;
80:2;88:12;116:1;
177:10
**among (4)**
179:14;181:5;184:5;
191:4
**amongst (1)**
46:9
**amount (1)**
112:1
**Analysis (2)**
86:21;171:9
**analyzed (1)**
95:24
**anchoring (3)**
108:1,14;195:1
**and/or (7)**
25:20;32:2;70:21;
83:4;159:14;172:21;
196:18
**anger (1)**
189:18
**angry (3)**
189:13,17,17
**answered (1)**
122:3
**anti-bullying (2)**
64:24;154:4
**antidepressant (1)**
59:19
**anymore (1)**
12:17
**apolitical (1)**
12:10
**apologize (7)**
40:17;51:15;60:1;
103:20;110:12;162:12;
196:8
**apparent (1)**
128:4
**apparently (7)**
47:6;91:1;97:24;
101:10;124:7;142:8;
146:12
**appear (1)**
141:13
**appearing (1)**
17:1
**appears (1)**
85:23
**appendices (2)**
170:17;179:11
**appendixes (1)**
76:21
**applicable (3)**
80:7;85:19;158:24
**applicable/available (1)**
135:18

**applies (1)**
73:16
**apply (3)**
73:16;80:15;110:20
**applying (1)**
156:10
**appointed (4)**
25:12,16;26:2;
149:11
**appointment (1)**
27:3
**appointments (1)**
165:12
**appreciation (1)**
147:13
**approach (3)**
26:20;27:4,10
**appropriate (3)**
59:19;60:16;87:6
**appropriately (1)**
111:14
**approves (2)**
27:1,2
**Approximately (3)**
97:11;108:22;109:4
**April (11)**
54:21;58:1,4;126:11;
148:18,19,21,21;
149:19;150:12,16
**aptitude (1)**
18:23
**architect (1)**
196:24
**architects (1)**
196:14
**area (12)**
7:2,16,19;9:24;
12:12,15,17;13:11;
18:23;28:24;89:22;
198:23
**areas (4)**
7:15;12:9;13:9;
27:16
**arguing (1)**
81:9
**Arizona (2)**
28:8,16
**arm (2)**
104:14;206:24
**around (8)**
11:8;52:15;114:1;
184:22;195:11;198:10;
203:24;206:18
**arrest (1)**
119:20
**arrived (1)**
151:20
**arson (1)**
119:20
**art (2)**
20:8;106:14
**article (1)**
196:24
**articulate (2)**
180:8;187:8
**articulated (1)**
180:17
**arts (1)**
12:3
**aside (5)**
86:18;116:23;
137:20,21,22
**aspect (1)**
31:21
**assaulting (2)**
165:23,24
**assess (2)**
44:23;55:4
**assessed (6)**
67:6;109:11,20,23;
110:9;136:3
**assessing (1)**
157:8
**assessment (65)**
42:2,3,20;43:16;
44:3,4,8,14,18,22;45:8,
10,16;46:12;48:24;
49:1,5,17;56:4,6;57:11,
19;58:6,14,15;61:22;
65:19;66:1;68:12;69:8;
70:5;71:19,20;73:12,
13;77:15,18,22;78:6,
12,22;79:11,14;83:4;
90:1;109:8;110:15,24;
111:4,5;118:11;120:2,
9;122:7,9;126:18;
129:6;133:17;134:5;
135:15;136:24;138:3;
152:22;156:1;180:5
**assessments (9)**
44:1,19;45:5,6;
67:22;69:7;79:1,7,8
**assigned (3)**
16:1;27:20;107:12
**assist (2)**
64:23;116:24
**assistance (1)**
57:6
**assistant (3)**
42:18;43:4;46:19
**assisted (1)**
16:2
**associate (1)**
112:8
**Association (7)**
79:21,22,24;80:2;
88:13;116:2;177:10
**assume (15)**
6:17;11:14;82:24;
87:19;107:22;121:2,5;
122:24;123:1;141:12;
176:8;177:2;181:17;
202:22;205:6
**assuming (2)**
78:10;177:13
**assumption (7)**
67:13;78:15;123:19,
20,22;124:5,6
**assumptions (3)**
122:17;123:7;124:1
**attached (2)**
194:20,21
**attempt (10)**
31:4;103:22;108:10;
155:22;168:22;197:19;
205:24;206:4,16;207:4
**attempts (8)**
41:10;51:7;93:9,17,
20;104:1,2;206:2
**attention (3)**
107:20;115:20;
206:19
**attention-getting (1)**
206:21
**ATTORNEY (2)**
51:22;186:18
**atypical (3)**
181:12;185:3;203:23
**atypically (1)**
205:3
**audience (1)**
18:3
**August (1)**
119:19
**aunt (2)**
124:22,22
**authentic (2)**
206:4,9
**automobile (1)**
53:3
**avail (1)**
159:15
**availability (3)**
42:13;43:24;46:6
**available (30)**
10:24;11:22;41:23;
42:4,14,16,21;47:1;
52:7,8;58:12,15,17;
69:16;70:4,16;72:13;
86:23;87:8;100:6;
131:6,8;132:4,21;
138:3;144:23;152:24;
153:5;193:23,23
**AW (2)**
130:5;151:2
**aware (30)**
10:21;11:21;20:7,22;
21:4;101:22;102:4,19,
22;104:2,5,7,10;108:1;
114:12,20;115:17;
116:15;117:17;121:4,
8,16,17,23;124:18,21;
139:20;141:5;142:21;
153:19
**away (2)**
188:14,15

**B**

**bachelor (1)**
12:3
**bachelor's (1)**
12:20
**Back (40)**
9:6;19:8,10;27:1;
33:3;41:8;45:7;47:23;
50:5,13;53:3;60:15;
61:9,15;65:19;67:1,2,
2;73:7;82:5;98:1;
100:23;103:8,11;
115:16;117:23;118:2;
119:13;120:16;123:6;
136:11;155:7;157:12;
169:7,11,11;179:18,22;
182:4;188:16
**background (4)**
38:1;39:13;67:24;
155:21
**bad (2)**
105:6;159:2
**baggage (1)**
67:24
**balance (1)**
195:18
**Baltimore (1)**
7:14
**barred (1)**
20:20
**bars (1)**
13:1
**base (1)**
172:5
**Based (26)**
46:1,18;64:7;67:7;
73:8;74:1,24;87:20;
97:1;101:9;118:18,19;
124:1;142:15;152:7,
18;155:8;168:22;
171:24;172:6;173:9;
174:6;177:14;197:6;
204:10;205:11
**bases (1)**
92:6
**basic (2)**
135:8;137:18
**basically (6)**
95:11;111:7;112:10;
136:6;152:23;169:8
**basics (1)**
6:19
**basis (8)**
42:15,17;50:10;72:9;
140:10,11;165:19;
204:9
**Bates (1)**
77:11
**became (4)**
25:16;113:19;
121:16,17
**become (6)**
9:4;81:22;82:2;
158:15;173:23;174:2
**bed (2)**
108:16;165:15
**beer (1)**
13:1
**began (3)**
126:23;148:19;
150:17
**beginning (3)**
7:12;64:15;196:6
**begins (5)**
93:7;142:8;143:18;
156:19;157:2
**behalf (2)**
34:11;35:24
**behavior (31)**
56:7;61:2;64:7,16;
92:24;93:13,23,24;
94:19,21;103:6,7,10,
16;121:10;131:18;
136:18;141:16,18,19,
22;142:16;151:17;
152:10;155:11;165:21;
169:3;184:19;206:3,
11,15
**behavioral (10)**
105:13;111:13;
142:2;181:22;182:17;
183:4,16;184:1,5,9
**behaviors (1)**
98:21
**behind (1)**
161:8
**beings (1)**
12:9
**belief (2)**
46:17;198:6
**believes (1)**
88:19
**Bell (4)**
159:10;186:6,8,12
**belonged (2)**
45:16,20
**benchmark (1)**
159:1
**benchmarks (1)**
157:7
**beneficial (1)**
118:21
**best (8)**
27:12;35:13;68:11;
79:12,19,19;139:4;
165:5
**better (7)**
147:3;198:14,14,14,
15,16,16
**big (1)**
98:15
**billing (1)**
23:2
**binding (3)**
157:4;158:18,19
**bit (10)**
61:19;87:11;91:6;

92:21;95:23;96:5; 115:16;117:14;150:23; 179:17
**BJS (1)** 11:4
**blank (1)** 161:18
**bless (1)** 161:20
**BLEYER (9)** 38:3,8;40:19,22; 130:4;194:4;205:16; 207:15,19
**board (2)** 160:21;204:19
**borne (2)** 80:1,1
**both (19)** 14:12;17:19;19:20; 29:14;33:6;35:9;51:1, 1,3,3;58:24;72:11; 83:2;87:18;88:11; 89:10,10;179:23; 195:24
**bottom (4)** 83:14;194:21;195:3, 12
**bracket (2)** 194:20,21
**Brandy (4)** 38:14,17;40:21; 128:14
**break (7)** 50:18;73:19;85:3; 115:12;162:15;191:7, 14
**breakdown (1)** 32:7
**breaks (1)** 73:21
**briefly (3)** 15:16,17;153:11
**brightened (1)** 150:23
**bring (1)** 77:5
**broken (1)** 13:9
**brought (2)** 21:8;166:3
**budget (3)** 199:20;200:7;202:17
**budgetary (1)** 202:19
**building (2)** 200:6,10
**bulb (1)** 150:22
**bullet (1)** 153:2
**bullied (2)** 68:3;145:11
**bullying (2)** 61:12;68:3
**bunk (2)** 107:17,21
**Bureau (1)** 11:4
**business (3)** 7:4,6;8:24

## C

**calculate (9)** 99:14,18,22;100:4,5; 171:8;179:1;187:23; 198:9
**calculated (4)** 99:14;179:7;186:23; 187:4
**calculations (2)** 100:8;186:24
**call (8)** 29:23;31:7;41:21; 44:13;70:12;78:9; 123:9;169:8
**called (10)** 9:16;11:4;26:11; 28:13;37:11;69:19,24; 76:24;88:15;91:8
**calls (1)** 118:3
**came (9)** 16:23;39:16;47:18; 52:23;53:13;59:21; 104:21;172:20;200:10
**can (47)** 7:16;20:12;21:19,20; 30:19;31:18;32:7; 35:17;36:19;37:14; 43:7;50:13;57:13; 60:14;66:18;73:7;80:9; 82:5,20;85:4;86:5; 88:4;97:1;99:12; 101:24;111:13;116:8; 122:13,19;129:21; 131:8;140:13;159:10; 165:22;171:19;189:22; 193:17;194:5;196:23; 198:1,20;199:1;200:8; 206:5,5,15;207:18
**canceled (1)** 190:8
**care (49)** 14:20,24;18:11,15, 16,18;19:2,16;20:1,4,8, 17,21;74:1,5,14,23; 75:1,22,24;76:2;79:22; 80:6;84:8,12,14;85:8; 87:10,11,21,21;88:6,9, 10,11,20;91:3;94:16; 116:3;123:20;125:16; 130:18;140:11,13,24; 145:17;177:8;186:7; 201:2
**care' (1)** 157:8
**career (4)** 35:10;176:4,6,9
**carefully (2)** 106:19;107:4
**cart (2)** 183:21,22
**case (61)** 6:15;8:13,15,18; 16:13;18:16;19:4;21:8; 25:20;26:1,6;28:13; 30:13;34:8,9;35:17,23; 36:1,4,21;37:6,13,18; 46:21;48:5;49:13;54:3, 11;67:12;74:9;80:11; 85:20;86:20,23;87:8; 90:13;114:7;124:5; 132:22;136:22;142:6; 144:3;146:23;147:1; 158:4,13;159:8; 166:10;177:18;186:8, 12,12,17,19;192:6; 194:13;197:4;200:16; 203:8,22;205:12
**cases (31)** 8:13;19:12,20,22,24; 20:1;27:5;32:3,11,15, 21;33:2,20,22;34:1,3, 11;35:1,6,9,11;36:7; 37:15;123:11,12; 150:9;159:9;169:4; 170:20,21;171:13
**catch (1)** 162:13
**cause (12)** 52:20;89:4,6,14,18, 19;120:10;126:18; 137:2,8,9,10
**causes (5)** 89:14;90:2;136:1; 137:3,11
**cell (6)** 114:13,15,21; 193:14;197:1;203:5
**cells (1)** 196:17
**Center (46)** 7:7,9;8:3,8,10,14; 44:4;47:8;57:11,19; 58:6,13,15;61:3,11,18; 64:15;65:17;66:1;72:1; 84:16;87:15,23,24; 90:21;94:11;96:11; 110:3;121:14,15; 122:12;123:2,24; 124:4;135:20;138:6, 10,11;139:8;146:3,5; 147:4;152:22;185:7; 204:4,13
**centers (10)** 87:24;96:7,12,16,23; 99:20;100:1;109:4,5; 181:6
**center's (2)** 73:1;91:8
**Centerstone (3)** 91:13,18,20
**CEO (1)** 8:6
**certain (2)** 152:9;170:20
**certainly (14)** 12:1;31:9;48:17; 68:24;126:16;133:10; 135:4;137:4;157:19; 181:11;182:12;191:1; 195:23;206:5
**certainty (1)** 156:14
**certification (2)** 74:15;116:17
**certified (1)** 116:15
**chance (2)** 13:17;39:21
**change (2)** 144:18;173:9
**changed (1)** 112:10
**chaperone (2)** 15:9,11
**chaperoning (1)** 14:11
**characteristics (2)** 185:18;192:5
**chart (2)** 30:14,14
**CHC (20)** 74:11,17,20;78:11; 82:2;90:8,11;106:6; 135:3;145:23;146:6, 17,20;147:10,15,17; 156:9;159:15;199:20; 202:15
**CHC's (1)** 146:1
**cheapest (1)** 207:22
**check (1)** 177:9
**checks (22)** 111:21;112:2;160:5, 21;161:6,12,14; 162:22;163:2,7,8,11, 12;173:7;174:13; 175:1;176:9,13,20; 177:3;184:24;185:10
**Chicago (1)** 74:24
**chief (5)** 58:22;59:3;199:9; 204:14;205:13
**child (9)** 47:23;48:3;53:16; 68:21;71:4;72:23; 114:10;124:13;161:6
**children (5)** 161:3;163:14; 166:12;167:1;187:21
**choose (1)** 116:4
**circle (2)** 95:11,23
**circling (1)** 184:22
**Circuit (4)** 199:9;200:3;205:8, 13
**citations (2)** 21:14;186:19
**cited (1)** 186:6
**cities (1)** 12:9
**citing (1)** 184:11
**city (1)** 9:21
**civil (3)** 12:14;26:11,12
**Claims (1)** 44:6
**clarify (3)** 164:20;168:3;206:7
**class (2)** 168:24;169:6
**classic (6)** 59:16;60:10,12,21, 24;63:16
**clean (1)** 204:21
**clear (15)** 51:16;65:3;78:14; 79:9;84:5;86:1;106:17; 134:17;146:15;150:12; 152:4;174:12;188:17; 201:4,13
**Clearly (3)** 47:3;80:4;111:15
**client (2)** 157:24;199:5
**clinical (3)** 16:7;18:21;180:5
**clinician (7)** 134:5;135:2,10; 139:11,13;140:19; 149:23
**close (1)** 189:21
**closely (1)** 111:15
**closet (1)** 108:17
**clothing (1)** 194:23
**coauthored (1)** 196:23
**collect (3)** 11:7,10,24

