# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARY MCKINNEY, AS** | ) | |
| **ADMINSITRATOR FOR THE ESTATE** | ) | |
| **OF R.E., DECEASED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 15-CV-1044-SMY-RJD** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FRANKLIN COUNTY, ILLINOIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Tragically, on September 23, 2014, 12 year old R.E. attempted suicide while he was being detained at the Franklin County Juvenile Detention Center. He died the same day. Plaintiff Mary McKinney, Administrator of R.E.'s Estate filed this action against Franklin County, Illinois and various individuals, asserting violations of 42 U.S.C § 1983 and state law claims for wrongful death, *respondeat superior,* and indemnification.

This matter is now before the Court for consideration of the motions for summary judgment filed by Defendants Michael Abell, Anthony Bechelli, Shawn Freeman, Daniel Lynch, Alicia Mendoza, Diane Sanders, Alan Stewart, Samantha Thomas, and Stephanie Upchurch (the "Center Defendants") (Doc. 145) and Defendants Franklin County and Randall Crocker (Doc. 151). Plaintiff filed Responses (Docs. 182 and 185).

Plaintiff states the following causes of action in the Second Amended Complaint:

Count I:     Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendants Franklin County, Crocker, Abell (official and individual capacities), Freeman (official and individual capacities), Sanders (official and individual capacities), Thomas

(official and individual capacities), Lynch, Mendoza, Bechelli, Upchurch and Stewart;

Count II:       Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant CHC and/or Correct Care;

Count III:      Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant Little;

Count IV:       Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant Vipin Shah, M.D[1].; and

Count V:        claim under the Illinois Wrongful Death Act, 740 ILCS 180/1.

Defendants seek summary judgment on Counts I and V. For the following reasons, Defendants' motions are **GRANTED**.

**Factual Background**

Construed in the light most favorable to the plaintiff, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motions:

***Management of the Franklin County Juvenile Detention Center***

In 2006, Franklin County, Illinois and the Chief Judge of the Second Judicial Circuit executed a "Memorandum of Understanding Between the Chief Judge of the Second Judicial Circuit and the Franklin County Board and Other Franklin County Agencies" (the "Memorandum") for the management of the Franklin County Juvenile Detention Center (the "Center"). (Doc. 146-1). The Franklin County Board approved the Memorandum on May 26, 2006 (Doc. 182-2, at pp. 33-35; Doc. 182-7, at pp. 3-4), and the Memorandum was executed by the Franklin County Board Chairman, the State's Attorney for Franklin County, and the Office of the Chief Judge of the Second Judicial Circuit (Doc. 146-1, p. 7).

---

[1] Plaintiff settled her claims in Counts II, III and IV with Defendants Shah, Little, and CHC/Correct Care.

The Memorandum sets forth the respective responsibilities of Franklin County and the Second Judicial Circuit with respect to the ownership, maintenance and operation of the Center (Doc. 182-2, at pp. 41-42).  The Second Judicial Circuit's responsibilities include:

- Taking all responsible steps, based upon legal authority, to operate the Juvenile Detention Center in accordance with state law, rules and regulations.  If at any time the Center was not in compliance, the County shall be immediately notified of the non-compliance;

- Providing for the overall direction of programs and services at the Juvenile Detention Center and under the authority of the Circuit's Chief Judge;

- Designating the Director of Court Services to provide general supervision of the Center and the Superintendent.  Shall meet and confer with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Center;

- Developing written policies and procedures supportive of meeting the goals and objective established by the Franklin County Board and the Chief Judge of the Circuit;

- Directing, administering, managing and supervising the day to day activities of the Juvenile Detention Center in order to assure that it meets the established standards of operations and programs for a juvenile detention center;

- Providing for complete, adequate and necessary training of all persons employed to perform services at the Center.

Franklin County's responsibilities include:

- Establishing an annual budget for the operation of the Center after first conferring with the Chief Judge and/or Director of Court Services.  The County reserved the right to declare final figures for the annual budget;

- With respect to support service staff only, after conferring with the Director of Court Services, hiring individuals and/or contract independently for necessary support services/staff for the efficient operation of the Center;

- Arranging for liability insurance for the Center and on persons employed to provide juvenile detention services;

- Providing appropriate salaries and fringe benefits to Detention Center staff. The number of persons employed, their salaries and fringe benefits, shall be set

only after appropriate meetings between the Chief Judge of the Circuit, Director of Court Services, and appropriate County Board members.

- Placing on the County's roles, the individuals selected by the Director of Court Services and the Superintendent as persons hired to perform the necessary services and duties in the Juvenile Detention Center.

(Doc. 146-1).

More specifically, Franklin County is reimbursed for the salaries paid to Center employees (Doc. 146-3, at p. 35). The Administrative Office of the Illinois Courts ("AOIC") processes the reimbursements, which are then paid for by the Probation Services Division with funds from the Illinois Supreme Court. *Id.* at pp. 37-38. Franklin County maintains liability insurance covering its employees and agents (Doc. 182-4, at pp. 240-241).

At all relevant times, Michael Abell was the Director of Court Services for the Second Judicial Circuit (Doc. 146-3, at p. 8). The Chief Judge delegated to Abell the overall responsibility for the management of the Center and control of the work of subordinate personnel there. *Id.* at pp. 20, 169-170; Doc. 146-1. Abell was directly accountable to the Chief Judge (Doc. 146-3, at pp. 8, 20, 169-170). Abell's duties and responsibilities included: general supervision of the Center and its Superintendent; meeting and conferring with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Center; evaluating the performance of the Superintendent; conferring with Franklin County on numerous issues; and developing written policies and procedures to support the goals and objectives established by Franklin County and the Chief Judge of the Circuit (Doc. 146-1).