**collection (2)** 69:10,11
**Columbia (2)** 28:12,17
**combination (6)** 67:18;88:11,17;140:14;193:20;199:14
**combined (3)** 138:7,8;199:15
**combining (1)** 173:5
**coming (2)** 61:9;185:4
**commensurate (1)** 160:19
**comments (1)** 128:15
**Commission (4)** 17:20;74:14,22;116:2
**commissioners (1)** 204:19
**commit (10)** 53:17,23;155:22;169:13;187:13;189:1;190:2;197:23;198:2;207:1
**commitment (9)** 45:4;72:12;95:16;97:12,14,20;99:21;100:2,3
**commits (1)** 53:15
**committed (12)** 49:15;52:16;54:11;97:17;98:2;110:4;138:22;145:5;155:17;156:17;169:22;186:2
**committing (1)** 89:15
**common (4)** 19:19;70:20;184:6;204:16
**communicate (5)** 114:20,24;132:8;138:10,12
**communication (4)** 47:9;123:23;138:5;149:22
**community (1)** 199:1
**Companies (1)** 74:12
**companion (1)** 77:2
**complained (1)** 133:20
**complaint (2)** 58:22;59:4
**complaints (1)** 139:21
**complete (4)** 89:20,21;136:8;170:10
**completed (3)** 9:23;26:3;136:8
**completely (2)** 136:9;195:11
**completes (1)** 24:7
**complex (3)** 59:17;62:11,20
**compliance (4)** 30:18,19,22;196:3
**compliant (4)** 193:15,21;194:10,15
**component (3)** 30:2;75:3,5
**components (5)** 192:18,22;193:3,11;197:1
**conceivably (1)** 141:21
**concentrated (1)** 62:23
**concentration (4)** 13:11,15,22;184:19
**concentrations (1)** 13:14
**conception (1)** 83:23
**concern (3)** 64:6,13;108:11
**concerned (11)** 34:18;61:10;65:5;108:7,7;123:9;133:4;184:17;185:24;186:3;203:1
**concerning (2)** 64:16;80:6
**concerns (5)** 59:12,14;67:12;122:15;202:19
**conclude (1)** 30:17
**concluded (1)** 208:1
**conclusion (3)** 20:12;187:24;191:17
**conclusions (3)** 129:6;171:2;188:5
**condition (4)** 48:6;181:2,19,21
**conditions (7)** 26:14,19;28:21;149:13;186:13;187:19,22
**conduct (6)** 31:19;34:19;78:12;151:10;201:11;202:4
**conduct' (1)** 157:8
**conducted (6)** 93:3;99:13;111:5;118:22;130:9;171:7
**conducting (4)** 31:19;71:20;72:1;135:14
**confident (2)** 19:23;29:18
**confidential (3)** 47:4,20;48:2
**confidentiality (1)** 48:7
**confined (8)** 57:18;115:5;119:18;120:5;152:22;167:13;169:20;192:10
**Confinement (117)** 10:8,19;11:2;26:14,19;28:21;92:1,18;94:10;97:10,23;105:7,10,12,17,20,24;106:3,8,13,14,24;107:8,11;110:5;111:11,12,22;112:3,9,11,14,17;113:14,15,20;114:2,11;115:4;122:12;123:1;127:5;132:7,10;137:14;139:8;140:10,23;141:2,4;147:14,18,23;160:23;164:3,7,13,16;165:2,6,16,17,20;166:1,7,17,19,22;167:7,12,14,17;168:2,7,13;169:9,15,20;171:4,16,18;172:9,17,22,23;173:3;174:3,14,20;175:2,13;176:14,18,21;177:4,22,23;186:14;187:6,9,12,14;188:9,10,11,23;189:5,16,22;190:14;191:1,5,18;192:2,5,7,13
**confirmed (2)** 154:15,18
**confirming (1)** 65:3
**confusion (1)** 85:17
**connection (1)** 26:1
**consent (1)** 26:22
**consequences (1)** 147:14
**consider (2)** 102:13;166:16
**consideration (1)** 41:15
**considered (3)** 59:20;164:13;165:17
**consistent (7)** 78:13;80:7;116:9;131:20;153:9;160:3;163:5
**consistently (2)** 87:22;148:4
**constant (2)** 54:12;186:21
**constitutional (1)** 157:5
**constructing (1)** 196:11
**construction (4)** 196:4;197:4;198:15;202:24
**consultant (8)** 7:2;8:20,23;25:23;27:6;31:11;196:13,21
**consultation (11)** 7:19;34:17;41:12;117:2,6,8,10,17,18;118:5,14
**consultations (1)** 35:21
**consulted (3)** 34:13;116:20,24
**consulting (5)** 8:16;34:7;35:20;117:21;196:16
**consuming (1)** 160:24
**contact (5)** 110:15;122:4,7,11;148:23
**contacted (2)** 121:14;122:14
**contacting (3)** 121:8,15,24
**contagious (1)** 106:11
**context (4)** 49:18;136:17;180:1;183:23
**continue (3)** 56:19;125:2;153:10
**continues (4)** 52:12;59:22;183:9,9
**continuing (2)** 65:4;153:3
**continuous (1)** 30:4
**contract (22)** 74:2;77:6;78:17;80:12,13,18,24;81:24;82:14;83:20,22;86:7;90:15,16;91:2;156:22;157:23;158:15;199:5;202:9;204:5;205:7
**contracted (2)** 199:20;202:15
**contracting (1)** 200:9
**contractor (2)** 200:7;204:6
**contracts (1)** 74:9
**contractual (4)** 74:10;147:11,19;157:12
**contractually (1)** 90:19
**contrary (1)** 83:5
**contribute (2)** 120:10;126:19
**controlling (1)** 98:20
**converse (1)** 192:11
**Cook (2)** 19:13,14
**cooperated (1)** 170:22
**cooperation (3)** 170:9,9,20
**cooperative (2)** 33:15,24
**cope (2)** 56:22;153:16
**copied (1)** 134:11
**copies (1)** 22:9
**coping (2)** 64:23;190:1
**copy (6)** 36:10;48:10;58:20;66:20;77:5;134:14
**core (3)** 204:1,1,2
**correction (4)** 34:16;97:18;142:22;169:16
**correctional (43)** 7:3,20;10:1;17:20;18:9,12;20:15;74:5,11,14,23,24;75:22,24;76:2;77:7;80:16;81:17;85:8;88:13,14,19;106:21;115:24;116:2,3;156:20;157:3;159:15;172:2,12,13,16;173:24;174:8;177:7,10;188:23,24;195:24;198:24;200:21,22
**corrections (22)** 9:5,17;10:3,4;13:10,11,16;15:3;49:1;75:19,20,20,23;117:11;124:23;130:13,16;131:6;151:21;156:4;173:1;175:16
**corrective (2)** 30:9;31:2
**correctly (3)** 32:20;59:3;138:20
**correspond (1)** 24:20
**corridor (1)** 114:18
**CORRIGAN (15)** 51:22;144:15;161:23;162:4,14,20;

174:15;181:9,14;183:2;194:1;205:18,22;207:13,21
**costly (1)** 116:6
**Council (5)** 88:14;106:20;172:12,13;173:24
**counsel (6)** 21:19,23;86:22,24;87:1;200:5
**counseled (5)** 181:18,21,23;182:4;184:3
**counseling (20)** 48:17;50:9,10;62:2;64:22;103:4;120:13,18;121:4;154:1;181:16;182:3,6,7,16;183:13,15,16;184:1;200:13
**counselor (5)** 14:2,6;39:2;41:11;156:15
**counselors (4)** 120:20;121:5;125:6;183:17
**country (10)** 11:8;12:11;26:15;113:21;114:1;117:11;118:18;176:5;198:11;203:24
**county (38)** 9:21;15:17;16:15;19:14,14;37:11;44:12;68:8;74:2,11;96:10;119:19;156:10;157:24;159:14;163:7;199:6,10,14,17;200:14,16;201:3,6,9;202:3,7,13,21;203:10;204:2,15,18,19;205:1,5,8,12
**county's (2)** 91:15,21
**couple (3)** 54:20;189:8;190:4
**course (9)** 6:19;29:21;72:22;73:15;107:15;121:21;123:4,12;127:15
**court (40)** 19:7;20:21;25:12,17;26:23;27:1;31:14;36:1,4;44:9,23;45:12,16;46:11;55:5,17;58:24;59:2;61:9,16;62:1;73:20,22;97:16;116:23;142:8;149:11;150:3;154:8,8;157:6;158:4,20,21,22;159:5,6,10;162:17;200:3
**court-ordered (4)** 44:19;55:2;149:12;200:11
**courts (5)** 13:10;19:3,14;158:18;205:2
**covered (1)** 179:17
**crafted (2)** 106:19;107:4
**created (1)** 146:10
**criminal (4)** 7:16;12:14,19,21
**crisis (3)** 91:10,18;200:12
**criteria (3)** 136:14,19;137:23
**critical (2)** 49:16;108:4
**CROSS-EXAMINATION (2)** 162:19;194:3
**cry (1)** 150:14
**crying (10)** 61:5;128:5;136:12;137:23;145:11;151:19,23;154:21;185:17;200:24
**culture (1)** 12:14
**current (9)** 51:6;54:22;55:13;77:18,23;93:22;94:19,21;134:3
**currently (2)** 7:14;10:24
**curricula (3)** 118:15,20;119:1
**curricular (1)** 191:23
**custodial (1)** 14:10
**custodian (1)** 71:3
**Custody (4)** 11:6,9;71:3;93:3
**cut (4)** 79:9;105:4;132:7;206:23
**cuts (1)** 104:13
**cutting (1)** 104:18
**CV (4)** 27:22;28:4;38:1,7

**D**

**dad (1)** 51:5
**daily (2)** 140:12;165:19
**danger (1)** 125:13
**dangerous (2)** 108:9;172:11
**data (22)** 10:16,24;11:7,10,11,13,16,19,21;33:4,12;95:24;100:5;163:18,19;171:12;174:6;178:4;191:19,21;198:6,9
**date (8)** 59:15;60:2,9,20;63:12,16;150:14,18
**daughter (1)** 123:14
**day (10)** 44:5,5;123:5;128:1,4;140:23;165:10;166:1,8;168:17
**dayroom (1)** 166:4
**days (9)** 110:4,17;111:5;120:5;137:14;138:24;189:8;190:4;191:6
**day-to-day (2)** 16:2;149:13
**DC (1)** 7:13
**deal (2)** 147:8;149:12
**dealing (3)** 55:9;196:3;203:14
**death (41)** 11:5,6;46:22;51:8,13;52:10,11;55:10;64:23;68:1;89:19;91:4;94:1;97:13;105:17;109:16,20,24;110:17;111:6;120:10;126:19;127:11;130:10;132:2;137:2,4;138:19;139:1;140:23;141:8;146:21;149:3;154:2;168:7;182:14;183:10,18;189:3,10;190:19
**deaths (4)** 11:8;109:4;113:16;189:4
**December (1)** 36:22
**decide (1)** 71:21
**decision (2)** 161:5,13
**decisions (3)** 80:6;185:10;203:19
**decreased (1)** 100:19
**deem (1)** 59:6
**deemed (1)** 87:1
**defendant (5)** 27:11;36:1,17,18,23
**defendants (4)** 6:13;26:20;35:18;91:18
**define (5)** 105:10;107:4;171:19;174:10;181:11
**defined (8)** 96:12;103:9,12,14,17,22;106:24;140:12
**definition (13)** 20:16;94:23;103:12;106:18,18;107:5;114:3;164:10,11;166:10;168:2,5;207:10
**definitive (1)** 104:16
**degree (3)** 12:20,23;156:14
**demeanor (1)** 200:23
**demise (2)** 137:8,9
**demonstrated (1)** 30:18
**Demouchette (2)** 19:13,15
**D-E-M-O-U-C-H-E-T-T-E (1)** 19:13
**denies (3)** 41:8,10,12
**Dental (2)** 79:16;82:16
**deny (2)** 51:6;54:23
**Department (15)** 9:15,21;25:24;26:10,10;27:7,10;28:10;31:11,12;33:10;58:16;91:21;92:2;175:16
**departments (4)** 34:15;117:10;172:2;173:1
**Department's (1)** 11:3
**depending (1)** 73:6
**depends (7)** 8:15;94:2,7;173:13;180:16;181:10;199:11
**depose (1)** 144:17
**deposed (2)** 16:18;90:13
**deposition (15)** 16:19;19:6,11,20;22:11;23:2;42:17,22;52:23;120:17,24;121:2;124:16;144:7;208:1
**depositions (2)** 19:17;25:1
**depressed (7)** 48:4;126:23;137:7;148:19;150:17;151:11;180:12
**depression (19)** 56:11,17;57:3,8;59:11;63:4,9;64:2;103:1;154:13,14,17;179:23;180:2,3,5,8;183:10,18
**depressive (5)** 59:17;62:11,19;63:23;64:2
**described (1)** 60:13
**description (1)** 151:17
**design (1)** 196:4
**designers (1)** 196:14
**designing (1)** 196:10
**Despite (2)** 134:2,21
**detail (3)** 7:17;82:21,22
**detained (13)** 57:18;58:5;64:15;93:8,16;97:15,21,22;100:1,2;109:16;181:13;184:21
**detainee (1)** 84:7
**detainees (3)** 84:12;186:14,15
**detention (108)** 10:17;16:16;35:3;41:22;44:4,7,12,13,17,18;45:4,6,11;47:8;48:19;54:13;56:3,6;57:11;58:12;61:3,11,18,18;62:7;64:15;65:17;68:17;71:4;72:1,5,11,15,21;73:1,14;74:3;77:7;84:15;87:10,13,15,22,23,24;88:19;90:21;91:7;94:1,10;95:12,15;96:7,11,11,23;99:20;100:1,15,19;105:13;107:3,16;109:3,5;110:3;119:19;121:9,17,21,24;122:4,8,8,10,12,14;123:2,5,24;124:4;132:11;135:19;138:6,10,11;146:3,4;147:4;148:24;151:1;153:22;157:3;160:10;175:17;181:6;184:6;185:7,24;187:21;196:11,12;201:23;203:24;204:3,13,23;205:4
**detentions (1)**

96:16
**deteriorates (1)**
169:17
**determination (4)**
68:21;73:5;99:24;
170:23
**determine (5)**
31:1;68:14;118:7;
150:4;201:9
**determined (3)**
9:12;67:14;206:3
**determines (1)**
26:18
**determining (1)**
31:23
**develop (9)**
9:14;59:15;60:9,12,
21,24;63:12;116:8,9
**developed (3)**
62:18;63:16;87:20
**development (1)**
159:16
**develops (1)**
31:2
**devices (2)**
108:1,14
**diagnose (6)**
59:11;61:16;62:8,9;
63:4;64:2
**diagnosed (5)**
63:9,22;102:24;
138:1;154:17
**diagnosis (10)**
55:9;56:11;57:7;
62:14;63:1;65:4;103:3;
134:3,22;135:16
**Diane (1)**
42:19
**dictates (1)**
156:16
**died (3)**
8:5;51:6;180:21
**differ (1)**
87:16
**differed (1)**
97:24
**difference (16)**
35:22;78:21;79:6,13;
81:1,13;82:6;83:22;
85:18;98:5;100:14;
157:20,22;166:6;
169:2;202:2
**differences (1)**
98:9
**different (15)**
12:18;46:17;61:24;
94:22,23;109:21;
125:3,7;132:2;134:8;
164:19;176:18;182:23;
198:13;204:17
**differentiate (3)**
165:6;167:6;168:22
**differentiates (1)**
157:10
**differentiation (1)**
157:15
**difficulty (2)**
51:12;183:11
**dim (1)**
150:22
**DIRECT (1)**
6:8
**direction (1)**
89:9
**director (1)**
71:2
**directors (1)**
106:22
**discovery (1)**
144:12
**discuss (3)**
121:9;135:11;147:22
**discussed (12)**
28:19;32:20;34:3;
43:24;63:17;103:1;
145:1;148:2,11,13;
155:14;156:22
**discussing (5)**
65:8,12;81:2;144:21;
187:17
**discussion (7)**
67:7;111:11;119:18;
129:10,19;133:13;
162:9
**disease (1)**
106:12
**disorder (5)**
59:17;62:10,19;
63:23;64:3
**disorders (3)**
181:22;184:10,20
**display (1)**
64:16
**displayed (2)**
136:18;141:22
**displaying (5)**
94:4,13,14;131:19;
137:16
**disproportion (2)**
113:9,17
**disproportionate (1)**
187:11
**disputing (1)**
157:19
**disseminated (1)**
118:17
**distinction (4)**
77:3;84:2;85:14,15
**District (3)**
19:15;28:12,17
**division (3)**
26:11,11,12
**Doctor (2)**
60:8;128:23
**Doctrine (2)**
20:24;21:5
**document (9)**
11:1;41:3;42:16;
48:13;61:4;70:20;
134:8;146:16;197:18
**documentation (7)**
16:18;21:10;49:11,
14;51:17;131:22;
197:19
**documented (2)**
111:15;131:24
**documents (25)**
21:15;22:15;23:6;
24:18,20;25:2;27:2;
37:24;38:12;45:15;
46:7,8,12;49:24;50:2;
68:10;70:23;71:11,12;
76:23;86:23;87:2,7,7;
88:12
**done (24)**
6:15,16;9:13,22;
10:11;32:9;33:18;
34:10;45:7;59:1;69:8;
90:12,21;100:9;
118:21;142:1,1;152:6,
17;161:24;162:5;
163:18;200:14;201:20
**door (2)**
114:16;161:8
**doorknobs (1)**
108:13
**double (1)**
107:21
**doubt (2)**
120:19;121:20
**Doug (2)**
6:12;40:19
**down (6)**
96:5;117:14;161:18;
187:1;191:14;206:24
**dozens (1)**
176:3
**Dr (72)**
8:5;16:14,22;50:3,3,
14;51:1,2,4,9,10,11;
52:9,10;54:17;55:12;
56:13,24;57:10,14,17,
24;58:9,11,20;59:6,10;
60:13,15,20;61:1,15,
15,23,23;63:4,9;64:9,
18;65:12,19,21;66:1,4,
8,10,14;67:1,2,3,8,8,
21;68:7,8;103:2;
127:17,18;128:17,18,
20;129:6,11;149:10,17,
17,18;150:1;154:15,15,
18,18
**dramatic (2)**
113:19;198:18
**dramatically (4)**
171:15;172:22;
174:2;198:11
**drinking (1)**
13:1
**drive (5)**
21:16,19;24:19;
39:19;77:8
**driver's (1)**
6:5
**drives (4)**
21:18,18,23;24:9
**dropped (1)**
198:11
**dumb (2)**
6:23;13:3
**duration (3)**
59:18;62:12,20
**durations (1)**
111:14
**during (48)**
14:2,2;29:7,21;
47:10;52:23;79:11;
94:10;99:17;107:12;
109:23;120:20;121:21,
23;122:7,11;124:16;
125:6;126:21;127:15,
22;135:19;137:13;
139:8;142:13,17,22,24;
143:1;148:21;149:8;
153:20,22;156:15;
163:15,20,23;166:1;
167:12,19,22,23;169:6;
170:4,13;178:10,21,24
**duties (1)**
14:7
**duty (2)**
48:18;157:8

**E**

**Eads (12)**
53:12;70:1;119:14;
120:21;121:8,16,23;
122:6,13;124:6,18;
202:8
**Eads' (2)**
52:23;124:21
**earlier (8)**
55:2;91:5;117:9;
150:8;172:1;197:17,
20;199:4
**early (3)**
142:13;143:2;176:8
**easier (2)**
161:2,4
**easiest (1)**
167:6
**easily (2)**
70:4;176:23
**eat (1)**
129:16
**editing (4)**
80:8,24;83:17;158:1
**educated (1)**
97:2
**education (3)**
12:2;65:1;154:5
**effect (1)**
41:19
**effective (1)**
111:13
**effects (1)**
107:7
**efficacy (3)**
118:7;119:4,6
**eight (1)**
168:14
**either (14)**
14:21;26:21;66:9,20;
68:7;80:10;81:21;
102:11;116:1;121:14;
124:11;130:16;144:23;
183:21
**electronic (1)**
207:23
**else (16)**
21:15;23:1;38:23;
49:23;65:16;67:16;
68:22;71:7;84:24;90:3;
91:13;145:9;155:6;
167:15;199:2;202:5
**emergent (7)**
48:6,15;49:6,7,10,11,
18
**Emotional (2)**
102:1,4
**employed (2)**
201:16,21
**employee (2)**
8:10;43:10
**employees (8)**
83:2;86:4;199:13,13,
14;201:6,10;202:3
**employing (1)**
82:24
**encompassed (1)**
206:16
**encompasses (1)**
206:2
**encountered (1)**
116:16
**encouraged (1)**
33:10
**end (7)**
7:12;30:16;113:23;
151:5,7,15;169:17
**ending (2)**
54:3,3
**endogenous (4)**
59:16;62:9,10,18
**ends (1)**
143:2
**enforcement (1)**
130:10
**engage (1)**
206:11
**enlighten (1)**
194:5
**enlightening (1)**
162:9