Freeman was hired as the Superintendent of the Center and accepted employment with Franklin County (Doc. 146-5, at p. 12; Doc. 182-2, at pp. 93-94; Doc. 182-12). As Superintendent, Freeman represented the Second Judicial Circuit and Franklin County in matters related to the Center (Doc. 182-2, at pp. 93-94; Doc. 182-12). His duties and responsibilities included

maintaining and implementing the Center's Policy and Procedure Manual (Doc. 146-3, at p. 53) and the policies and procedures contained in the Security Manual (Doc. 146-5, at pp. 145-146).

Diane Sanders was hired as Assistant Superintendent of the Center and accepted employment with Franklin County (Doc. 182-25; Doc. 182-25, at p. 39; Doc. 182-26). Sanders' job duties included serving as an assistant to the Superintendent and acting as Superintendent during Freeman's extended absences (Doc. 182-26).

### *Jail Policies, Procedures, and Practices*

The Center's Policy Manual provides that "all policies and procedures shall, when appropriate, be compatible with the policies of the Second Judicial Circuit and the Franklin County Board" (Doc. 182-3, at pp. 5344-5345). Franklin County's Personnel Manual policies apply to Center staff (Doc. 182-4, at pp. 305-306; 310-314).

Franklin County is responsible for administering, managing and supervising the health care delivery system of the Center (Doc. 182-27, at p. 1). Consistent with this obligation, in December 2008, Randall Crocker (Chairman of the Franklin County Board) and Superintendent Shawn Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the Center (Doc. 182-4, at pp. 294-295; Doc. 182-15).

### *Staff Training*

Franklin County is responsible for the cost of training Center staff (Doc. 182-4, at pp. 180-181). Training is funded from revenue Franklin County receives from other counties who pay the County to house juvenile detainees. *Id*. at pp. 181-182. Franklin County is not reimbursed for training costs. *Id*. at p. 180.

The Illinois Department of Juvenile Justice ("IDJJ") requires detention staff who have direct contact with detainees to receive a minimum of 40 scheduled hours of training each year

(Doc. 182-7, at pp. 72-73).  Although all Center staff received CPR and First Aid training, between 2007 and 2013, not all staff members received the mandated annual 40 hours of training required by the IDJJ except for one year.  *Id*. at pp. 24-25, 32-33, 45-46, 55-56, 63-64, 72-73, 82-84.  Each year, the Franklin County Board held a meeting to review the IDJJ report; it accepted the findings through a formal vote but did nothing more to comply with the training requirements.  *Id*. at pp. 77, 66-70, 58-61, 49-53, 36-40, 26-30, 15-22.

Defendant Alicia Mendoza underwent training as a newly hired detention officer in July 2014.  The only suicide prevention training she recalls receiving was "PowerPoints" (Doc. 182-33, at p. 19).  Defendant Daniel Lynch, who had been working as a Center officer for two years prior to R.E.'s death, had not received basic training as of the date of R.E.'s death (Doc. 182-34, at pp. 55-56).  Defendant Anthony Bechelli cannot recall exact training in suicide prevention, but testified that "it could have been mixed in with other trainings that I have received" (Doc. 182-35, at p. 74).  Defendant Samantha Thomas does not recall if she received suicide prevention training at the Center (Doc. 182-36, at pp. 14-20).  She recalls only that "there was a section on suicide" at her basic training.  *Id*. at pp. 18-19.

### *R.E.'s Detention History*

Plaintiff's Decedent, R.E., had a documented history of Depression and Attention Deficit/Hyperactivity Disorder ("ADHD").  In March 2011, the Southeastern Illinois Counseling Center, Screening, Assessment, Support Services ("SASS") referred R.E. to counseling after he told a school counselor that he had thoughts of not being in the world (Doc. 185-1 at pp. 6792, 6808, 6824).  His DSM symptoms at that time included the death of his mother by suicide in November 2009, inattention, feelings of sadness, reported anger toward self, and vague suicide attempts at school.  *Id*. at p. 6792.  R.E. was diagnosed with Depressive Disorder and ADHD by history.  *Id*. at p. 6819.

R.E.'s first admission to the Center occurred in August 2012 (Doc. 185-2, at p. 6947). Sanders recalls having minor interaction with R.E. during this admission but does not recall any specific conversations (Doc. 146-8, at pp. 123-125). There is no evidence that R.E. made any statement to detention staff or did anything indicating he was suicidal during his nine-day detention (Docs. 146-25, 146-26).

R.E. was again admitted to the Center in March 2014 to undergo psychiatric, psychological and substance abuse evaluations (Doc. 146-27, pp. 143-44). Shift Supervisor Samantha Thomas and detention officer Alan Stewart completed the Center's intake and screening process for the admission (Doc. 146-28, at pp. 6936-38). Thomas administered the Massachusetts Youth Screening Instrument Version 2 ("MAYSI-2"), a screening instrument designed to identify and score behavioral risks. *Id*. R.E. responded "no" to each question pertaining to suicidal ideation and scored a zero in the MAYSI-2 category for Suicide Ideation. *Id*. Thomas also administered the MH-JJ Referral Screening, Medical Screening questionnaire, and screening for Methamphetamine Treatment Program Referral. *Id*. In the Medical Screening questionnaire, R.E. responded "no" to each question about the risk of suicide. Thomas noted that R.E. was sad but calm and not angry, restless, or unemotional. *Id*.