**enough (7)**
65:5;99:16;123:9;156:23,23;170:1;195:17
**ensure (1)**
30:1
**ensuring (1)**
78:11
**entered (1)**
202:9
**entire (3)**
28:9;168:11,13
**entities (3)**
47:16;73:11;159:14
**entity (10)**
7:4,6;8:24;9:15;47:10;62:5;74:23;91:8;203:21;204:6
**entree (1)**
9:24
**entrusted (1)**
24:16
**environment (1)**
132:12
**episode (1)**
61:12
**episodes (3)**
59:18;62:11,20
**equal (1)**
101:16
**equate (1)**
100:13
**equipment (1)**
196:1
**equivocating (1)**
78:1
**error (4)**
78:16,16;158:1;187:23
**escorted (1)**
188:16
**estimate (5)**
17:24;35:14,17;97:2;115:24
**etc (10)**
6:21,21;60:21,22;63:13,13;143:20,20;152:24,24
**e-tran (1)**
207:19
**evaluated (1)**
58:23
**evaluation (10)**
38:14;48:11;51:2;59:1;61:16;64:21;65:9,10;128:15;129:11
**evaluations (4)**
62:3;149:12;152:21;153:3
**even (12)**
42:8;52:14,15;55:13;78:24;106:3;149:15;161:10;168:13,24;173:17;195:20
**event (4)**
133:2,9;181:5;183:7
**eventually (1)**
197:24
**everybody (1)**
167:24
**everyone (5)**
22:10;46:23,24;67:16;170:12
**everyone's (1)**
161:4
**evidence (1)**
64:13
**exactly (3)**
151:14;195:7,9
**EXAMINATION (3)**
6:8;65:8;205:21
**examinations (1)**
32:8
**examine (1)**
86:22
**examined (2)**
32:3;57:10
**example (12)**
25:23;26:9;32:13;33:14;34:8;51:4;80:23;151:10;165:9;168:10;177:5;194:12
**examples (3)**
136:4;150:9;155:11
**exceeded (1)**
161:11
**except (1)**
24:8
**exclude (3)**
164:2,6;167:23
**excludes (1)**
167:21
**excluding (1)**
168:19
**exclusively (1)**
199:22
**Excuse (6)**
21:1;58:18;74:20;77:6;128:19;129:9
**excuses (1)**
202:18
**exemplifies (1)**
203:23
**exemplify (1)**
131:10
**Exhibit (20)**
22:21;23:8,10,18,21;24:4,11,15,19,24;25:6,10;40:11,13;41:22;92:13,17;93:24;134:15;195:22
**exhibited (1)**
103:7
**exhibits (1)**
207:24
**existed (1)**
134:24
**existence (1)**
144:10
**expand (1)**
118:24
**expansion (1)**
196:15
**expect (2)**
107:2,6
**experience (13)**
45:3;72:10;97:1;158:8,17;159:4;163:9;174:17;196:21;203:13;204:11,17;205:11
**expert (7)**
7:2;12:23;101:18;155:10;193:21,22;196:20
**expertise (3)**
27:17;203:13;204:8
**experts (3)**
88:22;106:19;169:23
**explain (1)**
195:20
**explained (1)**
104:14
**explanation (1)**
53:6
**explored (1)**
124:16
**express (2)**
94:9;183:9
**expressed (1)**
179:23
**extend (1)**
163:15
**extended (1)**
186:1
**extends (1)**
71:24
**extensive (1)**
13:1
**extent (4)**
11:1;200:15;201:12;204:8
**external (1)**
33:13

**F**

**faced (1)**
186:1
**facilities (76)**
7:3,20;10:1;11:9,11,12;13:19;25:14;26:16,16;27:19;28:5,9,16,20;29:6,6,12;32:4,18;45:5;70:23;72:12;75:1,12;80:17;88:16;89:1;95:4,13,16;96:2,19,23;99:21;100:3,3,9,11,15,19;105:14;113:18,21,24;115:18;116:1,12,20;117:6,7,12,16;118:16;119:2,2,7;170:12,21;172:3;174:4,22,24;175:17;176:2;185:19;188:24;192:17,21;193:4;195:24;196:15;198:8,24;203:24;204:24
**facility (78)**
13:20,24;14:13;15:4;16:16;17:21;18:12;34:22;41:22;44:13;45:3,10,11;54:14;56:10;62:7;68:13;72:16,21;73:17;74:3;75:6,6,21;77:7,17;82:11;83:1;89:12;90:23;91:1,4,11;94:1;97:18,18;107:3,7,16,19;109:15;119:19;121:9,18,24;122:5,14;123:16;124:9;126:5;141:6,7;143:19;146:7,10;149:14;150:2;151:20;160:10;165:14;185:1,12,19;186:2;196:11,12,20;197:5;198:17;199:10,18;200:4;201:19;202:24;203:11,20;204:12;205:5
**fact (27)**
13:20;53:10,24;65:7;66:13;90:10,18;95:20;107:18;108:7;113:22;121:3;124:11;137:22,24;138:2;140:17;149:14;161:5;167:23;172:12,18;181:18;188:7,18,19;189:1
**factor (9)**
53:20;54:7;99:1,4;102:13,23;181:15,17;188:9
**factors (20)**
62:22;67:19;68:5;94:4,14,23;137:17,21;144:22;145:2;148:11;171:10;179:21;180:22;185:1,5,8,11,16,23
**failed (1)**
149:6
**failure (6)**
120:8,9;137:1,5;145:14;156:2
**fair (4)**
100:17;129:5;147:6;201:18
**fairly (5)**
181:5,7;186:21;188:5;204:16
**fall (3)**
96:11;168:1;195:18
**falls (2)**
207:3,9
**familiar (4)**
32:23;79:3;174:24;184:12
**familiarity (2)**
26:1,6
**family (7)**
53:20;54:1,6,8,9,10;155:13
**far (9)**
80:9;86:4;116:5,5;161:2;165:23;190:23;202:24;203:6
**faster (1)**
191:9
**father (11)**
51:12;58:24;64:8;66:5,7,11,13,14;120:14;123:9,14
**father's (1)**
120:17
**fault (1)**
189:15
**federal (3)**
25:12,17;31:14
**feel (3)**
128:18;152:17;189:15
**feeling (2)**
137:7;148:22
**feelings (2)**
179:23;183:9
**fees (3)**
8:12,14,16
**felt (3)**
67:5;127:12;160:11
**Fergus (1)**
37:11
**few (7)**
34:7,9;113:14;116:3,4;172:3;193:9
**field (9)**
88:18,19,23;106:20;113:5,10,14;169:16;196:20
**fifth (1)**
147:24
**fight (1)**
189:14
**figure (1)**
94:20
**figured (1)**
162:1
**file (13)**
21:11,13;23:1;24:8;42:2,3,20;44:3;47:5;48:3;52:8;58:14;138:3
**files (2)**
43:16;44:4
**filled (1)**
136:8
**filling (1)**

141:17
**final (1)** 122:8
**finally (2)** 150:23;159:14
**find (15)** 82:20;84:24;86:12; 88:5,8;110:2;123:10, 10;140:7;169:15; 176:17,24;181:4; 191:9;204:24
**finding (3)** 55:12;135:5;187:17
**findings (8)** 27:9,11;95:21; 120:19;121:5,11; 187:5,9
**fine (3)** 162:4,16;184:16
**finish (1)** 162:3
**first (25)** 6:3,23;9:6,19,23; 89:5;93:2;95:2;110:4; 111:12;119:14;125:1; 128:13;129:10;144:21; 151:5,7,15,20;160:16; 171:6;182:21;190:4, 11;191:4
**fits (1)** 136:19
**five (8)** 24:8;115:9,24;149:3; 170:17;175:5,11,14
**five-year (6)** 95:9,12;170:4,13; 178:21,24
**flash (9)** 21:15,18,18,19,23; 24:9,19;39:18;77:8
**fleeting (5)** 39:16;48:4;52:3; 145:7;154:24
**focused (1)** 31:22
**folks (1)** 82:8
**follow (7)** 77:18,22;82:3,9; 85:10,24;174:22
**Followed (1)** 104:4
**Following (8)** 26:17;30:8;44:5; 61:11;82:15;83:2; 108:24;119:20
**follows (2)** 6:6;173:14
**follow-up (1)** 205:19
**food (1)** 165:12
**force (1)** 29:2
**Forest (1)** 19:12
**forget (2)** 21:21;161:1
**forgot (3)** 13:10;205:19;206:1
**form (12)** 15:10;20:10;38:19; 43:6;45:18;63:18; 66:17;81:8;113:24; 114:4;131:7;174:9
**formality (1)** 116:10
**forms (2)** 104:16;114:8
**forth (5)** 61:1;67:2;82:5; 142:18;144:4
**forward (5)** 65:6;66:22;68:6,11; 86:19
**found (23)** 9:8;24:20;93:8,15; 95:13;96:15;98:22,24; 108:21,23;109:5,10; 110:7;112:18;132:18; 137:6;167:16;169:19; 179:22;187:7,17; 188:20,21
**founder (3)** 7:21,24;8:6
**founders (1)** 8:1
**four (10)** 13:9,14;14:5;19:9; 27:22;35:5;178:9,12, 13,18
**fourth (7)** 13:10;28:11,11; 147:8,8;186:10,16
**frame (1)** 52:16
**frames (2)** 108:16,16
**Franklin (21)** 16:15;44:12;54:13; 74:2;96:10;119:18; 156:10;157:24;159:14; 163:7;199:6,10,17; 200:5,14,16;201:2; 202:7;203:10;205:1,2
**Franklin/Williamson (1)** 91:9
**frankly (2)** 39:10;84:18
**free (2)** 57:21;165:13
**freely (3)** 46:8;72:4;166:8
**Freeman (13)** 42:23;43:1,4,15,21, 24;45:22;46:13,14,24; 73:4;91:13;201:24
**Freeman's (1)** 46:18
**frequency (2)** 112:16;173:6
**frequent (1)** 175:2
**frequently (5)** 52:13;56:10;123:13; 177:22;188:23
**friend (1)** 101:11
**front (5)** 21:11,13;22:15;42:8; 58:21
**frustration (3)** 56:23;57:6;153:17
**full (3)** 111:11;125:1;129:10
**full-time (2)** 8:17;14:17
**function (1)** 45:12
**funded (1)** 9:17
**funding (2)** 9:11,19
**further (11)** 41:10;61:22;77:1; 115:2,3;134:5;136:24; 155:24;191:14;201:1; 207:15
**future (1)** 187:20

## G

**Gateway (1)** 50:2
**gather (2)** 68:19;71:5
**gathered (5)** 33:23;55:6,8;72:15, 20
**gathering (4)** 47:13;73:8,9;171:12
**gave (3)** 55:20;77:8;139:21
**general (3)** 75:23;99:8;192:24
**generally (3)** 41:21;112:3;157:4
**generated (2)** 45:15;126:15
**gentlemen (1)** 8:3
**germane (1)** 137:18
**gesture (2)** 103:23;104:9
**gestures (1)** 104:11
**gets (1)** 190:9
**given (5)** 16:21;19:5;77:16; 126:18;128:24
**giving (3)** 19:16;20:20;152:12
**goal (1)** 30:16
**God (1)** 161:20
**goes (4)** 41:6;93:22;130:2; 165:14
**good (10)** 54:5;86:18;119:12; 128:1;129:14,14,14; 133:16;153:20;159:2
**grab (5)** 195:6,10,15,15; 196:2
**grabbing (1)** 195:13
**graduate (2)** 12:21;13:21
**GRAVES (1)** 122:19
**greater (2)** 116:5;188:9
**grief (2)** 64:22;154:1
**Grossly (1)** 156:7
**group (2)** 71:12;132:16
**GROVES (26)** 15:10;20:10;22:4,7; 24:14;38:19;43:6; 45:18;60:1,6;63:18; 66:17;81:8;83:19; 129:15;131:7;134:16; 144:6,11,19;161:20; 174:9;181:7;182:24; 207:16,23
**Guard (2)** 22:6,7
**guess (8)** 35:10,13;67:12; 117:19,21;174:11; 199:11;203:9
**guest (2)** 15:21,23
**guidance (2)** 77:1;158:24
**guideline (4)** 76:1;79:7,14;82:7
**guidelines (27)** 76:1,8,12,17,19,24; 77:18;78:2,5,18,22; 79:1,4;81:7,14;82:15; 84:1,3;85:16,19; 152:16;157:7,11,16,21; 158:20,20
**guts (1)** 37:23
**guy (1)** 11:17
**guys (1)** 22:12

## H

**half (7)** 109:4;110:3,7,14; 111:7;138:24;189:1
**Hall (2)** 19:12,14
**Hamelin (2)** 36:13,21
**hand (5)** 40:24;41:8;108:8; 195:17;202:6
**handful (2)** 33:22;186:24
**handrail (11)** 108:8;194:12,14,17, 22,24;195:13,15; 197:11,20;203:2
**hands-off (1)** 27:4
**hands-on (1)** 26:23
**hanging (1)** 167:16
**happen (6)** 77:5;144:19;165:4; 194:18;197:24;202:16
**happened (5)** 49:4;134:12;142:5; 176:23;202:8
**happens (1)** 167:8
**hard (8)** 32:11;35:4;84:18; 151:14;176:3,11; 195:20,20
**hardware (7)** 193:14,17,22;194:7, 9,16;196:1
**harm (2)** 182:18;183:5
**harmful (1)** 175:10
**Hawaii (1)** 29:14
**HAYES (10)** 6:3,11,12;9:2;19:1; 22:19;24:18;25:11; 162:8;194:5
**HCC (1)** 77:6
**head (4)** 29:19;38:21;39:15; 116:13
**heading (1)** 91:16
**headquartered (1)**

7:13
**heads (1)**
108:17
**health (116)**
14:20;17:13,18;29:2;38:17;39:5;48:16,17;59:7;61:13,21;62:6;68:10;69:6,7;71:18,20,22;72:19;74:1,14,23;75:1,22,24;76:2;77:15,17,17,22;78:6,12,22;79:1,7,8,13,22;83:4;84:8,12,14;86:2;91:3,3,9,21;94:5,16;109:9,12;110:9,15,16,24;111:3,5;116:3;120:2,9,13;122:16;126:3,5,18;133:17,23;134:4,23;135:2,8,10,11,14,18;136:3,9,14,20,24;137:2,6,15,20;138:23;139:10,13;140:11,13,14,19,24;145:15;148:1;149:6,9,13;150:10,15,18;151:7,13,22;152:10;155:24;165:13;169:18;171:11;177:8;181:16;182:16;187:19,21;198:17;200:9;201:1
**Healthcare (6)**
17:20;74:6,12;77:7;81:18;85:9
**hear (2)**
21:2;196:6
**heard (3)**
20:23;117:23;133:5
**hearing (1)**
142:8
**hearings (1)**
61:9
**HEISE (56)**
6:9,12;15:13;20:19;22:6,13,14,24;23:13,18,24;24:7,15,17;37:22;38:5,10,11;39:7;40:10,16,20,23;42:10,12;43:14;45:21;50:18,23;52:1;60:3,5,7;63:24;66:24;73:23;82:13;84:4;92:16;115:8,15;122:21;129:20;130:5,6;133:11;134:18,20;144:9,18,20;161:21;162:1,5,12;199:4
**held (3)**
97:12;113:8,14
**help (3)**
77:10;153:24;171:13
**helpful (4)**
31:24;55:7;74:19;153:12
**Herbert (2)**
8:1,6
**here's (1)**
98:5
**hesitating (1)**
56:1
**Hey (1)**
82:8
**high (3)**
112:8,22;163:8
**higher (14)**
96:22;97:3;98:19,19;99:3,10;100:12;160:23;179:3,7,13;184:19,21;185:5
**highest (1)**
96:19
**highlights (1)**
40:17
**himself (4)**
42:8;104:18;125:13;169:10
**hindsight (1)**
131:1
**hinges (1)**
108:13
**hired (2)**
203:14,15
**hiring (2)**
199:21;200:7
**Historically (1)**
19:9
**histories (2)**
93:9,16
**history (24)**
44:8;49:12,24;50:3;51:7,17,19;53:21;54:1;55:8;64:8;68:3;93:19;94:13;101:4,9;102:18;105:7;124:8;127:4;133:18;154:10,11;155:13
**Hoelter (2)**
8:1,6
**Hold (3)**
83:11;100:22;139:4
**holding (1)**
195:15
**hole (1)**
194:19
**home (1)**
132:16
**Homeland (1)**
31:12
**hone (1)**
117:14
**honest (1)**
79:17
**hope (2)**
82:18;152:12
**Hopefully (1)**
156:23
**horrible (1)**
67:24
**horse (2)**
183:21,22
**hospital (1)**
18:6
**hour (9)**
163:24;168:19,23;169:22;189:7,11;190:4,11;191:4
**hours (14)**
17:15,24;107:13;141:7,11;163:21,21,22;164:3,7,8;166:2;167:22;168:14
**house (4)**
70:6;73:13,14;196:17
**housed (4)**
108:5;166:7;178:19;204:4
**housing (2)**
14:13;205:5
**HP (1)**
74:3
**huge (1)**
113:23
**human (4)**
7:15;115:6;161:3;190:6
**hundreds (1)**
81:16
**husband (1)**
123:15

## I

**idea (5)**
69:11;70:9;143:17;158:22;191:2
**ideation (5)**
49:12;103:10,23;104:4;124:8
**ideations (9)**
41:9;50:1,4;51:7,18,19;94:9;104:5;133:24
**identification (7)**
22:22;23:11,22;24:5,12;40:14;92:14
**identified (3)**
6:4;52:11;160:8
**ie (3)**
59:17;62:10,19
**Illinois (7)**
19:3,6,11;20:3,17,24;21:5
**illness (9)**
39:14;102:21,22;124:8;135:5;138:1;154:11,11;184:19
**immediate (2)**
135:7;169:24
**immediately (4)**
46:21,22;189:23;190:10
**impetus (1)**
55:3
**implemented (1)**
87:22
**importance (2)**
127:2;139:14
**important (14)**
30:24;46:5,5;53:19,19;67:21;68:10;69:1;82:23;113:2,19;136:16;138:17;169:15
**impose (1)**
106:13
**imposed (4)**
97:16;188:8,20;190:14
**impossible (2)**
17:17,23
**impression (1)**
152:12
**improper (1)**
20:11
**improve (1)**
34:22
**improvement (1)**
30:5
**impulsive (2)**
68:2;155:11
**impulsivity (5)**
98:20;155:8;170:2;184:20;189:24
**inactions (1)**
89:8
**inadequate (1)**
156:7
**Inc (1)**
9:2
**incarcerated (6)**
99:9,11;124:19;178:23;179:14;181:1
**incarceration (7)**
101:10,14;102:6;109:21,22,24;153:20
**incident (2)**
30:8;141:14
**incidents (2)**
31:3;34:20
**include (5)**
47:14;107:11;164:16;165:3;190:24
**included (5)**
33:19;47:16;103:10;142:20;170:16
**includes (5)**
11:9;41:7;163:22;164:8;206:18
**including (10)**
26:16;42:18;106:20;133:23;141:3;146:17;182:17;183:4;185:17;194:17
**inconsistent (1)**
91:6
**incorrect (3)**
81:15;101:7;124:6
**increase (3)**
67:19;153:13,16
**increased (15)**
67:10;99:1;100:19;112:6;155:19;161:8,15;163:13,15,17;164:15;165:1;168:21;190:12,13
**increases (1)**
191:18
**increasing (3)**
54:7;56:21,22
**independently (1)**
69:18
**indicate (17)**
25:12;32:2;38:13;50:3;54:5;73:24;86:21;102:11;119:17,22;120:1;134:2;139:22;148:3;155:23;179:22;182:15
**indicated (10)**
42:14;51:16;53:24;60:20;125:15;171:17;182:13;188:7;192:4;193:14
**indicates (2)**
60:8;192:12
**indicating (1)**
53:2
**indication (8)**
54:19;55:17,22;56:8;57:7;149:21,24;161:7
**indicator (2)**
101:1;102:2
**indifferent (1)**
186:3
**individual (16)**
48:1;50:10;56:20;62:2;65:1;67:17;89:10,17;153:4,10,12;154:5;194:22;197:16;201:21;203:21
**individually (1)**
89:13
**individuals (4)**
47:21;89:8;100:1,2
**infectious (1)**
106:11
**information (53)**
21:7;32:22;33:3;39:8,13;43:12,12;46:6,7;47:7,12,13,20,24;48:3,8,12,19,21;49:1,3,9,17;53:11;55:6,8;61:20;68:14,19;70:22;71:5,10,15;72:4,12,14;73:9,11;75:18;76:1;91:6;119:4;123:15;124:7;126:1;131:5;