Brandy Shirley performed a substance abuse evaluation on R.E. on March 31, 2014 (Doc. 146-30, at pp. 6897–98). Shirley reported that R.E. "denie[d] suicidal/homicidal ideations as well as previous attempts; denie[d] self-mutilation and the need to see a counselor for support at time of consultation; denie[d] medical problems." *Id.* at p. 6897.

Dr. Jeremy Jewell performed a psychological evaluation on R.E. on April 8, 2014 (Doc. 146-31, at pp. 6885-93). As a result of the evaluation, Dr. Jewell recommended: that a psychiatrist evaluate R.E. for the appropriateness of his current medication; the teaching of relaxation skills

and/or cognitive behavioral therapy to help R.E. decrease his frustrations; and grief counseling to assist R.E. in coping with the suicide death of his mother (Doc. 146-31, at pp. 6891-6892).

R.E. was readmitted to the Center on May 20, 2014 and underwent a psychiatric evaluation by Dr. L. Spalt (Doc. 146-33, at pp. 6880-84). Dr. Spalt noted R.E.'s mood as depression. *Id*. According to the report, R.E. indicated that he sometimes had difficulty with feeling "depressed" and "kind of moody," but denied all other symptoms of Major Depressive Disorder. *Id*. Dr. Spalt noted that R.E. had difficulty with inattention and that his father indicated that R.E.'s difficulty with low moods had been present since his mother's death when he was six years old. *Id*. Dr. Spalt found that R.E.'s history did not satisfy diagnostic criteria for or suggest the presence of an endogenous psychiatric disorder such as a mood, thought or anxiety state disorder. *Id*. He recommended continued treatment with anti-ADHD medications and noted that if R.E. developed more classic symptoms of an endogenous affective/mood disorder, treatment with appropriate antidepressant medications might be reconsidered at that time. *Id*. Shift supervisor Stephanie Upchurch completed the Center's intake and screening process. *Id*. at p. 6906.

### *R.E.'s September 2014 Detention*

R.E.'s final admission began on September 17, 2014 when he was transferred to the Center after being arrested and charged with burglary (Doc. 146-34, at pp. 70, 75-76). Upchurch and detention officer Stewart completed the Center's intake and screening process for the admission (Doc. 146-36, at p. 6964). Upchurch administered the MAYSI-2, MH-JJ Referral Screening and Medical Screening questionnaire. *Id*. Although Upchurch testified during her deposition that R.E. "was a little upset" during his admission (Doc. 185-10, at p. 63), she documented in the Medical Screening Questionnaire that he was calm, not angry, sad, or restless. *Id*. R.E. tested positive for marijuana/THC. The MAYSI screening document reflects that R.E. had never gotten in trouble when he had been high or had been drinking, had never used alcohol or drugs to help him feel

better, and had never had something very bad or terrifying happen to him (Doc. 185-2, at pp. 6969-70). Upchurch recorded R.E.'s MAYSI-2 scores as zero for "alcohol/drug use," "angry/irritable," "depressed-anxious," "suicide ideation," "thought disturbance," and "traumatic experiences." *Id*.

Upchurch noted that R.E. was taking Adderall and had received "some type of court ordered mental health treatment" (Doc. 185-2, at pp. 6978-80). Although she knew R.E. had been admitted to the Center for a psychiatric evaluation, she did not know why R.E. required the assessment (Doc. 146-11, pp. 55-56). Center policy required that any detainee who had been diagnosed with depression, was sad at intake, or who was currently taking psychotropic medications be referred for an evaluation by a mental health professional of (Doc. 185-2, at p. 6976). Upchurch did not complete the screening instrument requiring that a juvenile currently on any psychotropic medications be referred to a mental health professional, but instead left the form blank and signed it. *Id*.

Admitting detention staff were required by Center policy to notify the parent or legal guardian during the admission process, or as soon as possible, and to obtain information, including mental/emotional health information (Doc. 185-8, at pp. 5527-5528). Upchurch did not complete the parent notification (Doc. 185-12, at p. 5994). Written policies also required detention center staff to retrieve prior files from the intake area if the juvenile had previous admissions. *Id*. at p. 5525.

Center supervisors complete Shift Exchange Reports ("SERs") to pass information to the next shift supervisor (Doc. 185-12, at p. 5994). The SER for the end of the first shift on September 17, 2014 noted that R.E. was "upset." *Id*. There were no other notations in the Shift Exchange Reports about R.E.'s behavior. R.E. made two intercom calls on September 17, 2014 requesting to speak to Upchurch (Doc. 185-13). R.E. was told that Upchurch was busy. *Id*. There is no documentation that Upchurch responded to R.E.'s intercom request.