132:3,20;136:6;137:18;138:3;171:14;173:20
**informed (1)** 121:11
**inherent (1)** 112:16
**initially (2)** 26:13;27:6
**initiate (1)** 29:22
**initiated (1)** 122:4
**initiation (1)** 10:3
**injury (1)** 53:3
**inmate (6)** 9:9,13,20;74:1;84:7,12
**inmates (6)** 14:20;113:8,10;169:16;186:9;196:18
**inner (1)** 12:9
**input (1)** 105:22
**inquiries (1)** 9:8
**inside (2)** 14:12;203:5
**instance (3)** 120:3;130:20;141:24
**instances (2)** 126:22;128:10
**Instead (1)** 194:19
**Institute (1)** 9:16
**institution (1)** 205:24
**institutionalized (1)** 126:8
**Institutions (3)** 7:7,9;174:8
**instructed (1)** 17:9
**instruction (2)** 17:10;20:4
**Instructions (1)** 20:4
**instrument (1)** 108:1
**intake (12)** 47:10,11;49:17;68:19;69:6;72:2;82:16;83:3;104:15;123:21;138:11;198:15
**intend (1)** 82:6
**intended (3)** 94:8;140:20;206:12
**intends (1)** 198:1
**intent (2)** 83:18;85:23
**intention (3)** 16:13;81:19;82:8
**intentional (2)** 158:1,2
**intentionally (1)** 175:6
**interact (1)** 132:14
**interacted (1)** 128:1
**interacting (2)** 89:24;131:11
**interaction (1)** 190:6
**interactions (4)** 142:21;143:6,7;202:4
**interest (2)** 8:7;12:19
**interested (1)** 30:15
**interesting (2)** 132:18;162:8
**interior (1)** 196:17
**intern (2)** 15:11,15
**internship (3)** 13:20,24;14:9
**interpret (1)** 205:7
**interpreted (1)** 164:11
**interpreting (1)** 76:19
**interrupt (1)** 46:2
**intervals (1)** 163:9
**intervention (4)** 91:10,19;146:18;200:13
**interview (1)** 130:19
**interviewed (3)** 131:16;132:1,23
**interviewing (2)** 133:3,9
**interviews (3)** 130:3,9;151:1
**into (21)** 7:16;9:24;10:3;13:9;26:4;30:22;41:15;64:14;68:13;73:17;79:11;81:1,20;137:11;140:16;185:1;189:11,14;191:22;198:17;202:9
**investigate (2)** 30:8;31:18
**investigates (1)** 31:1
**investigating (1)** 34:11
**investigation (16)** 25:23;26:3,3,17,18;27:8;29:4,22,24;31:6,8,19;33:2,17;34:20;130:10
**investigations (1)** 26:14
**investigative (2)** 30:14;33:17
**investigator (1)** 31:10
**investigators (1)** 131:16
**invoice (1)** 23:16
**invoked (1)** 90:16
**involve (3)** 27:16;37:15;188:11
**involved (6)** 9:4;28:14;72:10;196:10;199:21;200:5
**involvement (4)** 25:20,22;27:5;200:18
**involving (3)** 84:14,15;123:12
**isolated (2)** 150:8;169:12
**isolation (7)** 106:9;107:8;111:13;113:6,8,11;114:9
**issue (5)** 47:2;48:15;128:4;202:20;203:7
**issues (6)** 27:16;28:24;29:2;53:16;98:20;133:23
**ivy (5)** 104:21,24;105:2,4;133:20

## J

**JABLEYER@BLEYERLAWCOM (1)** 207:20
**jail (19)** 14:21;15:1,4,8,17,24;16:1,6;32:3;33:6;80:2;98:3;99:13;159:12;178:1,20;196:5,14;198:15
**jails (16)** 9:21,21,21;26:15;75:2;79:23;113:6;158:23;178:12,13,14;196:15;198:7,10;204:18,18
**JDOs (1)** 44:6
**jealous (1)** 13:2
**jerk (1)** 94:17
**Jerome (1)** 8:2
**Jerry (1)** 28:13
**Jewell (27)** 50:3,14;51:4,9;52:9;55:12;56:13;57:10,17,24;60:15;61:23;64:18;65:19,21;66:10;68:7;127:17;128:17,18,20,23;149:10,18;150:1;154:15,18
**Jewell's (8)** 51:1;52:10;54:17;57:1;66:4,8,14;67:21
**Jewels (1)** 129:6
**job (1)** 31:23
**jockeying (1)** 201:16
**Joe (1)** 37:22
**jointly (1)** 89:12
**judge (1)** 150:4
**Judges (3)** 199:9;204:14;205:13
**judgment (1)** 26:22
**Judicial (3)** 199:9;205:8,13
**judiciously (2)** 22:6,8
**jump (2)** 38:2,6
**jumping (1)** 67:2
**jurisdiction (13)** 25:22;27:9;30:1,7,15,18;31:1,18;33:14;117:23;118:19;158:9,21
**jurisdictions (30)** 11:8;28:7;29:17;33:9,21,23;34:7;81:18;112:10;116:4;118:4;140:12;160:6,20;163:5,6;170:10;171:17,24;172:4;173:8,12;175:6,21,23;177:21;184:23;185:9;203:14,15
**Jury (1)** 20:4
**justice (23)** 7:16;9:15;11:3,4;12:14,19,22;13:5,8,17,22;25:24;26:10,10;27:7,10;28:10;31:11;33:10;34:12;92:1;106:22;173:1
**justice/juvenile (1)** 12:19
**justify (1)** 144:10
**Juvenile (125)** 10:8,16,19;11:1,9,11,13,16;13:16,19,20,22,24;14:2;15:4;16:16;22:2,3;26:16;28:5,8,16,20;29:11,15,16;32:4,8,14,18;33:7;34:12,15;35:2,6,9,11,17,23;36:20;37:4;44:7,12,23;45:4,4,11;47:8;48:1,19;54:13;55:16;56:2;61:18;62:7;70:23;71:2;72:11,11;74:2;75:1;83:1;87:10,12;88:14,16,18;89:1;91:24;92:17;94:10;95:12,19;96:2,10;97:18;99:10,15;100:8,11,14,18;105:13;106:20,22;107:3,7;113:13,18,21,24;115:17;116:12,20;117:7,11,16;118:16;147:3;157:3;170:12;172:2,2,13,13,15;173:1;178:8,10,16;184:6;186:20;188:24;195:24;196:11,15;198:8;200:22;201:23;203:24;204:13,23,23;205:2;206:12
**juveniles (7)** 36:15;37:15;98:6,9,23;178:23;206:11

## K

**keep (1)** 35:6
**kid (6)** 161:8;169:6;175:9,14;185:4;188:13
**kids (16)** 14:14;112:2;113:14;160:7;166:4;167:7,7,9,12,16,18;169:19;185:7,10;187:11;189:6
**kind (19)** 13:23,24;15:24;27:1,3;55:10,14;62:13;93:4;115:16;118:24;134:18;150:4;184:22;200:4;202:18;203:17,22;204:1
**kinds (7)**

14:14;27:5;29:3;69:7;75:18;88:3;118:3
**kites (1)** 140:2
**knees (1)** 206:24
**knew (1)** 121:20
**knowing (1)** 196:22
**knowledge (6)** 25:20;54:2;107:10;172:5;186:20;204:8
**known (4)** 49:13;121:10;140:22;144:23

## L

**L12 (2)** 146:17,21
**lack (8)** 89:20,21;128:3;147:13;190:1,5,6;198:9
**language (3)** 77:21;82:1;85:22
**large (1)** 185:18
**larger (1)** 27:16
**last (13)** 19:9;30:21;34:14;92:3,5;95:1;108:24;109:6;111:11;129:17;130:1;133:12;154:9
**lasts (1)** 168:16
**late (1)** 9:7
**later (14)** 10:7;59:15;60:9,12,20,24;63:12,16;74:5;130:7;145:12,13;159:13;178:2
**law (7)** 11:5,7,24;20:11;45:2;71:1;130:9
**lawyer (1)** 6:23
**lawyers (1)** 201:16
**lay-in (1)** 169:9
**layman (1)** 62:17
**leadership (1)** 88:23
**leafing (1)** 85:5
**learned (1)** 31:20
**learning (1)** 131:12
**least (5)** 46:24;77:13;106:14;152:21;156:23
**leave (1)** 129:15
**led (1)** 109:24
**left (1)** 114:19
**legal (11)** 14:9;20:8,12,15,16;27:1;71:3;129:18;200:4;201:15;203:18
**legally (2)** 157:4;158:19
**Length (4)** 97:23;98:12;110:10;169:14
**less (2)** 108:23;189:7
**lethality (1)** 207:5
**letters (1)** 74:21
**level (7)** 96:19;112:15;160:3,4,7,18;175:23
**levels (1)** 175:16
**license (1)** 6:6
**licensed (2)** 17:6;39:1
**life (2)** 161:4;206:12
**life's (1)** 10:4
**ligature (1)** 195:1
**lights (1)** 165:15
**likely (2)** 53:14,17
**likeness (1)** 88:1
**limited (5)** 10:17;33:2;69:3;83:3;182:12
**LINDSAY (3)** 6:3,11;9:2
**line (6)** 85:12;92:3,5;182:22;201:23,23
**list (6)** 19:24;35:5;36:9,19;37:17;181:15
**listed (2)** 185:17,23
**listen (1)** 70:16
**listing (1)** 79:9
**literally (2)** 81:13,16
**litigation (4)** 6:13;26:7,13;34:3
**Little (34)** 16:24;18:21;41:20;42:5;69:19,23;70:12,14;89:17;90:4,20;91:6;92:20;93:2;95:23;96:5;106:3;115:16;117:14;126:22;131:11,22;133:14;135:1;136:5;139:14,23;140:6,22;141:5;148:18;149:22;150:13,23
**live (3)** 19:7;161:21;195:21
**living (1)** 124:22
**local (5)** 11:7;15:17;69:19;175:17;176:2
**locations (1)** 153:6
**lockdown (1)** 169:18
**locked (8)** 163:14;165:4;166:12;167:1,15,21,24;168:23
**lockup (4)** 14:21;15:1,5,8
**lockups (2)** 9:22;16:6
**log (2)** 151:3,4
**long (5)** 12:7;88:2;168:15;170:17;189:5
**longer (2)** 172:10;189:8
**look (34)** 19:4,10;23:14;25:10;27:8;37:14;42:7;50:5,14;68:12;69:6;73:1,7;85:4;103:8;113:4;114:16;115:9;120:16;123:12;134:13;135:16;147:2;150:1;155:7;161:18;162:6;177:21;178:11;185:16,22;189:4;191:10,12
**looked (7)** 32:14,17;91:7;146:16;178:4,17;190:16
**looking (16)** 9:11;12:10,12,13;13:19;28:21,23;34:5;87:17;92:8;114:14;120:24;159:2;167:20;173:12;191:15
**looks (1)** 159:5
**Lori (1)** 133:13
**losing (1)** 141:20
**loss (1)** 190:15
**lost (1)** 190:9
**lot (15)** 12:18;13:18;14:11;50:8;74:21;81:1;132:13,19,20;173:13;180:15;198:13;203:21;204:21;206:10
**lots (4)** 83:8;175:8;177:15,17
**love (1)** 124:12
**loved (5)** 54:9,10;122:24;123:14,19
**low (3)** 51:12;160:3;171:5
**lower (1)** 99:10
**low-level (1)** 160:19
**LPC (2)** 38:24;39:1
**lunch (3)** 166:11;167:2,24

## M

**magic (1)** 117:20
**mail (1)** 22:10
**maintain (2)** 81:22;116:9
**maintenance (1)** 203:20
**major (3)** 63:22;64:2;95:11
**majority (5)** 34:10;164:22;165:18;174:23,23
**makes (2)** 81:1;112:12
**making (10)** 14:14;25:4,6;66:11;152:5,13,14,14,15;180:4
**male/female (1)** 88:2
**malpractice (1)** 20:9
**man (1)** 13:2
**managed (1)** 87:15
**management (1)** 111:13
**mandatory (3)** 75:12;76:5,8
**manner (2)** 54:4;87:14
**mantras (1)** 174:2
**many (37)** 17:15,24;27:19;28:5;29:9;35:1,11;45:8;73:2;95:8;112:9,10;114:8;117:7;123:11,17;137:10;160:2,6;167:4,4;169:3;171:17,19;172:8,8;173:2,8;174:21;176:1;177:21;178:22;181:23;185:7;187:20;193:23;195:23
**March (3)** 40:21;58:6;126:11
**margin (1)** 187:23
**marijuana (3)** 101:7,11;155:4
**mark (7)** 22:18,19;23:7,18;24:1,8;40:11
**marked (8)** 22:21;23:10,21;24:4,11,24;40:13;92:13
**Maryland (1)** 7:14
**Massachusetts (1)** 6:5
**master's (1)** 13:4
**match (1)** 112:11
**material (1)** 194:23
**maximum (1)** 111:24
**may (8)** 48:5;60:4;67:6;121:10;122:15;155:12,12;191:9
**maybe (8)** 35:15;51:15;76:16;103:17;175:12;187:3,7;190:7
**MAYSI (1)** 120:8
**MAYSI-2 (1)** 119:22
**McKinney (3)** 21:23;34:9;77:11
**meals (2)** 165:12;166:3
**mean (42)** 28:22;30:12;31:9;35:4;43:9,11;46:21;49:16;50:8;54:11;

72:17;76:10,15,18;83:19,23;87:12;89:5;94:2,7,8,20;115:2;125:20;127:17;131:9;141:21;158:7;159:17;162:13;168:10;173:18,19;176:22;182:11;183:8,19;185:3;188:2;194:9;197:24;206:5
**meaning (8)** 36:4;44:5;49:11;88:1;89:7;131:18;180:14,14
**meanings (1)** 45:9
**means (2)** 43:7;77:22
**meant (10)** 49:10;80:15;97:14;106:4;109:15;151:9,14;152:15;164:10;168:6
**Measles (1)** 106:10
**media (1)** 113:23
**medical (58)** 6:13;14:24;16:9;17:2,12,18;29:2;30:13;41:6,12,21;43:16,17;49:2;58:12,17;67:9;68:10;69:13;71:18;72:5,18,18,20;79:20,22,24;80:2,6;82:10;86:3;101:21,22;105:19,22;106:7,9,12;129:22;130:14,17;131:6;133:23;139:9;140:14,18;141:3,17;142:1;143:22;144:24;145:19;147:8;199:6;200:7;202:10,10;204:5
**medication (1)** 135:7
**medications (3)** 53:4,6;59:19
**Medicine (2)** 20:24;21:4
**meet (3)** 66:15;75:8,8
**member (3)** 54:9,10;141:2
**mental (90)** 14:20;17:12,18;29:2;38:17;39:5,14;48:16,16;59:7;61:13,21;62:6;68:10;69:6;71:18,22;72:18;86:1,2;91:2,3;94:5,15;102:21,22;109:9,11;110:9,15,16,24;111:3,5;120:13;122:16;124:8;126:3,5;127:15;133:23;134:4,22;135:2,5,7,9,11,14,17;136:3,9,14,19,23;137:1,5,15,20;138:1,23;139:10,13;140:14,19;145:15;148:1;149:6,9,13;150:10,15,18;151:6,13,22;152:10;154:11,11;155:24;165:13;169:18;171:10;181:16;182:16;184:19;187:19,21;198:16;200:9
**mentality (1)** 124:12
**mention (3)** 50:15;51:3;147:13
**mentioned (3)** 91:8,13;150:7
**method (1)** 107:24
**metropolitan (1)** 12:12
**MH-JJ (1)** 136:9
**Michael (1)** 6:11
**micromanage (1)** 158:23
**might (25)** 11:20;18:2;29:18;32:16;33:11,14;48:11;50:6;59:19;77:12;85:2;97:2;100:23;135:18;136:16,17;142:2;144:18;182:23;186:15;187:19;194:14;201:7;202:1,14
**Miller (2)** 8:2,5
**mind (3)** 23:15;46:4;64:17
**minority (2)** 32:10;113:3
**minute (1)** 149:8
**minutes (10)** 108:23;109:5;161:3;162:22;163:6;175:3,4,5,11,14
**miraculously (1)** 46:23
**misdiagnosed (2)** 128:19,20
**misperception (1)** 67:13
**misreading (1)** 168:5
**missed (2)** 13:2,3
**missteps (3)** 136:21;138:16,18
**mistake (1)** 80:4
**mixing (1)** 50:6
**mom (1)** 51:6
**moment (1)** 162:7
**mom's (1)** 51:13
**money (1)** 201:7
**monitor (15)** 25:13,17;26:2;27:20;28:8,12;29:5,14;30:19,22,24;31:14,17,21;116:23
**monitored (7)** 27:14;55:23;56:7,8,9;111:15;136:2
**monitoring (17)** 27:14;29:4,7,21,24;30:1,10;31:22;56:2;111:18,19,19,21;125:19,21,22;143:23
**monitors (2)** 27:3,17
**Montana (1)** 37:12
**monthly (2)** 50:9;120:13
**months (7)** 14:5;15:20;49:8;109:20;117:24;149:3;169:17
**mood (1)** 59:16
**moods (1)** 51:13
**more (55)** 28:3;29:1;30:14;32:18;34:18;37:23;43:12;52:15;53:16,24;56:9;59:15;60:9,12,21,24;63:16;68:14,14;69:1;82:21,22;85:19;86:15,16;95:23;97:5;98:22,22;99:20;110:2;111:10;113:12;117:15;124:7,8;128:15;131:12;132:15;138:17;140:20;148:8;165:23;171:9;175:2,7;177:7;179:18;180:15;187:9;191:6;194:5;198:5;200:1;201:15
**morning (2)** 142:14;143:2
**mortality-morbidity (1)** 30:4
**most (15)** 19:24,24;74:18;88:20;103:1;122:11;158:10;162:8;163:20,23;180:11;188:11;193:4;198:22;204:18
**mostly (1)** 204:20
**mother (9)** 49:14,15;50:2;52:11;53:2;64:24;68:1;145:4;180:21
**mother's (9)** 51:8;52:10,20;55:10;148:12;154:2;182:14;183:10,18
**move (4)** 37:23;42:10;57:21;86:18
**moving (1)** 203:21
**much (12)** 10:4;15:18;31:20;68:19;99:3;115:20;138:15;140:16;162:10;175:4;177:17;179:13
**multiple (1)** 117:12
**murkiness (1)** 204:22
**must (8)** 80:15;134:10;158:11,12,13,14,15;173:5
**myself (2)** 27:15;98:24