There is conflicting evidence regarding R.E.'s behavior between September 17, 2014 and September 23, 2014. Detention officer Alicia Mendoza recalls having contact with R.E. during meal times, and testified that "he didn't show any signs of distress," "did what was expected of him," "wasn't a troublemaker," "didn't talk back," and "listened to everything we told him" (Doc. 146-7, pp. 87-88). Detention officer Daniel Lynch remembers that on September 22, 2014, R.E. was "a little rowdy," "mouthy with some of the other kids," and "loud" in his room (Doc. 146-6, at pp. 84-85), but that he saw no behavioral problems from him. According to Lynch, R.E. was happy and played cards with other detainees on September 22, 2014. *Id*. at pp. 49-51. Detention officer Anthony Bechelli testified that R.E. "was always polite and respectful," "social," and that he "never had or saw any problems with [R.E.] behaviorally, emotionally, mentally" (Doc. 146-4, at p. 72). Juvenile S.B., who was housed in the same cell with R.E., recalls that R.E. was crying and upset; once when he was first detained and again after he returned from court and had not been released. (Doc. 185-14, at p. 160). R.E. talked to Z.P., a juvenile housed in A1, about being afraid that he might be sent to the department of corrections. He recalled that R.E. was also concerned about his behavioral level. *Id*. at p. 163. The Behavioral Sheets for September 17, 2014 through September 22, 2014 indicate that R.E. lost points for behavioral issues (Doc. 185-15).

Shift supervisor Thomas and detention officers Bechelli, Lynch, and Mendoza worked the second shift on September 23, 2014 (3:00 p.m. – 11:00 p.m.) (Doc. 146-10, pp. 141-142). As the control room officer, Bechelli was responsible for calling watch tours. (Doc. 146-4, pp. 116-117, 143). Lynch and Mendoza were responsible for performing watch tours and counts (Doc. 146-10, p. 144). Although the state standard set by the Illinois Department of Juvenile Justice calls for visual checks of each detainee at 30–minute intervals (Doc. 146-15, p. 143), the Center's Policy and Procedure Manual and Security Manual require detention officers to visually check each detainee every 15 minutes and to record the observation on the Center's watch tour system ((Doc.

185-16, pp. 5680-81). During watch checks, officers are required to see a living, breathing human body before verifying the juvenile's presence. *Id*.

There were 6 juvenile detainees in the A Pod when Mendoza conducted a watch tour at approximately 2:41 p.m. (Doc. 185-20). Video surveillance shows that Mendoza reached the first cell at 14:41:18 and finished her watch tour at 14:41:38. *Id*. Mendoza saw R.E. standing at the door in his room (Doc. 146-7, pp. 46-47). Mendoza helped supervise detainees during a recreation period outside after she completed her watch tour. *Id*. at pp. 66, 73.

At 3:11 p.m., Lynch entered A Pod to gather detainees for a recreation period (Doc. 185-20). Lynch allowed 3 detainees to leave their cells. *Id*. R.E. remained in room confinement due to behavioral demerits. Lynch entered the A Pod again at 3:31 p.m. to conduct a watch tour. He pushed the button outside of R.E.'s room, walked down to the end of the A Pod, and when walking back toward R.E.'s room, looked in the window and discovered that R.E. had hanged himself with a bed sheet tied to the handicap rail attached to his lavatory (Doc. 185-20; Doc. 146-6, at p. 118). Lynch entered R.E.'s room and loosened the sheet from around his neck. *Id*. at pp. 119-120.

Emergency medical services (EMS) arrived at 3:50 p.m. in response to a 911 call and took over CPR efforts (Doc. 146-3, at p. 113). R.E. was transported to Franklin County Hospital where he was pronounced dead at 4:11 p.m. (Doc. 146-42 at pp. 7938–39, 11061).

Detectives Richard Minton and Amy Tipton of the Franklin County Sheriff's Office conducted an investigation into R.E.'s death (Doc. 146-19, at pp. 24-26; Doc. 146-43, at pp. 100-191). During the course of their investigation, Minton and Tipton interviewed witnesses, including detention staff and detainees, asked for and received various requested materials from the Center, and authored Incident/Offense reports of witness interviews and findings (Doc. 146-19, at pp. 19-26). According to Minton, no one they interviewed indicated that R.E. had made any statement or acted in any manner that indicated he was a suicide risk (Doc. 146-19, at p. 188, p. 202). Minton

had no reason to believe anyone had been dishonest. *Id.* at p. 189. When asked whether it was true that "based on his investigation none of these state defendants … knew that R.E.'s mother had committed suicide, he testified that he could not say who but "someone knew because apparently the records came– from the detention center saying that" (Doc. 185-14, at pp. 203-204).

There were 37 suicide attempts at the Center in 2011 (Doc. 146-47, at pp. 9199–201; Doc. 146-5, at pp. 231-232), 43 suicide attempts in 2012 (Doc. 146-47, at pp. 9199-200, 9202; Doc. 146-5, at pp. 25-33), and 28 suicide attempts in 2013. *Id.* There were 21 suicide attempts at the Center in the eight months before R.E.'s death. *Id.* R.E. is the only detainee to have committed suicide since the Center opened in 2004 (Doc. 146- 3 at pp. 15, 94-95).

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### The Center Defendants' Motion (Doc. 145)

#### *Eleventh Amendment Immunity*

As an initial matter, the Court must address the Center Defendants' contention that Abell, Freeman and Sanders are non-judicial employees of the Second Judicial Circuit, an arm of the

State of Illinois, and that they are therefore state employees entitled to Eleventh Amendment immunity.[2]  Under the Eleventh Amendment, a state, its agencies, and its officials acting in their official capacities are immune from federal lawsuits unless the state consents to the suit or Congress abrogates the state's immunity.  *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996)).  Eleventh Amendment immunity does not extend to counties or municipal corporations.  *DeGenova v. Sheriff of DuPage* Cty., 209 F.3d 973, 975 (7th Cir. 2000).  Plaintiff argues that Abell, Freeman, and Sanders (who she has sued in their individual and official capacities) were agents of Franklin County – not the State of Illinois – with respect to training, supervising, disciplining, creating and enforcing policy, and overseeing the provision of healthcare at the Center.