**N**

**name (8)** 6:10,12;16:23;17:1;62:5;68:18;141:13;197:18
**narrative (2)** 40:8;83:7
**narrow (1)** 89:23
**National (20)** 7:7,9;9:9,16,20;10:8,20,20;17:20;32:13,16,19;74:14,22;91:24;99:13;116:2;159:15;163:1;178:1
**Nationally (2)** 156:20;163:10
**nationwide (1)** 178:23
**nature (7)** 11:1;49:10;76:24;95:3;132:9,11;200:23
**NCC (1)** 75:5
**NCCHC (45)** 74:21,21;75:7,11,15;76:17,18,20;77:18,23;78:6,13,21;79:2,4,14,15,23;80:1,7,15;81:5,19,21,23;82:3,9,15,20;83:2,9,16,24;84:9,16;85:9,18,24;86:8;88:12;116:9;156:22;158:12,14;177:6
**NCCHC-certified (1)** 115:17
**NCIA (2)** 8:17,20
**necessarily (5)** 29:23;30:12;61:23;108:6;201:21
**necessary (1)** 30:9
**necessitate (1)** 136:23
**necessitated (3)** 94:5,15;135:1
**neck (1)** 206:19
**need (22)** 26:19;27:12;41:11;48:16;55:22;68:19,21;69:5,20;73:19;86:14,17;99:23,23;100:23;126:4,8;130:14;136:7;150:5;158:23;207:20
**needed (6)** 46:9;49:19;61:21;125:16,19;160:12
**needs (8)** 57:5,7;72:13,17;73:20;135:16;150:5;188:13
**negative (1)** 143:6
**nervous (1)** 24:14
**next (27)** 22:10;23:16;24:1;44:5,5;93:7,12;97:10,23;120:12;126:10;128:13,17,19;129:9;139:7;142:13;143:18;145:21;148:14,16,17;150:24;152:20;166:13,14;181:15
**night (3)** 129:17;164:17;165:4
**nighttime (1)** 163:16
**nine (1)** 120:5
**nonclinical (1)** 180:14
**non-disciplinary (1)** 165:3
**None (1)** 139:16
**non-legal (1)** 158:7
**nonlethal (1)** 206:23
**non-probation (1)**

47:21
**nonprofit (1)**
7:11
**non-programming (1)**
167:23
**non-sleeping (1)**
166:2
**non-waking (3)**
107:13;164:3;167:22
**nor (4)**
49:20;54:15;139:9;158:22
**normally (10)**
26:21;28:24;31:16;45:12;70:23;71:11;87:7;97:17;140:9;203:20
**Northern (1)**
19:15
**notation (2)**
52:9;128:3
**notations (3)**
127:3,22;148:20
**note (6)**
40:5;60:8,19;126:17;127:21;146:16
**noted (6)**
46:10;127:14;133:18;142:16;150:13,16
**notes (15)**
23:3;24:1,23,24;25:5;39:21,24;43:21,23;44:2;46:10,15;115:10;148:23;162:6
**notice (5)**
23:2;38:24;67:9;68:8;143:12
**noticed (1)**
85:5
**notify (1)**
123:16
**noting (1)**
127:4
**November-December (1)**
52:15
**Number (41)**
22:19,21;23:8,10,21;24:4,11,15,19,24;25:6,10;32:8,12;34:15;35:18;40:11,13,24;41:22;92:13;99:24;100:2;112:8;116:5,16;117:5,24;119:7;128:23;156:2,7;170:15,21;185:18;187:11,18;191:2;192:17;196:16;197:20
**numbered (2)**
92:23,24
**numbering (2)**
113:9,17
**Nurse (24)**
16:24;18:21;41:20;69:8,18,23;71:14;82:24;86:5;89:17;90:4,20;106:3,6;107:2,6;125:23;135:1;139:14,23;140:3,5;141:5;165:13
**nurses (6)**
17:11,16,17;18:1,5,8
**nurses' (1)**
68:16
**nursing (9)**
16:11;17:3,7,10,13;18:11,16,18;120:2
**nurturing (1)**
132:12

## O

**Oak (1)**
19:12
**Object (4)**
20:10;43:6;45:18;131:7
**Objection (5)**
15:10;38:19;66:17;81:8;174:9
**obligation (9)**
14:7;130:17;138:9,12;140:6;203:16,17;204:9;205:10
**obligations (2)**
14:7;66:15
**observation (7)**
108:24;109:6;112:1;160:3,7,18;173:6
**observe (4)**
156:3;161:2;175:4;177:22
**observed (8)**
61:6;112:15;136:2;145:10;148:3;151:21;160:18;200:22
**obtained (1)**
149:9
**obvious (1)**
49:13
**obviously (14)**
15:21;26:7;44:17;49:16;75:15;90:12;98:17,22;99:22;144:6,8;164:8,22;200:5
**occasions (1)**
163:8
**occupation (1)**
7:1
**occur (6)**
113:6,6;163:20,23,23;164:23
**occurred (9)**
30:12;96:1,6;117:18;133:10;170:4;190:20;191:3;192:17
**occurring (2)**
67:16;204:24
**occurs (1)**
189:11
**o'clock (2)**
161:24;165:15
**October (1)**
37:12
**off (11)**
29:19;38:21;39:14;50:21;51:23;53:5;105:23;116:13;129:19;132:7;134:19
**offenders (1)**
95:19
**offer (1)**
101:19
**offhand (1)**
181:4
**Office (3)**
199:9;204:14;205:13
**officer (19)**
15:3;44:9;47:5,6,14,17;48:10,13,14,22;50:12;69:21;71:13;123:23;124:23;138:7,9,13;151:21
**officers (7)**
44:7;46:11;48:23,24;200:21,22;201:23
**officer's (1)**
47:5
**officially (1)**
9:1
**officials (1)**
89:9
**often (1)**
17:19
**oftentimes (1)**
185:9
**old (8)**
49:9;51:14;67:17,18;71:8;107:8;180:7,11
**olds (1)**
178:19
**once (5)**
12:23;75:8;135:10;170:15;191:16
**one (75)**
6:24;10:9;15:16;29:13,18,19;34:18;36:13;42:1;49:22;53:6;54:9,10,20;67:11;69:4,8;71:21;72:23,23,23;77:13;79:5;81:19;87:19;89:14;90:1,13;91:17;98:13;100:4,17;101:11,16;104:15;105:22;109:4;116:13;118:2;122:23;123:14,18,19;124:14,20;129:13;132:5;136:7,13;137:3,4,10,12,13;138:17;143:18;145:18;152:20;155:3,20;159:11;163:2;168:18;170:11;174:2;177:20;178:6;180:22;184:2;185:22;187:9;189:18;192:4;203:1;206:1
**onerous (1)**
175:7
**ones (5)**
33:20;70:5;98:15;122:24;171:3
**ongoing (2)**
62:6;144:12
**on-hands (1)**
119:1
**online (1)**
196:23
**only (63)**
10:20;11:23;15:8;16:24;19:20;20:14;28:23;33:22;34:9;36:24;37:10;38:21;43:19;44:8,22;46:11;51:13;56:1;64:9,19;67:11,14;75:11;79:15,16;81:19;82:19;85:14;86:3,4;90:20;91:24;99:12,12;107:16;113:7;115:5;118:10;123:12;132:9;135:24;136:4;137:4;148:20;161:12;169:22;171:24;173:6;175:19;176:21;177:6;178:14;186:23;187:5;191:21;193:8;198:24;201:11;203:1,3,7,13;207:19
**operated (1)**
204:14
**operating (1)**
88:24
**operation (2)**
199:10;203:11
**operator (1)**
158:22
**opine (1)**
106:5
**opinion (56)**
18:18,21,23;20:21;38:18;58:11;60:11,23;62:21;69:13,23;72:3;79:12;81:5,11,12;82:12,15;83:17;85:15,20;86:10,13;88:10;90:24;97:19;98:9,16;101:4,19;105:16,19;130:13,16;140:5;144:2;146:7,22,24;147:6,17,24;152:7;156:13;157:22;158:8;159:23;197:9,11;200:16;201:12;202:2,3,6;203:7,18
**opinions (32)**
16:5,5,7,14,20;18:15;19:2,17;35:2;39:9;41:16;63:15;74:9;85:8;92:6;127:3;129:3;144:3,6,13,16,22;152:6;197:3,6;199:8;200:19;201:11,19;202:12;203:10;205:6
**opportunities (1)**
137:19
**opportunity (2)**
132:13;173:16
**opposed (9)**
82:7;99:20;104:19;132:14;177:8;190:10;191:5;200:17;202:5
**Oral (1)**
79:16
**order (8)**
44:23;99:22;116:24;130:17;150:3;169:12;175:7;206:19
**ordered (3)**
45:12;62:1;158:9
**organization (5)**
7:11,22;9:6,10;89:2
**original (1)**
134:14
**originally (1)**
7:13
**others (7)**
34:11;54:7;68:4;98:24;192:7,13;201:8
**out (50)**
9:7,10;12:8,15;22:13;32:9,22;37:18;59:22;80:1;82:21;86:12;94:20;96:14,15;106:23;111:2,3;114:16;117:11;123:10;124:13;130:18;131:17;136:8,17;140:6;141:18;163:19;165:10,11,12,12,15;166:4;167:10,10,11,18;170:4,11,19;172:20;173:20;176:24;189:18;191:8;197:1;198:24;204:5
**outpatient (1)**
50:10
**outside (12)**
14:12;47:9,16;69:10,12;73:11;89:23,23;100:12;166:5;179:4;207:7
**over (13)**
32:3,4;70:12;95:8,12;115:9;125:3;148:14,16;176:6;190:1,9;195:18
**overall (4)**

35:19;55:5;110:10; 166:20
**oversight (5)** 200:1,4;204:2,21; 205:3
**own (12)** 8:21;43:19;48:20; 57:22;73:10;118:7; 136:15;150:10;152:18; 156:11;159:16;206:12
**owned (1)** 204:14
**ownership (2)** 8:7;46:4

## P

**page (49)** 24:21;25:11;32:1; 38:13;43:23;83:11,12; 86:20;91:23;92:2,4,23, 23,24;95:1,20;97:5,10, 23;100:22,23,24; 102:1;107:24;108:20; 109:8;111:10;119:13; 125:1;128:13;129:9, 21,23;133:12;134:9,9; 139:7;142:7,24; 152:20;156:19;157:2; 161:18;170:17;179:21; 182:15,19,21,23
**pages (2)** 119:12;129:14
**pagination (1)** 134:11
**paid (1)** 201:6
**pain (5)** 53:4,6,7,16;54:4
**paper (3)** 12:24;13:1;207:20
**papers (1)** 76:23
**paragraph (34)** 63:6;78:3,19;89:5; 93:7,12;95:2;111:12; 119:14;120:12;125:1; 126:10;128:13,13,18, 19;129:9,10;130:1,2; 133:12;139:7;142:7, 11,13,15,18,20;143:1, 18;154:9;157:2; 159:13;182:24
**parent (7)** 53:15;54:3;66:19; 71:6;124:3,13;125:22
**parental (2)** 66:22;120:18
**parents (1)** 122:24
**part (31)** 25:23;27:7,17;29:24; 47:4;52:8;58:14;67:18; 68:16,17;69:1;74:19; 78:15;79:23;117:2,4; 118:13;138:11;141:9; 147:14,15,16,21;150:3; 158:14;164:16;182:11; 183:14;186:11;191:11; 205:4
**participate (1)** 121:3
**participated (1)** 120:14
**participating (2)** 31:6;178:1
**particular (17)** 10:2;17:21;34:22; 75:6;78:9,19;85:6,11; 95:3;128:10;135:12; 145:23;158:3;160:22; 197:4;203:13;205:12
**particularly (4)** 53:19;54:2;70:4; 185:22
**parties (2)** 25:19;78:11
**partner (1)** 75:5
**parts (1)** 203:22
**part-time (1)** 107:2
**past (7)** 32:4;34:16;35:5; 116:21;124:19;145:8; 198:11
**patient (7)** 51:14;58:23,24; 59:15;60:9,21;63:12
**patient's (1)** 51:12
**Pattern (1)** 20:3
**pay (3)** 107:20;115:20;116:7
**peer (4)** 165:24;189:14,16,18
**peer-reviewed (1)** 196:24
**peers (5)** 169:10;182:18; 183:5;188:15;190:7
**people (14)** 42:18;53:22;71:21; 90:17;167:7;173:14, 15;176:10;177:15,18; 180:11;181:1;191:4; 198:23
**per (10)** 43:13;136:14; 138:21;150:9,21,21; 151:12;152:2,3;166:8
**percent (25)** 29:17;35:21;96:6; 97:6,11;108:22; 109:10,22;110:3,14,19, 23;111:4,7;113:5,16; 115:24;138:21;171:20, 20,22;180:24;184:9; 187:13;198:21
**percentage (6)** 99:3;113:7;174:21; 187:18;191:3;192:20
**percentages (2)** 93:8,16
**perfectly (1)** 79:17
**perform (3)** 118:6;120:8,9
**performance-based (1)** 88:16
**performed (6)** 9:9;98:1;119:2,23; 123:21;152:21
**perhaps (2)** 32:17;85:17
**period (29)** 14:3;85:24;95:8,9, 12;99:17;126:15,21; 142:17,23,24;149:8; 160:10;163:21;166:19; 167:19;168:11,13; 170:5,14;178:10,22,24; 190:3,10;191:5,17,24; 192:1
**periodically (1)** 84:1
**periods (3)** 125:7;169:21;189:6
**permission (1)** 71:9
**permits (1)** 70:22
**perpetuation (1)** 115:3
**personal (4)** 54:2;152:6,16,16
**personnel (1)** 121:12
**persons (1)** 201:19
**pertain (1)** 145:19
**pertinent (5)** 71:19;81:4;86:22; 87:2,6
**Phase (1)** 170:10
**phone (1)** 196:9
**photocopy (1)** 23:2
**photographs (1)** 203:5
**physical (7)** 48:10;102:9,14; 103:10;199:18;200:6; 203:6
**physically (3)** 166:18;204:4;205:5
**physician (3)** 16:15;83:1;86:5
**pick (3)** 170:7,8,20
**picky (1)** 157:9
**picture (1)** 132:2
**piece (1)** 194:23
**place (8)** 79:15;88:4;99:17; 129:17;177:3;178:22; 189:21;190:5
**placed (3)** 49:19;159:24;189:22
**placing (1)** 81:19
**plaintiff (3)** 35:21;37:13,21
**plaintiffs (1)** 35:18
**plaintiff's (3)** 86:22,24;87:1
**plan (5)** 65:1;143:15;144:3; 154:5;171:13
**plane (1)** 162:13
**plant (3)** 199:18;200:6;203:6
**plate (1)** 195:2
**Please (8)** 6:10,22;50:16;69:24; 82:9;92:21;100:24; 206:8
**PO (1)** 44:9
**Pod (2)** 143:3;167:17
**point (19)** 16:20;31:9;56:3; 58:19;60:11,23;77:11; 83:10;84:20;94:12; 104:20;126:21,22; 128:10;174:5;178:23; 183:24;185:13;195:1
**pointed (1)** 82:20
**pointing (1)** 15:14
**points (2)** 141:20;159:18
**poison (5)** 104:21,23;105:2,4; 133:20
**police (2)** 9:21;13:10
**policies (12)** 89:9,11;112:11; 116:9;145:22;146:17; 152:19;156:8;159:16; 171:15;174:24;198:14
**policy (40)** 47:7,15;48:21;72:23; 73:2,10,16;87:16,20, 21;90:22,24;91:8; 106:2,2;134:24;135:3; 136:15;143:19;145:24; 146:2,6,10,20;147:4, 17;148:4;150:10,21; 151:12;152:2,3,7,9; 156:10,16;159:3; 161:2,9,13
**political (1)** 13:3
**politics (1)** 12:11
**poor (5)** 80:8,8,24;83:18; 124:4
**popular (1)** 12:17
**population (9)** 84:16;96:22;97:3; 99:9,11;100:12;181:5; 184:6,9
**position (2)** 76:22,23
**positions (1)** 84:13
**positive (4)** 101:13;127:21; 135:5;143:6
**possibility (1)** 186:1
**possible (5)** 53:9;68:20;185:21; 190:22;191:11
**possibly (2)** 103:15;179:10
**postmortem (1)** 31:7
**pot (1)** 101:16
**potential (9)** 68:5;90:1;101:1; 102:2,13;107:9; 137:17;161:15,15
**potentially (1)** 48:6
**practice (11)** 17:6;20:15,15;87:16, 23;174:7,10,14,19,22; 176:13
**practiced (1)** 17:3
**practices (6)** 25:13;87:10,13; 118:12;175:18;176:19
**practitioners (2)** 171:13,14
**precaution (3)**