The Supreme Court's decision in *McMillian v. Monroe County, Alabama*, 520 U.S. 781 (1997) guides this Court's analysis of the issue.  In that case, the parties agreed that the sheriff was in a policymaking position, but disagreed whether he was an officer of the state or an officer of the county when acting in a law enforcement capacity.  *Id*. at 786.  In concluding the sheriff was a state officer, the Court emphasized that the determination was fact-specific:

> First, the question is not whether [the sheriff] acts for [the State or County] in some categorical, "all or nothing" manner… our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area or on a particular issue… Second… whether a particular official has final policymaking authority is a question of state law.  This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy.  But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*Id*. at 785-86.

It is undisputed that Abell, Freeman, and Sanders had final policymaking authority. *See* Doc. 169, ¶¶ 20, 32-33, 138. The dispute centers on whether under Illinois law, these defendants were final policymakers for the State of Illinois or Franklin County when they managed the Center. *See McMillian*, 520 U.S. at 786.

While these defendants may be labeled as employees of the Second Judicial Circuit, under *McMillian* and its progeny, the label itself is inconsequential. For example, in *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000), the Seventh Circuit was confronted with the question whether a sheriff in Illinois is an agent of the county or state when administering the county jail. While the Illinois Constitution defines sheriffs as county officials, consistent with *McMillian*, the Court looked beyond the label, examined the sheriff's particular functions at issue, and concluded that the sheriff acted as a county officer when managing the jail:

> [T]he county maintains and furnishes the jail and bears all of the costs to maintain prisoners. The county board builds the jail and provides for the Sheriff's reasonable and necessary expenses. And the Sheriff, as warden of the jail, must notify the county board if he decides that the jail is insufficient to secure prisoners.

*DeGenova*, 209 F.3d at 976.

The Illinois Constitution does not define juvenile detention employees as either state or county officials, nor does it authorize the Second Judicial Circuit to administer a juvenile detention center.[3] Instead, Franklin County and the Second Judicial Circuit operate the Center pursuant to the County Shelter Care and Detention Home Act (the "Detention Home Act") 55 ILCS § 75/1 *et seq.* and, to a certain extent, the Probation and Probation Officers Act (the "Probation Act"), 730 ILCS 110/0.01, *et seq.* Under the Detention Home Act, a county may establish, support and maintain a detention home for the care and custody of delinquent minors, and may levy and collect

---

[3] Article VI, § 7(c) of the Illinois Constitution provides that the State shall be divided into judicial districts. The chief judge of each judicial district shall have general administrative authority over his court, including authority to provide for divisions, general or specialized, and for appropriate times and places of holding court. Article VI, § 7(c) is a grant of limited administrative authority over the workings of the circuit court. *See People ex rel. Brazen v. Finley*, 497 N.E.2d 1013, 1015 (Ill. Ct. App. 1986), *aff'd*, 519 N.E.2d 898 (Ill. 1988).

taxes to pay for the operation of its juvenile detention center. 55 ILCS 75/1. The statute mandates that counties regulate detention centers and requires detention centers to comply with minimum standards established by the Illinois Department of Juvenile Justice, with administrators and necessary personnel to be appointed by the Chief Judge of the Circuit Court. 55 ILCS 75/1, 75/3. The County Board determines and provides the funding for the detention center and can demand any type of report it needs from the Center's administrator. 55 ILCS 75/3, 75/4. The statute gives a county the exclusive right to eliminate its juvenile detention center. 55 ILCS 75/7. Relatedly, the Probation Act grants the Chief Judge of a judicial circuit general administrative and supervisory authority over administrators and necessary personnel, such as the Director of the Court Services Department. The County Board is responsible for providing support and maintenance to the Court Services Department. 730 ILCS 110/13.

Consistent with the Detention Home and Probation Acts, Franklin County and the Second Judicial Circuit memorialized their responsibilities in a Memorandum of Understanding. Under the Memorandum, the Second Judicial Circuit's responsibilities include the general administrative and supervisory management of the Center, including the day-to-day operation of programs and services of the Center, the development of Center policies and procedures, and the provision of training to Center employees. Franklin County determines and establishes the annual budget for the operation of the Center. The majority of the Center's funding comes from revenue Franklin County receives from other counties that pay it to house their juveniles and from taxes levied and collected to pay for Center operations. The County provides salaries and fringe benefits to Center employees and maintains liability and workers compensation insurance covering the Center and Center employees. The only expense reimbursed by the State is for Center employee salaries, as mandated in the Detention Home Act.

Franklin County is also responsible for hiring and contracting for necessary support staff. In keeping with this obligation, Crocker and Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the Center and Freeman signed amendments to the Agreement on behalf of Franklin County. When Freeman and Sanders were hired, they accepted employment with Franklin County as well as the Second Judicial Circuit.

Franklin County built the Center and is solely responsible for its budget and finances. The County maintains and furnishes the Center and bears most of the costs to maintain detainees at the Center. Abell, Freeman and Sanders are required to notify and confer with the County Board regarding the operation of the Center and any issues arising at the Center. These collective factors demonstrate that Abell, Freeman, and Sanders functioned as county employees relative to the Center.