160:1,4;173:3
**precautions (4)**
49:19;55:15;112:5;127:10
**precipitants (3)**
127:10;190:5,18
**predictor (1)**
187:20
**preexisting (3)**
185:11;187:18,21
**preface (1)**
173:5
**preliminary (1)**
9:12
**prescription (2)**
134:3;135:6
**present (2)**
51:13,22
**presented (1)**
132:3
**presumably (2)**
167:17;169:23
**presume (2)**
71:18;200:8
**pretending (1)**
206:24
**pretrial (1)**
186:14
**pretty (13)**
10:4;13:13;19:23;31:22;54:5;67:24;78:6;79:3,8,8;135:8;153:19;204:21
**prevalent (3)**
181:5,8,11
**prevent (5)**
117:20;195:12;198:1,20;201:20
**preventable (4)**
198:4,20,22;200:20
**prevented (1)**
199:2
**prevention (40)**
7:3,19;9:5,24;17:12,16;18:19,24;20:2;25:13;28:23;29:1;34:23;74:17;89:22;90:11,19,22;118:11,16,20;145:22,24;146:2,6,10;147:12,16,20,21;156:8,9;160:12,13;192:18,21;193:3,11;197:5;198:23
**previous (4)**
41:9;55:9;65:4;98:1
**previously (5)**
102:24;103:2;106:23;108:10;197:13
**principally (1)**
112:7
**prior (17)**
25:19;53:5;66:1;94:1;98:3;101:10;102:5;103:6,7,15;109:12,20;110:11;127:5;176:23;186:24;205:23
**prison (8)**
14:21;15:1,4,9;16:6;26:15;32:4;140:1
**prisoners (1)**
14:24
**prisons (2)**
75:2;116:14
**privacy (1)**
169:13
**private (7)**
7:11;8:16,20,23;74:23;96:1;204:6
**privilege (1)**
190:15
**privileges (1)**
190:9
**probably (13)**
12:16;15:19;27:21;28:1,3;32:15;33:22;34:10;87:5;103:13;115:23;185:6;190:5
**probation (32)**
44:9;46:11;47:5,5,6,9,14,16,18,19;48:9,13,14,22,23,24;50:11;52:8;58:16;69:17,21,24;70:12;71:13,14;72:3,19,21;123:23;138:6,9,12
**problem (1)**
115:4
**problematic (1)**
115:7
**problems (10)**
41:12;67:12;101:21,22;132:6;182:17;183:4,16;184:2,5
**procedure (1)**
134:24
**procedures (1)**
89:12
**proceedings (1)**
115:13
**P-R-O-C-E-E-D-I-N-G-S (1)**
6:1
**process (10)**
30:16;33:8;47:10;49:17;69:2;72:2;73:12;116:8,11;138:17
**production (1)**
6:5
**profession (1)**
199:3
**professional (21)**
20:9;38:18;39:2,6;59:7;77:17;92:6;109:12;110:10,16;135:12;136:3,24;137:2,6,15;140:24;142:2;145:15;148:1;155:24
**professionals (6)**
17:13,18;68:11;109:9;127:15;138:23
**program (8)**
13:13;120:13,15;125:2;141:20;160:13;183:6;190:24
**programming (2)**
166:8;167:13
**programs (3)**
95:17;125:3;167:9
**prohibited (3)**
114:22;166:2;192:6
**prohibitions (2)**
48:7,11
**Project (2)**
80:2;95:24
**projects (2)**
9:11,17
**prominent (1)**
187:9
**promulgate (1)**
116:8
**promulgated (3)**
75:11;79:2,23
**promulgates (2)**
74:24;75:15
**promulgation (1)**
89:8
**properly (1)**
75:20
**proposal (1)**
9:14
**proposed (1)**
9:18
**proposition (2)**
112:19,23
**protect (1)**
130:17
**protected (1)**
84:8
**protection (1)**
84:7
**protocols (1)**
145:22
**prove (1)**
83:9
**provide (21)**
16:14;18:15,17;21:19,20;39:9;62:1;74:17;75:18;76:1;77:1;87:1;90:11,19;91:3;118:12;119:3;147:11,20;200:12;202:11
**provided (20)**
14:20,24;17:9,24;18:11;21:8,22;39:12;62:6;91:10,18;117:6,8,9,16;131:5;199:18,18,19;200:3
**provider (6)**
78:11;85:24;199:6;200:12;202:10,10
**providers (3)**
81:18;125:8;126:3
**provides (1)**
79:9
**providing (6)**
82:10;86:1,2,3,4;202:14
**provision (2)**
30:6;84:12
**provoking (1)**
169:3
**proximate (14)**
89:4,5,13,14,18,19;90:2;136:1;137:2,3,8,9,10,11
**proximity (1)**
189:21
**psychiatric (5)**
41:7;64:21;65:9,10;133:17
**psychiatrist (2)**
50:14;59:9
**psychological (10)**
16:5;41:7;47:20;48:10;50:7;52:12;55:2,5;65:7;128:24
**psychologically (1)**
150:3
**psychologist (1)**
16:1
**psychotropic (1)**
135:6
**public (1)**
96:1
**publicized (1)**
191:22
**published (4)**
10:12;11:11,16;12:1
**publishing (1)**
11:13
**purchased (1)**
118:17
**purchasing (1)**
118:19
**purpose (1)**
25:4
**purposes (1)**
44:18
**push (1)**
113:23
**put (16)**
35:8;55:14;67:9;108:12;112:2;136:12;140:1;143:12;155:19;161:8;175:8,13;184:23;185:10;189:11;195:2
**putting (4)**
68:8;132:6;137:22;195:16

## Q

**qualification (1)**
63:11
**qualifications (1)**
203:9
**qualified (19)**
18:15,17,20,22;38:17;39:5;59:7;62:8,9,13;63:13;109:8,11;110:16;128:22;129:2;138:23;145:15;155:24
**qualifies (1)**
16:4
**qualify (1)**
196:19
**quality (1)**
30:5
**quantify (1)**
177:17
**queried (1)**
79:10
**quick (5)**
23:14;25:10;50:18;115:9;194:6
**quickly (1)**
37:14
**quite (7)**
39:10;61:19;84:18;172:3;179:17;185:21;201:4
**quote (5)**
51:5;64:23;151:17;159:7;168:18
**quoted (2)**
41:17;51:3
**quotes (1)**
51:4
**quoting (2)**
51:11,11

## R

**rail (7)**
194:20;195:3,6,10,15,16;196:2
**rare (1)**
163:8
**rate (13)**
99:10,15,18;100:5,11;113:10,17;179:2,14;186:20,23;198:7,10
**rates (11)**
98:19;99:14,23;100:4,8,14,18;171:8,10;179:7;198:10
**rather (4)**
8:20;12:10,24;31:7
**reach (3)**
144:2;171:2;188:5
**reacting (3)**
189:13,23,24

**reaction (2)**
142:1;169:24
**read (10)**
16:19;32:20;42:22;58:22;59:3;80:6;81:16;101:10;140:16;207:16
**reader (1)**
140:16
**readily (2)**
72:13;100:6
**reading (6)**
48:13;57:13;59:13;85:17;96:5;134:18
**ready (2)**
37:23;50:24
**real (5)**
23:14;25:9;115:9;133:1;174:5
**realize (1)**
201:15
**really (19)**
12:10,15;13:2;52:21;70:24;71:15;73:20;90:9;104:14;106:5;117:19;129:21;157:10;162:16;176:24;185:13;191:15;197:23;198:2
**reason (19)**
34:17;53:18;56:1;63:2;85:6;100:4;106:12;122:1,13,23;123:8;136:20;140:7,8;144:19;146:14;164:1,14;173:11
**reasonable (7)**
69:16;70:2,7,10,11;156:14;157:8
**reasonably (1)**
68:20
**reasons (11)**
53:22;106:8;122:20;123:18;124:14,15;155:16,19,20;189:9;202:18
**rec (1)**
167:19
**recall (31)**
19:16,20;29:16,19;40:7;41:4,13;43:15;45:22;51:16;53:1,8,10,13;66:9;70:13;101:24;122:9,10;125:14,15,17,18;126:1,3,6,7;142:19;143:4,5;153:23
**receive (2)**
8:12;153:10
**received (3)**
9:19;111:3;120:1
**receiving (3)**
50:9;110:15,23
**recent (1)**
122:12
**recently (2)**
56:20;103:1
**RECESS (1)**
51:22
**recognize (1)**
20:6
**recognized (2)**
111:20;156:20
**recognizes (1)**
163:13
**recollection (5)**
17:1;25:5;53:9;77:10;199:22
**recommendation (2)**
173:9,15
**recommendations (10)**
34:21;57:14;64:19;65:6,21;66:8,14,16,21;153:9
**recommended (2)**
56:19;64:21
**recommending (2)**
55:14;153:3
**record (13)**
21:22;22:4;35:7;50:21;51:23;65:2;102:7,10;104:20;121:13;129:19;152:4;192:12
**records (41)**
17:2;19:4;39:17;46:20,23;47:4;49:5,8;50:11;52:5;53:2;62:5,17;69:10,12,14,16,20,22;70:1,3,3,7,13,14,16;71:14,19;72:19;73:9;84:8,11,16;104:8;135:17;142:5,15;148:13;180:10,20;182:13
**recreate (1)**
190:7
**Recreation (3)**
14:13;166:5;168:19
**RE-CROSS (1)**
205:21
**reduce (4)**
172:21,22;174:3;175:7
**reduced (1)**
173:2
**reducing (1)**
118:22
**reduction (3)**
113:20;119:6;198:18
**refer (12)**
68:21;88:5;105:3,4;130:7;135:1;137:1,5;145:14;148:21;151:1;158:4
**reference (21)**
39:24;40:1,3;52:10;79:20;80:3;82:19;83:11;84:5;86:8;88:6,14;91:24;101:6,8;104:22;120:18;148:5;159:18;179:11;192:16
**referenced (4)**
79:16;100:10;159:6;172:14
**references (10)**
21:14;23:5,8;81:5;83:9;84:7;85:1;86:16;104:13;126:24
**referencing (2)**
40:7;84:20
**referral (24)**
48:16;61:13;68:15;71:22;94:5,15;126:4;135:7,10,21;136:7,9,14,23;137:24;138:2;139:23;149:7;150:11,15,18;151:7,13,23
**referrals (2)**
149:9;152:11
**referred (18)**
61:21;63:5;78:23;134:4,22;136:19;137:20;139:10;140:18;147:24;155:23;182:16;183:5,12,14,15;184:1;201:1
**referring (9)**
26:6;45:9;51:18;60:15;80:5;159:8;181:24;182:5,20
**refine (1)**
95:23
**refinement (2)**
64:24;154:4
**reflected (1)**
193:12
**reflecting (1)**
152:7
**reflection (2)**
152:18;153:8
**reflects (3)**
166:11;178:9;179:4
**refresh (1)**
25:5
**regard (2)**
178:8;192:5
**regarding (35)**
6:14;16:5,6,14;18:16;29:11;30:2;35:2;39:13;44:3,8,19;47:24;55:8;75:19,19;78:17,22;93:3;98:2;102:9;121:10;122:16;126:1;133:13;142:10,17;154:1;157:15;158:5;170:18;182:14;183:10,18;200:16
**regardless (2)**
199:12;207:5
**regards (14)**
8:18;12:2;16:21;21:7;22:15;29:20;38:12;99:8;109:3;117:5;141:15;142:14;146:21;186:7
**region (1)**
12:11
**regular (3)**
15:4;140:10,11
**regulation (1)**
138:7
**regulations (2)**
45:2;162:23
**regulatory (1)**
33:15
**reign (1)**
165:13
**relate (1)**
28:22
**related (6)**
89:13,15,16;98:20;141:19;155:12
**relates (3)**
18:18;48:15;197:5
**relationship (10)**
16:23;26:24;36:15;54:6;110:9;141:1;147:22;171:4;176:17;199:8
**relatively (3)**
169:20;171:5;189:6
**relaxation (2)**
64:22;153:24
**release (3)**
70:22,22;71:10
**released (2)**
65:18,24
**relevant (1)**
71:15
**rely (1)**
86:24
**remained (1)**
186:21
**remedial (1)**
26:20
**remedy (2)**
26:21;27:12
**remember (12)**
37:19;59:13;79:4;105:5;124:20,24;159:10;181:3;186:11,16,19;190:21
**reminded (1)**
205:24
**render (3)**
35:2;144:3;197:3
**rendering (1)**
84:14
**repeat (5)**
21:1;57:16;60:14,17;126:16
**repeated (1)**
154:15
**repeating (2)**
63:20;64:9
**report (90)**
9:23;21:14;22:16,19;23:6,8;24:21;25:6,11;27:9;32:1;33:17,17;38:22;39:8,11,12,18,22;40:1,2,8,21;41:17;49:21;54:16,17,18,21;55:1,3,3,5,12;56:9;57:1;58:9,12,20;59:13,22;60:2,19;61:5;63:6,21;64:7;66:4,11;67:3,8,9,20,21;83:17,19;86:20;88:6;90:7;91:23;92:4;94:12,18,20;100:10;106:17;108:12;114:6,7;119:13;125:11;127:13;130:8;144:4,14;153:7;166:11;172:14;179:12,17;184:8,12,15,17;191:21;193:10;197:7,7,12;204:19
**reported (5)**
32:21;53:11,11;133:17;148:18
**reporter (3)**
73:20,22;162:17
**reports (13)**
39:13;42:1;44:8;50:6,7,7;51:3;52:5;66:21;126:15;141:14,16;153:21
**represent (1)**
6:13
**representative (1)**
8:19
**request (3)**
58:23;70:20;87:7
**require (3)**
160:21;175:1;184:23
**required (12)**
11:5,7,24;33:9,11;90:19,22;136:23;143:19;148:4;160:17;161:12
**requirement (11)**
30:6;74:12,13,16;90:14;138:2,5;158:11;177:8,8,11
**requirements (3)**
45:2;152:8;157:5
**requires (4)**
47:8;87:17,17;152:9
**requiring (2)**
82:2,3
**research (5)**
9:12,17;53:23;54:5;93:2
**residential (1)**
95:16
**resist (1)**
193:16

**resistant (5)** 193:18,22;194:15; 195:6,19
**resources (1)** 198:16
**respect (1)** 187:5
**respected (1)** 13:13
**respond (1)** 33:9
**responded (1)** 170:22
**respondents (2)** 108:22;190:17
**response (6)** 70:13,17;91:14,15, 17;187:7
**responses (4)** 32:22;34:5;91:17; 190:21
**responsibilities (6)** 14:10;16:3;61:24; 138:8;199:16;202:8
**responsibility (16)** 48:18,20;66:23; 68:17;71:24;106:6; 147:11,15,20;200:1,11; 202:15;203:17;204:1, 3,7
**responsible (7)** 71:21;113:15; 199:19;200:9;202:17; 203:11;205:3
**responsive (1)** 42:11
**restricted (1)** 192:9
**result (7)** 25:24;37:6;112:9; 142:2;149:6;151:13; 190:23
**resulted (7)** 61:13;113:19; 138:19;170:2;176:13, 18;198:18
**resulting (1)** 152:10
**results (3)** 26:21;129:3;170:24
**retained (1)** 35:1
**retired (1)** 124:23
**retrofitting (1)** 196:14
**return (1)** 22:8
**returning (1)** 154:7
**review (15)** 30:9,13,13;35:16; 39:11;42:9;55:7;67:8; 81:4;87:2;129:2; 135:12;142:15;146:16; 180:9
**reviewed (19)** 16:18;20:3;21:10; 24:20;25:1,2;32:2; 37:24;38:12,13,22,22; 44:3;46:23;49:4;58:9; 73:18,24;190:19
**reviewing (2)** 41:4,13
**reviews (3)** 30:4;31:2;32:8
**revise (1)** 171:15
**rewrite (1)** 80:22
**rewriting (2)** 80:11,13
**rid (1)** 172:9
**right (34)** 9:3;15:14;23:17; 37:2;38:10;47:2;51:5; 56:24;59:22;62:16; 64:4;71:5;76:7;92:10; 101:15;103:20;107:15; 112:22;114:19;117:5; 120:6;121:7;131:4; 141:10;164:9;173:17, 17;174:12;177:15; 180:14;184:16;186:5; 197:6,8
**rights (3)** 12:14;26:11,12
**R[redacted] (121)** 49:6;51:4,6,19; 52:11;54:12,19;55:17, 22;56:19;57:10,10,17, 24;58:5;60:12,24; 61:14;62:18;63:16,22; 65:6,7,18,24;67:4,9,22; 68:9,12;70:1;73:17; 89:14,24;93:19,24; 97:19;101:4,11,23; 102:5,21,23;103:6; 104:1,10;105:16; 108:2,4;109:19; 114:12;119:14,18; 120:20;121:4,17; 122:7,11;123:4;125:3, 6,8,12,16,19,23;126:4, 7,17,22,23;128:1,1,3, 11,20,24;131:19,23; 133:20,22;134:4; 135:1;137:1,5;139:8, 15,21;140:3,7,22; 142:8,17,22;143:11,12, 15;144:22;147:24; 148:18;151:5,15,19; 152:21;153:19;154:7; 155:16,23;156:3,14; 159:24;166:23;167:14; 168:10;179:22;180:18; 183:9;185:3;192:6,9; 202:8
**R[redacted]'s (36)** 39:14;44:4,8;46:22; 50:1;51:11;53:2;54:11; 55:4;66:5,7,10,13,14; 69:14,20;71:13;89:19; 91:4;97:20;105:20; 120:10,12,14;121:10; 122:7,16;124:22; 126:19;130:10;135:22; 137:8;141:7,16; 146:21;148:12
**risk (58)** 47:24;49:7;53:20; 54:7,19,22;55:4,13,17; 62:22;67:4,10,14,19; 68:5;73:5;90:1;94:4, 14,22,23;99:1,3;101:2; 102:2,13,23;107:10; 112:6,16;137:17,21; 143:13;144:22;145:1; 148:11;155:19;160:23; 161:9;163:13,15,17,21; 164:15;165:2;168:21, 22;179:21;181:17; 184:21;185:1,4,5,8,11; 190:12,13;191:18
**rodeo (1)** 6:16
**rods (1)** 108:17
**role (2)** 7:18;31:22
**room (116)** 105:7,10,12,16,20, 24;106:2,8,13,14,24; 107:8,11,12;108:2,5; 111:11,12,22;112:2,9, 10,14,16;113:14,15,20; 114:2,11;115:4,5; 132:6,9;140:10,23; 141:1,4;147:14,18,22; 164:3,7,12,13,16; 165:2,4,6,7,8,16,16,17, 20,24;166:6,16,18,22; 167:7,12,14,17,22,24; 168:2,7,12,21,24; 169:7,9,14,19;171:4, 15,18;172:9,17,22,23; 173:3;174:3,13,20; 175:2,9,13;176:10,14, 17,21;177:3,21,23; 187:5,8,12,14;188:9, 11,16,22;189:5,16,22; 190:14,24;191:4,17; 192:1,5,7,13;197:13,21
**rooms (11)** 107:17;143:2;166:5, 12;167:2,9,10,11,14; 168:8;192:10
**rounding (1)** 34:2
**rude (2)** 161:17;162:13
**ruled (1)** 158:18
**rules (3)** 73:16;165:23;192:14
**run (2)** 75:20;204:18
**running (1)** 104:18
**rural (1)** 12:9