Defendants cite *Drury v. Cty. of McLean*, 89 Ill. 2d 417, 424 (1982) and *People v. Kavinsky*, 91 Ill. App. 3d 784, 787, 793 (1st Dist. 1980) for the proposition that, under the Probation Act, employees who perform services for county courts in non-judicial roles are employees of the appointing court and are therefore state employees. Defendants' reliance on these cases is misplaced. In determining that certain non-judicial employees were court employees, the *Drury* and *Kavinsky* Courts looked to the employees' role in effectuating the Court's *judicial powers* (emphasis added). *See, eg*., *Kavinsky*, 91 Ill. App. 3d at 793 (holding that probation officer's testimony concerning statements made by a juvenile were barred because officer was acting as an assistant to the court in its performance of its judicial functions when statement was made); *Drury*, 89 Ill. 2d at 424 (court clerks are state officials because to hold otherwise would interfere with the circuit court's exercise of Article VI's judicial power and the administration of justice). By contrast, Abell, Freeman and Sanders' authority to administer the Center does not

stem from the exercise of Article VI judicial power. Rather, their authority is purely statutory and derives from the Detention Home Act. Thus, the Eleventh Amendment does not bar Plaintiff's official capacity claims against these defendants.

### Count I - Deliberate Indifference of Individual Defendants

In Count I, Plaintiff claims the individual defendants were deliberately indifferent to R.E.'s risk of self-harm and suicide. Because R.E. was a pretrial detainee and not an inmate, Plaintiff's claim arises under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. *See*, *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015); *Miranda v. County of Lake*, 900 F.3d 335, 350-351 (7th Cir. 2018).

Under *Kingsley* and *Miranda*, a pretrial detainee need only establish that the defendant's conduct was objectively unreasonable – not that the defendant was subjectively aware that it was unreasonable. *Miranda*, 900 F.3d at 352-53. In other words, a plaintiff must show that a defendant acted intentionally or recklessly as he "knew, or should have known, that the condition posed an excessive risk to health or safety" and "failed to act with reasonable care to mitigate the risk." *Id.* This is a more exacting standard than that required to prove negligence, or even gross negligence and is "akin to reckless disregard." *Id.*

Obviously, suicide poses an excessive risk to health and safety. The question presented then, is whether based on the evidence contained in the record, a jury could reasonably conclude that the defendants knew or should have known that R.E. was at a substantial risk for suicide and failed to exercise reasonable care to protect him from that risk. Defendants argue there is no evidence they were aware of facts that should have caused them to objectively conclude R.E. was on the verge of suicide, or to support an inference that they were objectively reckless or indifferent to any such risk. The Court agrees. Even taken in the light most favorable to Plaintiff, the evidence

is insufficient to establish the individual defendants had actual knowledge of facts to put them on notice of a substantial risk that R.E. would attempt suicide.

Upon admission to the Center, R.E. reported that he was not suicidal and denied suicidal ideation. During their depositions, Defendants generally testified that R.E. was a likable child who did not exhibit significant behavioral problems. Additionally, Mendoza testified that R.E. did not show any signs of distress, did what was expected of him, was not a troublemaker and listened to everything that was told of him. Lynch testified that he did not notice any behavioral problems from R.E. and recalled that he was happy. Thomas testified that she did not have any issues with R.E. Bechelli described R.E. as "always polite and respectful" and testified that he never had or saw any issues with him behaviorally, emotionally or mentally." Defendants Mendoza, Bechelli, Thomas, and Lynch all testified that R.E. showed no signs of distress or mental illness.

Plaintiff points to testimony indicating that R.E. was upset during intake, cried on several occasions, expressed concerns about his behavioral level, and was in a minor altercation with another detainee. But these facts were not enough to put the defendants on notice that R.E. was a suicide risk. Plaintiff also notes that Upchurch conducted the Center's intake and screening process for R.E.'s admission and knew that R.E. was taking psychotropic medications. Although Upchurch knew that R.E. was taking psychotropic medications for ADHD and had a previous mental health evaluation four months prior to his death, she testified that she did not know why R.E. required the evaluation. Regardless, knowledge that a detainee has had a psychological or mental health evaluation does not constitute notice that he is at a substantial risk of self-harm. *See Estate of Novack*, 226 F.3d at 530 (jail officials who were informed that decedent had recently been at a mental health facility, was a potential risk for suicide, and exhibited strange behavior while at the jail was not enough to put officials on notice that there was a significant likelihood that he would attempt to harm himself).

Plaintiff also argues that each defendant acted with deliberate indifference to R.E.'s risk of suicide because they were "exposed to and knew of a longstanding, pervasive" and substantial risk of self-harm and suicide to Center detainees. Defendants' general knowledge of the risk of suicide, however, is insufficient to support a finding that they knew or should have known there was a significant risk R.E. would attempt suicide.

Finally, Plaintiff contends that Defendants Abell, Freeman, and Sanders are liable in their individual capacities as supervisors for condoning and facilitating the conduct of their subordinates. But the doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001). Supervisory liability can be found only if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. *Id*. Because this Court has concluded that the conduct of the individual defendants does not amount to a constitutional violation, Defendants Abell, Freeman, and Sanders cannot be held liable as supervisors. Therefore, the individual defendants are entitled to summary judgment on Count I.