**S**

**sad (7)** 128:11;136:13; 137:6,23;145:11; 148:22;151:10
**Sadness (9)** 154:21;179:24; 180:2,4,14,16;182:13; 183:10,18
**safe (2)** 14:14;123:2
**safer (1)** 123:2
**salary (1)** 8:17
**Same (24)** 27:24;29:11;55:19, 21;71:24;72:2;76:17; 102:9,16;112:15; 113:13;114:3;130:22; 136:6;142:11;167:12; 171:18;173:3;183:22; 186:2;195:18;197:13, 20,21
**sample (3)** 171:1,5;188:4
**sanction (11)** 105:13;142:3; 168:16;169:2;170:1; 188:8,12,19;189:11; 190:8,24
**sanctioned (4)** 164:12;165:21; 188:16;189:24
**sanctions (1)** 190:13
**Sanders (3)** 42:19;47:1;201:24
**SAS (3)** 148:16;154:14,18
**SASS (7)** 103:4;120:13; 121:12;125:2;182:6, 13;183:6
**satisfactorily (1)** 6:4
**satisfied (1)** 86:9
**saw (11)** 12:23;57:17,24; 125:6;127:15;149:9, 10,19,20;203:4,4
**saying (28)** 11:23;42:15;43:15; 53:8;57:5;80:14,23; 82:8;85:14;117:24; 126:4,7;135:24;137:7; 147:19;151:8;152:14; 160:9,14,14;164:5; 170:13;175:22;176:20; 180:20;181:3;188:17; 205:10
**SB (3)** 130:3,5;151:2
**Scattered (1)** 176:4
**scenario (1)** 165:19
**school (30)** 16:9,11;17:10,13; 20:23;21:4;39:17;50:7, 11;52:5;56:23;57:6; 69:14,19,20,20;104:8; 121:10;123:7;125:22, 23;148:13;153:17,20; 155:1;165:11;166:3, 14;182:8;183:11
**schooling (1)** 153:22
**schools (2)** 96:18,23
**scientifically (1)** 196:23
**scientist (1)** 13:3
**scope (5)** 51:20;81:2;88:1; 96:11;109:23
**scrapes (1)** 104:17
**screening (13)** 47:11;68:11,22;69:3, 6;72:2;79:16;83:4; 104:16;123:21;136:10; 138:11;198:15
**se (2)** 43:13;166:9
**Seafood (1)** 129:18
**searches (1)** 186:9
**second (19)** 25:9;36:13,21;58:18, 19,19;92:2,5;100:23; 137:22;145:18,18; 160:20;170:10,16; 177:24;199:9;205:7,13
**section (4)** 26:13;103:12;105:8; 179:11
**secure (2)**

96:18,23
**Security (1)**
31:12
**seeing (2)**
53:1;66:1
**seek (4)**
57:5;75:6,12;76:6
**seem (2)**
53:14;90:17
**seemingly (3)**
54:3;90:15;132:20
**seems (5)**
90:15,15;157:9,15;203:7
**segregation (6)**
113:11,24;114:3,4,9;169:17
**selected (1)**
25:18
**self-harm (3)**
55:18,23;104:19
**Self-Injurious (2)**
92:24;93:13
**self-monitor (1)**
30:3
**self-monitoring (2)**
56:21;153:13
**self-mutilation (4)**
41:10;103:24;104:10,11
**self-report (4)**
42:7;67:15;73:6;133:22
**self-reported (2)**
33:21;64:8
**self-reporting (2)**
33:5;47:12
**semester (1)**
13:21
**seminars (1)**
17:19
**send (3)**
33:16;70:12,17
**sense (2)**
112:12;151:11
**sensitive (1)**
191:24
**sent (2)**
32:22;170:16
**sentence (6)**
93:2;95:2;111:12;157:10;158:5;183:8
**separate (4)**
32:16;35:7;79:5,5
**separately (1)**
130:14
**separating (1)**
169:10
**September (6)**
61:4,19;127:5;142:14;143:2;150:24
**series (3)**
9:7;69:9;138:18
**serious (2)**
31:3;165:23
**seriously (1)**
207:6
**serve (1)**
157:7
**served (1)**
16:15
**service (3)**
7:15;202:11,12
**services (17)**
62:6;71:3;74:1;82:11;84:13,14;86:3,3;91:9,10,19;135:17,18;150:4;200:10,13;204:5
**serving (1)**
97:16
**sessions (2)**
120:21;121:4
**set (6)**
60:24;85:19;86:18;142:17;144:3;157:5
**setting (6)**
18:6,9;132:15;137:20,21;143:23
**settlement (8)**
26:4,22;27:2,13;28:9;30:7,16;158:10
**Seven (7)**
84:10;137:14;170:17;192:18,21;193:3,11
**several (12)**
25:13;26:9;33:19;49:8;61:6;94:4,14;144:22;159:9,11;170:12;197:17
**severe (4)**
52:15;53:3,7,16
**sexual (2)**
102:16,18
**shadowing (1)**
14:17
**Shah (2)**
16:14,22
**shall (3)**
77:18,22;80:6
**share (5)**
47:7,19;48:10,18;72:4
**shared (11)**
46:9;48:24;66:5;72:13,17,20;120:21;203:16;204:7,9;205:10
**shares (1)**
185:18
**sharing (3)**
48:7;202:7;205:4
**Shawn (1)**
42:22
**sheet (1)**
206:18
**sheets (2)**
141:18,19
**sheriff (1)**
204:20
**shield (1)**
195:12
**shift (6)**
65:19;151:3,4,5,7,15
**shifted (1)**
49:23
**Shirley (6)**
38:14,17;39:8;40:21;41:6;128:14
**Shirley's (2)**
39:18,22
**shocked (1)**
155:21
**SHORT (6)**
51:22;88:2;111:14;169:21;189:6;191:5
**shorter (1)**
169:21
**show (4)**
49:24;84:2;92:17;161:18
**shown (1)**
124:5
**sick (1)**
169:8
**side (15)**
44:14,14,17,18,22;45:10,16;49:1;56:4,6,6;70:5;73:13,14;114:17
**sides (1)**
44:13
**sign (2)**
70:21;71:10
**signed (1)**
90:10
**significance (3)**
170:24;187:4;191:17
**significant (13)**
59:18;62:12,20;93:8,15;98:8;113:7;187:10,14;188:20,21,22;189:3
**signs (1)**
137:16
**similar (7)**
8:13;35:19;87:24;107:1;112:4;151:10;185:8
**simple (3)**
165:22;194:11,18
**Simply (13)**
18:2;53:20;74:10;78:12;83:3,24;127:4;153:2;159:18;165:14;180:16;187:17;188:21
**single (2)**
107:16,20
**singular (1)**
88:4
**sinks (1)**
108:17
**sister (1)**
124:21
**sit (2)**
80:10;147:5
**site (4)**
17:21;34:19;118:10;179:9
**sits (1)**
27:1
**sitting (2)**
8:19;11:15
**six (10)**
14:5;27:22;40:19,20;68:1;110:4,17;111:5;137:13;138:24
**six-month (1)**
14:3
**six-years (1)**
51:14
**size (4)**
88:1;171:1,5;188:5
**skills (3)**
64:22;154:1;190:1
**skip (1)**
129:21
**sleeping (7)**
123:5;163:22;164:8,13;165:16;168:8,14
**slightly (1)**
110:2
**small (5)**
9:15,17;113:3,7;188:5
**Smith (2)**
36:13,22
**smoked (1)**
101:11
**smoking (2)**
101:7,16
**sob (3)**
126:23;148:19;150:17
**sobbed (1)**
148:22
**sobbing (3)**
128:5;137:7;151:11
**social (2)**
12:6,9
**socioeconomics (1)**
12:13
**sociology (3)**
12:3,5,24
**solicit (2)**
48:21;73:11
**solution (1)**
194:19
**somebody (3)**
11:14;59:6;186:3
**somehow (1)**
123:23
**someone (9)**
47:15;68:22;91:13;123:1;140:9;161:12;197:23;198:1;201:2
**Sometimes (14)**
26:23;87:14;114:10,10;118:12;140:13;166:2,3;168:17,18;169:11;189:10,18,20
**son (2)**
121:21;123:10
**son's (1)**
124:7
**sorry (22)**
15:14;21:3;28:2;38:9;41:1;46:2;57:13,14;58:21;60:3,14;64:1;92:8,11;93:11,12;115:16;180:3;181:7;182:20;196:6,8
**sort (2)**
19:2;190:15
**sorts (3)**
136:21;137:16,19
**sought (2)**
118:6;119:10
**sound (3)**
32:23;44:14;58:6
**source (2)**
10:24;11:21
**sources (3)**
33:12,13;47:14
**space (1)**
188:14
**Spalt (27)**
50:3;51:2,10,11;58:9;59:6,10;60:8,13,20;61:1,15,15,23;63:4,9;64:9;65:12;66:1;67:1,2;68:8;103:2;127:18;149:17;154:15,18
**S-P-A-L-T (1)**
51:2
**Spalt's (7)**
57:14;58:11,20;67:3,8,8;129:11
**span (1)**
108:21
**speak (3)**
11:20;99:12;198:8
**speaking (1)**
167:21
**special (2)**
26:13;125:16
**specialty (1)**
28:22
**specific (16)**
7:18;32:12;43:17;45:1,5;61:16;62:21;71:11,12;85:7;159:12,24;170:18;196:16;201:22;203:20
**specifically (8)**
45:9;73:8;109:3;

115:19;116:12;117:15; 150:1;164:2
**specified (1)** 158:17
**spend (1)** 131:11
**spent (2)** 13:18;138:15
**spoke (2)** 47:16;66:10
**spot (1)** 142:12
**sprinkler (1)** 108:17
**Stacy (2)** 37:11,18
**staff (56)** 14:18;41:21;42:21, 21;43:18,19;46:9;47:8; 48:19;58:17;61:6,22; 68:17;72:1;89:11; 90:20;94:6;95:24; 108:23;117:1;118:13; 120:2;124:9;125:22; 127:22;131:10,20,24; 132:5,14;133:2;138:6; 139:9;140:11,13,14,18; 141:2;142:17,22; 143:6,7,12;144:23; 149:23;160:24;165:24; 175:7,8,12;188:14; 189:17;191:23;198:17; 199:21;201:23
**staff-driven (1)** 161:2
**stainless (1)** 194:21
**stamped (1)** 77:11
**standard (49)** 18:15;19:2,16;20:1, 4,7,17,21;78:7;79:6,9, 14;82:7;87:9,10,11,12, 17,20,21,23;88:6,9,10, 11,20,24;111:21;135:4, 8,9,11;140:9;145:16; 158:11,12,13;162:21; 163:1,5;174:7,10,14, 18;176:21;177:1,3,13, 14
**standards (69)** 75:1,8,9,11,15;76:5, 11,18,21;77:2,23;78:2, 13,18,21;79:4,21,22; 80:7,16;81:5,14,21,23; 82:4,10,16;83:3,5,16, 24;84:2,6,9,17,21,21; 85:1,9,16,24;86:8,16; 88:12,13,16,18,21; 106:23;116:6,10; 152:16;156:20,21; 157:4,6,10,16,20; 158:8,14;159:5,12,16; 161:11;177:6,9,10; 186:7
**standpoint (1)** 164:6
**stands (2)** 39:3;108:18
**start (7)** 44:10;50:1;100:24; 133:13;162:2,15;183:1
**started (6)** 7:12;9:22;12:8,15; 27:6;150:14
**starting (2)** 9:7,10
**starts (1)** 143:1
**state (33)** 6:10;17:7,22;19:14; 20:18;28:7,9;29:13; 31:5;33:15;34:15; 97:17,18;106:16,22; 117:10;129:5;161:11, 11;162:21;172:1,15; 174:1;175:16,22; 186:2;199:13;200:1, 17,17;201:7,9;202:2
**stated (8)** 63:10;91:5;108:22; 127:12;139:16;157:6; 197:12;202:11
**statement (8)** 17:4,7;20:11;25:7; 140:17,21;143:8;147:6
**statements (1)** 76:22
**states (2)** 173:18,21
**stating (1)** 107:22
**statistic (3)** 109:21;113:18; 116:15
**statistical (5)** 119:3;170:24;171:9; 187:4;191:16
**statistically (2)** 112:18;187:10
**Statistics (8)** 11:4;99:8;103:16,17; 119:10;139:3;184:11; 192:19
**stats (1)** 96:6
**Status (25)** 97:10,12,14,20,20; 112:3,4;113:3;141:4; 166:1,20;167:4,18; 168:9,11,12,12,15,17, 21;169:20;175:2; 176:10;187:12;189:2
**stay (7)** 69:11;110:10; 127:16,22;135:19; 148:21;169:14
**Staying (3)** 54:17;70:9;99:2
**steel (1)** 194:21
**Stephanie (1)** 136:5
**Steve (1)** 161:18
**stigma (1)** 188:19
**still (10)** 8:3,6;9:16;28:13; 93:5;112:15;114:23; 139:3;168:15;193:10
**stop (1)** 129:16
**stopped (1)** 135:22
**store (1)** 123:6
**straightforward (1)** 78:7
**street (1)** 123:3
**streets (1)** 179:15
**stress (1)** 139:12
**strictly (2)** 167:20;168:1
**strike (6)** 42:10;59:23;63:14; 89:2;129:23;202:22
**strip (1)** 186:9
**strong (2)** 54:6;147:22
**strongly (2)** 33:10;199:1
**structured (1)** 167:8
**student (2)** 14:8,9
**studied (4)** 96:14;116:19;119:8; 170:3
**studies (13)** 9:9,13;10:9;33:6,7; 93:7,15;99:13;106:15; 163:18;179:6;184:15; 197:22
**study (63)** 9:4,20;10:19;12:6,9, 18;13:7;32:13,16; 33:18;91:24;92:9;95:3, 10,14,24;96:12;97:24; 98:1,3;99:15,15; 100:20;107:1;108:21; 109:10;110:20;112:7; 114:7;118:7,20,23; 138:21,22;164:2; 167:21;168:2,20; 169:4,19;170:3,17,22; 171:6,7;172:20; 176:12,13,16,22; 177:24;178:1,9,16,22; 179:4,9;180:24;181:3; 191:7;192:16;193:10, 12
**stuff (1)** 38:7
**stupid (1)** 6:23
**sturdy (1)** 195:17
**subparagraph (2)** 78:23;84:19
**subpart (1)** 91:21
**sub-project (1)** 79:24
**subsequent (5)** 61:3,17;64:7;118:5; 183:3
**subsequently (2)** 64:14;131:16
**subspecialty (1)** 13:16
**substance (8)** 38:14;101:1,5,17,18; 155:3,6;171:11
**substantial (1)** 30:19
**successfully (1)** 30:17
**suffered (3)** 102:5;145:5;181:1
**sufficient (1)** 171:2
**suggest (18)** 49:3,6;54:22;55:12; 61:20;62:17;67:4,21; 68:7;85:18;100:10; 125:8,12;128:4; 131:14;142:5;163:20; 176:12
**suggested (5)** 56:16;125:18; 129:18;179:6;198:21
**suggesting (12)** 49:20;54:15;61:14, 17;69:21;127:8; 131:21;132:24;133:8; 136:7;176:15;180:18
**suggests (1)** 198:7
**suicidal (35)** 39:16;48:3;49:12,24; 50:4;51:7,17,19;54:19; 67:15,23;68:9,13;69:4; 93:23,24;94:9,19,21; 103:6,7,16,22,23,23; 104:4,5,9,11;124:8; 125:9;133:24;144:22; 160:8;196:17
**suicidal/homicidal (1)** 41:9
**suicide (211)** 7:3,19;9:5,5,9,20,24; 10:3,8,17,19;11:1,16; 17:11,16;18:18,23; 20:2;25:13;28:23;29:1, 7,8,16;30:11;31:3,3; 32:3,14;33:6;34:23; 35:2;44:5;47:24;48:4, 15;49:7,15,19;52:4,17, 20;53:5,7,15,17,18,21, 23;54:6,11,12,23;55:4, 13,14;62:22;67:4,10, 14,19;68:1,5;69:3; 73:5;74:17;89:15,22; 90:1,11,19,22;92:1,17; 93:3,9,17,19;94:4,9,14; 97:24;98:4,10,12;99:1, 10,14,15,23;100:4,5,8, 11,14,18;101:1;102:2, 13;104:1,2;107:9; 108:10;109:12;110:4, 11;112:4,12,13;115:4; 118:11,16,20;123:12; 127:9;130:18;133:5; 135:23;137:17,21; 138:22;141:2,12; 143:13;145:5,7,21,22, 23;146:2,6,9,17; 147:11,16,20,21,23; 148:12;154:24;155:14, 17,19,22;156:7,9,17; 160:1,4,12,13,19,24; 161:9,11,15;163:2,13; 169:13,23;170:2,13; 171:8,10,18;173:3; 176:17;178:2;179:2,7, 13;184:22;185:6; 186:21,23;187:13,20; 189:2,9,20;190:2,13, 18,22;191:18;192:18, 21;193:3,11,16,18,22; 194:15;195:6,19; 197:5,19,22,24;198:2, 9,10,18,23;200:20; 205:23;206:2,4,16; 207:1,4
**suicide-resistant (5)** 194:9,16;196:1; 197:1,11
**suicides (42)** 9:14;11:13;16:6; 29:21;32:17;34:18; 95:5,11;96:1,15,19; 98:2;99:13,16;112:8, 17,21;113:5,10,17; 116:16;117:17,20; 118:4,22;119:7; 163:20,23;164:22; 170:3,19;178:8,10; 191:3;192:17,23; 193:1,8;198:7,20,22;

199:1
**summarized (1)** 145:4
**summary (1)** 39:22
**summer (2)** 15:16,19
**superintendent (6)** 42:19;43:2,5;46:19; 71:2;73:4
**superior (4)** 43:4,7,9,10
**supervised (2)** 18:5,8
**Supervisor (1)** 130:2
**supervisors (2)** 89:10;204:20
**supplement (2)** 144:13,15
**supplemental (1)** 76:24
**supplementally (1)** 144:16
**supplements (1)** 144:7
**support (2)** 41:11;86:12
**supporting (1)** 86:10
**Supreme (4)** 157:5;158:3;159:6, 10
**sure (34)** 11:12;14:14;19:18, 23;21:3,21;33:19; 39:14;43:8;57:17,17; 60:3,19;70:2;76:10; 80:14;86:7;91:20; 92:22;98:18;100:9; 103:11,21;110:13; 113:22;115:1;125:20, 23;134:11;144:9; 148:7;151:8;158:16; 191:8
**surmise (1)** 189:22
**surprised (1)** 90:17
**Survey (13)** 10:8,20,20;32:19,21; 34:5,6;103:13;170:11, 16;171:9;186:21; 190:17
**surveyed (5)** 175:15,17,20; 177:19;193:8
**surveys (3)** 34:5;170:11;177:20
**sustained (1)** 95:4
**sworn (1)** 6:6
**symptom (3)** 59:17;62:11,19
**symptoms (13)** 56:22;59:14,16; 60:10,12,21,24;61:12; 62:18;63:17;137:16; 153:13;155:22
**synonym (2)** 180:2,4
**synonymous (1)** 57:2
**system (4)** 12:20;29:15;34:12; 45:16
**systems (1)** 117:13