### Count V - Wrongful Death

The Center Defendants argue if the Court finds that any of the individual defendants are county employees, then Plaintiff's wrongful death claim is barred by the Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act"). 745 ILCS 10/2-204, 10/2-202, and 10/4-103. The statute protects public officials from liability for conduct within the scope of their employment "unless such act or omission constitutes willful or wanton conduct." 745 ILCS 10/2-204 and 10-2-202. Conduct is "willful and wanton" under the Act if it shows a "conscious disregard for the safety of others." 745 ILCS 10/1-210. The Seventh Circuit has likened this standard to the deliberate indifference standard. *Williams v. Rodriguez,* 509 F.3d 392, 404–05 (7th Cir.2007). Thus, because Plaintiff cannot establish that any of the individual

defendants were deliberately indifferent to R.E.'s risk of self-harm or suicide, she cannot meet the willful and wanton standard.  The Center Defendants are also entitled to summary judgment on Plaintiff's wrongful death claim.

**Franklin County and Randall Crocker's Motion (Doc. 151)**

*Count I - Monell Liability*

Plaintiff alleges that Franklin County and Defendant Crocker in his official capacity[4] were deliberately indifferent to the risk that R.E. would commit suicide in the following respects: (1) the policymaking defendants failed to train detention staff in suicide prevention, identification and monitoring of at-risk detainees; (2) detainees were housed in unsafe cells and unsafe conditions without monitoring; and (3) the policymaking defendants failed to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees.  A local governmental body, such as a county or other municipal corporation, can be held liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the body caused the constitutional violation.  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978); *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000).

A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation.  *Monell*, 436 U.S. at 694.  Plaintiff must provide competent evidence tending to show that the alleged practices were, indeed, widespread.  *Davis v. Carter,*

---

[4] Plaintiff has also sued Crocker in his individual capacity.  The Court will grant summary judgment in favor of Crocker in his individual capacity for the same reasons that Defendants Abell, Freeman and Sanders were entitled to summary judgment.

452 F.3d 686, 695 (7th Cir. 2006). A municipality can also be liable for its own failure to act in the face of "actual or constructive notice" that such failure is likely to result in Constitutional deprivations. *See Ross v. Town of Austin, Ind*. 343 F.3d 915, 918 (7th Cir. 2003) (citing *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)). Liability is possible even if no individual official is found deliberately indifferent. *Miranda v. Cty. of Lake*, 900 F.3d 335, 344 (7th Cir. 2018); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*).

Defendants argue no Center policy or custom was established by a final policymaker of Franklin County because the policymakers for the Center were actually non-judicial employees of the Second Judicial Circuit who are not county employees under Illinois law. As previously noted, Franklin County built the Center and is solely responsible for the budget and finances. The County maintains and furnishes the Center and bears most of the costs to maintain detainees at the Center. Center administrators are required to notify and confer with the County Board regarding Center operations and other issues arising at the Center. Based on these undisputed facts, this Court finds that Franklin County had final policymaking authority over the Center.

Plaintiff claims the defendants had a widespread custom and practice of failing to adequately train, supervise and discipline Center staff with respect to suicide prevention in the following ways:

> (a) failing to train detention center staff and contract healthcare providers in suicide prevention, identification and monitoring of at-risk detainees; (b) failing to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees; and (c) failing to discipline staff for known violations of policies, thereby condoning the unconstitutional behavior of their subordinates.

(Doc. 157, ¶¶ 143-144).

She argues that there was a longstanding and persistent epidemic of suicide attempts at the Center such that the failure to provide suicide prevention training to Center staff constitutes deliberate indifference.

In *City of Canton v. Harris,* 489 U.S. 378, 388 (1989), the Supreme Court recognized that under certain circumstances, the inadequacy of police training may serve as the basis for § 1983 liability. *Id.* at 388. Liability attaches only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* Deliberate indifference in this context can be shown one of two ways: the failure to train employees on how to "handle a recurring situation that presents an obvious potential for a constitutional violation" or the failure to provide further training "after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003) (internal citations omitted). This standard cannot be met by merely "showing that the police training was grossly negligent or reckless." *Smith v. City of Joliet,* 965 F.2d 235, 237 (7th Cir. 1992). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Harris*, 489 U.S. at 391. These standards also apply to municipal corporations and jail officers.

 Under the Detention Home Act, the Center was obligated to comply with minimum standards established by the Illinois Department of Juvenile Justice ("IDJJ"). *See* 55 ILCS 75/2. These minimum standards required that Center staff having direct contact with detainees receive a minimum of forty scheduled hours of training each year. Between 2007 and 2013, the Center failed to meet the 40-hour requirement every year except one. Each year, the Franklin County Board held a meeting for the purpose of reviewing the IDJJ report, accepted the findings through a formal vote, but did nothing to comply with the training requirements.

Plaintiff also points to the testimony of the detention center officers as evidence that no suicide prevention training was provided. Particularly, Mendoza underwent training as a newly hired detention officer in July 2014; the only suicide prevention she recalls receiving was "PowerPoints." Lynch, who had been working as a Center officer for two years prior to R.E.'s death, had not even received basic training as of the date of R.E.'s death. Bechelli could not recall

exact training in suicide prevention, but testified "it could have been mixed in with other trainings that I have received." Thomas could not recall if she received suicide prevention training at the Center. This evidence is sufficient to support a finding the training was deficient.