**T**

**tab (2)** 21:23;24:8
**table (1)** 11:15
**tailored (1)** 70:15
**talk (26)** 10:7;26:5;74:20; 87:9;107:24;108:20; 115:6;120:12;128:8; 129:22;130:1,3; 133:13;140:2;145:12, 13,21;148:17,17; 150:24;154:7,9; 156:21;167:3;182:1; 192:12
**talked (18)** 55:1;87:11;128:14; 139:13;141:15;145:14, 16;152:23;153:6; 154:21;156:1,9; 175:15;177:1;194:7; 198:9;199:5;205:23
**talking (26)** 50:1;51:20;73:12,13; 76:11,11;92:18; 106:19;111:8;125:2; 131:4,17;157:14; 165:1;166:23;167:1; 171:19;177:14;184:14, 15;186:7;192:7;197:8; 200:21,24;201:2
**talks (4)** 77:15;95:2;109:22; 206:1
**taught (2)** 17:11,15
**teach (1)** 17:19
**team (3)** 27:8,14,18
**television (1)** 108:18
**telling (2)** 113:12;131:15
**ten (2)** 165:15;175:4
**term (21)** 20:7,8;45:8;49:7,22; 76:16;88:2,2;89:4; 94:19;97:16;106:4,14, 24;161:1;164:3; 171:19;180:13;184:17; 206:9;207:3
**termed (1)** 106:9
**terminology (3)** 157:20;206:2,16
**terms (6)** 20:14;85:16;95:10; 138:20,21;171:1
**Terry's (1)** 38:3
**tested (1)** 101:13
**testified (8)** 6:6;19:21;35:24; 43:18,19;47:15;106:3; 121:2
**testify (1)** 143:11
**testifying (3)** 36:17;45:22;122:10
**testimony (14)** 19:11;36:22,23,24; 42:17;46:18;62:21; 63:19;86:15;120:17; 121:1;176:15,16; 199:23
**tests (3)** 128:24;129:2,7
**thankfully (2)** 99:16;188:6
**Thanks (1)** 133:16
**theirs (1)** 177:11
**theories (1)** 190:20
**theorize (1)** 189:12
**therapeutic (1)** 132:15
**therapies (2)** 153:10,12
**therapy (4)** 56:20;64:24;153:4; 154:4
**thereof (1)** 199:15
**third (2)** 58:18;145:21
**thorough (3)** 52:21;111:10;118:11
**though (3)** 40:18;55:1;168:14
**thought (11)** 13:2;43:19;46:3; 51:18;77:12;103:16; 175:22;186:12,16; 190:19;198:4
**thoughts (5)** 39:16;48:4;52:4; 145:7;154:24
**thousand (1)** 170:12
**threat (5)** 49:7;103:23;104:4,5; 183:5
**threaten (1)** 94:8
**threatening (1)** 133:5
**threats (1)** 182:17
**three (3)** 15:19;28:8;52:4
**throughout (10)** 26:15;35:10;94:12; 113:20;118:17;138:16; 166:1;174:3;176:4,4
**tied (1)** 137:11
**timeout (7)** 114:8,11;168:18,18, 23;169:5;188:13
**times (13)** 25:21;26:24;27:15; 29:20;33:7,11;61:8; 105:5;106:7;123:17, 17;156:15;188:12
**title (2)** 43:10;92:9
**today (8)** 10:23;21:9;68:13; 80:11;81:2;93:5;139:4; 147:5
**together (2)** 22:11;138:14
**toilets (1)** 108:17
**token (1)** 186:2
**told (4)** 65:20,20;66:7,13
**took (3)** 31:13;99:17;178:22
**tools (1)** 111:14
**top (5)** 29:19;38:21;39:15; 116:13;182:21
**topic (1)** 19:19
**topics (1)** 79:10
**total (2)** 27:23;110:20
**touched (2)** 16:8;93:4
**tough (1)** 124:11
**tours (5)** 14:13;143:23,24; 148:5,9
**traditional (1)** 107:12
**tragically (2)** 124:5;132:21
**train (2)** 17:21;46:3
**trained (2)** 147:18;191:23
**training (28)** 17:19,22,24;64:22; 74:18;75:8;89:21; 90:12,20;96:18,22; 117:1;118:8,10,12,15, 20;119:5;147:12,13,21, 21;154:1;191:23; 196:19;198:14;202:14, 15
**trauma (1)** 52:12
**treat (1)** 171:18
**treated (2)** 57:7;173:2
**treating (1)** 183:17
**treatment (4)** 56:16;59:18;64:20; 95:16
**trend (1)** 173:13
**trial (6)** 19:7,22;36:4,22,24; 37:10
**trips (1)** 14:12
**trouble (1)** 115:2
**troubled (1)** 206:8
**true (3)** 107:23;121:6;139:4
**truth (1)** 131:15
**try (5)** 66:15;110:13;116:5; 118:7;140:6
**trying (11)** 86:12;94:17,20; 117:14,15;133:6; 161:1,17,18;168:3; 176:24
**tune (1)** 184:8
**turn (1)** 37:18
**turned (2)** 26:4;191:22
**Turning (2)**

119:12;129:14
**turns (1)**
131:17
**two (30)**
8:1,5;15:19;19:11;
21:18,23;24:9;28:6,6;
44:13;86:4;125:3,7;
126:22;127:3,14;
128:10;148:20;149:9;
150:8,9;160:15;162:7;
164:18;169:22;170:11;
178:6,7;190:11;191:6
**two-page (1)**
147:3
**two-thirds (1)**
97:11
**two-year (1)**
178:10
**type (13)**
7:16;17:10;26:7;
78:16,16;119:3;
125:16,19;126:5;
132:15;140:6;171:6;
196:12
**types (3)**
16:14;31:10;152:10
**typo (1)**
78:9
**typographical (1)**
78:16

## U

**ultimately (1)**
138:18
**unable (2)**
174:6;177:17
**unclear (5)**
6:22;62:5;70:10;
91:22;104:20
**uncommon (3)**
68:4;122:24;201:8
**under (20)**
8:24;21:24;28:9;
58:22;59:3;86:20;
91:16;93:12;103:15;
111:22;119:14;130:18;
145:21;155:6;166:10,
18;168:8,15;169:14;
178:18
**undergraduate (1)**
13:19
**Understood (1)**
159:23
**unfortunately (2)**
118:1;123:11
**unimportant (3)**
42:6;67:18;89:24
**units (1)**
14:14
**University (1)**
13:13
**Unless (9)**
33:4;117:23;118:2;
133:3,4;141:21;158:9,
17;160:22
**unstructured (1)**
167:13
**unsure (1)**
61:10
**unusual (3)**
130:21;142:16;205:1
**up (23)**
7:14;13:9;16:23;
27:14;45:7;47:23;50:6;
52:23;106:21;115:16;
152:5,13,14,14,15;
163:14;167:15;172:15;
174:1;180:18;182:7;
187:1;201:13
**Upchurch (3)**
68:18;130:2;136:5
**updated (1)**
10:14
**upon (19)**
46:18;64:7;67:7;
73:6,8;87:20;101:9;
118:18,19;142:15;
152:7,18;155:8;
171:24;173:9;197:7;
199:11;204:10;205:11
**upset (11)**
61:8;126:23;128:6;
148:18;150:13;151:5,
9,15;169:6;170:1;
185:17
**use (20)**
20:14;29:2;57:18;
78:17;84:11;87:5;
106:15;113:20;134:14;
155:3,6;159:18;161:1;
172:10,21,22;174:3;
175:8;177:21;195:13
**used (16)**
49:22;84:1,13;89:4;
94:18;105:12;107:1;
108:8,10,13;111:14;
158:19,20;160:10;
188:23;194:12
**useful (1)**
56:21
**uses (1)**
188:11
**using (3)**
180:13;184:14;
197:19
**Usually (4)**
25:18;30:21;97:16;
180:13
**utilized (10)**
91:1;145:24;146:2,4,
7,23;147:1;196:17;
197:2,12

## V

**vague (1)**
16:24
**valuable (1)**
187:19
**varies (1)**
25:18
**variety (3)**
7:15;47:13;53:22
**various (8)**
25:1;27:1;42:18;
61:4,8;126:14;138:16;
146:17
**vary (1)**
189:10
**vast (4)**
32:10;34:10;164:22;
165:18
**vents (1)**
108:16
**verbalized (1)**
180:19
**verbiage (1)**
78:17
**verdict (1)**
37:20
**verification (1)**
49:14
**verified (1)**
39:15
**verify (2)**
133:6;135:16
**versus (17)**
19:12,13;35:18;
36:13,21;37:11;43:18;
78:18;98:6;99:6;
159:10;168:23;173:15;
179:14;186:6,8,12
**victim (2)**
108:23;109:23
**victims (5)**
97:6,12;109:11;
110:4,14
**videotape (3)**
107:19;114:15;203:4
**view (1)**
89:23
**Village (1)**
19:12
**violate (1)**
186:9
**violated (2)**
85:9;146:21
**violating (2)**
165:22;192:14
**violations (1)**
26:18
**visit (4)**
110:16;120:9;140:8;
190:7
**voluntary (4)**
33:8;114:10;169:4;
188:13

## W

**wait (5)**
110:8,8,8;149:8;
183:8
**waive (2)**
207:17,18
**waking (2)**
163:20,24
**walk (1)**
133:16
**walking (1)**
184:24
**walks (1)**
68:13
**wall (1)**
194:20
**wants (4)**
169:8;188:14,14;
197:23
**Washington (1)**
7:13
**waste (1)**
86:17
**watch (12)**
54:13;112:12,14;
143:23,24;148:5,9;
160:19;163:3;171:18;
175:11,14
**way (16)**
27:12;44:11,22;67:5;
105:23;124:20;125:13,
21;127:12;128:21;
134:11;159:7;165:5;
167:6;184:17;195:17
**ways (1)**
160:2
**weave (1)**
194:22
**website (1)**
76:22
**week (3)**
34:14;141:11;168:18
**weekly (2)**
56:20;140:13
**welfare (1)**
47:22
**weren't (3)**
99:16;104:14;198:4
**whatever's (1)**
207:21
**what's (7)**
21:13;46:5;53:19;
105:1;106:9;158:24;
181:7
**Whenever (1)**
35:16
**Whereas (1)**
187:16
**Whereupon (2)**
115:12;208:1
**whole (2)**
81:1;94:12
**who's (5)**
11:15;71:8;140:10;
141:3;201:16
**whose (2)**
62:5;91:15
**wife (1)**
123:14
**window (2)**
108:16;114:15
**wish (1)**
86:6
**within (24)**
7:15;26:12;51:20;
54:7;96:11;100:8,14;
109:5;110:4,17;111:5;
113:17;117:12;138:24;
142:20;149:14;156:13;
168:1;189:4;190:10;
191:3;206:16;207:3,9
**without (5)**
33:5;116:10;118:1;
120:24;195:21
**witness (17)**
6:3;15:12;20:14;
38:20;43:8;45:19;60:4;
63:19;66:19;81:11;
83:21;131:9;162:11,
16;174:11;181:10;
207:18
**witnessed (1)**
141:22
**Wolfish (4)**
159:11;186:6,8,12
**wondering (3)**
38:6;159:8;164:14
**woods (2)**
104:18;123:6
**word (12)**
43:3;56:1;57:18;
78:1;84:1,21;86:16;
87:5;139:12;180:8,18;
184:14
**worded (1)**
79:19
**wording (1)**
77:19
**words (4)**
48:2;73:2;78:18;
195:2
**work (24)**
6:15;7:4;8:13,18,24;
10:5;12:21;13:19,21,
23;14:1;15:8,24;16:4;
31:10;34:4,6,7;44:19;
117:19;119:1,4;
176:12;198:23
**worked (8)**
15:16;22:13;35:8;
172:24;173:12,18;
175:19;176:1
**working (7)**
8:21;28:20;107:6;

124:9;171:24;172:21;173:14
**workings (1)** 124:4
**works (3)** 7:14;124:12,12
**world (1)** 57:21
**wrapping (1)** 206:18
**writer (2)** 86:21;92:6
**writing (2)** 88:21;157:14
**written (7)** 88:17;106:2;118:15;125:10;177:2,13;196:22
**wrong (5)** 15:15;78:4;110:13;184:15;187:3
**wrongly (1)** 123:1
**wrote (2)** 12:24;40:18

**Y**

**year (3)** 95:8;178:6;198:5
**years (19)** 8:5;19:9;28:15;32:5;33:19;34:16;35:5;72:10;118:1;178:2,6,7;193:9,24;196:22;197:17,20;198:3,12
**younger (1)** 49:16
**youth (95)** 14:12,21,24;42:8;47:12;54:23;56:2,5,10;61:7;68:24;70:21,24;71:8;72:15,19;73:6,16;93:3,8,16;98:19;105:23;107:11,17;108:13,24;110:23;111:3,22;113:3;114:13,19,21;128:2;130:18,20,21,22,23;131:5,14;132:1,6,14,22;133:3,9;135:13,19;136:12,18,19;138:22;141:3,22;143:19;151:4,22;155:21;160:5,12,17,22,23;161:16;162:22;163:2;164:7,12;165:7,10,14,18,20;166:7;175:1;177:22;179:14;181:12;184:2,20,23;185:19;187:18;188:8,22;189:1;190:2,14;192:11;196:18;197:13,17,18
**youths (8)** 72:21;130:3,5,19;131:12,13;151:2;197:23

**Z**

**zero (1)** 107:10

**1**

**1 (5)** 22:19,21;25:7;127:9;161:24
**1.11 (3)** 77:12,13;82:16
**1.4 (2)** 79:16;82:17
**1.5 (1)** 80:5
**1:51 pm (1)** 208:2
**10 (5)** 83:12;97:5;129:21;148:21;171:20
**10:00 (1)** 50:21
**10:04 (1)** 50:21
**10:05 (1)** 51:23
**10:07 (1)** 51:23
**100 (4)** 29:17;32:15,17;198:21
**10-minute (1)** 112:2
**10th (2)** 148:19;150:16
**11 (4)** 97:10;129:23;133:12;134:9
**11:32 (1)** 115:12
**11:40 (1)** 115:12
**110 (6)** 32:21;95:5;96:14;170:4,15,19
**12 (5)** 68:2;97:23;134:9;139:7;182:4
**12-year (2)** 67:17;107:8
**12-years (1)** 71:8
**13 (3)** 100:24;142:7,24
**14 (3)** 40:21;100:22;102:1
**15 (5)** 97:6;108:23;109:5;175:3;179:21
**15- (1)** 163:10
**15-minute (20)** 111:18,21;160:5,10,12,13,21;161:6,13;163:7,12;173:6;174:13;175:1;176:9,13,20;177:3;184:24;185:10
**15th (1)** 126:11
**16 (8)** 34:15;117:10;152:20;172:1,24;173:18;175:21,22
**17 (3)** 97:7;107:24;178:18
**17-year (1)** 178:19
**18 (1)** 108:20
**19 (2)** 83:12;109:8
**1970s (1)** 9:7
**1977 (1)** 7:12
**1978 (1)** 7:12
**1979 (1)** 9:18
**1981 (1)** 9:23
**1989 (1)** 98:1
**1995 (1)** 96:2
**1999 (1)** 96:2
**1st (1)** 119:19

**2**

**2 (7)** 23:8,10;25:10,11;127:10;156:2;170:10
**20 (5)** 35:15;156:19;171:22;178:2;198:11
**20/20 (1)** 131:1
**2000 (1)** 11:6
**2005 (1)** 178:4
**2006 (1)** 178:4
**2008 (1)** 179:22
**2009 (3)** 10:11,12;172:20
**2010 (1)** 172:20
**2011 (1)** 182:4
**2012 (2)** 37:12;119:19
**2013 (1)** 182:5
**2014 (5)** 58:3;67:6;127:6;142:14;193:24
**2016 (1)** 36:22
**20th (2)** 60:4;67:6
**22 (1)** 157:2
**23rd (2)** 142:14;143:2
**24 (2)** 163:21;164:7
**24/7 (2)** 163:17;168:11
**24-hour (1)** 168:13
**25 (1)** 198:12
**26 (1)** 111:10
**28th (2)** 58:6;126:11
**29 (2)** 96:6,15

**3**

**3 (9)** 23:19,21;24:21;32:1;38:13;92:23,23,24;156:7
**3,500 (2)** 32:3,9
**30 (5)** 28:15;34:16;35:15;162:22;163:6
**30-minute (2)** 161:12;163:11
**30-year (1)** 176:6
**31st (1)** 40:21
**34 (1)** 173:19
**36.7 (1)** 96:6
**37 (4)** 32:5;72:10;196:22;198:3

**4**

**4 (5)** 24:2,4,21,24;148:21
**40 (1)** 28:15
**400 (2)** 35:9,11
**41 (1)** 108:22
**42-year (1)** 67:17
**46 (1)** 180:24
**49 (2)** 110:23;111:4
**49.1 (2)** 110:14,19
**4th (2)** 148:18;150:12

**5**

**5 (7)** 24:11,15,19;86:20;91:23;92:2,4
**5- (1)** 112:1
**50 (7)** 32:17;34:1;113:16;171:20;172:15;184:9;187:13
**50/50 (2)** 112:19,23
**51.7 (1)** 110:3
**55 (2)** 111:3,4
**55/60 (1)** 35:21
**5770 (1)** 77:11

**6**

**6 (5)** 40:11,13,24;41:22;119:13
**60 (1)** 161:3
**60-minute (1)** 163:9
**66 (1)** 113:5
**67.1 (1)** 97:11
**6-years (2)** 180:7,11

**7**

**7 (7)** 92:13,17;95:1;125:1;182:15,19,21
**7.3 (4)**

83:14;84:6,6,10
**70 (6)**
97:5;109:10,22;111:7;113:5;138:21
**70s (1)**
186:13
**77 (1)**
12:7
**79 (15)**
9:22;32:22;33:2,19,20;95:24;96:6,14,15;110:20;111:3;170:3,7,20;171:13

**8**

**8 (1)**
128:14
**83 (1)**
95:4
**8th (2)**
58:4;149:19

**9**

**9 (2)**
95:21;129:9
**90 (1)**
184:9