Assuming the training was inadequate, the issue is whether the failure to train Center staff can be said to represent a municipal policy of deliberate indifference. As the Supreme Court explained in *Harris*:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.
> 489 U.S. at 389 (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483–84 (1986)).

Abstractly, Franklin County's failure to provide adequate suicide prevention training could create a risk that is sufficiently obvious as to constitute deliberate indifference to the needs of juvenile detainees at the Center. But as *Harris* instructs, a causal link is necessary for liability to attach. In other words, the alleged deficiencies in Franklin County's training program must be closely related to R.E.'s suicide. The record does not support the requisite causal link.

There was nothing to trigger a heightened response or to put the defendants on notice of a potential suicide. R.E. never displayed or voiced self-harm ideation and the individual defendants testified that they had no knowledge that he was suicidal. On these facts, it is unclear how additional or better training would have prevented R.E.'s death. Speculation that better trained officers would have responded differently or that a different outcome was possible with better training is insufficient to establish causation. *See Lapre v. City of Chicago,* 911 F.3d 424, 437 (7th Cir. 2018). Moreover, while there were previous suicide attempts at the Center, "statistics without any evidence that the failure to maintain a policy contributed to the suicides [attempts] are insufficient to support a *Monell* claim." *Id.*; *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th

Cir. 1985). The record is simply devoid of evidence linking a lack of training to the attempted suicides.

Next, Plaintiff contends there was a custom and practice of housing juvenile detainees under conditions that Defendants knew or should have known posed a substantial risk of harm. Specifically, Plaintiff alleges that R.E.'s cell was equipped with a sink-toilet combination with a handrail that was not an ADA compliant suicide resistant handrail, and that this posed an obvious danger. The sink/toilet combination had a space between the sink and handrail bar which, according to Plaintiff, could easily be used to tie a sheet around it in a suicide attempt. Plaintiff argues the cell and handrail posed a particular risk of harm to detainees given multiple suicide attempts by hanging at the Center.

Sink/toilet combinations themselves are not inherently dangerous. The general use of an otherwise benign object has not been found to violate constitutional rights based solely on the possibility that a potentially suicidal detainee or inmate would use the object for self-harm. *See Miller v. Kozel*, 2011 WL 5024554, at *16 (N.D. Ill. Oct. 19, 2011), *aff'd sub nom. Miller v. Harbaugh*, 698 F.3d 956 (7th Cir. 2012); *Frake v. City of Chicago*, 210 F.3d 779 (7th Cir. 2000). As such, Plaintiff's theory does not trigger *Monell* liability.

Finally, Plaintiff argues the policymaking defendants were deliberately indifferent in that they failed to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees. However, Plaintiff has failed to produce evidence of unconstitutional acts from which it may be inferred that Franklin County knew Center staff were violating the constitutional rights of detainees and did nothing. *See Estate of Novack*, 226 F.3d at 531. Plaintiff points to evidence showing that Upchurch failed to follow established policies during R.E.'s intake, including failing to properly complete the screening instruments, failing to complete the parental notification, and failing to ask R.E. follow-up questions, and failing

to properly classify R.E. under the written policies. But Upchurch's conduct cannot impose *Monell* liability on the policymaking defendants. *See Holmes v. Sheahan,* 930 F.2d 1196, 1201–02 (7th Cir.1991) ("[W]ithout more evidence pointing to deficiencies in these procedures, [the plaintiff's] story suggests a problem with personnel and the implementation of policy, ... but not a problem with County policy itself."); *Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2014).

For the foregoing reasons, Defendants Franklin County and Randall Crocker are entitled to summary judgment on Plaintiff's *Monell* claims.

### Count V - Wrongful Death

In Count V, Plaintiff seeks to hold Franklin County and Crocker liable under the Wrongful Death Act based on a *respondeat superior* theory. 740 Ill. Comp. Stat. Ann. 180/1; *See, e.g., McHale v. W.D. Trucking, Inc.*, 39 N.E.3d 595 (Ill. App. Ct. 2015). An essential element of a wrongful death claim is the defendant's breach of a duty to the decedent to protect him from a foreseeable harm that was the proximate cause of his death. *Bovan v. American Family Life Ins. Co.*, 897 N.E.2d 288, 292 (Ill. App. Ct. 2008). Here, as previously noted, there is insufficient evidence that the individual defendants failed to protect R.E. from a foreseeable harm. Given there was no breach of a duty to R.E. by the individual defendants, Franklin County and Crocker cannot be held liable under a *respondeat superior* theory. Additionally, the Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act") provides immunity to the extent that Plaintiff seeks to hold Defendants liable for failure to train Center staff or failing to provide sufficient supervision to R.E.. *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1044-45 (7th Cir. 1998) (holding that defendants were immune under the Illinois Tort Immunity Act on plaintiff's claim for failure to protect inmates from self-harm). As such, summary judgment is granted on Plaintiff's wrongful death claim against these defendants.

**Conclusion**

The record is insufficient to raise material issues of fact for a jury's determination as to whether R.E.'s suicide was the result of deliberate indifference on the part of the individual defendants or of any Franklin County policy, procedure or custom. Accordingly, Defendants' motions for summary judgment (Docs. 145, 151) are **GRANTED** in their entirety.

**IT IS SO ORDERED.**

**DATED: September 30, 2019**

**STACI M. YANDLE**
**United States District Judge**